## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| MARKHAM CONCEPTS, INC., SUSAN GARRETSON, and LORRAINE MARKHAM, individually and in her capacity as Trustee of the Bill and Lorraine Markham Exemption Trust and the Lorraine Markham Family Trust,<br><br>                              Plaintiffs,<br><br>                    -against-<br><br>HASBRO, INC., REUBEN KLAMER, DAWN LINKLETTER GRIFFIN, SHARON LINKLETTER, MICHAEL LINKLETTER, LAURA LINKLETTER RICH, DENNIS LINKLETTER, THOMAS FEIMAN, in his capacity as co-trustee of the Irvin S. and Ida Mae Atkins Family Trust, ROBERT MILLER, in his capacity as co-trustee of the Irvin S. and Ida Mae Atkins Family Trust, and MAX CANDIOTTY, in his capacity as co-trustee of the Irvin S. and Ida Mae Atkins Family Trust.<br><br>                              Defendants. | Case No. 1:15-cv-419-S-PAS<br><br><br>**<u>Jury Trial Demanded</u>** |
| REUBEN KLAMER,<br><br>                              Counterclaim Plaintiff,<br><br>                    -against-<br><br>MARKHAM CONCEPTS, INC., and LORRAINE MARKHAM,<br><br>                              Counterclaim Defendants. | |

## <u>THIRD AMENDED COMPLAINT</u>

Plaintiffs Markham Concepts, Inc. ("Markham Concepts"), Lorraine Markham, and

Susan Garretson (each individually a "Plaintiff", and collectively, "Plaintiffs"), by and through

their attorneys, Cadwalader, Wickersham & Taft LLP and Blish & Cavanagh LLP, allege in this

Third Amended Complaint against Defendants Hasbro, Inc. ("Hasbro"), Reuben Klamer ("Klamer"), Dawn Linkletter, Sharon Linkletter, Michael Linkletter, Laura Linkletter Rich, Dennis Linkletter, and Thomas Feiman, Robert Miller, and Max Candiotty, in their capacities as co-trustees of the Irvin S. and Ida Mae Atkins Family Trust (collectively, "Defendants") on personal knowledge as to matters relating to themselves and on information and belief on all other matters, as follows:

## NATURE OF THE ACTION

1.      This is an action (a) to establish ownership of the intellectual property rights, proprietary rights, and royalty streams related to the board game "The Game of Life" ("the Game") that rightfully belong to Markham Concepts, successor-in-interest to Bill Markham ("Markham"), the creator, designer, developer, inventor, author, and owner of the rights to the Game; (b) to establish that Lorraine Markham, together with any one of the other Markham heir(s), has the requisite authority and ability to terminate all copyright grants related to the Game pursuant to 17 U.S.C. § 304(c); (c) to obtain an accounting from Defendants; (d) to remedy various breaches of contract by Defendants; and (e) to obtain equitable, declaratory, injunctive, and monetary relief from and against Defendants.

## THE PARTIES

2.      Plaintiff Markham Concepts is a Nevada corporation, organized and existing under the laws of the State of Nevada, with its principal place of business in Las Vegas, Nevada.  Markham Concepts is the owner of the rights and obligations of Bill Markham' s estate, including his ownership interest in the Game and ownership interest to intellectual property associated with the Game.

3.      Plaintiff Susan Garretson is an individual and a citizen of the State of California, with a residence at Westlake, California.  She is the lawfully adopted child of Bill Markham.

4.      Plaintiff Lorraine Markham is an individual and a citizen of the State of Nevada, with a residence at Las Vegas, Nevada.  She is the widow of Bill Markham and current President of Markham Concepts.  By the terms of the Bill and Lorraine Markham Exemption Trust (the "Exemption Trust"), as amended, Lorraine Markham is the sole Trustee of the Exemption Trust.  By the terms of the Certificate of Trust of the Lorraine Markham Family Trust (the "Family Trust"), Lorraine Markham is the sole Trustee of the Family Trust.

5.      Defendant Hasbro is a Rhode Island corporation, organized and existing under the laws of the State of Rhode Island, with its principal place of business in Pawtucket, Rhode Island.  Hasbro is the successor-in-interest to Milton Bradley Company's ("Milton Bradley") rights and obligations concerning the Game.

6.      Defendant Klamer is an individual and a citizen of the State of California, with a residence at 10639 Roselle Street, Suite C, San Diego, California 92121.  He is the former president of the Link Research Corporation ("Link"), and upon information and belief, he is a successor-in-interest to Link.  Klamer acts as the agent of, and represents the interests of, all other successors-in-interest to Link.

7.      Defendant Thomas Feiman is an individual and a citizen of the State of California, with a residence of 11578 Dona Evita Dr., Studio City, California 91604.  Upon information and belief, he is a co-trustee of the Irvin S. and Ida Mae Atkins Family Trust, which is a successor-in-interest to Link.

8.      Defendant Robert Miller is an individual and a citizen of the State of California, with a residence of 23623  Edenton Pl., Valencia, California 91354. Upon information

and belief, he is a co-trustee of the Irvin S. and Ida Mae Atkins Family Trust, which is a successor-in-interest to Link.

9.     Defendant Max Candiotty is an individual and a citizen of the State of the State of California, with a residence of 11500 W. Olympic Bl., # 550, Los Angeles, California 90064. Upon information and belief, he is a co-trustee of the Irvin S. and Ida Mae Atkins Family Trust, which is a successor-in-interest to Link.

10.     Defendant Dawn Linkletter Griffin is an individual and citizen of the State of Arizona, with a residence at 95 Skyline Drive, Sedona, Arizona 86351.  Upon information and belief, she is the granddaughter of Art Linkletter and a successor-in-interest to Link.

11.     Defendant Sharon Linkletter is an individual and citizen of the State of California, with a residence at 4533 Park Allegra, Calabasas, California 91302.  Upon information and belief, she is the granddaughter of Art Linkletter and a successor-in-interest to Link.

12.     Defendant Michael Linkletter is an individual and citizen of the State of California, with a residence at 208 Emerald Bay, Laguna Beach, California 92651.  Upon information and belief, he is the grandson of Art Linkletter and a successor-in-interest to Link.

13.     Defendant Laura Linkletter Rich is an individual and citizen of the State of California, with a residence at 160 Santa Margarita Avenue, Menlo Park, California 94025.  Upon information and belief, she is the granddaughter of Art Linkletter and a successor-in-interest to Link.

14.     Defendant Dennis Linkletter is an individual with a residence at JI Batu Gang 18 no8, Canggu, Bali, Indonesia 9036.  Upon information and belief, he is the grandson of Art Linkletter and a successor-in-interest to Link.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1) because Plaintiff and Defendants are all citizens of different states, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

16.     This Court also has subject matter jurisdiction over this action under 17 U.S.C. § 101, *et seq.*; 28 U .S.C. § 1331; and 28 U.S.C. § 1338(a).  This Court has supplemental jurisdiction over the state law claims asserted by Plaintiffs pursuant to 28 U.S.C. § 1367.

17.     This Court has both general and specific personal jurisdiction over Hasbro, as Hasbro is incorporated in this District and maintains its principal place of business in this District.

18.     This Court has both general and specific personal jurisdiction over Klamer, Dawn Linkletter Griffin, Sharon Linkletter, Michael Linkletter, Laura Linkletter Rich, Dennis Linkletter, and Thomas Feiman, Robert Miller, and Max Candiotty, in their capacities as co-trustees of the Irvin S. and Ida Mae Atkins Family Trust (collectively, "the Link Successors") as each conducts business in this District and has received royalties from Hasbro directly as a result of business conducted in this District.  In addition, Klamer has willingly subjected himself to the personal jurisdiction of this Court by intervening.

19.     Venue in this District is proper under 28 U.S.C. § 1391(b) and 28 U.S.C. § 1400(a) as one or more of the Defendants reside and/or maintains its principal place of business in this District.

## GENERAL FACTUAL ALLEGATIONS

### The Creation of the Game

20.     Bill Markham, a celebrated inventor of board games and other toys, created, designed, developed, invented, and authored the Game in 1959.  The iconic Game has since sold over 30 million copies and has been displayed at the Smithsonian Institution.

21.     Upon information and belief, Link was incorporated in the late 1950s in order to promote various toy and game products, including through the efforts of Art Linkletter, a television host and public persona.  Klamer, who formerly worked for two different toy companies in a sales promotion capacity, served as president of Link.  Irvin Atkins, a long-time business and professional associate of Linkletter, served as Link's Treasurer.

22.     The same year that Link was created, Klamer became aware that Bill Markham (d/b/a California Product Development) had created the Game and had produced a prototype of the Game.  Klamer approached Markham and inquired if Klamer and Link, acting for Markham, could attempt to market the Game.  Markham and Link, acting through Klamer, reached an understanding that Link would attempt to market the Game to Milton Bradley in order to secure a royalty deal for the use and exploitation of the Game.

23.     On or about September 21, 1959, Link and Milton Bradley entered into a licensing agreement related to the Game ("the Licensing Agreement ") (annexed hereto as Exhibit "A" and made a part hereof by this reference).  Under the terms of the Licensing Agreement, Milton Bradley was provided the "exclusive right and privilege to manufacture and market" the Game in exchange for payment of "a royalty of 6% of [net wholesale] on all shipments of the Game" with certain set offs for discounts and returns and otherwise in accordance with the governing law and its terms.

24.     Thereafter, Markham and Link entered into an assignment agreement, dated October 20, 1959, whereby Bill Markham (d/b/a California Products Corporation), subject to the governing law and terms of the agreement, assigned Link "all of his right[s], title and interest in and to the Game" ("the Assignment Agreement") (annexed hereto as Exhibit "B" and made a part hereof by this reference).  The Assignment Agreement acknowledged that "Markham has invented, designed and developed a game tentatively known as 'THE GAME OF LIFE.'"  Under Section 4 of the Assignment Agreement, Markham was free to, and at Link's request was required to, "pursue any copyright, trade-mark and patent applications in the United States and foreign countries to which he may be entitled as the inventor, designer and developer of the Game, and for any improvements made by him there to."   Subject to the governing laws and terms of the agreement, Markham was required to assign all intellectual property in the Game to Link, "provided that said assignments will revert to Markham upon the termination of this agreement."

25.     At the time Link entered into the Licensing Agreement it had not yet entered the Assignment Agreement and therefore it did not yet have any intellectual property or other rights to license to Milton Bradley.

26.     In consideration of his assignment of his rights and privileges to the Game under the Assignment Agreement, Link assigned to Bill Markham "30% of the total royalties to be received by it from the manufacture and sale of the Game."   In addition, Link agreed to serve as Markham's "agent to receive the royalties due him from the manufacturer" (i.e., Milton Bradley).

27.     In order to protect Markham's interests, a provision was included in the Assignment Agreement pursuant to which "Markham shall have the right, either directly or through a duly authorized agent, to examine Link's books of account and records, for purposes of verifying the reports submitted and the royalties paid to him."

28.     From the late 1950s through the early part of the 1960s, Mr. Markham and Klamer, acting on behalf of Link, worked on many other projects together.  In each instance, Markham would create, design, develop, invent, and author a toy or game, and Link would attempt to market those toys and games to various manufacturers.  In the event that Link could not secure a manufacturer to manufacture and sell a specific toy or game, the rights to that toy or game would revert back to Markham.

29.     Upon information and belief, Link was dissolved in or around 1968. Eventually, Klamer, Art Linkletter, and Irvin Atkins, became the successors-in-interest to all of the rights and obligations of Link.

**The 1989 Litigation and the Escrow Agreement**

30.     In 1989, there was litigation involving Bill Markham, Klamer, Art Linkletter, Irvin Atkins, and Milton Bradley related to the Game.  The litigation against Klamer, Linkletter, and Atkins was settled pursuant to a written settlement agreement, dated July 9, 1989 ("the Link Settlement Agreement") (attached hereto as Exhibit "C" and made a part hereto by this reference).  The Link Settlement Agreement affirmed and amended the Assignment Agreement. It provided that, from the date of settlement forward, Bill Markham would receive 36.66% of all royalties earned on international sales related to the Game, while continuing to receive 30% of all royalties earned on domestic sales related to the Game.  As a result of the Link Settlement Agreement, Markham was entitled to a royalty payment of at least 1.8% on all domestic sales and 2.1996% on all international sales.

31.     The Link Settlement Agreement further provided that "Milton Bradley will pay the royalties on the board game 'The Game of Life' into a trust account, under written instructions by the parties as to distribution of the royalties to Markham and Link's successors in

interest.  Such instructions **<u>shall</u>** be that Markham shall be paid 30% of all domestic royalties and 36.66% of all foreign royalties unless jointly instructed in writing by the parties hereto."

32.     Shortly after the Link Settlement Agreement was entered into, Bill Markham entered into a separate agreement with Milton Bradley, which upon information and belief was incorporated into a written agreement dated July 24, 1989 ("the MB Settlement Agreement") (attached hereto as Exhibit "D" and made a part hereto by this reference) (the License Agreement, the Assignment Agreement, the Link Settlement Agreement, and the MB Settlement Agreement collectively, "the Royalty Arrangement").   Under the terms of the MB Settlement Agreement, Milton Bradley agreed that the royalty payments Bill Markham was entitled to under the Licensing Agreement and Assignment Agreement would no longer be paid to Markham indirectly through Link.  Rather, Milton Bradley agreed to pay royalty payments to a third-party escrow agent, who would then distribute funds directly to the parties to, beneficiaries to, or assignees of the Licensing Agreement, including Bill Markham.

33.     Bill Markham, Klamer, Irvin Atkins, and Art Linkletter executed an escrow agreement with First Interstate Bank of California, a predecessor-in-interest to Wells Fargo (collectively, "Wells Fargo"), dated November 1, 1989.  Milton Bradley thereafter remitted royalty payments into the escrow account with Wells Fargo until it merged with Hasbro in 1990.

34.     Upon information and belief, in 1990, Milton Bradley merged with Hasbro, with Hasbro, Inc. the surviving entity.  As a result of this merger, Hasbro became the successor-in-interest to the obligations of Milton Bradley, including the obligations under the Royalty Arrangement such as the obligation to pay Bill Markham royalties related to the Game.  After the merger, Hasbro remitted royalty payments directly to Markham through an escrow agent in the same manner that Milton Bradley had done previously.  With quarterly remittance of royalty payments to the escrow agent, Hasbro was obligated to provide a "full, complete and accurate

statement showing the quantity of the 'GAME OF LIFE' shipped, returned, and net gross dollar billings (if any) during the preceding quarter," as required under § 2(b) of the Licensing Agreement.

**Bill Markham's Successors-in-Interest**

        35.    Bill Markham died on April 1, 1993.  Bill Markham was survived by his widow Lorraine Markham and his adopted children.  Plaintiff Markham Concepts serves as Mr. Markham's successor-in-interest to the intellectual property rights owned by Mr. Markham at the time of his death, including but not limited to the rights with respect to the Game and including the rights to which he was entitled under the Royalty Arrangement, or otherwise.

        36.    On or about March 29, 1993, E. David Wilson, an employee at Milton Bradley, sent Lorraine Markham, on Milton Bradley letterhead, a condolence note indicating that "Bill's friends at Milton Bradley . . . are pulling for his complete and speedy recovery."  The note further stated that "Bill Markham is a friend of the Milton Bradley team not just because of his contribution to the Game of Life but for what he represents as a wonderful person with creative flare."

        37.    Five days after Bill Markham's death, Klamer sent a letter to Lorraine Markham derisively stating that he "received the news of Bill's death with great sadness," and then with no basis warned Mrs. Markham not to directly communicate with anyone at Hasbro or Milton Bradley.  Klamer stated that "direct contact with Milton Bradley or Hasbro with respect to the Game of Life or its royalties by anyone is not permitted under applicable agreements and understandings and that all intended communications are to be funneled through" Klamer and Link's attorney.  Klamer demanded "strict adherence" to this purported prohibition.

**The TV Option Agreement and Other Exploitation of the Game**

38.     On information and belief, on or about May 20, 2003, Reuben Klamer, Art Linkletter, and Irvin Atkins purported to assign to Hasbro an option to purchase and acquire the exclusive rights to produce a television pilot or presentation, television series and/or theatrical or direct-to-video motion picture based upon the Game ("the TV Option").

39.     Under the terms of the Assignment Agreement, as amended, "[i]f the agreement which Link has signed with Milton Bradley should be terminated or amended, and Link should enter into another license agreement or agreements with said company, or if Link should enter into any other license agreement with any other person or persons, pertaining to the manufacture and sale of the said Game, Link will furnish to Markham a copy of said agreement or agreements, and will assign to Markham 30% of the total royalties to be received by it as a result of the new agreement or agreements, and will act as Markham's agent to collect the royalties as in the case of the present [Licensing] [A]greement."

40.     Upon information and belief, Klamer and the other Link Successors never consulted with Plaintiffs with respect to the TV Option.  Nor were Plaintiffs informed of the TV Option.

41.     Upon information and belief, the TV Option was exercised, and Hasbro developed and sold a television show based on the Game in 2011 ("the TV Show").  Again, Klamer and the other Link Successors failed to inform Plaintiffs or consult with Plaintiffs with respect to the exercise of the TV Option by Hasbro as required under the Assignment Agreement.

42.     In exercising the TV Option, Hasbro agreed to pay the Link Successors "50% of 100% of Modified Adjusted Gross Receipts" related to the TV Show, which was defined in the agreement to mean "all non-refundable revenues actually received by Hasbro from the distribution and/or exploitation of the Series (excluding any merchandising or other ancillary

revenue [which are subject of separate agreements between Hasbro and Owner] and excluding licensing fees paid by the Hub Network),” less a set of five deductions.  Upon information and belief, Klamer and the other Link Successors never obtained a license from Plaintiffs or paid Plaintiffs for any royalties or option contract fees or any other payments made by Hasbro related to the TV Option or TV Show.

43.     In addition, an amendment to the TV Option provided that “Hasbro will receive $7,500 executive producer fee for each episode produced and that Klamer personally will received a $5,000 executive producer fee for each episode produced (which will not be shared with the other parties comprising Owner or any other person).”  By characterizing this payment as an “executive producer fee” as opposed to a royalty, Klamer sought to avoid the requirements of the Assignment Agreement.

44.     In addition to payments that Hasbro was required to make under the January 28, 2011 amendment to the TV Option, Hasbro was also required to provide the Link Successors “a reasonably detailed written statement in Hasbro’s standard format . . . showing the calculation of Modified Adjusted Gross Receipts,” which were to “be issued o n a quarterly basis.”  Upon information and belief, Plaintiffs never received copies of these reports related to the TV Option or TV Show.

45.     Upon information and belief, Hasbro and Klamer have failed to remit payment for royalties related to the TV Show that rightfully belong to Markham.

46.     In addition, Klamer negotiated in an amendment to the TV Option that he would receive a credit during the show that incorrectly stated that the “the Board Game [was] created by Reuben Klamer”, without any reference to Bill Markham.

47.     Upon information and belief, Hasbro has purported to enter into other sub- licensing agreements and executed other assignments with respect to the Game that are

beyond the scope of its rights under the License Agreement and the Assignment Agreement. Among other things, upon information and belief, Hasbro has entered into agreements related to gambling and electronic gaming under which the Game is being used and exploited.  Plaintiffs have not been informed of these agreements and have not been compensated related to these agreements.

**Reuben Klamer and Link's Bad Faith Conduct**

48.    Upon information and belief, in late 2014 Wells Fargo informed Markham and the Link Successors that it was no longer willing to serve as an escrow agent with respect to the Royalty Arrangement.  Following Wells Fargo's termination of the escrow agreement, Hasbro ceased making royalty payments related to the Game under the terms of the Royalty Arrangement. Hasbro refused to remit payment until a new escrow agreement was executed by Plaintiff Markham Concepts and the Link Successors.

49.    Although Markham Concepts has a direct right to receive royalty payments from Hasbro, the Link Successors also have an obligation to pay royalties owed to Markham Concepts.  The Link Successors, however, have also refused to make payment to Markham Concepts of royalties accrued under the Licensing Agreement to which Markham Concepts is entitled.  On or about February 14, 2015 Markham Concepts demanded payment under the terms of the Assignment Agreement.  Link refused to remit appropriate payment.

50.    In an attempt to remediate Link's and Hasbro's breaches of contract, Markham Concepts attempted to negotiate a new escrow agreement, but was unable to reach agreeable terms due to the unreasonable, bad-faith actions of Klamer.

51.    Using the absence of an escrow agreement as leverage, Klamer attempted to extract concessions from Markham Concepts, including an agreement to pay Klamer – at the expense of Markham Concepts – the following:  (i) purported "expenses incurred in review and

enforcement of Hasbro's compliance with the License Agreement"; (ii) an additional 10% of all royalties "as compensation for managing the License Agreement and Escrow"; and (iii) an increase in his share of the total remaining international royalties after setoffs for any "expenses" and management fees.

52.     Not once in the over five decades that the parties had shared in the royalties paid by Milton Bradley or Hasbro had anyone – including Klamer – been entitled to receive payment for purported "expenses" or a management fee of any type under the applicable agreements.

53.     Markham Concepts rejected Klamer's bad-faith proposal.   Following Markham Concepts's rejection of Klamer's bad-faith gambit to enrich himself at Markham Concepts's expense, Klamer next attempted to condition signing of a new escrow agreement on the inclusion of terms not contained in the original escrow agreement with Wells Fargo, and not permitted under any of the applicable agreements.  These unnecessary provisions would result in prejudice to Markham Concepts in favor of benefit to Klamer.  Among other provisions, Klamer sought to include provisions in a new escrow agreement whereby:  (i) the parties agreed to waive the right to a trial by jury with respect to claims outside the context of the escrow agreement itself; and (ii) the escrow agent would notify Klamer – and only Klamer – in the event that some discrepancy occurred with respect to payment by Hasbro.  This bad-faith proposal was also rejected.

54.     Markham Concepts repeatedly offered to sign an escrow agreement, so long as extraneous provisions that materially changed the parties' relationship vis-à- vis each other (as opposed to vis-à-vis the escrow agent) were excluded.  But Klamer repeatedly refused to sign any such agreement.

55.    On or about June 15, 2015, Klamer repudiated the express terms of the Assignment Agreement (as amended), by renouncing his agency relationship with Markham Concepts.  Klamer stated in a correspondence to Lorraine Markham, "I am not your agent with regard to your decision on whether or not to sign the Escrow Agreement or with regard to anything else," a statement contrary to the terms of the Assignment Agreement.  Klamer also warned that "there cannot be any distribution of royalties" unless Markham Concepts acceded to Klamer's demand to include extraneous and unnecessary provisions into a new escrow agreement.

56.    Despite Klamer's bad faith conduct, Markham Concepts attempted one last time to reach agreement on a new escrow agreement by setting forth a proposal designed to maintain the status quo and to remediate both Klamer's and Hasbro's breach by getting royalty streams flowing again from Hasbro ("the Status Quo Provisions").  U.S. Bank, the proposed new escrow agent, accepted in substance the inclusion of the Status Quo Provisions in a new escrow agreement.

57.    Klamer, however, rejected the inclusion of the Status Quo Provisions and provided one more bad-faith proposal, which sought to require Markham Concepts to:  (i) reaffirm the unenforceable arbitration provision in the Link Settlement Agreement; (ii) reaffirm the validity of the Assignment Agreement that Klamer had already repudiated; (iii) represent and warrant that there i s no pending or threatened claims against Klamer, other Link Successors, Hasbro, or any other affiliated party; and (iv) represent and warrant that "it is not aware of any allegations or facts which, i f proved true, would constitute a breach of the [Royalty Arrangement] by [Link, any Link Successor] or by Hasbro, Inc. or any affiliated or related party of the foregoing."  Further, this proposal sought to re-characterize the agreements existing amongst the parties in the introductory portion of the proposed new escrow agreement.  Markham Concepts rejected this outrageous, bad-faith demand.

58.    As a result of Klamer's misconduct, on September 27, 2015, Plaintiffs confirmed the termination of their business, agency, and any other relationship with Klamer and the other Link Successors.  This termination included Plaintiffs' termination of the Assignment Agreement, which was terminable at will.

59.    Thereafter, Markham Concepts demanded payment directly from Hasbro for all royalties to which it was entitled from the moment that Hasbro stopped making royalty payments through the date of termination of the Assignment Agreement ("the Unpaid Markham Royalties").  Markham Concepts further directed that such payments as well as future undisputed royalty payments be made to a trust account that was specifically identified by Markham Concepts, which is the client trust account maintained by counsel to Plaintiffs.  Markham Concepts made clear that, although Markham Concepts is reserving its rights to additional royalty payments, it was for these purposes only limiting its request for payments by Hasbro to those amounts previously paid to Markham Concepts through the escrow agent.  Hasbro refused to remit payment in the limited and *pendent lite* manner directed by Markham Concepts.  Hasbro's refusal to pay and/or to use an escrow account as directed by Markham Concepts caused Plaintiffs irreparable harm.

60.    As one final alternative designed to remediate Hasbro's breach, Markham Concepts provided an escrow agreement to Hasbro that Markham Concepts was willing to sign. Hasbro, however, refused to sign this proposed escrow agreement.

61.    Upon information and belief, even though Hasbro ceased making royalty payments related to the Game, Hasbro continued to sell, market, manufacture, use, and exploit the Game resulting in millions of dollars in additional revenue that Hasbro has not paid royalties on. Hasbro withheld more than $2 million worth of royalty payments.

62.     Upon information and belief, Hasbro continued to provide royalty reports to Klamer and other Link Successors related to the Game as required under Section 2 of the Licensing Agreement.  Markham Concepts was entitled to receive those reports under Section 2 of the Assignment Agreement, and elsewhere under the Royalty Arrangement.  Neither Hasbro nor Klamer, however, provided those royalty reports to Markham Concepts.

63.     The royalties that Markham Concepts receives from Hasbro amount to nearly all of the income Markham Concepts receives.  Hasbro has irreparably harmed and continues irreparably to harm Markham Concepts by withholding royalties to which Markham Concepts is entitled.

64.     Plaintiffs have performed all of its obligations or conditions to suit or recovery under the Royalty Arrangement or otherwise, including all of its obligations under the Licensing Agreement and MB Settlement Agreement.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract as against Hasbro)

65.     Plaintiffs repeat and reallege all other paragraphs of this Complaint as if fully set forth herein.

66.     A valid and enforceable contract exists between Markham Concepts and Hasbro pursuant to which Hasbro must:  (1) pay Markham Concepts royalty payments related to Hasbro's use and exploitation of the Game, (2) make use of a valid escrow agreement to remit payment, and (3) keep Markham Concepts informed as to the use and exploitation of the Game. In the alternative, privity of contract between Markham Concepts and Hasbro exists through Markham Concepts's status as an assignee of the right to receive royalties under the License Agreement or as an intended third-party beneficiary of the Licensing Agreement or because Link

was acting as Markham's agent in entering into the Licensing Agreement, a status known to Hasbro at all relevant times.

67.     Both Markham Concepts and Hasbro assented to and ratified the benefits provided to both Markham Concepts and Hasbro in the Licensing Agreement, and in all other documents or agreements constituting the Royalty Arrangement.

68.     Hasbro has breached the terms of the Licensing Agreement and the MB Settlement Agreement (both individually and collectively) in that it has:

(a)     failed to pay the Unpaid Markham Royalties to which Markham Concepts is entitled related to Hasbro's use and exploitation of the Game;

(b)     refused to pay 100% of all future royalties accrued from the sale, marketing, manufacturing, use, and exploitation of the Game to Markham Concepts;

(c)     failed to use a valid escrow account as directed by Markham Concepts in order to remit payment of royalties;

(d)     failed to pay royalties related to the TV Show;

(e)     failed to pay royalties related to the use and exploitation of the Game related to electronic gaming, gambling, and other still--unknown uses and exploitations of the Game, which Hasbro has failed to inform Markham Concepts about;

(f)     refused to permit an inspection of the books and records of Hasbro with respect to its use and exploitation of the Game.

69.     Markham Concepts has suffered damages as a direct and proximate cause of Hasbro's breaches, and such damages exceed the jurisdictional minimum of this Court.  By upending the status quo and stopping the royalty payments, Hasbro has also caused and is continuing to cause irreparable harm to Markham Concepts.

## SECOND CLAIM FOR RELIEF

### (Unjust Enrichment and/or Quantum Meruit as against Hasbro)

70.     Plaintiffs repeat and reallege all other paragraphs of this Complaint as if fully set forth herein.

71.     Markham Concepts provided and is continuing to provide valuable services and property rights to Hasbro, including the right to use and exploit the concept of the Game and its associated intellectual property.

72.     Hasbro accepted the services and property rights provided to it by Markham Concepts and benefited from these services.

73.     Hasbro has failed and refused to pay Markham Concepts for the services and rights referenced herein.

74.     As a result of the conduct described above, Hasbro has been unjustly enriched at the expense of Markham Concepts by maintaining funds to which Markham Concepts is legally entitled.

75.     It would be inequitable to allow Hasbro to retain the value of this benefit without properly compensating Markham Concepts for the value of the services performed.

76.     Hasbro should be required to disgorge all monies, profits, and gains which it obtained or will unjustly obtain in the future at the expense of Markham Concepts, and a constructive trust should be imposed for the benefit of Markham Concepts.

## THIRD CLAIM FOR RELIEF

### (Declaratory Judgment as against Hasbro and Klamer and the other Link Successors)

77.     Plaintiffs repeat and reallege all other paragraphs of this Complaint as if fully set forth herein.

78.     An actual controversy exists between Plaintiffs and Defendants as to the true owner of the intellectual property rights and other ownership rights to the Game.

79.     Bill Markham is the creator, designer, developer, inventor, author, and owner of the Game, and all intellectual property rights related to the Game belonged to Bill Markham at the Game's inception.   Klamer has repudiated the Assignment Agreement, or alternatively, that Plaintiff has properly terminated the Assignment Agreement, and as a result of said repudiation and/or termination, all intellectual property and other rights related to the Game have reverted back to Markham Concepts, as the successor-in-interest to Bill Markham.

80.     Plaintiff Lorraine Markham, together with other Markham heir(s), intends to terminate any transfer, grant, assignment, or license of copyrights related to the Game pursuant to 17 U.S.C. § 304(c).

81.     Klamer claims he "is the creator of the popular board game 'The Game of Life'" (Br. at 1).  In addition, Klamer believes that the Assignment Agreement continues to remain in effect.   Furthermore, Klamer believes that Lorraine Markham, together with other Markham heir(s), do not have termination rights under 17 U.S.C. § 304(c).

82.     Hasbro claims to have an ownership interest in certain intellectual property related to the Game.  Among the intellectual property rights claimed by Hasbro is the claimed right to continue using purported derivative works that Hasbro claims it is manufacturing and that were purportedly derived from the copyrights to the Game, in the event that the grant or transfer of copyrights is terminated pursuant to 17 U.S.C. § 304(c).

83.     Plaintiff requests a declaratory judgment that:

(a)     Bill Markham was and is the sole creator, designer, developer, inventor, author, and owner of the Game and all of its intellectual property, including without limitation as

those words are defined under 17 U.S.C. § 101, *et seq.*; 35 U.S.C. § 100, *et seq.*; and 15 U.S.C. §§ 1051, *et seq.*;

(b)     All intellectual property, and all of the rights associated with the ownership of that intellectual property, with respect to the Game vested in Bill Markham at its inception, including without limitation all rights under 17 U.S.C. § 101, *et seq.*; 35 U.S.C. § 100, *et seq.*; and 15 U.S.C. §§ 1051, *et seq.*, and specifically including, without limitation, those rights provided under 17 U.S.C. §§ 203 and 304;

(c)     Lorraine Markham, together with any one of the other Markham statutory heirs, has the authority to terminate all relevant copyright grants or transfers, including both the Assignment Agreement and the License Agreement pursuant to 17 U.S.C. §§ 203 and 304(c);

(d)     Any products that exploit or otherwise relate to the Game in any manner that are produced, manufactured, or licensed by Hasbro pursuant to the License Agreement or otherwise, including by any actual or purported grant or transfer of copyright related to the Game, are not "derivative works," as that term is defined under 17 U.S.C. § 101;

(e)     Hasbro was never given authority to create or commission derivative works based upon the copyrights related to the Game pursuant to 17 U.S.C. § 106(2), and therefore Hasbro has no right to continue using or exploiting any derivative work based upon the copyrights related to the Game in the event that (a) the Licensing Agreement is terminated, as set forth above, or (b) the grant or transfer of copyright to Hasbro is terminated pursuant to 17 U.S.C. § 304(c).

(f)     The Assignment Agreement, as amended, was repudiated by Klamer and/or validly terminated by Plaintiffs and is no longer enforceable, such that all intellectual property and other rights related to the Game have reverted to Markham Concepts, as the successor-in-interest to Bill Markham, pursuant to Section 4 of the Assignment Agreement or otherwise under applicable law; and

(g)     All future royalties related to the Game payable under the Licensing Agreement or otherwise shall be paid directly to Markham Concepts, or in the alternative, Hasbro shall have no further right to sell, manufacture, market, distribute, use, or exploit the Game as such Licensing Agreement is null and void.

## FOURTH CLAIM FOR RELIEF

### (Breach of Contract as against Klamer and the other Link Successors, individually and collectively)

84.     Plaintiffs repeat and reallege all other paragraphs of this Complaint as if fully set forth herein.

85.     A valid and enforceable contract exists between Markham Concepts and the Link Successors that requires the Link Successors to, among other things:

(a)     Remit payment to Markham Concepts for all royalties earned with respect to the exploitation and use of the Game;

(b)     Provide copies of any royalty reports received from Hasbro;

(c)     Execute a valid escrow agreement in order to facilitate payment of royalties under the Licensing Agreement;

(d)     Provide notice of any amendments or modifications to existing licensing agreements related to the Game, or any new licensing agreements related to the use or exploitation of the Game;

(e)     Permit an inspection of the books and records of the Link Successors;

86.     The Link Successors have breached the terms of the Assignment Agreement, as amended by the Link Settlement Agreement, both individually and collectively, in that they have failed to:

(a)     Remit payment to Markham Concepts for all royalties;

(b)      Provide copies of any royalty reports received from Hasbro;

(c)      Execute a valid escrow agreement in order to facilitate payment of royalties under the Licensing Agreement;

(d)      Provide notice of any amendments or modifications to existing licensing agreements related to the Game, or any new licensing agreements related to the use or exploitation of the Game;

(e)      Permit an inspection of the books and records of the Link Successors; and

(f)      Pay any royalties or provide any royalty reports to Markham Concepts related to the television show.

87.      Markham Concepts has suffered damages as a direct and proximate cause of the Link Successors' breach, and such damages exceed the jurisdictional minimum of this Court.

<u>**FIFTH CLAIM FOR RELIEF**</u>

**(Unjust Enrichment and/or Quantum Meruit as against Klamer and the other Link Successors, individually and collectively)**

88.      Plaintiffs repeat and reallege all other paragraphs of this Complaint as if fully set forth herein.

89.      Markham Concepts provided and is continuing to provide valuable services and property rights to the Link Successors, including the right to use and exploit the concept of the Game and its associated intellectual property.

90.      The Link Successors, individually and collectively, accepted the services and property rights provided to it by Plaintiff and benefited from these services.

91.      The Link Successors, individually and collectively, have failed and refused to pay Markham Concepts for the services and rights referenced herein.

92.     As a result of the conduct described above, the Link Successors been unjustly enriched at the expense of Markham Concepts by maintaining funds to which Markham Concepts is legally entitled.

93.     It would be inequitable to allow the Link Successors to retain the value of this benefit without properly compensating Markham Concepts for the value of the services performed.

94.     The Link Successors should, individually and collectively, be required to disgorge all monies, profits, and gains which they obtained or will unjustly obtain in the future at the expense of Markham Concepts, and a constructive trust should be imposed for the benefit of Markham Concepts.

<u>**SIXTH CLAIM FOR RELIEF**</u>

**(Breach of Fiduciary Duties as against Klamer)**

95.     Plaintiffs repeat and reallege all other paragraphs of this Complaint as if fully set forth herein.

96.     As an agent of Markham Concepts with respect to its relationship with Hasbro, Klamer owes Markham Concepts fiduciary duties of care, loyalty, and good faith. Klamer's fiduciary duties include obligations to exercise good business judgment, to act prudently with respect to the licensing of intellectual property related to the Game, to discharge his actions in good faith, to act in the best interests of Markham Concepts, and to put the interests of Markham Concepts before his own.

97.     Klamer breached his fiduciary duties by, among other things, refusing to sign an escrow agreement to facilitate payment by Hasbro under the Licensing Agreement, attempting to use the absence of an escrow agreement as leverage to extract concessions from Markham Concepts, failing to keep Markham Concepts informed with respect to the licensing

relationship with Hasbro, and surreptitiously entering into additional licensing agreements with Hasbro without the knowledge or consent of Markham Concepts.

98.     The actions of Klamer in violation of his fiduciary duties have caused Markham Concepts to suffer damages in an amount exceeding the jurisdictional minimum, the amount to be determined at trial.

**SEVENTH CLAIM FOR RELIEF**

**Breach of (the Covenant of Good Faith and Fair Dealing as against Klamer)**

99.     Plaintiffs repeat and reallege all other paragraphs of this Complaint as if fully set forth herein.

100.     Markham Concepts and Klamer entered into a valid contract wherein Markham Concepts has discharged all of the obligations the contract imposed upon it.

101.     Applicable law implies a covenant of good faith and fair dealing for all contracts entered into in the state in which each of the agreements constituting the Royalty Arrangement were executed.

102.     Klamer has breached the covenant of good faith and fair dealing by: (a) failing to pay Markham Concepts royalties owed to Markham Concepts; (b) by failing to make a good faith effort to execute an escrow agreement; and (c) by attempting to condition the signing of an escrow agreement upon unreasonable terms not required under the Link Settlement Agreement or under any other applicable contract or law.

103.     The actions of Klamer in violation of the implied covenant of good faith and fair dealing have caused the Markham Concepts to suffer damages in an amount exceeding the jurisdictional minimum, the amount to be determined at trial.

## EIGHTH CLAIM FOR RELIEF

**(Tortious Interference with Contract as against Klamer)**

104.    Plaintiffs repeat and reallege all other paragraphs of this Complaint as if fully set forth herein.

105.    Markham Concepts and Hasbro have a valid and binding contractual relationship or beneficial business relationship.

106.    Klamer was aware of the relationship between Markham Concepts and Hasbro.

107.    Klamer knowingly caused Hasbro to cease making payments on royalties owed under the Licensing Agreement by refusing to execute a valid escrow agreement and/or conditioning the signing of an escrow agreement upon unreasonable terms that are not required under the Link Settlement Agreement or under any other applicable contract or law.  Klamer's conduct was improper in both means and motive.

108.    As a result of Klamer's conduct, Hasbro has breached its contractual relationship or beneficial business relationship with Markham Concepts.

109.    The actions of Klamer that have caused Hasbro to breach its contract or beneficial business relationship with Markham Concepts have caused Markham Concepts to suffer damages in an amount exceeding the jurisdictional minimum, the amount to be determined at trial.

## NINTH CAUSE OF ACTION

**(Negligent Interference with Prospective Economic Advantage as against Klamer)**

110.    Plaintiffs repeat and reallege all other paragraphs of this Complaint as if fully set forth herein.

111.    An economic relationship exists and/or existed between Markham Concepts and Hasbro that contains or contained a reasonably probable future economic benefit or advantage

to Markham Concepts.  Markham Concepts had an expectancy in continuing this advantageous economic relationship with Hasbro.

112.    Klamer knew of the existence of the economic relationship between Markham Concepts and Hasbro, and was aware or should have been aware that if he did not act with due care, Klamer's actions would interfere with this relationship and cause Markham Concepts to lose, in whole or in part, the probable future economic benefit or advantage of that relationship.

113.    Klamer owed a duty of care to Markham Concepts not to act negligently or otherwise interfere with the relationship between Markham Concepts and Hasbro.

114.    Klamer acted negligently in failing to execute a valid escrow agreement and by attempting to condition the signing of an escrow agreement upon unreasonable terms that are not required under the Link Settlement Agreement or under any other applicable contract or law.

115.    Klamer's negligence caused damage to Markham Concepts in that the relationship was actually interfered with or disrupted and Markham Concepts lost, in whole or in part, the economic benefits or advantage reasonably expected from the relationship.

## <u>TENTH CAUSE OF ACTION</u>

### (Accounting as against Hasbro)

116.    Plaintiffs repeat and reallege all other paragraphs of this Complaint as if fully set forth herein.

117.    Under the terms of the Royalty Arrangement, Hasbro had fiduciary and contractual obligations with respect to the receipt and accounting of money paid to Markham Concepts.  Moreover, pursuant to Section 2(c) of the Licensing Agreement, royalty recipients "shall have the right to an examination of the books of account and of all document and other material in the possession or under the control of License, with respect to the subject matter of this

contract, and shall have free and full access thereto for said purpose, and for the purpose of making extracts therefrom, at all reasonable hours of the day during which the offices of Licensee shall be open."

118.    Hasbro has failed to account to Markham Concepts for the number of units shipped, returned and net gross dollar billings.  Hasbro has further failed to account to Markham Concepts for the amount of royalties it had paid to Klamer and other Link Successors.  Markham Concepts has no other means of ascertaining the exact amount that Markham Concepts is owed from the sale, use and exploitation of the Game, or how much has been paid out by Hasbro.

119.    Additionally, Hasbro has failed to account for the revenues and royalties related to the TV show and other uses of the Game for which royalties have not been paid to Markham Concepts.

120.    The amount of money Markham Concepts is rightfully owed under the Royalty Arrangement can only be ascertained through a full and complete accounting of the above.

121.    Markham Concepts seeks an accounting of all amounts of which Hasbro paid money to either Markham Concepts, Klamer, any Link Successor, or any escrow agent related to Hasbro's use or exploitation of the Game, as well as the methods by which such payments were calculated.

## ELEVENTH CAUSE OF ACTION

### (Accounting as against Klamer and the other Link Successors)

122.    Plaintiffs repeat and reallege all other paragraphs of this Complaint as if fully set forth herein.

123.    Under the terms of the Royalty Arrangement, Klamer had fiduciary and contractual obligations with respect to the receipt and accounting of money paid by Hasbro. Moreover, pursuant to Section 2 of the Assignment Agreement, "Markham shall have the right,

either directly or through a duly authorized agent, to examine Link's books of account and records, for the purpose of verifying the reports submitted and the royalties paid to him."

124.    Klamer has failed to account to Markham Concepts for the number of units shipped, returned and net gross dollar billings by Hasbro.  Klamer has further failed to account to Markham Concepts for the amount of royalties he has received from Hasbro.  Klamer has further failed to account to Markham Concepts for the amount of royalties Klamer has paid to other Link Successors.  Markham Concepts has no other means of ascertaining the exact amount that Markham Concepts is owed from the sale, use and exploitation of the Game, or how much has been paid out by Hasbro.

125.    Additionally, Klamer has failed to account for the revenues and royalties related to the TV show and other uses of the Game for which royalties have not been paid to Markham Concepts.

126.    The amount of money Markham Concepts is rightfully owed under the Royalty Arrangement can only be ascertained through a full and complete accounting of the above.

127.    Markham Concepts seeks an accounting of all amounts by which Hasbro has paid money to Klamer or any entity owned or controlled by Klamer, as well as all amounts paid out to either Markham, Klamer, Atkins, or Linkletter (or any successors-in-interest), and the methods by which such payments were calculated.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prays for judgment against Defendants, as follows:

1.    For damages in an amount to be determined at trial;

2.    For a declaratory judgment that:

(a)    Bill Markham was and is the sole creator, designer, developer, inventor, author, and owner of the Game and all of its intellectual property, including without limitation as

those words are defined under 17 U.S.C. § 101, *et seq.*; 35 U.S.C. § 100, *et seq.*; and 15 U.S.C. §§ 1051, *et seq.*;

(b)      All intellectual property, and all of the rights associated with the ownership of that intellectual property, with respect to the Game vested in Bill Markham at its inception, including without limitation all rights under 17 U.S.C. § 101, *et seq.*; 35 U.S.C. § 100, *et seq.*; and 15 U.S.C. §§ 1051, *et seq.*, and specifically including, without limitation, those rights provided under 17 U.S.C. §§ 203 and 304;

(c)      Lorraine Markham, together with any one of the other Markham statutory heirs, has the authority to terminate all relevant copyright grants or transfers, including both the Assignment Agreement and the License Agreement pursuant to 17 U.S.C. §§ 203 and 304(c);

(d)      Any products that exploit or otherwise relate to the Game in any manner that are produced, manufactured, or licensed by Hasbro pursuant to the License Agreement or otherwise, including by any actual or purported grant or transfer of copyright related to the Game, are not "derivative works," as that term is defined under 17 U.S.C. § 101;

(e)      Hasbro was never given authority to create or commission derivative works based upon the copyrights related to the Game pursuant to 17 U.S.C. § 106(2), and therefore Hasbro has no right to continue using or exploiting any derivative work based upon the copyrights related to the Game in the event that (a) the Licensing Agreement is terminated, as set forth above, or (b) the grant or transfer of copyright to Hasbro is terminated pursuant to 17 U.S.C. § 304(c);

(f)      The Assignment Agreement, as amended, was repudiated by Klamer and/or validly terminated by Plaintiffs and is no longer enforceable, such that all intellectual property and other rights related to the Game have reverted to Markham Concepts, as the successor-in-interest to Bill Markham, pursuant to Section 4 of the Assignment Agreement or otherwise under applicable law;

(g)     All future royalties related to the Game payable under the Licensing Agreement or otherwise shall be paid directly to Markham Concepts, or in the alternative, Hasbro shall have no further right to sell, manufacture, market, distribute, use, or exploit the Game as such Licensing Agreement is null and void.

3.     For, in the alternative, a permanent injunction prohibiting Hasbro from selling, marketing, manufacturing, using, or exploiting the Game;

4.     For, in the alternative, specific performance of the Royalty Arrangement;

5.     For an award of prejudgment interest at the maximum rate allowed by law;

6.     For costs of suit incurred herein, including reasonable attorneys' and experts' fees and expenses;

7.     For such other and further relief as the Court may deem just and proper.

Dated:  October 13, 2017

<table>
<tr><td>

/s/ Robert M. Pollaro

John T. Moehringer
Robert M. Pollaro
David Cole
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York 10281
Telephone (212) 504-6000
*Admitted Pro Hac Vice*

</td><td>

/s/ Mary C. Dunn

Joseph V. Cavanagh, Jr. (#1139)
Mary Cavanagh Dunn (#6712)
BLISH & CAVANAGH LLP
Commerce Center
30 Exchange Terrace
Providence, Rhode Island 02903
Telephone (401) 831- 8900

*Attorneys for Markham Concepts, Inc. and Lorraine Markham*

</td></tr>
</table>