1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF RHODE ISLAND
2

3

4     * * * * * * * * * * * * * *
                                  * CA NO. 15-419-WES
5     MARKHAM CONCEPTS, INC.,    *
      SUSAN GARRETSON, and       *
6     LORRAINE MARKHAM,          *
      individually and in her    *
7     capacity as Trustee of     *
      the Bill and Lorraine      *
8     Markham Exemption Trust    *
      and the Lorraine Markham   *
9     Family Trust               *
                                  *
10          VS.                   * MARCH 5, 2018
                                  *
11    HASBRO, INC., REUBEN       *
      KLAMER, THOMAS FEIMAN,     *
12    ROBERT MILLER, MAX         *
      CANDIOTTY, DAWN            *
13    LINKLETTER GRIFFIN,        *
      SHARON LINKLETTER,         *
14    MICHAEL LINKLETTER, LAURA  *
      LINKLETTER RICH, and       *
15    DENNIS LINKLETTER          *
                                  * PROVIDENCE, RI
16    * * * * * * * * * * * * * *

17

18

19          BEFORE THE HONORABLE WILLIAM E. SMITH

20                    CHIEF JUDGE

21
            (BENCH TRIAL - VOLUME III)
22

23

24

25

1   **APPEARANCES:**

2   FOR THE PLAINTIFFS:        ROBERT M. POLLARO, ESQ.
                              JOHN T. MOEHRINGER, ESQ.
3                             DAVID A. COLE, ESQ.
                              Cadwalader, Wickersham & Taft
4                             200 Liberty Street
                              New York, NY  10281
5
                              MARY CAVANAGH DUNN, ESQ.
6                             Blish & Cavanagh
                              30 Exchange Terrace
7                             Providence, RI  02903

8   FOR THE DEFENDANTS:       JOSHUA C. KRUMHOLZ, ESQ.
    Hasbro, Inc.              COURTNEY L. BATLINER, ESQ.
9                             MARK T. GORACKE, ESQ.
                              ROBERT TURNER, ESQ.
10                            CAMILLE FRAMROZE, ESQ.
                              Holland & Knight
11                            10 St. James Avenue, 11th Floor
                              Boston, MA  02116
12
    Ruben Klamer              ERIKA J. VAN LOON, ESQ.
13                            Glaser Weil Fink Howard Avchen
                              & Shapiro
14                            10250 Constellation Blvd.
                              19th Floor
15                            Los Angeles, CA  90067

16                            ERIC E. RENNER, ESQ.
                              Renner Law
17                            50 South Main Street, Suite 202
                              Providence, RI  02903
18

19  Linkletter and Rich      CHRISTINE K. BUSH, ESQ.
    Defendants               Hinckley, Allen & Snyder
20                            100 Westminster Street
                              Suite 1500
21                            Providence, RI  02903

22                            DAVID B. JINKINS, ESQ.
                              Thompson Coburn
23                            One US Bank Plaza
                              St. Louis, MO  63101
24
    Court Reporter:           Denise P. Veitch, RPR
25                            One Exchange Terrace
                              Providence, RI  02903

1                              I N D E X

2     PLAINTIFF'S WITNESS                                        PAGE

3     LINDA MACK ROSS
      Direct Examination By Mr. Moehringer                        18
4     Cross-Examination By Ms. Batliner                           42

5     ROBERT THOMAS CARTY, JR.
      Direct Examination By Mr. Pollaro                           49
6     Cross-Examination By Mr. Krumholz:                         106
      Redirect Examination By Mr. Pollaro                        127
7

8     DEFENSE WITNESS

9     PHILIP EDWARD ORBANES
      Direct Examination By Mr. Krumholz:                        143
10

11

12                          E X H I B I T S

13

14
      DEFENDANT                                      FOR ID    FULL
15
      HTX101                                                    144
16    HTX102                                                    122
      HTX104                                                    148
17    HTX105                                                    173
      HTX107                                                    170
18    HTX109                                                    180
       HTX16                                                    210
19     HTX18                                                    210
       HTX19                                                    122
20

21

22

23

24

25

1    5 MARCH 2018 -- 9:30 A.M.

2              THE COURT:  Good morning, everyone.  Welcome

3    back.  We're here for the continuation of the bench

4    trial in the matter of Markham Concepts v. Hasbro,

5    Inc., et al, and I think we should start by having all

6    of you identify yourselves for the record and the court

7    reporter, so let's begin with the Plaintiffs.

8              MR. POLLARO:  Robert Pollaro, representing the

9    Plaintiffs, the Markham parties.

10             MR. MOEHRINGER:  John Moehringer, Cadwalader,

11   Wickersham & Taft, also representing Plaintiffs.

12             MR. COLE:  David Ashley Cole, Cadwalader,

13   Wickersham & Taft, also representing Plaintiffs, the

14   Markham parties.

15             MS. DUNN:  Mary Dunn, local counsel, Markham

16   parties.

17             THE COURT:  Thank you.

18             MR. KRUMHOLZ:  Good morning, your Honor.

19   Josh Krumholz, Hasbro.

20             MS. BATLINER:  Good morning, your Honor.

21   Courtney Batliner on behalf of Hasbro.

22             MR. GORACKE:  Good morning.  Mark Goracke on

23   behalf of Hasbro.

24             MS. VAN LOON:  Good morning, your Honor.

25   Erica Van Loon on behalf of Ruben Klamer.

1          MR. RENNER:  Eric Renner on behalf of Ruben

2    Klamer.

3          MS. BUSH:  Christine Bush on behalf of

4    Linkletter Defendants and Rich Defendants.

5          MR. JINKINS:  David Jinkins, on behalf of the

6    Linkletter Defendants and the Rich Defendants.

7          MR. TURNER:  Robert Turner on behalf of Hasbro,

8    your Honor.

9          MS. FRAMROZE:  Camille Framroze on behalf of

10   Hasbro.

11         MS. GARRITY:  Mackenzie Garrity on behalf of

12   Hasbro.

13         THE COURT:  All right.  Thank you.

14         So I think we have a few preliminary things to

15   do before we take testimony, and I imagine you all have

16   some things you want to cover as well, so I'm not sure

17   who wants to take the lead here, but why don't you -- I

18   have some questions for you with respect to your

19   respective motions *in limine* on the experts.  So

20   besides the two experts, what else do you expect to

21   present in the testimony?

22         MR. POLLARO:  Your Honor, we had a motion that

23   we brought in to strike a belated errata.

24         THE COURT:  Say it again.

25         MR. POLLARO:  We filed a motion on Friday to

1    strike an errata on one of the depositions.

2            THE COURT:  I do have that.  I haven't had a

3    chance to review that, but we can take that up.

4            What else in terms of testimony?  That's one

5    thing I'm --

6            MR. MOEHRINGER:  Linda Mack Ross will be

7    testifying today, too.

8            THE COURT:  All right.  Anything else?

9            MR. KRUMHOLZ:  From our side, your Honor, we

10   don't have any other witnesses.  There will be a little

11   deposition testimony that we'll designate, unless your

12   Honor wants us to read it in.

13           With regard to Ms. Ross, just so the Court is

14   aware, Ms. Batliner will be taking that witness and it

15   will be her first cross-examination to the extent that

16   becomes necessary today.  But we also just want to flag

17   because we had this concern with whether she has any

18   admissible testimony based on the deposition.  We still

19   believe that's not the case, so we will be addressing

20   that during the course of her attempted testimony.

21           THE COURT:  So refresh my recollection on how

22   this proceeded.  I think I allowed you to take a

23   deposition of her; correct?

24           MR. KRUMHOLZ:  That's correct.

25           THE COURT:  And you did that, and obviously I

1    haven't seen that deposition, but you haven't filed any

2    motions based on that deposition.

3          MR. KRUMHOLZ:  No.  The time was short and she's

4    got a -- it obviously depends what they are offering

5    her for.  To the extent they're going to try to offer

6    her for the issues related to who physically created

7    the game, the various components of the game and

8    work-for-hire issues, it does not appear she has any

9    firsthand knowledge that's admissible.  She has a

10   little bit of information, having seen the prototype,

11   and we'll actually likely be asking her questions

12   regarding the commercial version versus the prototype,

13   and we think she has observations relative to the

14   derivative works issue, but we don't think she has any

15   information relative to the work-for-hire or

16   authorship.

17         THE COURT:  All right.  That's helpful.  So it

18   sounds like the only testimony then is Ms. Ross,

19   subject to this discussion about what she may testify

20   to, and then the two experts plus any deposition

21   designations you are going to submit.  Is that about

22   right?

23         MR. KRUMHOLZ:  Yes, your Honor.

24         MR. POLLARO:  Yes.

25         THE COURT:  All right.  So what order?  I take

1      it the Plaintiffs would be presenting Ms. Ross first or

2      your expert first?

3          MR. POLLARO:  Ms. Ross first.

4          THE COURT:  Okay.  So before we get to that, I

5      do want to take up the issue of the experts.  I've

6      reviewed all the briefing in your motions *in limine*,

7      and I think it makes sense to have a discussion about

8      both experts and to try to give you some guidance with

9      respect to what I think permissible areas of expert

10     testimony would be and what some impermissible areas

11     are, but I think in order to do that most effectively I

12     need to understand what it is that each of you thinks

13     your expert is going to offer in terms of opinions that

14     would be helpful to the issues that I have to

15     determine; so I think I'm going to ask Plaintiffs to

16     respond first with respect to Mr. Carty.

17         MR. POLLARO:  Yes, your Honor.

18         THE COURT:  Why don't you come up to the

19     lectern.  By the way, before we get into that, you

20     mailed to me a binder of the exhibits that you compiled

21     at my request after the trial in Los Angeles and then

22     another one was given this morning.  These are the same

23     binders; right?

24         MR. KRUMHOLZ:  They should be, your Honor.  We

25     were asked to provide three more copies and that's what

1    we did.

2              THE COURT:  Good.  All right.

3              Mr. Pollaro.

4              MR. POLLARO:  Thank you, your Honor.  So I think

5    our expected testimony from Mr. Carty is not going to

6    be very long, so we think based on his experience he

7    can assist the Court with talking about the timeline,

8    and he's had significant experience with prototypes

9    submissions, game submissions, that type of thing, and

10   we anticipate asking questions about the timing of the

11   prototype and how long prototypes take and the

12   commercialization process in general.

13             THE COURT:  So the relevant period of time here

14   is 1959; right?

15             MR. POLLARO:  Yes.

16             THE COURT:  So as I understand then the motion

17   *in limine*, Mr. Carty began his work life in the 1980s.

18             MR. POLLARO:  I think that's for both experts.

19   I think both of them came into the industry late and so

20   obtained their experience through different means.

21   Obviously neither one of them was practicing in 1959

22   and, quite frankly, we looked for people with that in

23   that time frame and were not able find any, so --.

24             THE COURT:  All right.  So I guess what struck

25   me overall about all of the back and forth over the

1    experts is that it might be useful for me to hear

2    testimony, maybe, about what the industry practices

3    were in 1959 to the extent that those practices could

4    inform me about the context in which the agreements

5    were made that are relevant to this case.  That might

6    be useful testimony.  But what would not be useful, and

7    I don't think would be permissible, is any testimony

8    from either expert who opines upon the credibility of

9    any witnesses, who is telling the truth, who is not

10   tell the truth, or who invented the game or didn't

11   invent the game.  I mean the facts, I have to make that

12   determination from the facts that are submitted in the

13   course of the trial, and I don't think any expert from

14   either side should be expressing opinions with respect

15   to whether Markham invented the game or Klamer invented

16   the game or whether the contribution of Mr. Israel and

17   Ms. Falco was characterizing that.  So that's kind of

18   how I am assessing it.

19          So how do you fit Mr. Carty into that general

20   set of parameters I just outlined?

21          MR. POLLARO:  That's an excellent observation,

22   your Honor, but what we've tried to do is use the

23   experience that he has and obviously all the contacts

24   and all the conversations he's had in the industry and

25   kind of extrapolate back; I mean basically how the

1    industry handles certain issues and deals with certain

2    issues and views certain issues, and obviously, you

3    know, using his experience to inform you of how it was

4    and how it currently is in his experience.  So that's

5    exactly how we tried to do it.

6         We tried to stay away from anything that was

7    obviously legal in nature, but we're trying to use his

8    experience, and knowing that expert witnesses from 1959

9    are not available, you know, this is the available pool

10   of people that we had.

11        THE COURT:  All right.  Let me have you all

12   respond.

13        MR. KRUMHOLZ:  Your Honor, we're in a hundred

14   percent agreement with what you would like to see and

15   that's what we have attempted to do with regard to

16   Mr. Orbanes.  I'll deal with both of them, I think,

17   because I think the contrast is useful.  It's true that

18   Mr. Orbanes was not in the industry in 1959.  He was,

19   however, fully in the industry by 1965 and is one of

20   the foremost game historians, probably the foremost

21   game historian in the country, and he was trained at

22   the feet of people in 1965 that had been in the

23   industry for many years, that taught him the ropes,

24   that taught him the practices that had existed for some

25   time prior to that.  So it's not a perfect match

1    because there is no perfect match.

2          The reason we settled on Mr. Orbanes, and

3    notwithstanding what we knew would be the claims of

4    bias, is because he is the single most qualified person

5    in the country, in our view, to be able to talk about

6    industry custom and practice at that time and in that

7    time frame, and what we anticipate that he'll be able

8    to do is we're going to ask him to assume some facts

9    and then to talk about industry custom and practice

10   with regard to the questions that you need to answer on

11   the instance and expense test.  So he'll be in a

12   position to be able to say, well, somebody in

13   Mr. Klamer's position under these facts typically did

14   assume the economic risk, typically did attain control,

15   and he'll explain why that's the case, as opposed to

16   somebody that was in Mr. Markham's position.  The idea

17   being that if a certain set of facts is more typical or

18   more consistent in the industry, that would tend to

19   make those facts more reliable and more likely to be

20   true.

21          If a certain set of facts is aberrational or

22   contrary to economic motivations, or just inconsistent

23   with the practices, that would make those facts tend

24   less likely to be true, and it's just one piece of

25   information for the Court to have in making factual

1　findings.  So that is what we intend to have

2　Mr. Orbanes talk about.  That will not be very long

3　testimony with regard to that.

4　　　　　With regard to Mr. Carty, the problems are

5　two-fold.  He started in 1985.  When I asked him at his

6　deposition, you know, what is your knowledge base for

7　1959, he actually pointed to Mr. Orbanes and to one

8　other person.  He actually has no knowledge.  I don't

9　doubt that he has a level of expertise for what he

10　does, but he has no knowledge about any practices back

11　at that time, so, the first problem.

12　　　　　The second problem is their report is not

13　directed toward that question.  Their reports plural

14　are directed toward credibility assessment, assessing

15　the witnesses, opining on facts.  I don't see anything

16　in their reports that constitute a disclosure of

17　industry custom and practice along the lines that I

18　just talked about, so if they're going to try to get up

19　and do that now I'm going to object on a disclosure

20　basis.

21　　　　　THE COURT:  All right.

22　　　　　Mr. Pollaro, can respond to that.  Is that

23　opinion disclosed, the opinion with respect to industry

24　custom and practice in the 1959 time frame?

25　　　　　MR. POLLARO:  It's wrapped up in the opinions

1    that were disclosed, absolutely, your Honor, and some

2    of that has to deal with some of the agreements and how

3    in his practice and his experience were interpreted and

4    how they were handled in the industry.  And yes, so as

5    far as we're concerned they are included in our

6    disclosure documents.  And we've submitted three

7    reports because, as your Honor knows, the trial

8    transcripts came a little late, so we had our first

9    round of expert reports before the trial transcripts,

10    and then we filed a supplemental based on those trial

11    transcripts and then obviously the rebuttals.

12         THE COURT:  Do you have copies of the reports of

13    all of your experts that I can have?  I know you

14    submitted them as attachments.  I didn't print them

15    out.  I could print them out, but I'm wondering if you

16    have copies available; I would take them and have them

17    through the examination.

18         MR. POLLARO:  I'm sure we do.  If we don't,

19    we'll get them in short order.

20         MR. KRUMHOLZ:  We have them right here.

21         MR. POLLARO:  Do you have them all, Josh?

22         MR. KRUMHOLZ:  Yes.  I'll just bring them up.

23    How many copies would you like, your Honor?

24         THE COURT:  Just one is fine.

25         MR. KRUMHOLZ:  These are Mr. Carty's and

1    Mr. Orbanes'.

2           THE COURT:  All right.  Well, I'm going to leave

3    this pretty much where I started it, which is I've

4    given you some guidance as to what I think is what are

5    permissible areas of opinion testimony and what would

6    not be permitted and ultimately admitting -- the

7    testimony will be subject to objections, if there are

8    objections to whether this was properly disclosed, and

9    I'll deal with that as we go.

10          I may hear the testimony and take those

11   objections under advisement just so that we don't slow

12   down the process too much, given the fact this is a

13   bench trial, and I might allow testimony to occur

14   subject to my ruling later about its ultimate

15   admissibility as well, if it's admitted, about the

16   weight that I'll give it, okay?  So that where we're

17   going to leave it.

18          All right.  So let's move forward with your --

19          MR. KRUMHOLZ:  Your Honor, on the derivative

20   works, is it useful to just flag what I think the

21   issues are there for you?

22          THE COURT:  Yes.

23          MR. KRUMHOLZ:  Should I --

24          THE COURT:  Yes, go ahead.

25          MR. KRUMHOLZ:  The issues with regard to

1      derivatives works is not a qualification issue; it's a

2      methodology issue, basically two broad problems.  One

3      is to do a derivatives works analysis one needs to do a

4      comparison of the copyrightable expressions between the

5      works, to the extent that the later work has some

6      original copyrightable expression in it; and also to

7      the extent that there's new additional copyrightable

8      expression, those two factors would make the work a

9      derivative work.  If there was no original

10     copyrightable expression in the second from the first,

11     then it's an independent work, and if it's just all the

12     original work and nothing more, then it's the same

13     work.   That's the spectrum.

14              THE COURT:  Uh'huh.

15              MR. KRUMHOLZ:  The problems with what Mr. Carty

16     has done is, one, he does not compare copyrightable

17     expressions.  He compares ideas or concepts, and he

18     says these concepts carry through.  The second problem

19     is that he does not do a comparison of differences; he

20     just does a comparison of similarities.  He was

21     answering actually really a different question.

22              In this business you sometimes have disputes

23     with inventors and you sometimes have questions about

24     whether some later work you still need to pay royalties

25     on that, and that becomes a question of whether the

1    original concepts carry all the way through.  That's

2    the kinds of disputes he's apparently been involved

3    with.  Hasbro certainly has been involved with those

4    kinds of disputes.  That's the question he answered,

5    but that's not the question before the Court.

6         So again, we'll deal with it when the questions

7    come up, but I just want to make sure the Court is

8    aware when we're objecting that those are going to be

9    our concerns.

10        THE COURT:  Right.  I did get that out of your

11   filings, and I'm a little reluctant to rule now on

12   everything, but I do, I appreciate that and I

13   understand your concern.

14        MR. KRUMHOLZ:  Thank you.

15        THE COURT:  Yes.

16        All right.  Mr. Pollaro.

17        MR. POLLARO:  Yes, your Honor.

18        THE COURT:  Call your witness.

19        MR. POLLARO:  John Moehringer will be handling

20   Ms. Mack Ross.

21        MR. MOEHRINGER:  Good morning, your Honor.  We

22   call Linda Mack Ross, as our fourth witness, today.

23        <u>LINDA MACK ROSS, PLAINTIFF'S WITNESS, SWORN</u>

24        THE CLERK:  Please state your name for the

25   record and spell your last name.

1          THE WITNESS:  Linda Mack, M-a-c-k, R-o-s-s,

2     separate.

3          THE COURT:  Good morning, Ms. Mack.

4          And you may inquire, Mr. Moehringer.

5          MR. MOEHRINGER:  Good morning.  Thank you, your

6     Honor.

7            <u>DIRECT EXAMINATION BY MR. MOEHRINGER</u>:

8     **Q.**   Good morning, and I heard you just stated your

9     name for the record.  Can you also state what your

10    birth name was for the record.

11    **A.**   Linda Makiesky.

12    **Q.**   How do you spell your last name?

13    **A.**   M-a-k-i-e-s-k-y.

14    **Q.**   If you don't mind me asking, how old are you?

15    **A.**   75.

16    **Q.**   Are you taking any medication that might impair

17    your memory or your ability to truthfully testify here

18    today?

19    **A.**   No.

20    **Q.**   Do you have any condition that would inhibit your

21    memory or your ability to truthfully testify here

22    today?

23    **A.**   No.

24    **Q.**   What year did you graduate high school?

25    **A.**   1960.

1    **Q.**    Where did you live at the time you were in high

2    school?

3    **A.**    Minneapolis.

4    **Q.**    I'm going to ask you a couple of questions about

5    your college.  What did you study when you went to

6    college?

7    **A.**    My undergraduate degree is in sociology, child

8    psychology.  My master's is in organizational

9    development and training.  And then I have additional

10   training in mediation.

11   **Q.**    And where did you go to get your bachelor's

12   degree?

13   **A.**    University of Minnesota.

14   **Q.**    Master's degree?

15   **A.**    University of Minnesota.

16   **Q.**    What is your current line of employment?

17   **A.**    I'm a mediator.

18   **Q.**    And what types of things do you mediate?

19   **A.**    I mediate employee-management disputes for federal

20   agency.

21   **Q.**    And do you understand this case involves Bill

22   Markham?

23   **A.**    Yes.

24   **Q.**    Were you related to Bill Markham?

25   **A.**    He was my uncle.

1    **Q.**    How exactly were you related to him?

2    **A.**    He was married to my dad's sister.

3         THE COURT:  Ma'am, would you just maybe move

4    that microphone.

5         THE WITNESS:  Okay.  Is that better?

6         THE COURT:  That's better.

7    **Q.**    And what was your aunt's name?

8    **A.**    Sue, or Sue Makiesky at one time.

9    **Q.**    And she married Bill Markham and became Sue

10   Markham; is that correct?

11   **A.**    Yes.

12   **Q.**    When did you first meet Bill and Sue Markham?

13   **A.**    1956.  Well, I heard about them for years and

14   years, but they came for my uncle's funeral in 1956.

15   **Q.**    And where did you meet them?

16   **A.**    At my, well, at my home at the funeral.  The after

17   funeral things were at my home, so I met them during

18   the funeral and at my home.

19   **Q.**    And that was in Minneapolis?

20   **A.**    Yes.

21   **Q.**    After you met them did you become close to Bill

22   and Sue Markham?

23   **A.**    Yes, I saw them more often.

24   **Q.**    Did you visit Minneapolis periodically?

25   **A.**    They came for events, and Bill was also doing work

1    with Lakeside Plastics, which was getting into the game

2    business, and so he would come and be with Lakeside

3    Plastics as well.

4    **Q.**   And what is Lakeside Plastics?

5    **A.**   Well, it was a sign maker at the time, but then it

6    became Jax, J-a-x, eventually.  And now it was just

7    sold to another game company; I don't know the name.

8    **Q.**   And was there anyone in particular your uncle

9    would come see in Minneapolis?

10   **A.**   Zom Levine, who was the owner of Lakeside

11   Plastics.  But they also traveled to Hong Kong and did

12   a lot of things together in Minneapolis, not in

13   Minneapolis.

14   **Q.**   Why would they travel to Hong Kong?

15   **A.**   Looking up molds or looking up products.  I don't

16   know, you know, they went fairly often, so I'm not

17   exactly sure everything they did there.

18   **Q.**   Where did your aunt Sue and uncle Bill live?

19   **A.**   At that time in Hollywood Hills.

20   **Q.**   In California?

21   **A.**   Yes.

22   **Q.**   At some point did you live with them for a month

23   while you spent a summer in California?

24   **A.**   Yes.

25   **Q.**   What year was that?

1  **A.**   1962.

2  **Q.**   And did you spend more time with them in

3  California as they grew older?

4  **A.**   Yes, a lot more time.

5  **Q.**   And why was that?

6  **A.**   Well, as they got older and they had needs, I just

7  went there to help out.  My aunt wasn't so well so I

8  would go back and forth.

9  **Q.**   In your own words can you please tell the Court

10  today a little bit about the type of person your uncle

11  Bill was.

12  **A.**   He was creative.  He was fun.  He was caring.  He

13  was very generous, very trusting, so a little naïve.

14  He just had a lot of life to him.  And he saw -- one of

15  those who saw the glass, well, my aunt saw it half

16  empty, he saw it half full.

17  **Q.**   You said he was creative.

18  **A.**   Yes.

19  **Q.**   Can you explain what you mean by him being a

20  creative person.

21  **A.**   Well, he just always thought about different

22  ideas, and actually I think in the 70s we met with my

23  friend who was a nursery school teacher so he could

24  pick her brain and think about things that preschoolers

25  might like.  So he was always thinking about things

1    like that.

2    **Q.**   Did you consider your uncle Bill a good

3    businessman?

4    **A.**   No.

5    **Q.**   He wasn't business savvy?

6    **A.**   No.

7         MS. BATLINER:  Objection.

8         THE COURT:  Overruled.

9    **Q.**   Do you recall the first time your uncle Bill

10   brought The Game of Life to you in Minnesota?

11   **A.**   I don't.  It was either '59 or '60.

12   **Q.**   But you did recall that he brought the game; you

13   just don't know exactly what year it was?

14   **A.**   No.  I was, like, 17.

15   **Q.**   So he brought the game to Minnesota in either 1959

16   or 1960?

17   **A.**   Yes.

18   **Q.**   Did you play The Game of Life with your uncle Bill

19   at that time?

20   **A.**   Yes.

21   **Q.**   What do you recall about the first time you played

22   The Game of Life with your uncle Bill?

23   **A.**   Well, the spinner and the three-dimensional aspect

24   to it, and just that he was asking me for, you know,

25   did I have any thoughts about it or how to play it or

1  anything that should be added.  But again, I was 17 so

2  I wasn't exactly worldly.

3  **Q.**   Was it your understanding that the reason he

4  brought it to you was to have you play the game and

5  give him feedback about the game?

6  **A.**   Yes, as a teenager.

7  **Q.**   Do you recall specifically where in Minneapolis

8  you were when you played The Game of Life?

9  **A.**   I don't remember.  It was the hotel he was staying

10  at at that time.

11  **Q.**   Was your aunt Sue present at the hotel room --

12  **A.**   No.

13  **Q.**   -- when you played the game?

14  **A.**   No.

15  **Q.**   Was anyone else present when you played the game

16  with your uncle Bill?

17  **A.**   No.

18  **Q.**   So it was just the two of you?

19  **A.**   Yes.

20  **Q.**   Do you recall approximately how long you were

21  playing The Game of Life that day?

22  **A.**   I don't.  It wasn't a very long time.  It was just

23  enough time to see it and give him some feedback, and

24  that was it.

25  **Q.**   How would you describe the game board that you

1   played the first time with your uncle Bill?

2   **A.**   It was just a three dimensional, and I'm not sure

3   what else you want me to say here or what I should be

4   saying here.  It was a three-dimensional game board.

5   It was different than, you know -- I was a game player,

6   so it was different than Monopoly or another kind of

7   game because of the three-dimensional aspect.

8   **Q.**   Do you remember what aspects of the game were

9   three dimensional?

10   **A.**   I don't know if it was the mountain or a bridge,

11   you know, it's hard to -- it was just in general I saw

12   that.

13   **Q.**   Do you recall, was there a path on the game board

14   that you played with your uncle Bill?

15   **A.**   I think there was a path on it like a bridge, but

16   I can't exactly tell you that.  This is --.

17   **Q.**   When you referred to a bridge, did the track that

18   was on the game board include a three-dimensional

19   overpass?

20   **A.**   Yes; it was a three-dimensional game.  I mean

21   everything to me was three dimensional; it just was so

22   different.

23   **Q.**   And you mentioned the spinner.  Can you describe

24   the spinner that was on the game board.

25   **A.**   It was kind of a little noisy, had different

1    colors on it.

2    **Q.**    And did it have numbers on it?

3    **A.**    Yes

4    **Q.**    Do you recall whether the three-dimensional game

5    board that your uncle carried in that day to the hotel

6    room was foldable?

7    **A.**    I don't.

8    **Q.**    Do you remember if the path on the game board had

9    writing on it?

10   **A.**    I don't.

11   **Q.**    Did it include anything about life elements on the

12   game board that you played?

13   **A.**    Life elements being what you do in life, yeah,

14   because I had to comment on, you know, that I think

15   something else was or should be added.

16   **Q.**    So he asked you for comments regarding the life

17   elements of the game board?

18   **A.**    Right.  Yes.

19   **Q.**    Do you recall any particular comments you might

20   have given?

21   **A.**    No.  When I read the stuff after I thought about

22   the -- when I read the car that was being expanded,

23   because at that time I sort of dreamed I was going to

24   have 12 kids and I remember the car was like four and I

25   thought oh, this is too little, so I think he expanded.

1    But when I read that they had expanded the car, that's

2    when I thought that was probably something I might have

3    said to him.

4    **Q.**   Do you remember how many folks the car you played

5    with held?

6    **A.**   It was four, four spaces.

7    **Q.**   Four spaces in the car?

8    **A.**   Yeah, which would only give two kids, so.

9    **Q.**   Were you asked to provide feedback regarding

10   anything else with respect to The Game of Life?

11   **A.**   No.  Just what I thought about it, how you played

12   it, that kind of thing.

13   **Q.**   Did you discuss the rules of the game with your

14   uncle that day?

15   **A.**   I know he asked me about those.  I can't tell you

16   specifically what I know what they were, but I mean he

17   asked about, when we played it, if I thought that it

18   played easily or whatever.

19   **Q.**   Did he explain how to play the game to you that

20   day?

21   **A.**   Yeah.

22   **Q.**   And did he ask you feedback about how the game

23   would be played?

24   **A.**   Yes.

25   **Q.**   At the time you played The Game of Life with your

1  uncle, was it your understanding that it was not still

2  yet commercially available?

3  **A.**   I don't think I had an -- I mean it's hard for me

4  to look back at 17 and say did I know it was ready.  I

5  just knew that Milton Bradley had got it and it was

6  going, so I don't what -- you know, he was testing it

7  with me, so I don't know that I thought about it at

8  that time.

9  **Q.**   Were you asked to sign any kind of confidentiality

10  agreement?

11  **A.**   No.

12  **Q.**   Were you instructed not to discuss The Game of

13  Life with anybody else after you played it with your

14  uncle?

15  **A.**   No.  I was really excited that Milton Bradley had

16  bought it, so I guess my friends all knew that my uncle

17  had created this game that Milton Bradley was putting

18  out.

19  **Q.**   That Milton Bradley was going to be putting it out

20  in the future?

21  **A.**   Right, right.  Yes.

22  **Q.**   How did you learn that Milton Bradley had bought

23  the game?

24  **A.**   I don't know.  I mean my mother could have told

25  me.  I just don't know which of my relatives would have

1    told me, but someone told me that they had, but I don't

2    know if it was my mother, my uncle, or another uncle.

3    **Q.**    At some point I think you mentioned you had spent

4    a summer in California; correct?

5    **A.**    Uh'huh.

6    **Q.**    That was 1962?

7    **A.**    Uh'huh.  Yes.

8    **Q.**    Did you spend some part of that summer living with

9    your aunt Sue and uncle Bill?

10   **A.**    Yes.

11   **Q.**    How long did you live with them during that

12   summer?

13   **A.**    Maybe four to six weeks.

14   **Q.**    During that time did you visit their office?

15   **A.**    Yes.

16   **Q.**    Do you recognize -- do you remember anything about

17   the visit to the office?

18   **A.**    No, not really.  I mean my uncle was in Hong Kong

19   when I first came, so my aunt had to stop in the office

20   and pick up things or do whatever; and I walked in, and

21   they'd talked about their employees, so I met them,

22   Grace and Leonard.  But no, looking back, I think I

23   went to the office with him one time, but it wasn't for

24   any length of time.

25   **Q.**    You mentioned the name Leonard.  Was that Leonard

1    Israel?

2    **A.**   Yes.

3    **Q.**   Who was Leonard Israel?

4    **A.**   An employee of my uncle's.

5    **Q.**   You met Leonard Israel when you went to visit in

6    the office?

7    **A.**   Yes.  And my aunt and uncle talked about them a

8    lot as well, so I did meet them.

9    **Q.**   What did they talk about?

10   **A.**   Just that they were their employees, they liked

11   them a lot.

12   **Q.**   Do you know anything about their work as employees

13   of your aunt and uncle?

14   **A.**   No.

15   **Q.**   What do you remember about meeting Leonard Israel?

16   **A.**   I just remember -- I mean I don't remember that

17   much, saying hello and, you know, meeting him.  I don't

18   have -- I just know I was at the office and met them.

19   I can't tell you too much about that at that time.

20   **Q.**   Okay.  And I think you mentioned the name Grace

21   also.  Were you referring to Grace Falco Chambers?

22   **A.**   I guess that's her last name.  I don't think I

23   ever knew it.

24   **Q.**   Do you know who she was?

25   **A.**   An employee of my uncle's.

1   **Q.**   And did you ever meet Grace?

2   **A.**   Yes.

3   **Q.**   What do you remember about meeting Grace?

4   **A.**   Again, just saying hello to them.  I don't

5   remember much else.

6   **Q.**   Do you know anything about the work that Grace did

7   as an employee of your aunt and uncle?

8   **A.**   Yes.

9   **Q.**   Are you familiar with the name Ruben Klamer?

10  **A.**   Yes.

11  **Q.**   Who is Ruben Klamer?

12  **A.**   Well, I thought he was my uncle's friend who was a

13  dealmaker, kind of marketing dealmaker kind of person.

14  **Q.**   And where did you get that understanding from?

15  **A.**   I just always heard his name, but I knew he was

16  going to put the deal together.

17  **Q.**   What deal are you referring to?

18  **A.**   The Game of Life.

19       MS. BATLINER:  Objection.  Foundation.  She just

20  said that she doesn't know what work he was doing.

21       THE COURT:  I'll sustain the objection.  You can

22  ask some more foundational questions about what she is

23  talking about in terms of this deal.

24  **Q.**   I believe you mentioned that you thought your

25  understanding was that Ruben Klamer was a marketing guy

1    and deal guy; correct?

2    **A.**   Right.

3    **Q.**   And that --

4         MS. BATLINER:  Objection.  We still don't know

5    how she knew what she knew, what she thinks she knew

6    about Klamer.

7         THE COURT:  I think he is getting to that, so

8    let's see where it goes.

9         MR. MOEHRINGER:  Thank you, your Honor.

10   **Q.**   Let me back up for a second so we make sure we ask

11   the right questions.  We're talking about Ruben Klamer

12   and your understanding of who Ruben Klamer was.

13   **A.**   Right.  I mean my uncle spoke about him often.

14   **Q.**   Okay.  So over the years you heard about Ruben

15   Klamer?

16   **A.**   Yes.

17   **Q.**   And what was your understanding who Reuben Klamer

18   was, again?

19   **A.**   That he was the one putting together the deal for

20   the game.

21   **Q.**   And when you say "putting together the deal for

22   the game," you mean the deal for The Game of Life?

23   **A.**   Yes.

24   **Q.**   How did you come to understand that there was a

25   deal with respect to The Game of Life?

1      MS. BATLINER:  Objection, your Honor.

2  Foundation.

3      THE COURT:  Well, that is a foundational

4  question, the "how" question, so overruled.

5      You may answer that.

6  **A.**   Just that when my uncle talked about the game and

7  how it came to be, he just said how it got sold to

8  Milton Bradley, that Ruben Klamer was the one who made

9  that deal with Milton Bradley.

10  **Q.**   And I think earlier you testified that you did

11  have an understanding that the game was sold to Milton

12  Bradley; correct?

13  **A.**   Yes.

14  **Q.**   And that you had heard that -- I don't want to put

15  words in your mouth -- that you had heard that both

16  from your mother and your uncle?

17  **A.**   I don't know who told me.  It could have been my

18  mother.  It could have been my uncle.  It could have

19  been another cousin.  I mean we all knew about it and

20  my whole family knew that that was happening.  It was a

21  very big deal for my uncle to have something with

22  Milton Bradley.

23  **Q.**   And it was your understanding that Ruben Klamer

24  was involved in helping put that deal together; is that

25  correct?

1    **A.**    Yes.

2    **Q.**    Did you have any understanding of what Reuben

3    Klamer might have been involved with with respect to

4    The Game of Life?

5         MS. BATLINER:  Objection.  Hearsay.  She said

6    what she knows of what Reuben Klamer did was from her

7    family.

8         THE COURT:  Right.  Well, we are deep into

9    hearsay here.

10        If I'm understanding her testimony, it's only

11   things that she's heard from either Sue or Bill

12   Markham; correct?  How is this admissible?

13        MR. MOEHRINGER:  I think we're just getting to

14   the point as to what her understanding of what Reuben

15   Klamer's role was, and she heard it from numerous

16   things and what she experienced over the years as far

17   as the deal went.  It's not actually that someone told

18   her that Reuben Klamer was this person; it was just her

19   understanding of what that deal was and what his role

20   was.

21        THE COURT:  Well, okay.  If you're asking -- do

22   you go by Ms. Mack or Ms. Ross?

23        THE WITNESS:  You can call me Linda, that's

24   fine.

25        THE COURT:  Well, we usually use last names.

1        THE WITNESS:  Ms. Ross, I guess.

2        THE COURT:  Okay.  Ms. Ross.

3        If you're asking Ms. Ross the question about the

4   specific roles of each of these people in this matter,

5   then the only place she could have learned that is from

6   what Bill and Sue Markham told her; right?  That's what

7   her testimony is, I think.

8        MR. MOEHRINGER:  Or the experience of her family

9   with this big event that occurred within her family.

10       THE COURT:  All right.  So I'll let you ask more

11  foundational questions about that big event or whatever

12  it is you're referring to, but what I'm getting at is

13  ultimately it sounds like most of her knowledge, if not

14  all of her knowledge, comes from what other people told

15  her; and what I'm asking you is how is that admissible

16  and not hearsay, not inadmissible hearsay?  What's the

17  rationale why that should be admitted?

18       MR. MOEHRINGER:  The primary rationale, again,

19  we're really only asking whether or not she knew Reuben

20  Klamer and what she knew about him.  She testified she

21  knew he was a marketing person.  That's her lay

22  assessment of the facts.  We're not asking whether or

23  not, you know, Bill Markham told her that, Sue Markham

24  told her that in any given moment.  It is her lay

25  opinion from her experience at that time and assessment

1    at that time that her understanding of what he was was

2    the marketing guy.  That's all she knows about him.

3    She doesn't know anything else about what he did or

4    what he didn't do, and we're not offering it for that.

5    We're just bringing up whether or not she does or

6    doesn't know who Reuben Klamer was.

7              THE COURT:  Well, I'll let you ask a few more

8    questions, --

9              MR. MOEHRINGER:  Okay.

10             THE COURT:  -- see what we have.

11   **Q.**   Did you personally meet Reuben Klamer?

12   **A.**   No.  I don't recall meeting him.

13   **Q.**   Did you know anything else about what Reuben

14   Klamer might have done with respect to The Game of

15   Life?

16   **A.**   No.

17   **Q.**   Thank you.  Did you live in New York City at some

18   point?

19   **A.**   Yes.

20   **Q.**   When did you live in New York City?

21   **A.**   1965 and '66.

22   **Q.**   And did your uncle Bill visit you while you lived

23   in New York City?

24   **A.**   Yes.

25   **Q.**   How many times do you recall him visiting you

1    while you lived in New York City?

2    **A.**   Well, he was there for the toy fair that I saw him

3    both times, so twice.

4    **Q.**   So he visited you twice?

5    **A.**   Yes.

6    **Q.**   And did you attend this toy fair with him twice?

7    **A.**   I attended the toy fair with him once.

8    **Q.**   Why did you only attend with him once?

9    **A.**   Because I was sick when he was there one time.

10   **Q.**   So one time you were sick and you couldn't go to

11   the toy fair with your uncle?

12   **A.**   Yes.

13   **Q.**   What did your uncle do when he visited you the

14   time when you were sick?

15   **A.**   He just brought me dinner and visited with me.

16   **Q.**   Do you recall the other time when you attended the

17   toy fair with your uncle?

18   **A.**   Yes.

19   **Q.**   Do you remember which year that was?

20   **A.**   No.  I think it was '66.

21   **Q.**   So it either could have been 1965 or 1966?

22   **A.**   Yes.  I believe it was '66.

23   **Q.**   What was your experience attending the toy fair

24   with your uncle Bill?

25   **A.**   It was a fun experience for me walking around and

1    seeing games and meeting different people that were in

2    the industry.  Made me feel kind of important.

3    **Q.**   Why did you feel important?

4    **A.**   I don't know; just I was my uncle's niece, and he

5    was recognized and, you know, just he included me in

6    that, kind of, so.

7    **Q.**   What do you mean he was recognized?

8    **A.**   Well, people would introduce him or know who he

9    was, that he was the creator of The Game of Life, and

10   that's how people talked about it when we were there.

11         MS. BATLINER:  Objection, your Honor, to the

12   extent they're offering her for the truth of the matter

13   asserted.

14         THE COURT:  Well, I think it's being offered

15   just for purposes of fact that it happened, not the

16   truth of the assertion, so I'll overrule the objection.

17         MR. MOEHRINGER:  Thank you, your Honor.

18   **Q.**   I'm sorry; did you have anything else in response

19   to that particular question about your experience?

20   **A.**   No.  I mean just that it was seemed to be known,

21   and he was known.  And I got to meet some interesting

22   people, and I even got a game out of it, so.

23   **Q.**   Do you recall who you met?

24   **A.**   No.  I mean just, I couldn't.

25   **Q.**   Do you recall what game you got?

1    **A.**    Yeah.  Perquackey.  Lakeside had just acquired it.

2    I had played it earlier, but it was off the market and

3    Lakeside Plastics had acquired it and it was there.

4    **Q.**    Okay.  Did you attend with anybody else while you

5    were at the toy fair, or was it just with your uncle?

6    **A.**    Just my uncle.

7    **Q.**    How was your uncle Bill treated as you moved

8    around the toy fair?

9    **A.**    People were friendly to him.

10   **Q.**    Thank you.  Was it your understanding that Bill

11   Markham received royalties on the sales of The Game of

12   Life?

13   **A.**    Yes.

14   **Q.**    Did you understand The Game of Life to be Bill

15   Markham's primary source of income?

16   **A.**    Yes.

17   **Q.**    Do you have any financial interest in The Game of

18   Life?

19   **A.**    No.

20   **Q.**    Did you ever receive any income in connection with

21   The Game of Life?

22   **A.**    No.

23   **Q.**    Did you receive any inheritance when Bill Markham

24   died?

25   **A.**    No.

1   **Q.**   Do you have any current relationship with Lorraine

2   Markham?

3   **A.**   No.

4   **Q.**   Do you know who Lorraine Markham is?

5   **A.**   Yes.

6   **Q.**   Who is she?

7   **A.**   She was married to Bill for a short time.

8   **Q.**   When was the last time you saw Lorraine Markham?

9   **A.**   At Bill's funeral.

10   **Q.**   When was that?

11   **A.**   1992, I think.

12   **Q.**   Have you communicated with Lorraine Markham at all

13   since your uncle's funeral?

14   **A.**   No.  I don't even think I talked to her at his

15   funeral.

16   **Q.**   When was the last time you saw your uncle Bill

17   alive?

18   **A.**   In 19 -- oh, at his wedding reception, so I don't

19   know if that was '91 or if it was '90, but it was right

20   at his wedding reception.

21   **Q.**   When he married Lorraine Markham?

22   **A.**   Uh'huh.

23   **Q.**   How did you become aware of this litigation?

24   **A.**   I was sent an article from a friend.

25   **Q.**   Why do you believe you were sent an article from a

1   friend?

2   **A.**   Because people knew my uncle invented The Game of

3   Life and they thought I would be interested in knowing

4   that.  I received -- a couple of people sent me an

5   article.

6   **Q.**   And what did you do after you received the

7   article?

8   **A.**   The last article I received, I talked to a couple

9   of my cousins and one of my friends who lived in LA

10   about this and what I should do, and thought about

11   that, and the only name that was listed was the

12   judge's, so I wrote the judge.

13   **Q.**   And what did you think about when you tried to

14   decide what to do?

15   **A.**   I don't care for Lorraine Markham, so I don't want

16   her to benefit from this.  And I felt like this was

17   60 years after the fact, my uncle is not here to defend

18   himself, and I know this was an important part of his

19   life, and I felt like he contributed a lot to my life,

20   he added some really nice experiences to my life, so I

21   felt I should be doing this.  But I had to weigh

22   whether -- I don't -- I didn't know enough, how much

23   she might benefit from it financially, but my issue was

24   that.

25        And I really, when I wrote the letter I had no

1  idea it would be such a cumbersome process for me, I

2  mean having to come to this cold weather. So when I

3  wrote the judge I don't think I had an expectation of

4  what would happen, I wanted him to kind of know; and

5  then this ended up a cumbersome process.

6  **Q.**  And can you tell us why you decided to come today.

7  **A.**  Well, it was a hard one since my flight was

8  cancelled on Friday and I went through the whole

9  process, but I felt like I needed to finish this or at

10 least speak for Bill, since he can't speak for himself.

11 MR. MOEHRINGER: Thank you very much.

12 I have no further questions.

13 THE COURT: Thank you, Mr. Moehringer.

14 Okay. Ms. Batliner.

15 CROSS-EXAMINATION BY MS. BATLINER:

16 **Q.**  Hi, Ms. Ross.

17 **A.**  Hi.

18 **Q.**  Thank you for coming to the cold weather.

19 **A.**  Okay.

20 **Q.**  Just a moment here. I have a few questions for

21 you today. First, very briefly, Bill Markham never

22 told you that he had started work on a

23 three-dimensional game before this 1959-1960 time

24 frame, did he?

25 **A.**  I don't remember discussing it, but --

1          MR. MOEHRINGER:  Beyond the scope --

2          THE COURT:  Hold it.  What is it?

3          MR. MOEHRINGER:  Beyond the scope of the direct.

4          THE COURT:  Overruled.  Go ahead.

5    **A.**   No, I don't recall.  I just remember hearing about

6    The Game of Life.  I don't recall anything before.

7    **Q.**   And you recall him as an idea's man and a creative

8    man, but do you remember him ever telling you that he

9    had ideas about The Game of Life from the time he was a

10   teenager?

11   **A.**   No.

12   **Q.**   Okay.  So switching gears.  Do you recall being

13   deposed in this case last month?

14   **A.**   Yes.

15   **Q.**   And do you remember in your deposition my showing

16   you some images of a few different games, Game of Life

17   versions?

18   **A.**   Uh'huh.  Yes.

19   **Q.**   So I'd like to show you one of those images again

20   and see how it compares to what you saw in that

21   Minnesota hotel room, okay?

22          MS. BATLINER:  Your Honor, I have copies if

23   you'd like them in-hand, or I can just use the ELMO.

24          THE COURT:  Use the ELMO.

25   **Q.**   This is the first page of a multi-page exhibit.

1          THE COURT:  Is this a full exhibit or --

2          MS. BATLINER:  That is -- okay.  So this is Ross

3    Exhibit 7 from her deposition, and it is images of the

4    same physical game that appears in HTX14 which was

5    admitted in November.  It's not the exact same images,

6    they were just taken on a different day, but it's the

7    same game.

8          THE COURT:  All right.  Why don't we just do

9    this.  I mean let's identify this as a separate exhibit

10   since you're going to -- are you going to be moving

11   this into evidence?

12         MS. BATLINER:  No, your Honor, it's just to get

13   her observations.  I mean I'd like to get on the record

14   that she recognizes it as Exhibit 7 from her

15   deposition, which we haven't done yet, but I don't

16   actually need to admit the document.  But we can, if

17   you'd like.

18         THE COURT:  Well, it's not what I like, it's

19   just what it is you're trying to do here and what the

20   point of it is.

21         But you're standing up, Mr. Moehringer.  What is

22   it?

23         MR. MOEHRINGER:  I would note that I think both

24   Ross Exhibit 6 and Ross Exhibit 7 with respect what

25   Courtney might be going to, Ms. Batliner might be going

1    to, the --

2         MS. BATLINER:  I'm not actually.

3         MR. MOEHRINGER:  Oh, you're not?  Okay.  Neither

4    one of them are on the actual exhibit list, so we would

5    have to deal with that.

6         THE COURT:  I'll let you proceed and see where

7    it goes.  Go ahead.

8         MS. BATLINER:  Thank you, your Honor.

9    **Q.**   Ms. Ross, you see this here?  It says Ross 7.

10   **A.**   Yes.

11   **Q.**   I'll represent to you that this is Exhibit 7 from

12   your deposition.  Do you understand that to be true?

13   **A.**   Okay.

14   **Q.**   Okay.

15        MS. BATLINER:  And like I said, I've told the

16   Court that this Ross Exhibit 7 comprises the same,

17   comprises photographs of the same physical game that is

18   represented in Hasbro trial Exhibit HTX Exhibit 14,

19   which was admitted in November.

20        And third, I'll just represent that the game

21   pictured here in Ross Exhibit 7 and also in HTX14 is a

22   1960 commercial version of the game, and I should

23   clarify that actually.  It's a commercial version of

24   The Game of Life that bears a copyright date of 1960.

25   **Q.**   Okay.  So Ms. Ross, turning back to this exhibit

1    from your deposition, let me show you another page from

2    it.  Do you remember seeing this image at your

3    deposition?

4    **A.**    Yes.

5    **Q.**    And you had seen a 1960 version of the game with

6    your attorneys the day before your deposition as well,

7    hadn't you?

8    **A.**    Yes.

9    **Q.**    So I'd like you to recall for a moment the

10   prototype that you saw with your uncle in Minnesota.

11   Do you have it in your mind's eye?

12       Now, as compared to the 1960 game that your

13   attorney showed you, the prototype that you saw was

14   more three dimensional; isn't that right?

15   **A.**    Yes.

16   **Q.**    And the prototype also was more colorful?

17   **A.**    I don't recall how colorful.  I just remember the

18   things jutting out.  I don't remember that it's more

19   colorful or not more colorful.

20   **Q.**    Okay.  Could we turn to a page of your deposition.

21       MS. BATLINER:  Your Honor, I have copies if

22   you'd like it in-hand, or I could just use the ELMO.

23       THE COURT:  Go ahead and use the ELMO.

24       Actually, do you have a copy you could hand up

25   to me?

1          MS. BATLINER:  I do, yes.

2          THE COURT:  Give it to the clerk.  Thanks.

3          Tell me what you're referring to.

4          MS. BATLINER:  We are looking at page 93, lines

5     93-11 to 94-10 really, and you can see -- I'm sorry.

6          THE COURT:  Hold on.

7          MS. BATLINER:  Uh'huh.

8          THE COURT:  All right.  You can read her

9     deposition from page 93-11 through 22.

10          MS. BATLINER:  Thank you.

11     **Q.**   I'm going to read from your deposition here.

12     Okay.  (Reading)

13          Question:  When you say that what you remember

14     playing with your uncle was more three dimensional

15     than --

16          Answer:  The game that came out.

17          Question:  What do you mean by that?

18          Answer:  Well, it just seemed like things were

19     bigger on that game and a little more colorful than

20     what we saw yesterday.

21          Question:  What elements were colorful?

22          Answer:  I don't know.  I mean there's just

23     color to it.  There wasn't so much color to it, the '60

24     game.

25          End quote.

1          Was that your testimony a few weeks ago?

2     **A.**   That's what you have down there.

3     **Q.**   No reason to doubt that that's what your testimony

4     was?

5     **A.**   No.

6     **Q.**   All right.  And now, again, as compared to the

7     game that you looked at with your attorneys, on the

8     prototype things were bigger; right?

9     **A.**   Yup.  Yes.

10    **Q.**   And as compared to that prototype, the 1960 game

11    that we're looking at here, Exhibit 7, doesn't have as

12    many 3-D figures on it; is that right?

13    **A.**   Right.

14    **Q.**   And the prototype that you saw had bridges and

15    overpasses on the board, but the commercial game that

16    you played did not; correct?

17    **A.**   Right.

18    **Q.**   Okay.

19    **A.**   And that's what stuck out to me was the

20    three-dimensional stuff more than anything, just the

21    scope of it.

22          MS. BATLINER:  I have no further questions.

23    Thank you, Ms. Ross.

24          THE COURT:  Thank you, Ms. Batliner.

25          Mr. Moehringer, do you have any redirect?

1       MR. MOEHRINGER:  I have nothing further, your

2   Honor.  Thank you.

3       THE COURT:  Ms. Ross, your testimony is

4   complete.  Thank you very much for being here.  You may

5   step down.  That will probably be the last time you

6   write a letter to a judge; right?

7       THE WITNESS:  I'll give more thought to it.

8       THE COURT:  All right.

9       Your next witness, please.

10      MR. POLLARO:  The Plaintiffs call Robert Carty

11  to the stand.

12   ROBERT THOMAS CARTY, JR., PLAINTIFF'S WITNESS, SWORN

13      THE CLERK:  Please state your name for the

14  record and spell your last name for the record.

15      THE WITNESS:  Robert Thomas Carty, Jr., last

16  name C-a-r-t-y.

17      THE CLERK:  Thank you.

18      THE COURT:  Good morning, Mr. Carty.

19      THE WITNESS:  Good morning, your Honor.

20      THE COURT:  You may inquire, Mr. Pollaro.

21      Let's go off the record for a moment.

22      (Discussion off the record)

23          DIRECT EXAMINATION BY MR. POLLARO:

24  Q.   Good morning, Mr. Carty.

25  A.   Good morning, Mr. Pollaro.

1  **Q.**  Thank you for being here today.  Can you please

2  state your name for the record.

3  **A.**  Robert Thomas Carty, Jr.

4  **Q.**  Do you understand your testimony here today is

5  under oath and subject to penalty of perjury?

6  **A.**  Yes, I do.

7  **Q.**  Have you ever testified in court before?

8  **A.**  No, sir, I have not.

9  **Q.**  How about deposition.  Have you been deposed

10  before this case?

11  **A.**  Once for less than 10 minutes.

12  **Q.**  Have you ever been retained as a consultant or an

13  expert in the board game industry before this case?

14  **A.**  Yes, sir.

15  **Q.**  How many times?

16  **A.**  Many times.

17  **Q.**  Can you tell me in what context.

18  **A.**  Three of them were with services that were doing

19  advice on investments and the purchase of other game

20  companies.  I did -- I had a couple of conferences with

21  the Library of Congress regarding putting games into

22  libraries and schools.  I did some work with the Korean

23  government on the import and potential distribution of

24  games manufactured in Korea into the U.S.  I've worked

25  with a lot of other companies, people that are friends

1    and designers and authors, just in general.

2    **Q.**    Do you have an understanding of your role in this

3    case?

4    **A.**    My understanding of my role in this case was to

5    offer a neutral view of the game industry's standard

6    practices and procedures regarding the submissions and

7    publication.

8    **Q.**    Do you believe that you have the skills and

9    experience to do just that?

10   **A.**    I've been doing that in one capacity or the other

11   for the past 33 years.  I believe that I have -- that I

12   do.

13   **Q.**    Can you give us a brief description of your

14   education.

15   **A.**    I'm a high school graduate.  I have some college,

16   but at one point I could no longer could afford to go

17   to college and so I enlisted and I served in the Marine

18   Corps, hoping to have a college bonus, but after

19   Grenada all bonuses were rescinded.

20   **Q.**    How long did you serve in the Marine Corps?

21   **A.**    Six years.

22   **Q.**    Can you tell us why you joined the Marine Corps.

23   **A.**    My father was a Marine, my uncle was a Marine and

24   served in Okinawa actually, and my father's

25   great-great-uncle was a Rough Rider.  We just have a

1    history of military service so I was -- I always wanted

2    to be in the Corps.

3    **Q.**    You were in the Corps, I believe you said, until

4    1988; is that correct?

5    **A.**    Yes.

6    **Q.**    And from your CV it looks like you worked for a

7    couple of distributors when you left the service.  Is

8    that correct?

9    **A.**    Yes.

10    **Q.**    Tell us the name of those distributors.

11    **A.**    I worked for Glenwood in '85, '87, and I worked

12    for Diamond, and then Liberty.

13    **Q.**    If we stick with the distributors for now that you

14    worked for, can you give us an overview of what your

15    job responsibilities were while working for the

16    distributors.

17    **A.**    Very broad and varied.  I did all kind of jobs

18    there, but primarily I was responsible for building the

19    systems that brought goods from the selection process,

20    the goods we would carry, and providing the conduits

21    that brought them into the consumers' and the

22    retailers' hands.

23    **Q.**    Were these distributors in the game industry?

24    **A.**    Yes, they were.

25    **Q.**    So then from your CV it looks like you went to

1    work for Mayfair Games.  Who was Mayfair Games?

2    **A.**   Mayfair was a prominent publisher in the game

3    industry primarily focused on board games when I went

4    to work there.  They had made notable changes in the

5    industry upping the -- raising the bar, as they used to

6    say, to improve part quality and improve the experience

7    for the consumer.

8    **Q.**   Can you give us an overview of what your work

9    experience was while at Mayfair Games.

10   **A.**   When I went to work at Mayfair Games and in the

11   building process, I had a lot of hats.  I was the

12   director of sales and marketing and became a partner in

13   the first year when they gave me stock for sweat

14   equity, and I was the gatekeeper, which is kind of a

15   person that got to look at every submission that came

16   in and determined which ones to proceed with.

17   **Q.**   When did you begin working for Mayfair Games?

18   **A.**   1997.

19   **Q.**   You used the term "submission."  What is a

20   submission?

21   **A.**   When a person or group have a game they want their

22   publisher to publish, they make a submission, they

23   offer the game to the publisher.  Different companies

24   have different procedures.  We had a varied three-step

25   process.

1    **Q.**   When you began working with Mayfair Games, what

2    business was Mayfair Games in?  What kind of products

3    did they sell?

4    **A.**   They made board games.

5    **Q.**   How many new product submissions would you say you

6    viewed while you were at Mayfair Games?

7    **A.**   A couple thousand.

8    **Q.**   Can you tell us a little bit about the process

9    that you undertook in reviewing submissions while you

10   were at Mayfair Games.

11   **A.**   We had -- the process involved the submitter to

12   provide us with basically a resume of the game and a

13   letter of intent why they believe Mayfair should be the

14   publisher.  These would be reviewed, and if they passed

15   what we called the sniff test we would evaluate them

16   and then request a set of rules.  If the rules then

17   passed the test, our next step would be to request a

18   prototype.

19   **Q.**   What are you looking for when you review the rules

20   and the prototype?

21   **A.**   Playability, making sure that the game system

22   itself wasn't broken, that it was developable, that we

23   could actually create a saleable product out of the

24   prototype and the design.

25   **Q.**   Are you looking at specific features of the

1    submission?

2    **A.**    We're looking at all the factors, and then the

3    goal would be whether we can actually reproduce that,

4    the look, the feel, the texture of the play in the

5    final game.

6    **Q.**    And would you accept or reject the game after your

7    analysis?

8    **A.**    Yes, sir, we would.

9    **Q.**    How many of the thousands of product submissions

10   made it to the prototype stage?

11   **A.**    A few hundred.

12   **Q.**    So you've analyzed hundreds of prototypes in your

13   experience?

14   **A.**    Yes, sir.

15   **Q.**    How about specifically board game prototypes?

16   **A.**    They were almost all board game prototypes.

17   **Q.**    In your experience do most product or game

18   submissions already include a playable model?

19   **A.**    Not in my experience.

20   **Q.**    Can you give an idea roughly how many did or

21   didn't include a playable model.

22   **A.**    In the -- immediately upon request only three or

23   four.  Almost all of them we would have to wait for a

24   prototype to be delivered.

25   **Q.**    So I want to make sure I have your testimony.  So

1    if a product submission is submitted to Mayfair Games,

2    you're in charge of analyzing that submission; correct?

3    Is that what you said?

4    **A.**   Yes, sir.  That's correct.

5    **Q.**   And when a prototype is eventually submitted -- I

6    think you said you had to wait -- what would happen in

7    that interim?

8    **A.**   Well, we'd have communication with the designer,

9    generally just a regular e-mail back and forth,

10   sometimes a phone call, just keeping in touch to make

11   sure that we knew what was going on.

12   **Q.**   Would these products that you were interested in,

13   as the gatekeeper, at Mayfair Games?  In other words

14   were you interested in ultimately putting that product

15   on the market if it passed the sniff test and all the

16   other tests that you were looking at?

17   **A.**   It would be products that we feel would be viable

18   that I thought we actually had a chance to sell and

19   possibly make money on.

20   **Q.**   Can you give us examples of a board game you

21   accepted and why.

22   **A.**   We accepted a game called Nuns On the Run.  That

23   was a very clever design involving naughty nuns dodging

24   discovery, which is the illustration from the cover.

25   **Q.**   Can you give us an example of a board game you

1    rejected and why.

2    **A.**    One comes to mind pretty clearly and that's in the

3    late 90s we had a submission of a Bible Monopoly game

4    where they replaced the neighborhoods with different

5    chapters in the Bible and there were Bible verses and

6    rewards and penalties on the chance and cards, and,

7    well, that duck won't fly.

8    **Q.**    And as a result you rejected that game?

9    **A.**    We rejected the game and told them they should

10   talk to somebody else.

11   **Q.**    Well, I'm sure Hasbro would appreciated that.

12          Can you tell us if you had any responsibilities

13   once you accepted a prototype and before the game was

14   published.

15   **A.**    Once the prototype was accepted, it would go into

16   development to make sure everything was workable.  A

17   lot of that required a distillation of the product; in

18   some cases, in most cases a reduction in some features

19   to reduce breakability, to make the game more

20   profitable, to guarantee that we could economically

21   manufacture the game without a lot of returns or

22   defects or other problems that reduces its

23   profitability and increases cost.

24   **Q.**    Once Mayfair and you accepted a game into the

25   line, would you then enter into a contract with the

1    designer, or was there already a contract in place?

2    **A.**    That varied.  Sometimes the known designers we

3    would have a contract on in advance, but generally it

4    was after the prototype was accepted.

5    **Q.**    Did you know the terms of those contracts?

6    **A.**    I was expected to know them, and if I didn't know

7    them I better ask.

8    **Q.**    Did you review any other types of contracts when

9    you were at Mayfair?

10   **A.**    I reviewed several thousand contracts in my tour

11   of duty at Mayfair, including freight contracts,

12   leases, distributor contracts, retailer contracts,

13   product submission contracts, trade show contracts.

14   Part of my job as a partner was to review all the

15   contracts.

16   **Q.**    And did you understand the terms of those

17   contracts that you were reviewing?

18   **A.**    I had to understand them, and if I didn't

19   understand them then I have to ask questions, which I

20   did a lot.

21   **Q.**    Are you currently employed, Mr. Carty?

22   **A.**    Yes, sir, I am.

23   **Q.**    Can you tell us a little bit about what your

24   current employment is.

25   **A.**    I'm a consultant to a very prominent board game

1    brand called Catan, which Mayfair was instrumental in

2    building into a global brand and which I was a catalyst

3    in that process, which is why they hired me as a

4    consultant.

5         I own small company in Virginia called Creative

6    Goods Companies.  We makes giant board games for floors

7    for companies.  We also provide specially-merchandised

8    support for other game companies primarily, and we make

9    floors for booths and things like that in the last

10   year.

11   **Q.**   Did I hear correctly you consult for Catan?

12   That's for Mayfair Games; correct?

13   **A.**   No.  Catan was purchased -- Mayfair Games was

14   purchased by Asmodee in 2015, and at that point all my

15   stock and all the other partners' stock were purchased,

16   and I left the company on December 31st, 2015 and I was

17   hired by the Catan folks immediately thereafter as a

18   consultant for Catan.

19   **Q.**   Do you know why the Catan folks hired you?

20   **A.**   Well, Mr. Fenlon, the CEO of the studio, and

21   Mr. Teuber told me I was a catalyst to the success of

22   the brand in the time I was with Mayfair and

23   instrumental in creating their global effect in 45

24   languages now, and at one point Pete Fenlon, the CEO of

25   Mayfair, told me I was driving the bus and had been for

1    years.

2    **Q.**    Are you a member of any professional

3    organizations?

4    **A.**    Yes, sir.  I'm a member of the Marine Corps

5    Association.  I'm also a member of the Game

6    Manufacturers Association, which is called GAMA.  The

7    company belongs to two professional organizations,

8    therefore I'm a member also, and they are PPAI, which

9    is Promotional Products Association International, and

10   ASI, Advertising Specialists International, and they're

11   both organization that bring suppliers and distributors

12   together to provide, well, everything from resalable

13   merchandise to advertising tchotchkes.

14   **Q.**    Have you held any supervisory roles in any of

15   these organizations?

16   **A.**    I was the first non-manufacturer ever elected to

17   the board of directors in the GAMA Association and

18   served on that board for many years, 11 or more.  And I

19   was also the secretary of the board after I was the

20   director at large and I served in that capacity for, I

21   don't know, I don't really remember, seven or eight

22   years.

23   **Q.**    Can you give us a general sense of what these

24   organizations are about, what they do, what they

25   attempt to accomplish.

1    **A.**   Well, GAMA is an organization founded by

2    manufacturers to help provide support and regulation,

3    some internal regulation to the game publishers.  In

4    the 80s, late 80s we developed a standardization of

5    codes with a distributor division which is there to

6    provide support and advice to the manufacturers on

7    trends.  We also had a retail division that did the

8    same sort of thing, but they're from two different

9    viewpoints.  And we created a publishers manual for new

10   publishers that explained to them how to properly code

11   and address books and product so that it could be more

12   easily resalable.

13   **Q.**   Can you give us a sense of the members of these

14   organizations.

15   **A.**   The members of GAMA are publishers, there are

16   communicating members that are designers and

17   developers, there are retailer members and wholesale

18   members.

19   **Q.**   Are these individuals that are currently in the

20   industry, have been in the industry?  You know, I'm

21   just trying to get a better sense.

22   **A.**   They're pretty much only currently in the

23   industry.  There's a few people that kind of hang out

24   still that are emeritus members for one reason or

25   another; but they're pretty much active members in the

1     industry.

2     **Q.**    Okay.  Any other organizations?  Any online

3     organizations, anything like that?

4     **A.**    I belong to a bunch of news groups which are

5     pretty loose, things on LinkedIn and Facebook, but --.

6     **Q.**    Have you authored any articles or published any

7     other materials in the game industry?

8     **A.**    I wrote a number of articles targeting to

9     retailers, some back in the 90s, generally talking

10    about selecting product for their stores or making

11    their store a better destination.  I haven't written

12    anything though for that in that capacity since the

13    late 90s.

14    **Q.**    How about interviews.  Have you provided

15    interviews to any sources?

16    **A.**    I have in my career done thousands of interviews,

17    everything from newspapers, magazines, bloggers,

18    video -- I don't know what they call them -- YouTube

19    reporter people.  I've been on TV 11 times in the

20    capacity with Mayfair, and in fact one time we actually

21    got on TV with Sunday Morning, and I don't remember the

22    interviewer's name, but he's the gentleman that

23    followed Mr. Kuralt.

24    **Q.**    These interviews, would these have been in the

25    game industry, in particular the board game industry?

1   **A.**   They were all involving the game industry, mostly

2   involving board game trends or practices or new product

3   coming out or family gaming or things like that.

4   **Q.**   I was on your LinkedIn page and I see you have

5   over 500 connections, so I'd like to ask you to explain

6   why connections are important to you or if they're

7   important to you and who your connections generally

8   are, if you can.

9   **A.**   Okay.  In my job, and my job as it has been,

10  connections are very important.  It's much easier to

11  deal with people you know than people you don't.

12  People do business with people they know; they don't do

13  business with companies generally.  And I have contacts

14  up there, everything from people who make components

15  and do printing, to designers, developers, other game

16  company personnel, a couple of artists and authors are

17  connected with me up there, even some fans that are

18  connected; so it's just broad.

19  **Q.**   Do you have any mentors or anybody that's been in

20  the industry that you look up to that you can go to

21  with questions if you have any?

22  **A.**   Well, sadly, they're dead.

23  **Q.**   Is that a recent passing or at some point --

24  **A.**   Two years ago I had a good friend, Bob Boyle, who

25  passed away.  Bill Beader (phonetic) died many years

1    ago.  He was one of the first reps.

2    **Q.**   But are these individuals that have been in the

3    game industry for many years --

4    **A.**   Many years before me.

5    **Q.**   Okay.  And do you have a rough idea how old these

6    individuals were?

7    **A.**   Bob Boyle was in his late seventies.  I don't know

8    how old Bill beater was.  He died of cancer.  There are

9    some people that I'm closely associated with in their

10   late sixties, but beyond that not too many.

11   **Q.**   And these are people you consider mentors, people

12   that you could talk to if you had questions?

13   **A.**   People I would talk to regularly.

14   **Q.**   Do you attend trade shows, toy fairs?

15   **A.**   Yes, sir, I do.

16   **Q.**   Can you give us an idea which toy fairs, game

17   shows you attend?

18   **A.**   This year I've already been to two trade shows.

19   I'm preparing to go to another one.  I went to the

20   Nuremberg Toy Fair in Germany specifically for meetings

21   with Cosmos, I had one Asma Gaming meeting, and I met

22   with a couple other publishers there and some other

23   folks to look at games.  The New York Toy Fair, which

24   was just recently.  and I'm getting ready to go to the

25   game manufacturers show, GES, out in Reno.

1  **Q.**   Switching gears slightly.  We talked a little

2  earlier about your experience evaluating product

3  submissions while you were at Mayfair.  Do you recall

4  that?

5  **A.**   Yes, sir.

6  **Q.**   Can you tell us -- let me back up.  I believe you

7  said you were the gatekeeper; is that right?

8  **A.**   That's the person that has to look at the first

9  instance.

10  **Q.**   Got you.  How did you learn that process?  Was

11  that always the process in the industry and at Mayfair?

12  I'm just trying to figure out how you came about that

13  process.

14  **A.**   Effectively, I had to do that job as a distributor

15  to select which products we would carry and which ones

16  we would reject, and I built more or less a mental

17  system.  With Mayfair we had other concerns about

18  protecting the designer and the company from litigation

19  by pre-reviewing the products to avoid conflicts, and

20  so that was the system that we came up with and it

21  seemed to work pretty well.

22  **Q.**   And that's the process where you said earlier the

23  designers would typically not have a prototype and you

24  would be waiting around for the prototype; is that

25  correct?

1    **A.**   Well, that was the end result at the end of the

2    process, yes.

3    **Q.**   Do you have an understanding of how long it takes

4    to make a prototype from concept to playable model?

5    **A.**   I only have my experience in dealing with the

6    designers and having been a modeler in my teens making

7    plastic models --

8         MR. KRUMHOLZ:  I object on relevance because

9    unless it was back in the 1950s and early 1960s there

10   is no relevance to the testimony.

11        THE COURT:  I tend to agree.

12        So can you establish that he has any

13   understanding of how long it takes to get from concept

14   to prototype or to commercially, commercial game from

15   the time period in question here?

16        MR. POLLARO:  I think we can, your Honor.  I

17   think -- two things.  I want to point out again, as

18   Mr. Krumholz has pointed out earlier, there is no

19   perfect match so there are not individuals around that

20   have that direct knowledge, so I think both sides are

21   dealing with that.  But the second point is obviously

22   Mr. Carty has been in the industry quite some time, and

23   using a date point on what it takes to create a

24   playable model in the time period that he's been in the

25   industry is relevant to determine --

1          THE COURT:  Well, I'll let you explore it if you

2     think you can tie it up to the relevant period of time,

3     but if all it is is what it takes now or what it took

4     10 or 20 years ago, it really doesn't help me.

5          Let's take a 10-minute break.  We'll be in

6     recess.

7          (Recess)

8          THE COURT:  Ready to proceed?

9          MR. POLLARO:  Yes, your Honor.  Thank you.

10    **Q.**   Mr. Carty, before the break we were switching

11    gears, as I recall, and we were talking and I just want

12    to back up a little bit.

13         Earlier we were talking about your experience

14    evaluating product submissions while you were at

15    Mayfair Games.  Do you recall that?

16    **A.**   Yes, sir.

17    **Q.**   And can you tell us how you learned that process.

18    **A.**   In the course of being a distributor, you look at

19    product lines and products to evaluate their

20    saleability by retailers and in the marketplace, by the

21    packaging, the content of the product and their

22    potential; you do it thousands and thousands of times,

23    hundreds of times each month, and you develop a

24    sensibility.

25    **Q.**   Is that something that had been done in the

1    industry before you appeared in the industry?

2    **A.**   Yes, sir.

3    **Q.**   And did you learn that process from people that

4    had done that process before you?

5    **A.**   Some parts of it, yes.

6    **Q.**   Did you have an understand of how long it takes to

7    make a prototype from a concept to a playable model?

8    **A.**   I had firsthand knowledge at Mayfair, but as a

9    distributor there would be different publishers would

10   share stories, probably often nightmare stories, but

11   stories just the same.

12   **Q.**   I appreciate that.  Let's stick to Mayfair.  I'm

13   trying to talk about that submission process you were

14   in charge of; correct?

15   **A.**   Yes, sir.

16   **Q.**   When you were at Mayfair, and I think you had

17   firsthand knowledge of that timing, do you have an

18   understanding of how long it takes to go from a --

19   sorry -- to create a prototype of a playable model?

20   **A.**   It could generally seem to take several --

21            MR. KRUMHOLZ:  I thought we were still on

22   foundational, and so I'm back to the same objection as

23   before the break, which is relevancy.

24            THE COURT:  Well, if I understand what

25   Mr. Pollaro is doing, he's setting a foundation for

1  that question that is relevant, so let's see how he

2  does.

3      MR. POLLARO:   Thank you, your Honor.

4  **Q.**  Sorry, Mr. Carty.  Can you tell us what that

5  understanding is of the time it takes to create a

6  playable model for a concept?

7  **A.**  Experience dictates that it takes several months,

8  sometimes longer.  Sometimes it was years before we

9  actually got a playable model that we could actually

10  enter into a contract with.

11  **Q.**  Would that playable model depend on the complexity

12  of the design itself?

13  **A.**  Yes, sir.  The more complex or involved the

14  product, the longer you generally took to create the

15  model, which is just simply logical.  The more

16  components or parts, more moving features, the longer

17  it takes.

18  **Q.**  Based on your experience with board games, which I

19  believe you stated began in the 80s and continued at

20  Mayfair, does it take longer to create a prototype of a

21  game now or back in the 80s?

22  **A.**  It takes less time now to create a prototype.

23  Technology has made life much simpler for an awful lot

24  of people.

25  **Q.**  Based on your experience with board games, does it

1    take longer to create a prototype of a game now or back

2    in the 90s, today versus the 90s?

3    **A.**   Today is much faster.

4    **Q.**   Can you tell us why that is.

5    **A.**   Well, desktop publishing a big factor in all of

6    that.  3-D printers, there are print-on-demand houses

7    where you can print 20 cards if you are trying to do a

8    prototype.  There's just a lot more assets available.

9    We have the Internet for communication, which actually

10   speeds things up a great deal.  Files can be sent back

11   and forth much easier than they could in the 90s.

12   **Q.**   Have you talked with anyone in the industry about

13   how long it took to create a prototype prior to your

14   entry into the game market?

15   **A.**   A few times.

16   **Q.**   And based on your experience and your

17   conversations, would it take longer to create a

18   playable prototype of a game now or in 1959?

19          MR. KRUMHOLZ:  Objection.  Foundation.

20          THE COURT:  I'll sustain that.  You need to

21   establish more with respect to where this is coming

22   from.

23   **Q.**   Can you -- you testified that you spoke with

24   people about the prototype development process; is that

25   correct?

1    **A.**    Yes, sir.

2    **Q.**    Can you tell us a little bit more about who you

3    spoke with with regard to this process.

4    **A.**    I spoke with a number of designers.  Craig Taylor

5    comes to mind, but he's passed away.  I had

6    conversations with folks at Avalon Hill and Victory

7    Games, SPI, TSR, West End Games.  I had conversations

8    with designers at the designer party at the toy fair a

9    couple years in a row when I was fortunate enough to

10   get invited, a variety of people who talked about

11   different things.

12   **Q.**    And would any of these individuals have experience

13   developing prototypes in the 1959-1960 time frame?

14   **A.**    I believe some of them did.

15   **Q.**    So based on your experience, would it take longer

16   to create a playable prototype of a game now or in 1959

17   or 1960?

18         MR. KRUMHOLZ:  Same objection.

19         THE COURT:  Again, I'm going to sustain it.

20   It's too vague at this point.  Who, how many, what was

21   their experience, you need to do more.

22         MR. POLLARO:  Thank you, your Honor.

23   **Q.**    Mr. Carty, can you give us a little bit more

24   detail about the conversations that you had with

25   individuals that were in the industry creating

1    prototypes in 1959 or 1960?

2    **A.**    I don't know what years, and I had conversation

3    with Mr. Sackson about when he was creating the game

4    called Acquire.  I don't remember what year that was.

5    I remember him saying that to make the -- it took him

6    quite a while to get, to take it from concept to the

7    prototype he submitted.

8    **Q.**    Can you tell me generally how long you believe

9    that time was.

10   **A.**    It was a couple of months, four, five.  I don't

11   remember clearly.  That was 1996 when I met him.  It's

12   a long time ago.

13        Craig Taylor I talked to when he was talking

14   about Wooden Ships Iron Men, which is an iconic board

15   name, about how long it took him to make all the ship

16   cards and pieces for the board.  Apparently it took him

17   quite a while, a couple of months to make the parts.

18        MR. KRUMHOLZ:  Your Honor, I'm sorry.  Before he

19   goes on, excuse me, repeating these conversations,

20   could we establish whether these people knew anything

21   relevant, what their time frame was?  It's all hearsay.

22        THE COURT:  I understand, but the fact that it's

23   hearsay, if it is going into an opinion that is an

24   opinion that he's developed is not impermissible in

25   itself.

1     But Mr. Krumholz is right; it's unclear what

2  time frame any of these things relates to, the Acquire

3  or Wooden Ships Iron Men.  I mean I don't know, so you

4  need to ask more questions.

5     MR. POLLARO:  I understand that, your Honor.  I

6  appreciate that.

7  **Q.**  Mr. Carty, can you give us any more detail about

8  the timing of the events that we're discussing about

9  the prototype creation based on your conversation

10  with --

11  **A.**  It was so long ago I don't really -- I don't

12  remember.

13  **Q.**  Do you have an estimate of, say, in 1996 when you

14  had the conversations how old these individuals were?

15  **A.**  Sid Sackson was probably in his eighties.

16  **Q.**  He was in his eighties s in 1996; is that correct?

17  **A.**  Yes, sir.  Late seventies, at least.

18  **Q.**  And you believe he was in the game industry?

19  **A.**  He is a well-known designer.  He's got -- he had

20  many very popular and sometimes iconic titles.  A lot

21  of people looked up -- he was, he had a lot of product

22  published, and he was successful.

23  **Q.**  Do you know that he was in the game industry in

24  1959?

25  **A.**  I believe he was, but I couldn't prove that, sir.

1   **Q.**   Do you have any more detail about when this game,

2   I believe it's called Acquire, came out?

3   **A.**   I don't know who the original publisher was, but I

4   believe it was 3M Games and then Avalon Hill, and when

5   I became familiar with it I owned a 3M copy, but I

6   don't remember the copyright date or any of that.  And

7   I sold the game when I worked in distribution when it

8   was an Avalon Hill product.

9   **Q.**   Could the game have been available in 1959?

10  **A.**   Sir, I don't know.

11  **Q.**   But could it have been available?

12  **A.**   I suppose.

13       MR. KRUMHOLZ:  Objection.

14       THE COURT:  Okay.   That is calling for

15  speculation.  If he knows if it was available, he can

16  answer that.

17       MR. POLLARO:  Okay.

18  **Q.**   So Mr. Carty, I want to go back to your testimony

19  about the timing of creating a prototype in the, since

20  you entered the industry in 19 -- in the 80s.  I

21  believe you testified that between the 1980s and today,

22  it would take longer to create a prototype in the 80s.

23  Do I have that right?

24  **A.**   Yes, sir.

25  **Q.**   And now if we use the mid 90s or the time you were

1        at Mayfair Games, it takes longer in the 90s versus

2        today.  Is that what your testimony is?

3    **A.**    Yes, sir.

4    **Q.**    And then I think you said previously that compared

5        between the 80s and the 90s it would take longer in the

6        80s; is that correct?

7    **A.**    Yes, sir.

8    **Q.**    While you were at Mayfair Games for the

9        approximately 20 years you were there, did the time it

10       took to create a prototype decrease from, say, mid 90s

11       to when you left in 2015?

12   **A.**    Yes, sir, it did.

13   **Q.**    It did.  It became faster?

14   **A.**    Yes, sir.

15   **Q.**    Do you have any reason to believe that that trend

16       will not continue in the future?

17   **A.**    No, sir, I do not.

18   **Q.**    Do you have any reason to believe that that trend

19       didn't occur in the past or before you got into the

20       game industry?

21   **A.**    No, sir.

22   **Q.**    Have you reviewed the images of the prototype in

23       this case?

24   **A.**    Yes, sir.

25           MR. POLLARO:  May I approach, your Honor.  I

1    want to show him a picture of the prototype.

2             THE COURT:  Yes.  Do you need an easel?

3             MR. POLLARO:  I do.

4             MR. KRUMHOLZ:  We have some back here.  Take

5    one.

6             MR. POLLARO:  May I approach, your Honor.

7             THE COURT:  Sure.

8    **Q.**   Can you see that, Mr. Carty?

9    **A.**   Yes.

10   **Q.**   I've placed next to you, Mr. Carty, what's

11   identified as PTX12.  Have you seen this image before?

12   **A.**   Yes, sir, I have.

13   **Q.**   Do you understand that would be the image of the

14   prototype of The Game of Life?

15   **A.**   Yes, sir, I do.

16   **Q.**   I'm just curious, have you seen in your lengthy

17   experience any game submissions that included a box

18   with graphics?

19   **A.**   No, sir, I have not.

20   **Q.**   Based on your experience, can you compare the

21   prototype in the image next to you to the hundreds of

22   prototypes that you have reviewed and analyzed?

23   **A.**   Well, this is an outstandingly complete prototype.

24   **Q.**   What exactly do you mean by that?

25   **A.**   It's complete.  Beyond distillation process and

1   making sure that you don't have breakables on the

2   board, it's almost ready to go to press.

3   **Q.**   Are you aware that it has been alleged that the

4   entire prototype, soup to nuts, was created in six

5   weeks?

6   **A.**   That would be incredible.

7          MR. KRUMHOLZ:  Objection.  Move to strike that

8   answer.  This is what they were trying to set the

9   predicate for, which they never set, to give that.

10          THE COURT:  So I'll sustain that objection.

11          And you may ask -- what you actually asked him

12   is whether he's aware of that allegation that that was

13   created in six weeks, so let's establish his awareness

14   first; and then if you want to ask him if he has an

15   opinion on that, you need to be clear on what the basis

16   of that opinion would be.

17          MR. POLLARO:  Thank you, your Honor.

18   **Q.**   Are you aware that it has been alleged that the

19   entire prototype was created in six weeks or less?

20   **A.**   Yes, sir.

21   **Q.**   Based on your experience in the industry, would it

22   be possible to design and build a prototype of The Game

23   of Life from a concept to the prototype that you see

24   there in six weeks?

25          MR. KRUMHOLZ:  Objection.

1          THE COURT:  I'm going to overrule the objection.

2     I am going to allow him to answer.  I think you can

3     handle it effectively on cross-examination, so you go

4     ahead and answer that question.

5     A.    I think it's highly unlikely.

6     Q.    How about if I told you that that prototype was

7     created in four weeks.  Based on your experience would

8     it be possible to design and build the prototype that

9     you see before you in four weeks?

10    A.    Even less likely.

11    Q.    Can you tell us upon which you base that

12    statement.

13    A.    Just the processing of the requests and the delays

14    and receiving prototypes over the years.  It always

15    seems to take a lot longer.

16    Q.    And remind me again how this prototype that you

17    see here compared to the hundreds of prototypes that

18    you reviewed when you were at Mayfair Games.

19    A.    Well, the box is complete, the little cars are

20    there, the mountains, the spinner.  It seems to be a

21    complete playable prototype with all the bells and

22    whistles attached.

23    Q.    Would that, based on your prior testimony and your

24    experience, would that mean that it would take longer

25    relatively for a prototype to be created, in your

1    experience, or less time?

2    **A.**    Given all the different prototypes I've looked at

3    over the years, it seems like it always takes longer

4    for more involved and complex designs to be prototyped

5    than simpler ones, so I would have to say this takes

6    longer than a simpler game.

7    **Q.**    I think I want to switch gears.

8         MR. POLLARO:  Your Honor, would you like me to

9    take the image down, or are you okay with leaving that?

10        THE COURT:  It's up to you.

11        MR. POLLARO:  I'm fine with leaving it.

12   **Q.**    Thank you, Mr. Carty.  So switching gears again

13   slightly.  So we talked about the process you undertook

14   in accepting or rejecting games.  Do you recall that?

15   **A.**    Yes, sir.

16   **Q.**    I want to talk about the case where a game has

17   been accepted.  Are you with me?

18   **A.**    Yes, sir.

19   **Q.**    But by that point would Mayfair have a contract

20   with the game designer?

21   **A.**    Yes, sir, we would.

22   **Q.**    Would the contract always be with the game

23   designer, or would it be with anyone else, the

24   designer's agent or anything like that?

25   **A.**    It could be either.

1    **Q.**   It could be either.  And are you familiar with

2    contracts in both situations?

3    **A.**   Yes, sir.

4    **Q.**   Would the contracts that you were familiar with

5    impose any obligations on Mayfair?

6    **A.**   There were often delivery clauses where we had to

7    produce and market the product within a certain given

8    window or there were consequences.

9    **Q.**   And it's a contract, right, so both parties have

10   obligations; right?

11   **A.**   Yes, sir, they do.

12   **Q.**   Are you aware of any instances where Mayfair, in

13   your experience, was unable to fulfill its obligations

14   for one reason or another under the contract?

15   **A.**   Regrettably, there were several.

16   **Q.**   Were those important or less important?  I guess

17   I'm trying to get a sense of were they fundamental to

18   the contract or were they something that you would call

19   more administerial?

20   **A.**   They were all cases where for one reason or

21   another we couldn't deliver the product on time.  It

22   was within any kind of reasonable extension of the time

23   frame, and so we had to return the design to the

24   designer.

25   **Q.**   Would you call that an important component to the

1   contract if you were not able to deliver based on a

2   certain time frame?

3   **A.**   Yes, sir.

4   **Q.**   In those instances that Mayfair wasn't able to

5   fulfill its obligations under the contract, what would

6   typically happen?

7   **A.**   We would --

8        MR. KRUMHOLZ:  I'm sorry, your Honor.  There's a

9   relevancy objection, but also this is way outside the

10  scope of his reports, as I recall.  I don't remember

11  this being disclosed at all.

12       THE COURT:  I'm not sure what you're getting

13  into here, so I'm not sure what to do with this

14  objection.  What are you doing here?

15       MR. POLLARO:  I can assure you it's in our

16  reports and will probably come clear in another couple

17  of questions.

18       THE COURT:  Then go ahead and let's see.

19       MR. POLLARO:  As a matter of fact it might be

20  this question.

21  **Q.**   So in those instances that we were talking about

22  where there was an important -- I don't know, for lack

23  of a better term -- a term that Mayfair couldn't comply

24  with, I think we were using the timeliness as an

25  example.  So in those instances where in your

1    experience Mayfair couldn't fulfill its obligations

2    under the contract, what would typically happen?

3    **A.**   We would return the rights to the design to the

4    designer and often the prototype, not always, and we

5    were no longer going to publish the product.

6    **Q.**   Could that designer take that design anywhere it

7    wanted?

8    **A.**   Yes, sir.

9    **Q.**   Is that common in the industry?

10   **A.**   It's common and normal.

11   **Q.**   Is that something that you dealt with or seen in

12   your experience in the industry?

13   **A.**   Yes, sir.

14   **Q.**   Is that something that you have discussed and

15   talked about with people in the industry?

16   **A.**   Certainly.

17   **Q.**   Is there anything unusual about that concept?

18   **A.**   Not to my knowledge.  I believe it's normal.

19   **Q.**   In your experience is it industry practice for

20   when the game went back to the designer -- let me ask a

21   better question.

22        Is it identified in the contract typically, in

23   your experience, where the game is being reverted to?

24        MR. KRUMHOLZ:  Your Honor, I object on two

25   grounds.  One is I still don't see the relevance of any

1    of this; two, we're also talking present, not 1959.

2         THE COURT:  Right.  And Mr. Pollaro is trying to

3    make a connection between the present and past, but I'm

4    going to give him some latitude here, so overruled.

5         Go ahead.

6         MR. POLLARO:  Thank you, your Honor.  And just

7    so we're clear, we don't believe -- you know, contracts

8    are contracts.  We don't believe there's any time

9    component, they were interpreted one way in 1959 and

10   one way in 1999, so.

11        THE COURT:  Go ahead with the question.

12        MR. POLLARO:  Thank you, your Honor.

13   **Q.**   Based on your experience, does this reversion of

14   rights that we've been talking about, this concept of

15   reverting the game back to the designer, so in the

16   provision you view does it generally indicate who the

17   creator of the work is?

18   **A.**   In the contracts that we signed?

19   **Q.**   Yes.

20   **A.**   Yes, sir, it did.

21   **Q.**   Have you reviewed and understood contracts that

22   include the concept we've been discussing?

23   **A.**   Yes, sir.

24   **Q.**   You have done that personally?

25   **A.**   Yes, sir.

1    **Q.**   Have you discussed those concepts with individuals

2    in the industry?

3    **A.**   Yes, sir, I have.

4    **Q.**   Based on your experience, would you recognize

5    language in a contract like we've been discussing?

6    **A.**   I believe I would.

7    **Q.**   Have you reviewed the assignment agreement in this

8    case?

9    **A.**   Yes, sir, I have.

10   **Q.**   If you could turn to Tab 11 in the binder in front

11   of you.

12        THE COURT:   Could you tell me what exhibit?

13   This is an already admitted exhibit, right, so just

14   remind me what number it is in this binder I have.

15        MR. POLLARO:   It is GTX2 (sic).

16        THE COURT:   2.   Thank you.

17   **Q.**   Mr. Carty, let me ask one question before I get to

18   the document we're talking about.   Do you recall

19   reviewing any contracts from the 1959 time frame?

20   **A.**   Only regarding this case.

21   **Q.**   Okay.   So are you with me on Tab 11?

22   **A.**   Yes, sir.

23   **Q.**   Do you recognize that document?

24   **A.**   Yes, sir.

25   **Q.**   Does that look like the assignment agreement that

1    you reviewed in this case?

2    **A.**    Yes, sir, it does.

3    **Q.**    Can you identify for the Court the portion of the

4    assignment agreement that you believe that retains

5    express reservation rights to Bill Markham?

6          MR. KRUMHOLZ:  Your Honor, objection to the

7    extent they're offering the witness to interpret the

8    contract.

9          THE COURT:  Right.  I'm not sure what you're

10   doing here, but the contract speaks for itself.  It's

11   the assignment agreement.

12         What is it you're -- I'm not sure what it is

13   you're trying to get at with the witness as to this

14   contract.

15         MR. POLLARO:  This witness has experience with

16   contracts in this industry, the custom and practice,

17   and I'm just having him apply that industry knowledge

18   to the facts.

19         THE COURT:  For what purpose?  I don't

20   understand.  The contract is the contract.  I will

21   interpret the contract based on facts that we get into

22   evidence here.  But you're asking him to interpret for

23   me what the contract says?

24         MR. POLLARO:  I'm asking as someone who is in

25   the industry customarily would understand what the

1    terms that he deals with every day is.  And honestly

2    Mr. Orbanes doesn't talk about it at all, so, quite

3    frankly, Mr. Carty is the only that's one able to look

4    at it because he deals with it every day and

5    understands what this means.

6         MR. KRUMHOLZ:  There's a reason, your Honor,

7    that Mr. Orbanes is not talking about it.  It's not

8    appropriate.

9         THE COURT:  What I'm hearing you say is that

10    you're going to be asking the witness to give his

11    opinion as to what the contract means.  Is that what

12    you're --

13         MR. POLLARO:  I was trying to do it from the

14    other way, but I appreciate --

15         THE COURT:  What do you mean the other way?

16         MR. POLLARO:  Based on his experience, and

17    basically not as a lawyer, not interpreting the

18    contract, but just looking at a contract and saying

19    this is what I dealt with every day.

20         THE COURT:  What value does that have to what I

21    have to decide?  I'm not sure I understand.

22         MR. POLLARO:  How the industry -- what is

23    customary practice in the industry that Mr. Carty can

24    talk about.

25         THE COURT:  Well, he's testified that it's

1    common in the industry that the designer would retain

2    rights, and it may be that this contract is consistent

3    with that.  Is that what you're trying to show?

4         MR. POLLARO:  That is what I'm trying to show,

5    your Honor.

6         THE COURT:  All right.  So, well, I'll let you

7    ask him to point to the portion of this contract that

8    he believes does that if that -- I'll let you ask him

9    that.

10        MR. POLLARO:  Thank you, your Honor.

11   **Q.**   Mr. Carty, can you point to the portion of this

12   contract that you believe is consistent with your prior

13   testimony that reservation of rights is customary in

14   the game industry.

15   **A.**   I believe it's page 4, Section 4, about six lines

16   down.

17   **Q.**   Can you read that into the record.

18   **A.**   (Reading)  Markham will assign any such copyright,

19   trademark, patent, or application therefor to Link,

20   provided that said assignments will revert to Markham

21   on the termination of this agreement.

22   **Q.**   Thank you, Mr. Carty.  Now, is the language you

23   just read standard customary practice in the industry,

24   as far as you know, based on your experience?

25   **A.**   As far as I know.

1    **Q.** Thank you. In your experience is it common for a
2    designer of a game to be credited as the designer on
3    the box?

4    **A.** It is a common and normal practice.

5    **Q.** Did Mayfair have a policy regarding placement of a
6    designer's name on the box?

7    MR. KRUMHOLZ: I'm sorry, I didn't hear his last
8    answer, whether it was or was not.

9    THE COURT: He stated that it was a common and
10    normal practice.

11    MR. KRUMHOLZ: Thank you. I apologize.

12    **Q.** Did Mayfair have a policy regarding placement of a
13    designer's name on the box?

14    **A.** Yes, sir, we did.

15    **Q.** What was that policy?

16    **A.** Generally -- well, it went on the box; sometimes
17    on the back, most of the time on the front, depending
18    on the cover art and other elements therefor.

19    **Q.** Can you tell us a little bit about your
20    understanding of what the policy is in the industry.
21    For example, does -- are you aware that the industry
22    had a particular policy about placement of the
23    designer's name on the box?

24    **A.** I know that prior to the late 80s it was not
25    common for designers' names to be placed on product

1    covers.

2    **Q.**   So from the late 80s it went from being uncommon

3    to being more common?  Is that what your testimony is?

4    **A.**   Yes, sir.  That's my experience.

5    **Q.**   Okay.  Are there any companies in particular that

6    you're aware of that had policies that changed?

7    **A.**   Well, Avalon Hill, Victory Games, they originally

8    did not ever include the designer's name on the box,

9    but as time passed they began to include it.  I'm sure

10   there are other examples, but that's all I remember

11   offhand.

12   **Q.**   Is the person credited on the box as the designer

13   typically the person who created the game?

14   **A.**   Yes, sir, they are.

15   **Q.**   In your experience would the prototype received

16   from the designer that you reviewed ever be identical

17   to the final product that you published?

18   **A.**   No, sir, it would not.

19   **Q.**   What types of changes are typically made?

20   **A.**   The changes were all directly related to

21   manufacturing and cost of goods, and it was always

22   about reduction simplification to make the game easier

23   to manufacture, reduce breakage, and increase

24   profitability.

25   **Q.**   And why is that done?

1  **A.**    In the end?  So you can be solvent and make money.

2  **Q.**    Would you, as someone who was involved in that

3  process at Mayfair Games, consider that process

4  creative?

5  **A.**    No, sir.  I would consider it normal.  It's

6  routine.  It's reduction of elements.  I don't

7  generally consider it creative.  We did it every day.

8  **Q.**    To make more money; right?  Is that what you said?

9  **A.**    Yes.

10  **Q.**    When you were at Mayfair would you consider

11  yourself the creator of a game when you were

12  responsible for simplifications like this?

13  **A.**    No, sir.

14  **Q.**    Did you, in your experience, have occasion to make

15  simplifications between a prototype and a published

16  version of the game?

17  **A.**    It happened every time.

18  **Q.**    And --

19  **A.**    With almost every prototype we ever received we

20  had to make simplifications and changes to be able to

21  manufacture the game to begin with.

22  **Q.**    And your testimony is that you personally had

23  experience doing that?

24  **A.**    Yes, sir, I did.

25  **Q.**    And that's, as I understand your testimony,

1    customary in the industry?

2    **A.**   Yes.

3         MR. KRUMHOLZ:  Sorry, your Honor.  Again, this

4    is my renewed objection.  The custom in the industry

5    today, there's no temporal time frame here.

6         THE COURT:  Right, I understand your objection.

7    I'm going to let you handle that aspect of it on

8    cross-examination.

9    **Q.**   Did you review the 1960 version of The Game of

10   Life?

11   **A.**   Yes, sir, I did.

12   **Q.**   Did your review include reviewing the rules, the

13   game board, and the box?

14   **A.**   Yes, sir.

15   **Q.**   Did you compare the 1960 version of The Game of

16   Life to the prototype?

17   **A.**   Yes, sir.

18        MR. POLLARO:  May I approach, your Honor.  I

19   have another demonstrative.

20        THE COURT:  Yes.

21        (Pause)

22        MR. POLLARO:  May I approach, your Honor.

23        THE COURT:  Yes.

24   **Q.**   Can you see?

25   **A.**   Yes, sir.

1    **Q.**   I believe I asked you if you compared the

2    prototype versus the 1960 version of the game, and you

3    said yes.  Is that correct?

4    **A.**   Yes, sir.

5    **Q.**   Do you recognize the image on your right, which

6    I'll represent to everyone is a blowup of an exhibit in

7    Mr. Orbanes' expert report of the 1960 copyright

8    game -- let me back up.  It's a Game of Life bearing a

9    1960 copyright date that was put in Mr. Orbanes'

10   report.

11          Now my question to you, Mr. Carty, is do you

12   find any similarities between the two?

13   **A.**   There are certainly similarities, and there are

14   differences.

15   **Q.**   Okay.  So let's talk about the differences.  What

16   differences do you see?

17          MR. KRUMHOLZ:  Your Honor, I have mixed feelings

18   with my objection.  There clearly are differences, but

19   he's not disclosed anything in the report about

20   differences.  That's one of the fundamental problems

21   with his analysis.  And I have to object and I'm trying

22   to correct that now because I don't think he can talk

23   about the differences because he never did, and I don't

24   know what he's going to say.

25          THE COURT:  All right.  Mr. Pollaro, was this

1    disclosed, this testimony?

2         MR. POLLARO:  He absolutely looked at the two.

3    He certainly compared the two games.  I can find out

4    where exactly that is in the report.

5         THE COURT:  Well, Mr. Krumholz, I'm looking at

6    page 32 of his report and it looks like in paragraphs

7    81 and 82 and 83 there is some significant discussion

8    about comparing the 1960 game and the prototype.

9         MR. KRUMHOLZ:  I don't dispute that.  What he

10   has done is he has identified some similarities and

11   without identifying differences, and then he wants to

12   opine that it's not a derivative work by only focusing

13   on similarities, and that's a fundamental

14   methodological flaw.  You can't determine whether

15   something is a derivative work without seeing whether

16   there's any original content that was added.  And he

17   doesn't disclose anywhere in the reports what the

18   differences are and therefore whether they're

19   significant or not.  In contrast to what Mr. Orbanes

20   did, where he identified similarities and then

21   identified differences and explains the significance of

22   that.

23        So he's now going to try to correct that by

24   getting up and saying here's a difference but it

25   doesn't matter, here's a difference but it doesn't

1   matter.  There's been no disclosure of that, and I

2   would be hearing him for the first time today.

3          And I can point you to places where I

4   specifically asked him whether he needed to look,

5   whether he felt he needed to look at differences, and

6   the answer was no, he didn't look at differences.

7          I think in his rebuttal report, paragraph 42, if

8   my outline works like it should, yes, paragraph 42, he

9   says Mr. Orbanes' analysis regarding the differences

10  between The Game of Life prototype --

11          THE COURT:  Slow down.

12          MR. KRUMHOLTZ:  Sorry.

13          THE COURT:  I can read it.

14          MR. KRUMHOLZ:  All right.

15          (Pause)

16          MR. KRUMHOLZ:  And I can also point you to two

17  places in his deposition I specifically asked him

18  whether he looked at differences, and he said he did

19  not.

20          THE COURT:  Well, hang on a minute.  I'm looking

21  at the witness's report, paragraph 82 and the beginning

22  of 83, and putting aside -- and taking the first

23  sentence of 82, "I've reviewed multiple versions of the

24  1960 Game of Life and cannot detect any nontrivial

25  differences between the versions."

1          MR. KRUMHOLZ:  That's the extent of his opinion.

2          THE COURT:  Well, so he's disclosed at least

3     that opinion.

4          MR. KRUMHOLZ:  And if he -- well, I would object

5     because of *ipse dixit*, but that as an aside, yes, I

6     mean that was disclosed.  But I understand the question

7     to be to start identifying what the differences are,

8     which there are many, I assume for the purposes of him

9     elaborating on whether he thinks those differences are

10    significant or not.  That's what Mr. Orbanes is going

11    to be talking about and that's what we fully disclosed,

12    and they had the opportunity to question him at

13    deposition on that at length.  I've had no such

14    opportunity.

15         THE COURT:  Well, I'm not sure why you say you

16    haven't had the opportunity.  He expressed these

17    opinions in paragraph 82 and paragraph 83, and you had

18    the opportunity to question him about the basis of

19    those opinions; right?

20         MR. KRUMHOLZ:  I did at deposition, and I'll

21    pull it out and give you the transcript.  I asked him

22    whether he looked at differences, and he said he did

23    not, so there was nothing left to ask.

24         THE COURT:  Well, I think you can deal with that

25    when you cross-examine him.

1          MR. KRUMHOLZ:  Respectfully, your Honor, that I

2   can't deal with on cross-examination because that's a

3   disclosure issue.  Now I'm going to hear for the first

4   time what these supposed differences are and why they

5   do or don't matter, and I will not have had the

6   opportunity to ask him about that because that was

7   never disclosed.  That is not about me, you know,

8   whether he's qualified to talk about it or the like;

9   it's whether I've been ambushed on this.

10          THE COURT:  All right.  I appreciate your

11  concern.  What I'm going to do is take this testimony

12  and then we'll see where we are.  I do understand what

13  you're getting at, but let me hear what the testimony

14  is first.

15          MR. KRUMHOLZ:  Okay.

16          THE COURT:  Okay.  Mr. Pollaro, you can ask your

17  questions.

18          MR. POLLARO:  Thank you, your Honor.

19  **Q.**   Mr. Carty, to back up to level set us.  So I

20  believe your testimony was that you did compare the

21  prototype, that's there on your left, versus the 1960

22  version of the game, of which the image on your right

23  is one.

24  **A.**   Yes, sir.

25  **Q.**   And did you find similarities?

1    **A.**    Yes, sir.

2    **Q.**    Did you detect any differences?

3    **A.**    Yes, sir.

4    **Q.**    Can you identify the differences that you

5    identified in your report as nontrivial.

6    **A.**    Well, they changed some of the hills or the hills.

7    They removed the oil derrick.  There were other changes

8    made which appear to have been made for manufacturing

9    purposes and to reduce costs and remove breakable

10   things off the board.  They kept the spinner and the

11   track.  There may have been rearrangement of the track

12   for any number of reasons.  But most of these would be

13   in the distillation process, making a prototype and

14   making it produceable in an economical manner.

15   **Q.**    Are these nontrivial differences that you just

16   identified consistent with your experience that

17   simplifications are made to prototypes following

18   product submissions before publication?

19   **A.**    Yes, sir, they are.

20   **Q.**    Are the changes that you identified between the

21   1960 edition on your right and the prototype on your

22   left in line with your experience that companies make

23   changes for monetary reasons?

24   **A.**    Yes, sir.

25   **Q.**    Did you personally make changes to prototypes for

1    monetary reasons before publication while you were at

2    Mayfair Games?

3    **A.**   Yes, sir.

4    **Q.**   Do you believe that to be standard and customary

5    practice in the industry?

6    **A.**   I do.

7    **Q.**   Do you have any reason to believe that it would

8    not have always been customary and standard practice in

9    the industry?

10   **A.**   I have no reason to believe that.

11   **Q.**   The mentors that you relied on in the game

12   industry, were they in the game industry to make money?

13   **A.**   Yes, sir.

14   **Q.**   Were the manufacturers that you discussed or

15   talked to during the course of your career, were they

16   in the industry to make money?

17   **A.**   Absolutely.

18   **Q.**   How many editions of The Game of Life have you

19   reviewed?

20   **A.**   I don't know the exact count, but through

21   pictures, hundreds, more than a hundred.  I don't

22   really -- there are a lot.

23   **Q.**   Have you reviewed the current version of The Game

24   of Life?

25   **A.**   Yes, sir, I have.

1    **Q.**   Have you reviewed the rules of the current version

2    of The Game of Life?

3    **A.**   Yes, sir.

4    **Q.**   How about the cover.  Have you reviewed the cover

5    for the current Game of Life?

6    **A.**   I have seen it.

7        MR. POLLARO:  May I approach, your Honor.

8        THE COURT:  Yes.

9        (Pause)

10   **Q.**   Do you see that, Mr. Carty?

11   **A.**   Yes, sir, I can.

12   **Q.**   Can you tell me what that is.

13   **A.**   That would be the game board or the current or

14   what I think is the current edition for The Game of

15   Life.

16   **Q.**   And did you review the current version of The Game

17   of Life, which is on the right there, as part of this

18   case?

19   **A.**   Yes, sir.

20   **Q.**   So I want to ask you to assume for a second for

21   this question that the prototype on your left is on the

22   market and being sold and it was the only edition of

23   The Game of Life on the market.  Are you with me?

24   **A.**   I'm with you.

25   **Q.**   So based on your experience reviewing product

1    submissions, if someone presented you with the current

2    version of The Game of Life which is on the right,

3    would you accept or reject that product?

4         MR. KRUMHOLZ:  Objection on relevancy grounds,

5    and also this is outside the disclosure of the reports.

6         THE COURT:  So what's the relevance of this?

7    Whether he would accept or reject this as a concept or

8    as a game now?  What does that have to do with this?

9         MR. POLLARO:  Because that analysis incorporates

10   the similarities, differences, the overall look and

11   feel and so -- -

12        THE COURT:  How?  I'm not sure I understand.  I

13   don't understand what you're saying.

14        MR. POLLARO:  What I'm saying is in Mr. Carty's

15   experience reviewing game submissions, he would look at

16   all those factors as he's accepting or rejecting a

17   product.

18        THE COURT:  I guess what I'm saying, what I

19   don't understand is how does the fact that he would

20   accept or reject a proposal, for whatever reason, how

21   does that relate to the question of derivative works

22   here?

23        MR. POLLARO:  Basically whether it's the same

24   game or not.  We have differences of opinion about

25   whether things are derivative or the same game or not,

1   and so derivative is one-half of the question.

2          THE COURT:  But you're not connecting the fact

3   that he might decide to accept it or reject it to even

4   that question.  I'm not sure that's the right question,

5   but even if it is, what does his decision about whether

6   to accept something or not have to do with that?  I

7   don't get it.

8          MR. POLLARO:  It may be ships passing in the

9   night, but I believe he testified earlier that he looks

10  at all those factors that go in to determining whether

11  or not it's a derivative work or an independent work.

12  He effectively was doing that in product submissions,

13  in charge of product submissions at Mayfair Games, and

14  so I'm trying to elicit --

15         THE COURT:  So maybe I get it now.  So you're

16  saying this is -- you're asking him kind of the

17  equivalent of that Monopoly example that he gave

18  before?  Is that what you're getting at?

19         MR. POLLARO:  Yes, your Honor, exactly what I'm

20  getting at, your Honor.  And so again, based on his

21  industry experience and custom and practice --

22         THE COURT:  I'm not going to let you get it that

23  way.  You can try to get at it in a more precise way

24  than that.

25  **Q.**   Looking at the current version of The Game of Life

1   on the right, do you see similarities between that and

2   the prototype?

3   **A.**   Yes, sir, I do.

4   **Q.**   Do you have any understanding under which product

5   code the current Game of Life is sold?

6           MR. KRUMHOLZ:  Objection.  Relevance.

7           THE COURT:  Product code?

8           MR. POLLARO:  SKU.

9           THE COURT:  What does that have to do with

10  anything?

11          MR. POLLARO:  The current version of The Game of

12  Life is sold under the same SKU as the 1960 version.

13          THE COURT:  Okay.  Well, I'm going to sustain

14  the objection.  I don't think that's relevant.

15  **Q.**   Mr. Carty, looking at the current Game of Life on

16  the right, I believe you said you see similarities.

17  **A.**   Yes, sir.

18  **Q.**   Can you tell me or tell the Court what those

19  similarities are.

20  **A.**   Well, the spinner is the big similarity, the book

21  folding board.  A lot of glare --

22          MR. KRUMHOLZ:  I didn't hear the words.

23          THE WITNESS:  I said there's a lot of glare.

24  Sorry.

25  **A.**   I've derailed my train of thought.

1          The overall goals and feel of the game is very

2     similar to the 1960s Game of Life.  I've read through

3     the rules.  I find them very similar.  And it as the

4     spinner.

5     **Q.**   Yes, I understand, it has the spinner.  I see

6     that.

7          And did you, did I hear you correctly that you

8     said you reviewed the rules of both versions?

9     **A.**   Yes, sir.

10    **Q.**   And what was your conclusion?

11    **A.**   The play style is basically the same.  I mean

12    there are differences in the tracks, but there's a

13    track on both boards, but there are differences.  There

14    are evolutionary changes that have occurred.  There's

15    still play money in both games.  The overall goal is

16    to, well, make a lot of money in this game.

17    **Q.**   Are you aware of the precise number of versions of

18    The Game of Life between the 1960 edition and the

19    current Game of Life?

20    **A.**   No, sir, I am not.

21    **Q.**   Do you know if anybody knows the number of

22    versions between the 1960 edition of The Game of Life

23    and the current?

24          MR. KRUMHOLZ:  Objection.  Foundation.

25          THE COURT:  Well, he was asking if he knows.  He

1    can answer that yes or no.

2         MR. KRUMHOLZ:  Yes, he did, and he asked whether

3    he knows and anybody else.

4         THE COURT:  Right.  But he can answer that

5    question.  It's overruled.  He can answer that

6    question, if he knows.

7         Do you know of anyone who knows the number?

8         THE WITNESS:  No, sir, I do not.

9         THE COURT:  Okay.

10   **Q.**   Thank you, Mr. Carty.  I'm going to switch gears a

11   little bit.  In your experience is an individual's

12   reputation important in the game industry?

13   **A.**   Reputation is critical.

14   **Q.**   In your experience do individuals attempt to

15   associate themselves with successful games with which

16   they've been involved --

17        MR. KRUMHOLZ:  I hate to keep interrupting, your

18   Honor, but relevancy, and there wasn't disclosure on

19   this at all.

20        THE COURT:  All right.  What do you say to that?

21        MR. POLLARO:  I will have to find that, your

22   Honor.

23        (Pause)

24        MR. POLLARO:  I apologize, your Honor.  In

25   paragraph 69 of Mr. Carty's report, page 28.

1          (Pause)

2          THE COURT:  All right.  I think all of this

3      falls into the category of what I told you at the

4      beginning of the hearing today that I was not going to

5      allow in terms of expert opinion, so I'm going to

6      sustain the objection.

7          MR. POLLARO:  I appreciate that, your Honor.  My

8      intention was just to have him, as someone in the

9      industry, to understand how important reputation was

10     and what a letter to the industry, someone like him,

11     would mean so I was trying to connect it directly to

12     his experience.

13         THE COURT:  I understand, but the ultimate

14     purpose of it is to obtain an opinion with respect to

15     and a comment upon the credibility of other testimony

16     in the case, so I'm not going to allow that.

17         MR. POLLARO:  Thank you, your Honor.

18     I have no further questions.

19         THE COURT:  Thank you.

20         MR. KRUMHOLZ:  It's 11:50.  Do you want us to

21     start or take a lunch break?  It takes a few minutes to

22     set up.

23         THE COURT:  Let's go off the record for a

24     moment.

25         (Discussion off the record)

1          THE COURT:  Mr. Carty, the rule is that you

2     can't have any conversations with attorneys about your

3     testimony while you are on the stand, so that doesn't

4     prohibit you from being together during the lunch hour,

5     but it does prohibit you and them from having any

6     conversation about your testimony.  Do you understand

7     that?

8          THE WITNESS:  Yes, your Honor.

9          THE COURT:  We'll be in recess.  See you at

10    1:15.

11          (Recess)

12          THE COURT:  Ready for cross-examination.  Let's

13    get the witness back on the stand.

14          Mr. Carty, --

15          MR. KRUMHOLZ:  Yes, your Honor.

16          THE COURT:  -- welcome back, sir.

17          You may inquire, Mr. Krumholz.

18          MR. KRUMHOLZ:  Thank you, your Honor.

19          <u>CROSS-EXAMINATION BY MR. KRUMHOLZ</u>:

20    **Q.**   Good afternoon, Mr. Carty.  As we established this

21    morning, you were not in the game industry in 1959;

22    correct.

23    **A.**   That's true.

24    **Q.**   Nor were you in the 1960s or 1970s, or about half

25    of the 1980s; correct?

1    **A.**    That is correct.

2    **Q.**    To the extent you know anything about what may

3    have happened or what custom and practice might have

4    been in the late 1950s, it's because of things that

5    people may have told you over the years.

6    **A.**    Yes, sir.

7    **Q.**    And even in that instance, you're not terribly

8    sure what time frame they might have been talking about

9    when they were sharing whatever information they

10   shared.  Is that fair?

11   **A.**    Yes, sir.

12   **Q.**    Okay.  But you did give some testimony about your

13   experience doing development work; correct?

14   **A.**    Yes, sir.

15   **Q.**    And that is -- and development work is the work

16   for taking a prototype and getting it to a commercial

17   product.  Fair?

18   **A.**    Yes, sir.

19   **Q.**    And that's something that's done by the game

20   manufacturer?

21   **A.**    Game publisher, manufacturer, yes, sir.

22   **Q.**    And by "publisher, manufacturer," we're talking

23   about the same thing, essentially.

24   **A.**    Yes.

25   **Q.**    A company like Hasbro.

1    **A.**    Yes, sir.

2    **Q.**    Or Mayfair.

3    **A.**    Yes.

4    **Q.**    And you were deeply involved in that for a number

5    of years; correct?

6    **A.**    Yes, sir.

7    **Q.**    And at Mayfair you had anywhere from 12 to 20

8    people at various times doing that kind of development

9    work; is that right?

10   **A.**    It's pretty close.

11   **Q.**    And it could take I think you said anywhere from

12   three months to several years to get a product from

13   prototype to commercial product on a marketplace.

14   **A.**    Yes, sir.

15   **Q.**    And to do that, obviously the people in the

16   company were using the experience that they had

17   accumulated over the years to get that prototype to a

18   successful, hopefully successful commercial product;

19   correct?

20   **A.**    Yes, sir.

21   **Q.**    And that was important work.  Yes?

22   **A.**    Yes, sir.

23   **Q.**    And you predicated much of your career on that

24   important work of getting from prototype to commercial

25   product; correct?

1    **A.**   Yes, sir.

2    **Q.**   And as I think, you testified this morning, there

3    are always going to be changes from the prototype to

4    what becomes the final commercial product; correct?

5    **A.**   Yes, sir.

6    **Q.**   And what you testified this morning was that all

7    those changes in your experience are related to

8    manufacturing and cost-type decisions.  Do you remember

9    that?

10   **A.**   Yes, sir.

11   **Q.**   The implication being that if there are changes

12   made they're not aesthetic reasons; they are for these

13   other reasons.

14   **A.**   In my experience, yes, sir.

15   **Q.**   And you're standing by that testimony?

16   **A.**   Yes.

17   **Q.**   You have in front of you --

18        MR. KRUMHOLZ:  And your Honor, you also have in

19   front of you Mr. Carty's deposition.

20   **Q.**   Do you see that in front of you?

21   **A.**   I do.

22   **Q.**   And you see that I took that deposition on

23   January 24th, about a month-and-a-half ago.

24   **A.**   Yes, sir.

25   **Q.**   And I asked you questions and you answered them.

1    **A.**   Yes, sir.

2    **Q.**   And you understood that you were under oath then

3    as you are under oath now.

4    **A.**   Yes, sir.

5    **Q.**   Can you go to page 107.  And I'm going to start at

6    line 8 and read through the remainder of the page:

7    (Reading)

8          "Question:  People within the company, you know,

9    using their game industry experience to, you know" --

10          MR. KRUMHOLZ:  That's really embarrassing, as an

11    aside.

12          "-- improve the prototype to make it more

13    commercially viable?

14          "Answer:  I believe I state that in number 6."

15          And there you're referring to your report;

16    correct?  Are you with me?

17    **A.**   I'm having trouble with the document.

18    **Q.**   I'm sorry about that.  So you see that there are

19    four pages per page?

20    **A.**   Yes.

21    **Q.**   Maybe not.  So it's the one that's page 107.

22    **A.**   Yes, sir.

23    **Q.**   Now, I have to read my "you knows" all over again.

24          So starting at line 8:

25          "Question:  People within the company, you know,

1    use their game industry experience to, you know,

2    improve the prototype to make it more commercially

3    viable?

4           "Answer:  I believe I state that in number 6."

5           And there you're referring to your report;

6    correct?

7    A.    Yes, sir.

8    Q.    "Question:  So I am correct?

9           "Answer:  As I stated in number 6.

10          "Question:  So the answer is yes, I'm correct?

11          "Answer:  Yes."

12          And then I go on to ask the following question:

13   "And there will be some, and there would be aesthetic

14   changes and from the prototype to the commercial

15   version; correct?

16          "Answer:  Almost all changes made are aesthetic

17   changes."

18          Did I read that correctly?

19   A.    Yes, sir.

20   Q.    So today under oath you tell the Court that all

21   changes are for cost and manufacturing reasons, but

22   just a month-and-a-half ago you said the exact

23   opposite, didn't you?  You said almost all changes are

24   for aesthetic reasons; did you not?

25   A.    I did.

1  **Q.**   Because aesthetics matter; correct?  The

2  aesthetics matter for a game?

3  **A.**   Yes, sir.

4  **Q.**   Because improving the aesthetics improves the

5  chances of the game becoming commercially successful.

6  Is that fair?

7  **A.**   Yes, sir.

8  **Q.**   And your job as a developer is to make the game as

9  likely to be as commercially successful as possible?

10  **A.**   Yes, sir.

11  **Q.**   And in fact, you personally, even as you've told

12  this Court that all changes are for cost reasons, you

13  personally have recommended aesthetic changes to

14  increase the game's chance of success from prototype to

15  commercial version; have you not?

16  **A.**   I have recommended changes.

17  **Q.**   Aesthetic changes?

18  **A.**   Aesthetics are a matter of taste.

19  **Q.**   Indeed.  But you have recommended aesthetic

20  changes from prototype to commercial version to improve

21  the chance of success of that product; is that fair?

22  **A.**   Yes, within the confines of the economics we were

23  dealing with.

24  **Q.**   Right.  There are always constraints on what you

25  can do based on cost, size of the board, all kinds of

1    other factors, but as you said in your deposition

2    almost all changes made from a prototype to a

3    commercial version are aesthetic changes; correct?

4    **A.**    It is what I said.

5    **Q.**    And The Game of Life is no exception; is it?

6    **A.**    I would expect not.

7    **Q.**    There are definite aesthetic changes between the

8    prototype and the early commercial versions that we

9    looked at, or at least one of which we looked at this

10   morning; right?

11   **A.**    Yes.

12   **Q.**    And in your view, it's correct that Milton

13   Bradley's development team used their own judgment to

14   make changes to the prototype that made the game more

15   commercially viable, that made the game more

16   aesthetically pleasing while still commercially viable;

17   isn't that correct?

18   **A.**    I believe so.

19   **Q.**    So let's touch on a few of these.

20           MR. KRUMHOLZ:  Your Honor, can I approach.

21           THE COURT:  Yes.

22           MR. KRUMHOLZ:  Your Honor, I also will be with

23   this witness and Mr. Orbanes using demonstratives.

24           THE COURT:  It would be good to give me a copy

25   and we can -- pass it up, two if you have them.

1          THE WITNESS:  Thank you.

2    **Q.**   What we have up on the board can be found at

3    page 7 of the demonstratives.  It's pages from two

4    exhibits that have been entered, JTX509 and HTX14.

5          Do you recognize the black-and-whites as photos

6    from the prototype and the color one in the right-hand

7    corner image from a version, commercial version with a

8    1960 copyright?

9    **A.**   Yes, sir.

10   **Q.**   And I'm just going to highlight a few of these

11   aesthetic changes, but the mountains, there are

12   mountains in the prototype; correct?

13   **A.**   Yes, sir.

14   **Q.**   And the mountains are handled differently in the

15   early commercial version; are they not?

16   **A.**   Yes, sir.

17   **Q.**   Rather than being free-standing, Milton Bradley

18   decided to change that look to put them, integrate them

19   into the path; correct?

20   **A.**   Yes, sir.

21   **Q.**   And that's the kind of decision that developers

22   make when trying to decide whether and how a commercial

23   product should look.  Agreed?

24   **A.**   Yes.

25   **Q.**   Okay.  And in the early commercial version, that

1  1960 copyright, you see that white bridge?

2  **A.**   Yes.

3  **Q.**   And do you see the blue underneath it?  If you

4  look on --

5  **A.**   Yes.

6  **Q.**   Do you see it?

7  **A.**   Yes.

8  **Q.**   Okay.  And so we're clear, there's a white raised

9  bridge not too far from the spinner.  Do you see that?

10  Right?  And then it's got that blue under it, which is

11  representing a river; correct?

12  **A.**   Yes, sir.

13  **Q.**   That's an aesthetic choice; is it not?

14  **A.**   Yes, sir.

15  **Q.**   Which we don't see in the prototype; correct?

16  **A.**   Correct.

17  **Q.**   And in fact, you believe that it was an aesthetic

18  improvement to replace some of the buildings in the

19  prototype with that river and bridge in the commercial

20  version; correct?

21  **A.**   Probably.

22  **Q.**   Now --

23  **A.**   I wasn't there.

24  **Q.**   You are of the view that it is an aesthetic

25  improvement to replace some of the buildings in the

1    prototype with that river and bridge; are you not?

2    **A.**   It's a change the Milton Bradley staff decided to

3    make.  Does it look better?  If you like bridges.

4           MR. KRUMHOLZ:  I seemed to have lost my

5    deposition transcript.

6           (Discussion off the record)

7    **Q.**   So you were of the view, though, that Milton

8    Bradley had decided that it would be more aesthetically

9    pleasing to have that bridge and river; did you not?

10   **A.**   I don't remember what I said in the deposition.  I

11   know that we went round and round about the aesthetics

12   and the word "aesthetics" because, you know, as we went

13   back and forth on this, they appeared to keep the same

14   volume of mountains but in trying to keep the 3-D feel

15   they removed things that would break, but it's their

16   decision to change that.  I can't say why.

17   **Q.**   Let's see what you did say.  Would you go to

18   page 246.  Are you there?

19   **A.**   I am.

20   **Q.**   On line 8:

21          "Question:  So instead of putting more

22   buildings, for instance, they decided it would be more

23   aesthetically pleasing to have the bridge and river?

24   That's a fair conclusion; is it not?

25          "Answer:  I expect so."

1          Right?

2    **A.**    Yes.

3    **Q.**    Because they want to keep 3-D images, but they

4    made different choices on what they thought was more

5    aesthetically pleasing; correct?  Yes or no.

6    **A.**    They made different choices for aesthetics and for

7    cost.

8    **Q.**    Right.  Okay.  So we're in agreement, they made

9    different aesthetic choices within the constraints that

10   they had for costs.  Agreed?

11   **A.**    Yes.

12   **Q.**    So in doing the analysis that you did, did you

13   understand that there's a difference between ideas and

14   expression?

15   **A.**    Yes.

16   **Q.**    And you understand that when you're doing this

17   analysis you're supposed to be looking at whether or

18   not there's been expressions of ideas that carry over

19   versus the ideas themselves; right?

20   **A.**    Yes.

21   **Q.**    So an idea would be, Hey, let's have 3-D

22   structures; correct?

23   **A.**    Yes.

24   **Q.**    But expression would be how you place them on the

25   board; correct?

1    **A.**    Can be.

2    **Q.**    So did you hear Ms. Ross talk earlier today about

3    how she thought that the structures in the prototype

4    were bigger than the structures in the commercial

5    version she looked at?

6    **A.**    I do.

7    **Q.**    That would be an example of expressing the 3-D

8    idea differently; correct?

9    **A.**    Yes.

10   **Q.**    And if you decide to put buildings in different

11   places or less of them or different colors, those are

12   all different expressions of the same 3-D idea;

13   correct?

14   **A.**    Yes.

15   **Q.**    Similarly with spinners, you talked about spinners

16   this morning.  Do you remember that?

17   **A.**    Yes.

18   **Q.**    You're not telling this Court that the mere idea

19   of using a spinner is something that's relevant to this

20   derivative analysis; are you?

21   **A.**    No.

22   **Q.**    So we have to look to see if the spinners are the

23   same or different, not for mere presence.

24   **A.**    Yes.

25   **Q.**    And did you do that?

1    **A.**   As much as I could with what's there.

2    **Q.**   Well, yeah, this is a hard analysis, right,

3    because you can't see the prototype very well.

4    **A.**   No.

5    **Q.**   You can't, for instance, see if the text on the

6    payouts are the same or different; correct?

7    **A.**   Correct.

8    **Q.**   And of course, that's a big issue with deciding

9    whether or not the works are the same or derivative or

10   independent of; right?

11   **A.**   Yes.

12   **Q.**   Okay.  But the spinner itself is different, is it

13   not?  I mean doesn't it even just functionally work

14   differently?

15   **A.**   I really can't say for sure because --

16   **Q.**   Well, can you not see that in the early commercial

17   version the whole thing spins, numbers included, but in

18   the prototype the only thing that appears to be

19   spinning excludes the numbers?

20   **A.**   I'm not positive on that.

21   **Q.**   Well, we're all working with what we got.  That's

22   what appears to be the case; right?

23   **A.**   No.  It could be either way.

24   **Q.**   So you can't tell us whether it's the same

25   expression or not because you can't see enough --

1    **A.**   I cannot tell if they are identical.

2    **Q.**   But you can't tell whether they're the, the

3    spinners are the same expression or not because you

4    can't tell well enough what the differences may be or

5    may not be; correct?

6    **A.**   Yes, sir.

7    **Q.**   And surely you're not telling us -- you talked

8    about collecting money or collecting resources this

9    morning as an overlapping concept; do you recall that?

10   **A.**   Yes.

11   **Q.**   Surely you're not telling us that the mere

12   decision to collect a resource is reflective of whether

13   a work is the same or derivative for copyright

14   purposes; right?

15   **A.**   I wouldn't be able to make that determination.

16   **Q.**   You understand that collecting resources is a

17   concept; it's an idea.

18   **A.**   Yes, sir.

19   **Q.**   Catan collects resources.

20   **A.**   Yes.

21   **Q.**   You're not saying that Catan collecting resources

22   is the same thing as the prototype where people were

23   collecting money; are you?

24   **A.**   No.

25   **Q.**   Even though it's a shared idea, it's expressed

1    differently; correct?

2    **A.**   Yes.

3         MR. KRUMHOLZ:  Your Honor, I'd like to admit

4    HTX19, which is a board game with a 2015 copyright.

5         THE COURT:  Is there any objection to -- this is

6    not yet a full exhibit or is it?

7         MR. KRUMHOLZ:  It is not an exhibit at all at

8    this moment.  It's not in the record.

9         THE COURT:  So is there any objection to it?

10        MR. POLLARO:  Not currently.  There was a

11   previous version, a similar version that we looked at

12   before so I don't know if it's the same, so I didn't

13   have an objection to that one.  So if that's the one,

14   I'm okay with it.  If it's a new one, I might have a

15   problem.

16        MR. KRUMHOLZ:  I have no reason to believe it's

17   any different.

18        MR. POLLARO:  Then I have no objection.

19        THE COURT:  Okay.  So --

20        Mr. POLLARO:  Actually, your Honor, could I take

21   a quick peek at it just to make sure.

22        THE COURT:  Sure.

23        MR. POLLARO:  No objection, your Honor.

24        MR. KRUMHOLZ:  So I'd actually like to admit two

25   exhibits, your Honor, HTX19, which is a version of The

1    Game of Life with a 2015 copyright, and HTX102, which

2    is a Despicable Me version of The Game of Life.

3          THE COURT:  Very well.  So HTX15 and 102 will be

4    full without objection.

5          MR. KRUMHOLZ:  HTX19.

6          THE COURT:  19.  I'm sorry.

7          (Defendant's Exhibit HTX19 was admitted in full)

8          (Defendant's Exhibit HTX102 was admitted in

9    full)

10         MR. KRUMHOLZ:  May I approach.

11         THE COURT:  Yes.

12   **Q.**   What I've just put up on the board can be found at

13   Slide 12 of the packet of demonstratives, and I will

14   represent that it is the board game from HTX19, which

15   is what we just entered, as well as the board game from

16   the prototype, which is JTX509.

17         You've looked at that board game before.

18   **A.**   Yes, sir, I have.

19   **Q.**   You've looked at that game board before; correct?

20   **A.**   Yes, sir.

21   **Q.**   And you would agree that the expressions, that the

22   looks and the imagery in the new game are different

23   than the looks and the imagery in the prototype;

24   correct?

25   **A.**   Yes, sir.

1          MR. KRUMHOLZ:  May I approach.

2          THE COURT:  Yes.

3  **Q.**   So I just put up on the board what is on page 14

4  of the demonstratives, which are images and the

5  prototype and HTX102, which we've just admitted, which

6  is the Despicable Me version of The Game of Life.

7          And, same question, you would agree that the

8  looks and the imagery used for Despicable Me, for the

9  board of Despicable Me is different than the looks and

10 the imagery used for the board for the prototype;

11 correct?

12 **A.**   Yes, sir.

13 **Q.**   The only thing that overlaps with any of the

14 versions is some concepts that you believe carry

15 through; is that fair?

16 **A.**   Yes.

17 **Q.**   So you were asked some questions with regard to

18 the assignment agreement.  Do you recall that?

19 **A.**   Yes, sir.

20 **Q.**   And you offered an opinion with respect to whether

21 or not it was consistent with your experience, your

22 present experience; correct?

23 **A.**   Yes, sir.

24 **Q.**   But your present experience, as you testified to

25 this morning, concerns deals between game companies and

1    designers; correct?

2    **A.**    Yes.

3    **Q.**    But that's not what the assignment agreement is.

4    It's not a deal between a game company and a designer;

5    is it?

6    **A.**    No; it's between the designer and his agent.

7    **Q.**    You in fact have never seen, you don't recall ever

8    having seen an agreement in your experience similar to

9    the assignment agreement; isn't that right?

10   **A.**    No.  I've seen a few, a couple, not quite like

11   that, though.  Nothing identical to that, certainly.

12   **Q.**    Can you go to page 92 from your deposition,

13   please.

14   **A.**    What page?

15   **Q.**    92.

16   **A.**    Okay.

17   **Q.**    Starting at line 8:

18        "Question:  You've been handed what has been

19   marked as Exhibit 6, which is entitled 'Assignment

20   Agreement.'  Have you seen that document before?

21        "Answer:  I have.

22        "Question:  Have you in your game industry

23   experience ever seen an agreement of that nature

24   before?

25        "Answer:  I don't recall.

1     "Question:  So sitting here today, you can't

2     think of any such documents?

3          "Answer:  I don't recall."

4          I read that correctly?

5     **A.**  You did.

6     **Q.**  And that was just a month-and-a-half ago.

7     **A.**  Yes, sir.

8     **Q.**  In fact, you are not personally aware of any

9     instances in your career where a person has presented

10    an idea to someone to create a prototype as has been

11    alleged in this case; have you?

12    **A.**  We assigned --

13    **Q.**  You understand what's been alleged in this case is

14    that Mr. Klamer came up with the idea and asked

15    Mr. Markham and his team to create a prototype.  You

16    understand that; correct?

17    **A.**  Yes, sir.

18    **Q.**  You are not aware, you have no experience with

19    that kind of situation in your --

20    **A.**  Not at that level.

21    **Q.**  So let's just be clear on the record.  In your  --

22    how many years, 30?

23    **A.**  Thirty-three.

24    **Q.**  In your 33 years, that's just not something that

25    you've had to deal with, dealing with a situation where

1    somebody came up with an idea and asked somebody else

2    to build a prototype for them.  Fair?  Fair?

3    **A.**    If I could explain?

4    **Q.**    I just want to know if you have or you have not

5    had that experience before.

6    **A.**    Not that exact experience, no.

7    **Q.**    Okay.  So you also offered some opinions with

8    regard to how long it takes to create a prototype;

9    correct?

10   **A.**    Yes, sir.

11   **Q.**    Now, you have no experience as a designer; right?

12   **A.**    No.

13   **Q.**    You've never designed a game yourself.

14   **A.**    No, sir.

15   **Q.**    You've never created a prototype.

16   **A.**    No, sir.

17   **Q.**    You've never been an inventor.

18   **A.**    No, sir.

19   **Q.**    You've never licensed anything to a third party.

20   **A.**    No.

21   **Q.**    So you don't have any personal experience of how

22   long it actually takes to create a prototype; correct?

23   **A.**    I have not personally created a prototype.

24   **Q.**    And you don't know whether two people working

25   full-time in close quarters could have created this

1    prototype in six weeks?  You're not in a position to

2    say that one way or the other; are you?

3    **A.**   I am not.

4    **Q.**   You don't know how much time they put into it?

5    **A.**   No.  Sir.

6    **Q.**   You don't know what kind of time pressures they

7    were under.

8    **A.**   No, sir.

9    **Q.**   And certainly in your experience when people are

10   under tighter time pressures they tend to work faster.

11   **A.**   Sometimes.

12        MR. KRUMHOLZ:  I have nothing further, your

13   Honor.

14        THE COURT:  Thank you.

15        Mr. Pollaro, redirect.

16        MR. POLLARO:  Thank you, your Honor.

17        REDIRECT EXAMINATION BY MR. POLLARO:

18   **Q.**   Mr. Carty, would you call any change that you can

19   see an aesthetic change?

20   **A.**   I don't really know if they're aesthetic or not.

21   I know that we made changes like this on a regular

22   basis.  Some of it was based on manufacturing

23   constraints, a lot of it was based on cost.

24   **Q.**   And if you could see the change, it was aesthetic?

25   I mean, how else would you know if there was a change

1    if you couldn't see it; correct?

2    **A.**   People make changes based on their personal

3    tastes.  I can't say for sure why they make a change.

4    **Q.**   Are you aware of any evidence in this case that

5    the changes made from the prototype to the commercial

6    version were made for monetary considerations?

7         MR. KRUMHOLZ:  Objection.  Foundation.

8         THE COURT:  Was that an objection?

9         MR. KRUMHOLZ:  Yes.  I'm sorry.

10        THE COURT:  Overruled.

11   **A.**   There's a letter from Mr. Markham to Milton

12   Bradley talking about changes to be made to the game to

13   assist the manufacturing.  I don't remember the

14   document number at all, but --

15   **Q.**   I appreciate that, Mr. Carty, but my question was

16   evidence related to changes that were made for an

17   economic reason.  In other words, have you seen any

18   evidence one way or the other that Milton Bradley was

19   making changes for an aesthetic reason or for a

20   monetary reason?

21   **A.**   No, sir.

22   **Q.**   Does "aesthetic" mean to you "creative"?

23   **A.**   No.

24   **Q.**   Are these the types of changes that we've been

25   talking about with some of these exhibits?  I think I

1    heard you say that these are changes that you would

2    have done when you worked at Mayfair Games as you were

3    commercializing a prototype; is that correct?

4    **A.**   I view most of these change when they're marrying

5    two different IPs and making changes to go to

6    production to be logical and normal.

7    **Q.**   And you made those, you have experience making

8    those changes in your experience?

9    **A.**   Yes, sir, I do make many of those changes.

10   **Q.**   And did you receive design credit when you made

11   those changes?

12   **A.**   No, sir, I did not.

13   **Q.**   Did you expect design credit when you made those

14   changes?

15   **A.**   No, I did not.

16   **Q.**   Let's look at some of the --

17        MR. POLLARO:  May I approach.

18        THE COURT:  Yes.  You need to get a microphone

19   if you want to inquire from there.

20   **Q.**   Mr. Carty, do you recall a little while ago you

21   were asked questions about the 1960 version of the game

22   bearing a copyright of 1960, which is on the bottom

23   right, versus two images of the prototype?

24   **A.**   Yes, sir.

25   **Q.**   And you were asked about some simplifications that

1    were made to the prototype during commercialization.

2    Do you remember that?

3            MR. KRUMHOLZ:  Objection to the form.

4            THE COURT:  Well, I think we're just getting

5    oriented right now so I'll overrule that, see what --

6    **Q.**   Do you recall discussing, for example, the height

7    of the mountains?

8    **A.**   Yes, sir.

9    **Q.**   Do you consider the height of the mountains to be

10   a creative design choice?

11   **A.**   No, sir.

12   **Q.**   Would you consider the removal of a transmission

13   tower to be a creative design choice?

14   **A.**   No, sir.  I would expect that's economic.

15   **Q.**   Would you consider the removal of a 3-D overpass

16   to make it 2-D to be a creative design choice?

17   **A.**   I would have removed it.

18   **Q.**   And can you tell us why you would have removed it?

19   **A.**   Because they would get broken and then you'd have

20   returns and that costs money.

21   **Q.**   Do you see any similarities between the prototype

22   and the 1960 edition of The Game of Life?

23   **A.**   I see many similarities.

24   **Q.**   Can you tell us those similarities.

25           MR. KRUMHOLZ:  Your Honor, beyond the scope of

1   cross, your Honor.

2           THE COURT:  I'm going to sustain that.  This is

3   beyond the scope.

4   **Q.**   Do you see any other differences to the, between

5   the prototype and the 1960 edition of the game that we

6   haven't discussed, for example, the height of the

7   mountains, the addition of a river, the removal of the

8   3-D overpass?  Can you identify any other changes

9   between the prototype and the commercial version of the

10  game?

11  **A.**   Well, they changed the number of buildings.  They

12  seemed to try to keep the same amount of volume in the

13  mountains and the raised areas.  In the analysis

14  process, a cut of all the little squares and they're

15  almost identical, all the little movement squares.  The

16  board or the style of art on the board is extremely

17  similar; whether it's same color I couldn't tell you.

18  The reduction in height on the mountains might have

19  been done so it would fit in a more standard-sized box,

20  but there's no way I could speak to that for sure.

21  **Q.**   And again, in your experience, do these changes

22  that were made for the commercialization process rise

23  to the level of creative?

24  **A.**   Not in my viewpoint, sir.

25  **Q.**   And would this be something you would expect to

1     occur between a prototype and a commercialization?

2     **A.**   Yes, sir, I would.

3     **Q.**   And in your experience would you expect that the

4     individual that made these changes would expect to be

5     considered a designer or design credit for those

6     changes?

7             MR. KRUMHOLZ:  Objection.

8             THE COURT:  Sustained.

9             MR. POLLARO:  May I approach, your Honor.

10            THE COURT:  Yes.

11    **Q.**   Do you see -- again, you were looking at this

12    image just a little bit ago, two images of the

13    prototype on the left, the current version of The Game

14    of Life on the right.  Do you see those?

15    **A.**   Yes, sir, I do.

16    **Q.**   Do you see expressions between the prototype that

17    are contained in the commercial version of the game?

18            MR. KRUMHOLZ:  Objection, your Honor.  Again,

19    beyond the scope of the cross.

20            THE COURT:  Well, you did have him take a look

21    at comparison of the two; right?

22            MR. KRUMHOLZ:  I did.  He testified to what

23    similarities he purported to see on direct.  I asked

24    him about differences and now he wants to re-engage on

25    similarities, which I didn't address on cross, and they

1    had the opportunity to ask them that.

2              THE COURT:  Well, all right, so that's probably

3    technically true.  I mean he didn't ask about

4    similarities, he asked about differences; and now

5    you're going back through --

6              MR. POLLARO:  Then he asked about the overall

7    concept and feel and if it was similar, and I had the

8    same reaction you did.  That's why I'm asking these

9    questions.

10             THE COURT:  I'll go ahead and allow it.  He did

11   testify that the looks and the imagery are different,

12   and I'll give you some leeway on this.  He did talk

13   about the spinner, so go ahead.

14             MR. POLLARO:  Thank you, your Honor.

15   **Q.**   Mr. Carty, can you identify for the Court the

16   similarities that you see between the prototype and the

17   current version of the game.

18   **A.**   Well, the spinner.  They both have basically the

19   same style winding track.  They have the similar style

20   play money.  The current version has removed almost all

21   the 3-D elements of the game.  I would have to say,

22   though, if this was ever presented to me as a separate

23   product I would have to reject it.

24             MR. KRUMHOLZ:  Your Honor, we're now moving into

25   if it was presented to him.

1        THE WITNESS:  I'm sorry.

2        THE COURT:  Well, I think he's ended his answer,

3    so go ahead.

4        MR. POLLARO:  Thank you, your Honor.

5    **Q.**   And Mr. Carty, just so we're clear on your answer,

6    you were talking about the expressions that you see in

7    the current version of the game; correct, not concepts?

8    You see an expression of a spinner; correct?

9        MR. KRUMHOLZ:  Objection.  Leading question.

10       THE COURT:  Overruled.  Go ahead.

11   **A.**   Yes, sir.

12   **Q.**   And I believe your testimony before that you made

13   or you reviewed the rules for each of the versions, the

14   prototype and the current version of the game; is that

15   correct?

16   **A.**   Yes, sir, I did.

17   **Q.**   Was it your testimony or can you tell me what you

18   thought as you compared the rules of the prototype

19   versus the current version of the game?

20   **A.**   Their presentation is very different.  The overall

21   goal and the texture is the same.

22   **Q.**   Would you expect that a company other than Hasbro

23   produced the current version of the game would likely

24   have a copyright violation allegation with respect to

25   the original Game of Life copyright?

1    MR. KRUMHOLZ:  Objection.

2    THE COURT:  Sustained.

3  **Q.**   Mr. Carty, you were asked questions about when you

4  entered the game industry.  Do you recall that?

5  **A.**   Yes, sir.

6  **Q.**   And that would have been roughly 33 years ago; is

7  that --

8  **A.**   Yes, sir.

9  **Q.**   When you entered the game industry, did you learn

10  the trade from individuals that were in the industry at

11  the time that you entered?

12  **A.**   Yes, sir.

13  **Q.**   And did you ask questions, did you gain

14  information, can you tell us a little bit more about

15  your, how your knowledge base grew as you entered the

16  industry.

17  **A.**   I sat with, I talked with, I met with a large --

18  well, everybody I do business with.  And I met a lot of

19  designers, developers, and people that worked at

20  different game companies and talked to them about

21  processes and procedures, printing, problems for making

22  product, prototypes, mold-making problems, print color

23  issues.  I've always had an interest in process, in

24  manufacturing.  I actually visit factories on vacation,

25  which is a crazy thing but that's all part and parcel

1    of that.  You want to know how it works; and if you

2    know how it works, you do a better job.  In my opinion,

3    I can do a much better job at picking product, at

4    developing systems that would get product to retail in

5    the proper manners and make everybody more money.

6    **Q.**   Now, would you say that even though you started in

7    the industry yourself in the mid-80s that your

8    understanding of the industry starts in the mid-80s or

9    does it predate that?

10   **A.**   I heard a lot of stories and I can't tell you that

11   they were all true, but I've heard a lot of stories

12   from different people over the years, especially in the

13   beginning when there were a lot of the older guys and

14   ladies were still around, so I have an inkling of what

15   went on, a pretty good one.  I made models, did model

16   railroading and did balsawood models and plastic models

17   as a kid and actually into my teens so I know how long

18   it takes to make a lot of different things from

19   scratch.  I've had the experience, and experience it

20   was, working with typeset machines, so --

21              MR. KRUMHOLZ:  Your Honor, I feel like we

22   strayed along with the question.

23              THE WITNESS:  I'm sorry.

24              MR. KRUMHOLZ:  Balsa models he made as a kid.

25              THE COURT:  Right.  Well, you don't have to

1    apologize.  He has a job to do to object and you don't

2    need to apologize for anything you're answering.

3              THE WITNESS:  Yes, your Honor.

4              THE COURT:  All right.  But he wasn't finished

5    with his answer.  So I'm going to overrule the

6    objection.  I want him to finish his answer and then

7    you may want to move to strike.

8              Go ahead.

9    **Q.**   Were you finished with your answer, Mr. Carty?

10   **A.**   More or less.  I visited both FASA Corporation,

11   Mayfair Games in the very early 80s after I started

12   work in the industry, and they were both using typeset

13   machines and had to lay out all the pages by hand.

14   That's a very time-consuming function.  That was the

15   end of my answer.

16   **Q.**   Okay.  I'm just trying to get a sense, if you

17   could inform the Court on basically the foundation of

18   your experience.  Even though you came into the

19   industry yourself in the early 80s, it sounds like you

20   spoke to people that were present in the industry.

21   **A.**   I did.

22   **Q.**   Okay.  And while you can't pinpoint a precise date

23   as far back as the information went, it certainly

24   predates your entry into the market.  Is that fair?

25   **A.**   Yes, sir.

1    **Q.**   Okay.

2          MR. POLLARO:  I have no further questions, your

3    Honor.

4          THE COURT:  All right.  Thank you.  Any recross?

5          MR. KRUMHOLZ:  No, your Honor.

6          THE COURT:  All right.

7          I've neglected to ask all the other assemblage

8    of attorneys whether anyone has any other questions,

9    but I take it nobody does.

10         Is that correct?

11         MS. VAN LOON:  Correct, your Honor.

12         MR. JINKINS:  Correct, your Honor.

13         THE COURT:  All right.  Very good.

14         Then your testimony is complete, Mr. Carty.  You

15   may step down.

16         MR. KRUMHOLZ:  Should we go straight into

17   Mr. Orbanes?

18         THE COURT:  Well, I want to know, first of all,

19   if the Plaintiff is resting.

20         MR. POLLARO:  We have no other witnesses, your

21   Honor.  We are resting.

22         THE COURT:  Plaintiff rests.

23         MR. POLLARO:  Your Honor, just one quick point.

24   Sorry.  We haven't addressed the issue of the

25   deposition transcripts with the other parties as far as

1   how we're going to give them to you.  Obviously, we've

2   designated, we've done all that, but we haven't got --

3          THE COURT:  We can go off the record for a

4   minute.

5          (Discussion off the record)

6          THE COURT:  We'll go back on the record, and so

7   subject to the submission of deposition designations

8   and cross-designations, the Plaintiff is resting.  Is

9   that correct, Mr. Pollaro?

10         MR. POLLARO:  Yes, your Honor.  I guess the only

11  other point is we maintain the objection about the late

12  addition of the defense, and so in California you said

13  make that objection before we rest so I'm just

14  following up on that.

15         THE COURT:  What is the objection on?

16         MR. POLLARO:  We objected to the addition of the

17  defense.  We had motions about the defense about the

18  work-for-hire for Bill Markham and we had briefing on

19  that, and I made the objection in California and you

20  said, well, it's premature; you haven't rested yet,

21  make the objection before you rest.  And so I just want

22  to make sure I do that before I rest.

23         THE COURT:  All right.  So you've made it.

24         MR. POLLARO:  Thank you, your Honor.

25         MR. KRUMHOLZ:  So your Honor, just to get my

1    directed verdict motion on the record.

2         THE COURT:  Yes, do that.

3         MR. KRUMHOLZ:  So in our view, we believe that

4    the undisputed evidence shows that the only authors of

5    the subject works were Ms. Chambers and Mr. Israel, and

6    there's no evidence that Mr. Markham was in any way an

7    author, so the only basis he could potentially have to

8    claim that he owned a copyright that was transferred

9    would be through a work-for-hire scenario.  We believe

10   there's two deficiencies with that.  One, as a matter

11   of law if it was a work-for-hire scenario the

12   termination provision Section 304(c) does not apply.

13        Also that they have not shown factually that any

14   work done by Ms. Chambers or Mr. Israel was done for

15   Mr. Markham personally, as opposed to a company, and

16   the only evidence in the record is that they were

17   working for a company, and there's no affirmative

18   evidence that Mr. Markham himself personally ever

19   applied the rights of that company.  So factually we do

20   not believe they have been able to establish that he

21   ever owned anything by way of copyright that he could

22   transfer.

23        We also believe that they have failed the Best

24   Evidence Rule to identify what materials were actually

25   the subject of the registration.  They had a duty under

1    that rule to make reasonable efforts to search for

2    those records.  There's nothing in the record to

3    suggest that they did any such thing.  They have not

4    put forth any evidence that they ever tried to even

5    request those reports from the copyright office, which

6    is their minimum duty under Best Evidence Rules, so we

7    believe the evidence fails for that reason as well.

8          In addition, we believe that the undisputed

9    evidence shows that any work that was done was done on

10   behalf of Mr. Klamer on a work-for-hire-basis and that

11   the only evidence that has been adduced supports the

12   instance and expense test in establishing that any work

13   was done at Mr. Klamer's instance and at his expense,

14   and for that reason as well 304(c) does not apply

15   because again It does not apply to work-for-hire

16   scenarios.

17         THE COURT:  Thank you.  Rather than have you

18   oppose this -- you want to --

19         MS. VAN LOON:  I just want to join in the

20   directed verdict.

21         MR. JINKINS:  For the record, we'd like to join

22   in, too.

23         THE COURT:  Very well.  So I'm going to take all

24   those motions under -- I'm going to reserve on them and

25   we can move directly to presentation of your evidence.

1           MR. KRUMHOLZ:  Thank you, your Honor.  Couple

2     minutes to move our boxes over.

3           THE COURT:  Sure.  Let's just take five minutes

4     to give you a chance to set up.

5           (Recess)

6           MR. KRUMHOLZ:  Your Honor, I neglected to add

7     just for the record on a motion for directed verdict

8     they had sought declaratory judgment on derivatives as

9     well, and I just want to make sure that's included in

10    our motion.  We don't believe they've shown failure to

11    do the proper test and failure to identify actual

12    expressions that they have met their burden on their

13    claim for derivative works declaratory judgment.

14          THE COURT:  Okay.  Thank you.

15          All right.  Let's call your witness.

16          MR. KRUMHOLZ:  Mr. Orbanes.

17          I'm assuming you guys want to join in on that

18    portion of the motion as well?

19          MS. VAN LOON:  Yes, we do.

20          MR. JINKINS:  Yes, your Honor.

21          THE COURT:  All right.  Thank you.

22    <u>PHILIP EDWARD ORBANES, DEFENSE WITNESS, SWORN</u>

23          THE CLERK:  Please state your name for the

24    record and spell your last name.

25          THE WITNESS:  Philip Edward Orbanes, spelled

1    O-R-B-A-N-E-S.

2              THE COURT:  Good afternoon, Mr. Orbanes.

3              THE WITNESS:  Thank you, your Honor.

4              THE COURT:  You may inquire, Mr. Krumholz.

5              MR. KRUMHOLZ:  Thank you.

6                   <u>DIRECT EXAMINATION BY MR. KRUMHOLZ</u>:

7    **Q.**   Good afternoon.

8    **A.**   Good afternoon.

9    **Q.**   Mr. Orbanes, I want to start by talking about your

10   background and experience.  Let's start with your

11   educational background.  Would you explain to the Court

12   where you went to college and what you studied and when

13   you went.

14   **A.**   Certainly.  I went to the Case Institute of

15   Technology in Cleveland, Ohio, between the years 1965

16   and 1969.

17   **Q.**   What did you study there?

18   **A.**   I studied a subject that was -- or a major that

19   was entitled Organizational Science.

20   **Q.**   What is Organizational Science?

21   **A.**   It was business management with a very strong

22   science and engineering background.

23           I think maybe I should just get a little water

24   here.

25   **Q.**   Yes, of course.

 1          MR. KRUMHOLZ:  Your Honor, while he's doing

 2     that, you have a binder that we're going to be using

 3     with this witness.  Inside the flap is a CV for

 4     Mr. Orbanes.  Some judges would like to receive the CV;

 5     some would not.  So it's been premarked as HTX101.

 6     We'll offer it for admission if the Court would find it

 7     helpful.

 8          THE COURT:  I'm sorry, where is this?

 9          MR. KRUMHOLZ:  It's HTX101.

10          THE COURT:  What tab would that be?  Oh, it's

11     inside?

12          MR. KRUMHOLZ:  That one is inside the flap.

13          THE COURT:  This is marked as an Exhibit HTX101?

14          MR. KRUMHOLZ:  Yes.

15          THE COURT:  Yes, I would like to have it

16     admitted.

17          MR. KRUMHOLZ:  My apologies.  We did not give

18     them a binder.  They'll need it for everything else.

19     Sorry about that.  I'm sorry, your Honor.

20          THE COURT:  So this will be a full exhibit.  I

21     take it there's no objection; is that correct?

22          MR. POLLARO:  No, sir.

23          THE COURT:  Okay.

24          (Defendant's Exhibit HTX101 was admitted in

25     full)

1          THE COURT:  Go ahead.

2          MR. KRUMHOLZ:  Can I ask logistics; when we have

3     a break do you want me to bring up all the exhibits,

4     copies for you?

5          THE COURT:  Yes, that would be fine.

6          MR. KRUMHOLZ:  Okay.

7     **Q.**    So let's talk about your board game industry

8     experience.  I take it you have worked in the board

9     game industry; correct?

10    **A.**    My entire career.

11    **Q.**    And for how many years have you been in the board

12    game industry?

13    **A.**    Professionally since 1965, so that would be

14    53 years.

15    **Q.**    When did you -- well, let me ask it differently.

16          How old were you when you came up with your

17    first game?

18    **A.**    I was nine years old.

19    **Q.**    And what did you come up with at that time?

20    **A.**    I had just learned Monopoly and I very was

21    fascinated by it, so I invented my own game that was

22    based on mineral exploration that was similar in

23    nature.

24    **Q.**    All right.  And when did you come up with your

25    next game after that?

1    **A.**    I came up with games continually after that; and

2    in 1962 I self-published one of my games and made 50

3    copies on a Spirit duplicator and sold these to

4    play-by-mail players, which was a special type of hobby

5    game back then.

6    **Q.**    All right.  So what year was that?

7    **A.**    1962.

8    **Q.**    And so by that point, you had sold -- you had at

9    least made some money off your first game?

10   **A.**    Yes.

11   **Q.**    What was the first company that you were involved

12   with?

13   **A.**    In 1965, after I graduated high school, I

14   incorporated a business that was named Game Science

15   Corporation.

16   **Q.**    And did you develop any products in connection

17   with that game?

18   **A.**    Yes.  The first game that I published, which was

19   my invention, was an educational game about the Vietnam

20   War, and it showed just how difficult it would be to

21   win that war.

22   **Q.**    So you were right, apparently.

23   **A.**    Apparently.  Sadly.

24   **Q.**    So did you sell that game?

25   **A.**    Yes, I did.

1    **Q.**   All right.  Can you turn to Tab 8 in your binder,

2    which is a document that has not yet been admitted.

3    It's HTX -- it's premarked as HTX104.  And can you tell

4    us what we're looking at in those images.

5    **A.**   Yes.  This is me at the Game Science booth at my

6    first trade show when I was a junior in college.  It

7    took place at the Drake Hotel in Chicago, Illinois, and

8    this was the annual hobby show.  The games that I was

9    marketing were known as "hobby games" back then.

10    **Q.**   And this was -- so you were at this game show in

11    1968 selling product?

12    **A.**   Right.  And I'm introducing my new game at that

13    show, featuring it, called The Battle of Britain.

14    **Q.**   There's a reference to Tom Shaw.  We'll talk more

15    about him later, but who is he and what significance

16    does he have to your career?

17    **A.**   He was my mentor.  Tom Shaw was the chief

18    executive at the Avalon Hill Game Company that

19    Mr. Carty mentioned from 1958 through 1977; and when I

20    did that early game in 1962 and submitted it to him, he

21    thought I had a lot of potential and for a variety of

22    reasons he helped me.  And so he gave me the background

23    of how the game industry worked, what inventor

24    contracts were, he even sent me a blank Avalon Hill

25    contract so that I would be familiar with it.

1    **Q.**   Okay.  And I guess for the sake of completeness,

2    who is Hugh O'Brian?

3    **A.**   Hugh O'Brian was a very famous television star.

4    He was appearing at that trade show endorsing

5    somebody's product line at the end of my aisle, and he

6    was the first celebrity I ever saw in person.

7    **Q.**   So I take it you were impressed.

8    **A.**   I was very.  He was a big guy.

9           MR. KRUMHOLZ:  Your Honor, we'd move to admit

10   HTX104.

11          THE COURT:  Any objection?

12          MR. POLLARO:  No objection, your Honor.

13          THE COURT:  All right.  104 will be full.

14          (Defendant's Exhibit HTX104 was admitted in

15   full)

16   **Q.**   So what eventually happened to Game Science?

17   **A.**   At this trade show, the very first trade show that

18   I went to, I was approached by a man named Lou Wetzel,

19   who was the president of what became known as the

20   Learning Aids Group, and Mr. Wetzel explained to me

21   that his company was in the process of acquiring a

22   number of small companies that had an educational

23   content to their product line and he liked what he saw

24   in Game Science and would I be interested in selling

25   the firm to him.  The following month was the New York

1    Toy Fair, and at that Toy Fair we consummated the deal.

2    **Q.**    Okay.  So you sold your first game company to

3    Learning Aids?

4    **A.**    It became the Learning Aids Group.

5    **Q.**    Okay.  And that was what year?

6    **A.**    1968, the following month from this trade show.

7    **Q.**    So did you go to work for Learning Aids?

8    **A.**    Yes.  As soon as we had consummated the deal, I

9    went to work developing a product line for them, and

10   the following June when I finished at Case I moved to

11   New York with my wife and went to work for them

12   full-time.

13   **Q.**    So you answered this in part, but what did you do

14   for them?

15   **A.**    I ran product development for the Game Science

16   Division.

17   **Q.**    What kind of products?

18   **A.**    The primary products were family games, but the

19   very first significant project that I did after I

20   arrived in New York City was actually an astrological

21   home computer.

22   **Q.**    Okay.  And I think we'll probably talk more about

23   that later in your testimony, but let's continue

24   through your background.

25        How long were you at Learning Aids?

1  **A.**  Until 1971 when the firm ran into financial

2  trouble and they had to sell off their assets.  At that

3  point this particular product whose name was

4  Aquarius 2000 was very successful and it was acquired

5  along with me.

6  **Q.**  So Aquarius 2000 was the game that you developed?

7  **A.**  Yes, invented and developed.

8  **Q.**  And it was invented and developed, is that what

9  you said?

10  **A.**  Yes.

11  **Q.**  And it was a commercially successful product and

12  ultimately got sold to another company?

13  **A.**  Right.  It got sold to a company called Reese

14  Sales Associates, and they were the nation's leading

15  sales representative company to the department store

16  and gift market.  The Learning Aids Group did not have

17  that capability so they had contracted with Reese to

18  reach this marketplace.

19  Reese was very successful with it, and they

20  wanted me to come to work for them to help develop a

21  game and puzzle line that would be their own in-house

22  line.

23  **Q.**  So what years were you at Reese?

24  **A.**  I think I joined in the summer of 1971, and I was

25  there until probably the end of 1972.

1    **Q.**    So again, I think you answered this a little bit

2    in part, but what were you doing at Reese?

3    **A.**    Product development.

4    **Q.**    For what kinds of products?

5    **A.**    They were decorative adult puzzles and more

6    sophisticated games.

7    **Q.**    And where from there?  Where did you go after

8    Reese?

9    **A.**    One of the other companies that Reese represented

10   was a small game company called Gamut of Games, and

11   Gamut of Games wanted to also expand its product line

12   and they hired me away from Reese Sales.

13   **Q.**    And what did they -- what did you end up doing for

14   them?

15   **A.**    My first position there was creative director,

16   which meant once again I was developing and getting

17   into manufacture a new product line.  Eventually, I

18   became the vice-president of the firm and had a lot of

19   the business responsibilities as well.

20   **Q.**    So what kinds of products were you involved with?

21   **A.**    Family games.

22   **Q.**    Family games?

23   **A.**    Family board games.

24   **Q.**    Family board games.

25   **A.**    With plastics as well as with cardboard

1  components.

2  **Q.**   So through this point you've been involved in

3  conceiving and designing and developing board games

4  starting when you were nine?

5  **A.**   That's when I first became an inventor, if you

6  will, yeah.

7  **Q.**   But starting in the industry in 1965.

8  **A.**   On a professional basis, yes.

9  **Q.**   So let's talk about your next job.  So I think

10  we're in 1976 at this point.

11  **A.**   Yes.   Three years later I came to the attention of

12  the Ideal Toy Corporation, which at that point in time

13  was the nation's third largest toy and game company and

14  Ideal, which was the leading maker of action games.

15  They made games like Mousetrap.  They pioneered the

16  category.  They decided in 1976 that based on their

17  success in action games they wanted to get into family

18  board games, and they saw me as the talent that they

19  needed to help them to expand into this new category

20  for them.

21  **Q.**   What was your position when you started there?

22  **A.**   Initially I was manager of the Board Game Division

23  and, again, on an annual basis I would develop their

24  product line.   I also began to work with inventors once

25  my boss realized that I knew what I was doing with

1    outside resources.  And probably 12 to 18 months later

2    they decided that I should run both divisions so I was

3    made Director of Games.

4    **Q.**    So how many years were you at Ideal?

5    **A.**    Three years.

6    **Q.**    And approximately how many games did you bring to

7    market at that time?

8    **A.**    Oh, probably 75.

9    **Q.**    And can you give us any examples of games that you

10   helped market.

11   **A.**    Yes.  Well, the first game that I developed for

12   the company was based on the TV game show Welcome Back

13   Cotter, and I was asked to invent the game and they

14   gave me two weeks to do it; but I knew the program, and

15   I had a real -- I knew how I wanted to do a

16   three-dimensional appearing game that looked like the

17   classroom, and once I had that, the game came pretty

18   quickly.  And then I was responsible for actually

19   developing it, using the resources of the company.

20   **Q.**    How quickly did that game come to you?

21   **A.**    Pardon me?

22   **Q.**    How quickly were you able to design, invent and

23   design --

24   **A.**    Yeah.  See, the problem was normally speaking in

25   the industry the cycle begins right after Toy Fair,

1    which means you start your product development

2    basically one year in advance.  As Mr. Mr. Carty says,

3    most of the time it does take time to put together a

4    new game, but this license fell into the hands of Ideal

5    Toy in September and that's why there was a rush

6    because we had to have it at Toy Fair and shipping at

7    Toy Fair, which I believe back then was probably still

8    in March.  Currently it's February, but it was in March

9    in those days.  So, yeah, there was a real rush on it.

10   Q.   And that was going from conception all the way to

11   commercial --

12   A.   All that they gave me was here's a license, here's

13   a price point, do a game.

14   Q.   So how fast did you turn it around?

15   A.   Well, we had the game in production in February.

16   Q.   And that was --

17   A.   And I actually remember specifically in January

18   they sent me to California to meet with the licensor to

19   get approval for the graphics, which was fortunately

20   not an issue.

21   Q.   So when you were at Ideal Toy for the development

22   of the games, were you working with people externally,

23   internally?  What developers were you typically working

24   with?

25   A.   Well, I found it to be a real relief to get to

1    Ideal Toy because the company had 80 people who did

2    product development, you know, graphic designers,

3    industrial designers, in-house inventors, model makers,

4    toolmakers, engineers.  But the lifeblood of the

5    company was still inventions that came in from outside

6    inventors.  And my boss, who was a pretty busy man,

7    realized soon after I joined the firm that I was

8    experienced and capable of making judgments on products

9    that were shown to us by outside inventors, so he began

10   to rely on me to meet with those who came in from out

11   of town and set up shop in Manhattan.

12        There was a lot of toy and game companies in the

13   New York area, Ideal was just one of them, and so it

14   behooved inventors to come there and present their

15   wares to all the companies in the area.

16   **Q.**   So for this first segment of your career where you

17   worked at, you know, Game Science, Reese, Gamut, Ideal,

18   how frequently were you working with outside inventors

19   and designers?

20   **A.**   Well, at all of these companies certainly on a

21   monthly basis, and it became more intense once I got to

22   Ideal.  It might even be weekly then.

23   **Q.**   Let's talk about your next position after Ideal,

24   so I think you said that took us to 1979.  Where did

25   you go from there?

1    **A.**    In 197, I came to the attention of Parker

2    Brothers.  They needed someone to head up what they

3    called new product research.  I always had the highest

4    regard for Parker Brothers.  It was the nation's second

5    largest game company behind Milton Bradley; and unlike

6    Ideal Toy, which sold toys, dolls, hobbies and games,

7    Parker was pretty much a game company so for me it was

8    my dream job.

9    **Q.**    What years were you there?

10   **A.**    I started in February, right after Toy Fair of

11   1979 so that would have been late February.

12   **Q.**    So you started in 1979 and you were there until?

13   **A.**    1990.

14   **Q.**    So approximately 11 years.

15   **A.**    Yes.  Close to 12 years, whatever.

16   **Q.**    What toys or I mean, sorry, what games were you

17   involved with during that time that we might have heard

18   of?

19   **A.**    Well, every game that Parker Brothers made from

20   1979 to 1990 I touched in some way, be it licensed

21   products like Star Wars or the Six Million Dollar Man

22   or Strawberry Shortcake.  Those games, by the way, were

23   invented by my staff based on the licenses that we

24   acquired.  But I also worked extensively with outside

25   inventors and brought in, even from Japan, quite a

1    number of games that came into the product line.

2    **Q.**    And when you say you worked with and you brought

3    in, can you elaborate a little bit on what you mean by

4    that.

5    **A.**    Yeah, initially just as at Ideal Toy, I was

6    assisting my boss, Bill Doorman, but when Bill decided

7    to leave the company eventually I became the senior

8    vice-president of research and development I believe by

9    the spring of 1994, and then it became my full -- I had

10   the full weight of responsibility on my shoulders to

11   see every significant game inventor in the company and

12   selective countries around the world.

13   **Q.**    So it was your ideal job.

14   **A.**    Yes, it was.

15   **Q.**    But you were only there until 1990.

16   **A.**    Right.

17   **Q.**    What happened?

18   **A.**    Parker Brothers was owned for a long time by

19   General Mills, and General Mills had instilled a really

20   good sense of security in the company; however, for a

21   variety of reasons in 1985 I believe General Mills

22   decided to get out of the toy business.  So they had by

23   this point built up a world-wide network of toy

24   companies, including Parker Brothers, and they put them

25   all together into a separate corporation that became

1   known as Kenner Parker Toys, and then they distributed

2   the stock in that company to the shareholders, which

3   meant that the vast majority of Kenner Parker stock was

4   in unfriendly hands.

5        Two years later we had been so successful that

6   we were engaged in a takeover battle, and eventually

7   the winner of that takeover battle was the Tonka

8   Corporation, which made metal trucks.  Tonka,

9   unfortunately, was not well-managed and they overpaid

10  and they went bankrupt.  And after they went bankrupt,

11  Hasbro bought Kenner Parker Tonka.

12  **Q.**   So how did that impact you?

13  **A.**   Hasbro already owned Milton Bradley, and they

14  didn't need to have two teams of senior management.

15  **Q.**   So that's a long way of saying that Hasbro fired

16  you.

17  **A.**   Yes.

18  **Q.**   Any hard feelings?

19  **A.**   Well, you know, it gave me a good incentive to go

20  start my own business.

21  **Q.**   All right.  And you did.  Or did you?

22  **A.**   I did.

23  **Q.**   What was the name of that business?

24  **A.**   It was Phil Orbanes Productions, or POP for short.

25  **Q.**   And this is 1990?

1    **A.**    '91 I got started, yes.  I incorporated in '91.

2    **Q.**    Were there any other employees besides you?

3    **A.**    No.  One of the advantages I had for having been

4    in the industry that long is that I knew the best

5    outside talent, the best model makers, the best

6    electronic designers, the best graphics people, so I

7    didn't need to have employees.  I would use outside

8    service providers to do any of the project work that I

9    took on.

10   **Q.**    And what kind of work were you doing at POP?

11   **A.**    I made myself available to all the toy companies,

12   all the -- pardon me, the game and toy companies in the

13   industry, and I did a lot of inventing which I would

14   submit on speculative basis, but I also took

15   assignments.  If I took assignments from a company such

16   as Mattel, I would put together a resource team to

17   deliver what they were expecting.

18   **Q.**    So did you get involved -- were you involved at

19   all with contractual arrangements between or with

20   inventors and designers?

21   **A.**    Yeah, and I had been doing that most of my career.

22   In fact, my first contract I wrote in 1967.

23   **Q.**    So how long was POP in existence?

24   **A.**    POP was in existence until 1995.

25   **Q.**    And where did you go from there?

1    **A.**   In 1994 I was approached by a very successful

2    inventor agent named Tom Kramer. Tom's great claim to

3    fame was he found the Rubik's Cube when it was still in

4    Hungary and negotiated the right to manufacture and

5    license it around the world. So Tom Kramer was Rubik's

6    Cube.

7    **Q.**   So I'm going to circle back to talk about Winning

8    Moves a little more in the context of some of the

9    claims that the Markham parties have raised, but let's

10    just get some of the nuts and bolts. So when did you

11    start at Winning Moves?

12    **A.**   At Toy Fair of 1994 Tom asked to have dinner with

13    me and he explained that he had a vision for this new

14    game company, which ultimately became name known as

15    Winning Moves. And his vision was -- it was unique.

16    It was that Winning Moves would sell new games that

17    were not licensed with characters and it would be, it

18    would distribute through a subset of the retail

19    marketplace known as specialty retailing, which is

20    about 7 percent of the entire retail marketplace.

21         But here was the point of difference. The

22    company would have a relationship with a mass market

23    company, some big toy game company who would provide

24    the seed capital to get it going, and in return this

25    company would have the right to select products from

1    our line that we had proven actually had sales appeal.

2    **Q.**   Who did that company end up --

3    **A.**   Ultimately, after a search, Tom settled on Hasbro.

4    **Q.**   Do you have an interest in Winning Moves?

5    **A.**   I do.

6    **Q.**   What percentage?

7    **A.**   I have acquired 30 percent of the company.

8    **Q.**   And does Hasbro have an interest?

9    **A.**   Yes.  At the initial inception of the company,

10   Hasbro, in order to gain this privilege, acquired

11   25 percent of the company.

12   **Q.**   And did this business model that you described

13   work?

14   **A.**   It took a long time before it actually worked.

15   **Q.**   And is it still going on today?

16   **A.**   No.

17   **Q.**   When did that whole business model end?

18   **A.**   I think it took about 10 years before we really

19   had satisfied Hasbro's expectations on the deal.  And I

20   was working in those days with the president of Hasbro

21   games, whose name was David Wilson.  When we reached

22   the point that we had satisfied the requirement, Dave

23   decided that it wasn't worth continuing and so the deal

24   expired.  However, Dave, who had been a longtime

25   salesman in the industry, realized that Winning Moves

1   had one very strong accomplishment.  We had established

2   a very effective sales network and specialty retailing

3   and we had built up -- I'm still the president at this

4   point -- I'm no longer the president, but we'll get to

5   that -- we had built up a very good reputation with our

6   accounts.

7         At that point, Hasbro was losing shelf space --

8   not losing shelf space, but they were losing SKUs,

9   stock keeping units at retail, and Dave said, you know,

10   we want to keep these games alive, you have the sales

11   network, I don't want to set up a special network, it's

12   just not worth my while, the volume is too tiny, why

13   don't you keep them alive in your marketplace.  And so

14   Winning Moves changed from being what we

15   euphemistically called a product nursery into a

16   purveyor of licenses not only from Hasbro but from

17   several sources.

18   **Q.**   So let me -- and again, we'll circle back to that

19   a little bit more, but let's talk about some of the

20   issues that got raised this morning with Mr. Carty.

21         You understand that the assignment agreement

22   that is the subject of this case was signed in 1959, --

23   **A.**   Yes.

24   **Q.**   -- which is approximately six years before you

25   were in the industry in earnest.

1    **A.**   Yes.

2    **Q.**   And explain to the Court, if you could, what your

3    experience is that you think allows you to talk about

4    industry custom and practice with regard to inventor

5    and designer relationships and those kinds of issues

6    dating back to 1959.

7    **A.**   Sure.  Well, first I should point out for the

8    Court that the game industry really didn't change until

9    the early 1980s, as Mr. Carty pointed out.  The means

10   by which you contracted for services, the services you

11   needed to contract for, the materials that were used in

12   building prototypes, they didn't really change until

13   the advent of work stations and most significantly

14   machines that could create type on demand.

15          The other change that occurred in the industry

16   was the development of marketing.  Back in 1959 really

17   through most of the 1970s big companies did not have

18   marketing departments.  Parker Brothers was one of the

19   first because General Mills was a marketing-oriented

20   company.  So the --

21   **Q.**   Let me orient you a little bit because I think the

22   Court needs to be comfortable that you can potentially

23   help me.  And the way you could potentially help is to

24   explain custom and practice with regard to

25   relationships between inventors and designers and the

1  commercial terms under which they worked, so can you

2  help the Court understand how you have that knowledge

3  that dates back to the late 1950s.

4  **A.**   First of all, I mentioned this gentleman, Tom

5  Shaw, who was very kind in explaining to me how the

6  industry worked from his entry into it in early 1958.

7  Through Tom I also met a very successful team of

8  agents, Alice Nichols and Felicia Parker, who happened

9  to be the famous game inventors, agents at Sackson.

10  Tom thought it would be good for me to know them in the

11  event I had inventions that needed representation.  So

12  they taught me how companies were approached, what

13  companies looked for, how you had to be very mindful of

14  trends and cost.  And their experience dated back into

15  mid-1950s.  Not much had changed by the mid-1960s.

16     The other thing was eventually I met Sid

17  Sackson, who was a very gracious individual.  When I

18  went to Toy Fair the month after this photograph was

19  taken, Sid invited me to his home.  He showed me not

20  only the manuscript for the book that he was writing,

21  which ironically was also called A Gamut of Games, but

22  he explained to me his dealings with the industry in

23  the late 1950s and showed me with pride his first

24  inventions.

25  **Q.**   How would you describe your relationship with

1    Mr. Sackson?

2    **A.**   It was -- it became an enduring friendship.  And

3    as a matter of fact, I employed Mr. Sackson at Gamut of

4    Games to do inventing for products that we had

5    opportunities to publish.

6    **Q.**   And one of the topics we want to talk with you

7    about involves these relationships between inventors

8    and designers and the commercial environment in which

9    they operated.  We talked about that a little bit with

10   regard to your background, but maybe you can just

11   elaborate a little bit for the Court about your

12   experience with those kinds of contracts and

13   relationships.

14   **A.**   With outside resources?

15   **Q.**   Yes.

16   **A.**   Well, from the very beginning I was fully

17   dependent on outside resources to bring my ideas to

18   life.  For example, the game in this picture, The

19   Battle of Britain, I had to sign a work-for-hire

20   agreement with a company named Laws (phonetic) Printing

21   Industries, who had a design staff to do all of the

22   artwork for the game under my direction.  So from that

23   point on I had a very strong comfort level in working

24   with outside resources to bring a product to fruition.

25   **Q.**   And we've also asked you to look at derivative

1   work issues, comparing one version of the game to

2   another.

3   **A.**   Yes.

4   **Q.**   Can you explain to the Court with your experience

5   with the creation of games and the design and how that

6   would come to bear on that kind of testimony?

7   **A.**   Yes.  The primary purpose of an inventor's

8   prototype -- and by the way, I should point out that in

9   my experience I almost, I almost exclusively saw

10  finished prototypes, and inventors seldom presented

11  anything less than a prototype to any of my companies.

12  There's strong reasons for that.

13        But the prototype's purpose is to make a sale.

14  We used to joke in the industry that it was sizzle, not

15  steak, but that's okay.  That was the reason why an

16  inventor put time and effort into creating a very

17  eye-catching prototype is he needed to inspire the

18  manufacturer that it could become a commercially

19  successful product, and it took away some of the

20  guesswork if it already had all of the bells and

21  whistles in it.

22  **Q.**   And then how does that, how did your experience

23  bear on taking it from that stage to a commercial

24  product?

25  **A.**   It was -- in the years that I was active in the

1    industry, I can tell you that sometimes a prototype was

2    changed so significantly that what came out the other

3    end bore almost no resemblance to what started.  For

4    example, I remember one game that we licensed at Parker

5    Brothers where all we ended up with from the original

6    prototype was the very clever mover in the game.  We

7    discarded everything else.  At other times the inventor

8    had the good fortune with his idea and his execution

9    that not too much had to be done.  So it really ran the

10   gamut.

11   **Q.**   Okay.  So a couple more questions about your

12   background.  What's the Association For Games and

13   Puzzles International?

14   **A.**   This is a 35-year old historical organization

15   whose charter is to promote the study and preservation

16   of games and games history, and it has been constantly

17   researching and publishing its findings during that

18   35 years.

19   **Q.**   And how long have you been associated with that

20   association?

21   **A.**   About 33 years.

22   **Q.**   And what is your present position with that

23   association?

24   **A.**   Yes.  Currently, I'm the association's president.

25   **Q.**   And how long have you been the president?

1    **A.**    For about 18 months.

2    **Q.**    How much time do you spend in that capacity?

3    **A.**    A lot more than I probably would like to right

4    now.  My mission and the reason why I agreed to become

5    president is because the organization needed to make a

6    very big transition from being print-oriented with this

7    research to getting all of this research published

8    online for the benefit of posterity.  And so this is a

9    business as well as an informational challenge, and I

10   accepted the position and sometimes spend quite a lot

11   of my time each week taking care of it.

12   **Q.**    I take it the history of the board game industry

13   is something that's important to you.

14   **A.**    Yeah, it has been since I was young.

15   **Q.**    Why is that?

16   **A.**    I was always fascinated where games came from.  I

17   figured out that somebody had to invent them; and as

18   time went on, I was delighted to find out who those

19   individuals were and how they went through the process.

20   **Q.**    Can I ask you to go to Tab 10 of your binder,

21   which has been premarked as HTX107.  And on this just

22   first tell us what this periodical is and then I'll

23   follow up.

24   **A.**    Yeah.  The AGPI, which in those days was known as

25   the AGPC, same organization, publishes its research

1    findings in this publication that's called

2    The Quarterly because it appears four times a year.

3    This particular issue came out after the organization's

4    annual convention.  And at the convention someone with

5    distinguished achievement in the field of games,

6    puzzles or mechanical puzzles is recognized.  And on

7    this particular occasion, I and one of the former

8    presidents of Parker Brothers were awarded the

9    organization's Bradley Parker Award.

10   **Q.**   For distinguished achievement?

11   **A.**   Yes.

12   **Q.**   Is that what we see on page 3?

13   **A.**   Yes.

14        MR. KRUMHOLZ:  Your Honor, we ask to move HTX107

15   into evidence.

16        THE COURT:  Any objection?

17        MR. POLLARO:  Only to the extent it looks like

18   it's an excerpt, so we haven't seen the full document.

19        THE COURT:  I take it that's correct.  And is

20   this an excerpt?

21        MR. KRUMHOLZ:  I think it is.  We can replace it

22   with the whole document if need be.

23        THE COURT:  All right.  Can he do that?

24        MR. POLLARO:  Yes, that's fine.

25        THE COURT:  All right.  Let's do that.  So I'll

1    admit it subject to production of the entire document.

2            (Defendant's Exhibit HTX107 was admitted in

3    full)

4    **Q.**   Do you have a collection that you maintain with

5    regard to board games?

6    **A.**   I did.  I very carefully built up a collection of

7    historically significant games.

8    **Q.**   Where is that collection now preserved?

9    **A.**   Well, if you look at the prior page it says, "The

10   Strong Behind the Scenes."  The Strong Museum of Play

11   in Rochester is the world's leading repository of play

12   things.  Over the course of the years they have

13   accumulated over 400,000.  For example, they have most

14   of the archive from Sid Sackson, and in 2012 they

15   persuaded me that my collection deserved a permanent

16   home as well as my personal archives, so I agreed that

17   both of them would go to The Strong.

18   **Q.**   Like your personal papers and your prototypes, is

19   that also at The Strong Museum?

20   **A.**   Yeah.  They wanted those for the library and I

21   guess for storage.

22   **Q.**   And have you written any books on board games?

23   **A.**   Yes.  I'm the published author of four books on

24   games.

25   **Q.**   And have you been interviewed or contributed to

1    other articles or periodicals?

2    **A.**    Yes.   Throughout my career I've written articles

3    on the game industry.   I've been interviewed on

4    television, radio enumerable times, and a lot of

5    authors come to me to get information for articles that

6    they're writing about the game industry.

7    **Q.**    And do you have any special affiliation with

8    Monopoly?

9    **A.**    When I joined Parker Brothers in 1979, they found

10   out pretty quickly that I knew the game well and I was

11   asked if I would take over the responsibility of being

12   the chief judge at US & World Monopoly Championships,

13   which were held every few years.

14   **Q.**    And are you still the chief judge?

15   **A.**    I still am.

16   **Q.**    Not the judge in this room, but otherwise the

17   chief judge.

18   **A.**    No, no.

19   **Q.**    So let me ask you some questions that have been

20   raised by the Markham parties with regard to potential

21   bias.

22   **A.**    Yes.

23   **Q.**    And you understand that that has concern both of

24   your opinions of Mr. Klamer as well as your involvement

25   with Winning Moves.

1    **A.**   Yes.

2    **Q.**   So let's deal with Mr. Klamer.  When did you first

3    meet him?

4    **A.**   In 1984 at an industry gathering.

5    **Q.**   Did you see him periodically thereafter?

6    **A.**   I had just become the senior vice-president of R&D

7    at Parker Brothers and I was about to go on my first

8    inventor tour, and Mr. Klamer said to me, You've got to

9    come see me, I have some Nerf items that I think will

10   be right for your line.

11   **Q.**   So did you over the years form any opinions about

12   Mr. Klamer -- well, actually, let me ask you this

13   first.  How would you describe your relationship with

14   Mr. Klamer?

15   **A.**   Well, I think Mr. Pollaro in my deposition came up

16   with a term that I never used before but it's very

17   appropriate, and he asked me if I was business friends

18   with Mr. Klamer, and I thought about this and I

19   realized that anyone that I feel comfortable in

20   conducting transactions on behalf of my company for

21   which, for whom I had prior experience is a business

22   friend, as opposed to a business adversary or business

23   acquaintance.  And I would also say that at least

24   70 percent of the inventors that I have worked with

25   under that definition would be business friends, and

1    that would include Mr. Klamer.

2    **Q.**   At the request of the Markham parties have you

3    provided any communications between yourself and

4    Mr. Klamer in this case?

5    **A.**   Yes.   That request was made after I submitted my

6    reports.

7    **Q.**   And can we go to Tab 9, which is HTX105.

8         MR. KRUMHOLZ:  This is not admitted, but there's

9    no objection so I'll just move now that it be admitted.

10        THE COURT:  Without objection?

11        MR. POLLARO:  No objection.

12        THE COURT:  All right.  This will be -- what

13   exhibit number is this?

14        MR. KRUMHOLZ:  HTX105.

15        (Defendant's Exhibit HTX105 was admitted in

16   full)

17   **Q.**   Is this e-mail back and forth between you and

18   Mr. Klamer?

19   **A.**   It is.

20   **Q.**   And at least the bottom e-mail is dated August 3,

21   2010.  Was your e-mail above it around that same time?

22   **A.**   Yes, I'm sure it was.

23   **Q.**   I'm going to refer you to the PS, and I'll read it

24   out loud, then I'll ask you a couple of questions.

25        "PS:  I have always admired you for the

1    following qualities, Ruben:  Engaging, straightforward,

2    clear-thinking, not egotistical like many of your

3    rivals, perhaps even tender, informative, even-keeled,

4    warm.  All of these qualities show through in your

5    writing style.  The big advantage is that the reader

6    instinctively, easily accepts the lessons you impart

7    without thinking he or she is being talked down to or

8    boasted to.  My compliments."

9         So let me just ask you first before I ask for

10   context.  Are these, do these reflect your views about

11   Mr. Klamer?

12   A.   Yes, especially in regards to his attraction to

13   our publisher.

14   Q.   What was the context in which you sent the e-mail?

15   A.   First I'd say that since I became a published

16   author in the late 1980s, any number of game inventors

17   who also wished that they could get into publishing

18   have asked me how do you do it, what does it take?  And

19   what I realized over time is it's not just your

20   manuscript, it's who you are.  Publishers want somebody

21   who can promote their book because, quite frankly, they

22   don't have a lot of budget to do it on their own, so

23   they will arrange for radio interviews and book

24   signings and they need somebody whose qualities will be

25   projected.

1       So over time I began to realize that this is

2    what I need to help these game inventors with, is who

3    are you and why might you be appealing to a publisher.

4    **Q.**   So let me ask you, does your professional

5    relationship with or your views of Mr. Klamer prevent

6    you from being impartial in this case?

7    **A.**   No.  As an experienced expert witness, I know I

8    must compartmentalize my personal opinions and I

9    wouldn't let that interfere.

10   **Q.**   Are your opinions dependent on your views of

11   Mr. Klamer?

12   **A.**   No, they're not.

13   **Q.**   Are any of your opinions in any way dependent on

14   your assessment of the credibility of any of the

15   witnesses?

16   **A.**   No.

17   **Q.**   I'd like to ask you about something you said in

18   your deposition.

19       MR. KRUMHOLZ:  Your Honor, you should have a

20   transcript up there, and I believe you should have the

21   transcript --

22       THE COURT:  Yes.

23       MR. KRUMHOLZ:  -- as well.

24       THE COURT:  Go ahead.

25       MR. POLLARO:  If I may, I believe Mr. Krumholz

1    is going to get to the very point of our motion to

2    strike that's pending with the Court.

3          THE COURT:  All right.  Well, first of all, it's

4    unusual to direct a witness to something in his

5    deposition on direct examination.  So what's the

6    purpose of that?

7          MR. KRUMHOLZ:  The purpose is, at least in my

8    experience, your Honor, that we're afforded the

9    opportunity for him to explain some testimony that he

10   gave in the direct case during his direct examination.

11   So there's a Q and A that was highlighted in their

12   papers that does indeed form the basis of their motion

13   and I want to -- that the witness has an explanation

14   for that answer, and I want to afford the Court an

15   opportunity to hear that explanation.

16         THE COURT:  All right.  Well, I have not had an

17   opportunity to read the motion because that was just

18   filed.  Somewhere here I have a copy of it.

19         MR. KRUMHOLZ:  It's not the errata motion.  It's

20   the *in limine* motion.

21         THE COURT:  Oh, I see.  Okay.  So I thought you

22   were referring to the errata motion.

23         MR. POLLARO:  It is.  It's both, your Honor.

24         MR. KRUMHOLZ:  Well, I guess it is both.  And we

25   could care less about the errata sheet.  It's a

1    complete nonissue for us.  I think they're wrong on the

2    law in terms of what he can do with an errata, but it

3    doesn't expunge the testimony anyway so that's what we

4    want to talk about.

5         MR. POLLARO:  Your Honor, if I may, then it

6    sounds like that would be if I bring it up on cross he

7    can redirect on that.  I think that would be the

8    easiest solution.

9         THE COURT:  On the errata or on this point?

10        MR. POLLARO:  This point is the errata.

11        THE COURT:  Here's what we're going to do.  I'm

12   going to allow you to go ahead and inquire on it on

13   direct and then you can deal with it on cross and then,

14   as with everything in your motions *in limine,* I've

15   taken all of that under advisement, and I'll deal with

16   it when I get to the point of making my decision here.

17   So go ahead.

18        MR. KRUMHOLZ:  Thank you, your Honor.

19        THE COURT:  Actually, I'm not sure I have a copy

20   of the deposition.

21        MR. KRUMHOLZ:  I think you do now.

22        THE COURT:  Here it is.

23        THE WITNESS:  It's not in my binder.

24        MR. KRUMHOLZ:  It's not in your binder?

25        THE WITNESS:  No.  I just have the index.

1          MR. KRUMHOLZ:  That's okay.  We can correct

2     that.

3          May I approach, your Honor.

4          THE COURT:  Yes.

5          THE WITNESS:  Thank you.

6     **Q.**    If you could turn to page 49, starting at line 10.

7     **A.**    Yes.

8     **Q.**    And I'll just read it out loud and inquire of you

9     thereafter.

10         "Question:  Are the opinions expressed in your

11    reports based on your testimony that you believe Ruben

12    Klamer to be trustworthy?"

13         And you say:

14         "Answer:  In my experience he has always been

15    trustworthy.

16         "Question:  And your opinions in your report are

17    based on that fact; is that correct?

18         "Answer:  Yes, they are."

19         Is that indeed what you said in the deposition?

20    **A.**    It's what I said, yes.

21    **Q.**    And does it accurately reflect your opinions?

22    **A.**    No, I, with apologies, had become confused at this

23    point.  I thought we were talking about what I was

24    basing my opinion on that Mr. Klamer was trustworthy,

25    and I simply overlooked the question that Mr. Pollaro

1    asked, which was am I basing my opinions and report on

2    that.  I'm sorry.

3    **Q.**   Okay.  So have we asked you to assume facts for

4    purposes of your testimony?

5    **A.**   Yes.

6    **Q.**   And did you do that in your report?

7    **A.**   I did.

8    **Q.**   And are you prepared to do that today?

9    **A.**   I am.

10   **Q.**   And if Mr. Pollaro on cross-examination has

11   appropriate hypotheticals, are you prepared to answer

12   those as well?

13   **A.**   I am.

14   **Q.**   Okay.  So let's talk quickly about Winning Moves

15   and then get to the substance of your testimony.

16   **A.**   Certainly.

17   **Q.**   What's your current position at Winning Moves?

18   **A.**   I retired from active management in 2013.  I'm

19   known as the vice-chairman of Winning Moves now.

20   **Q.**   So do you have any role in the day-to-day

21   operations of the company?

22   **A.**   None.

23   **Q.**   But you still do own your interest?

24   **A.**   Sorry?

25   **Q.**   You still do own your equity interest?

1    **A.**    I do.

2    **Q.**    And Hasbro still owns its?

3    **A.**    It does.

4    **Q.**    And in your deposition, did you indicate that you

5    needed Hasbro's permission before selling your shares?

6    **A.**    Yes, I did say that, but I misremembered the

7    nature of the agreement.  It's been ages since I looked

8    at it.

9    **Q.**    Since that time, have you looked at the actual

10   shareholder agreement?

11   **A.**    I have.

12       MR. KRUMHOLZ:  And the shareholder agreement is

13   at Tab 11, which is HTX109, also been designated as

14   PTX296.  We ask that that be admitted.

15       THE COURT:  All right.  Is there any objection

16   to the PTX -- or HTX109?

17       MR. POLLARO:  No objection.

18       (Defendant's Exhibit HTX109 was admitted in

19   full)

20   **Q.**    And I don't want to spend a lot of time getting

21   into the weeds on the language, but can you just

22   explain to the Court what restriction, if any, you have

23   on selling your shares.

24   **A.**    Yeah.  Well, most importantly, I have no

25   restriction to pass my shares down to my heirs.  I have

1     no restriction to sell my shares with one

2     qualification, and that is that Hasbro is entitled to

3     match the offer.  The reason that's in there is because

4     when Winning Moves was started and had a different

5     charter Hasbro was the beneficiary potentially of

6     products that we were creating and bringing to market,

7     and they didn't want to wake up one morning and decide

8     the four founders had suddenly decided, well, let's

9     sell our shares to Mattel, so Hasbro made sure that in

10    the event we had a bona fide offer they could match it.

11    **Q.**   Okay.  So you've been accused of agreeing to

12    testify to curry favor with Hasbro.  Is that a fair

13    accusation?

14    **A.**   Yes.

15    **Q.**   Yes, that is a fair accusation?

16    **A.**   No, no.  Yes, that I was accused.  I'm not saying

17    it's fair.  Sorry.

18    **Q.**   So is that a fair accusation?

19    **A.**   No, it's not.

20    **Q.**   Why not?

21    **A.**   Because this was a one and done.  I can tell you

22    that when this deal was made, Hasbro was in the process

23    of acquiring huge companies like Wizards of the Coast

24    and Tiger Electronics for hundreds of millions of

25    dollars.

1          After this was made, it literally was forgotten.

2     As a matter of fact, I can recall two times in ensuing

3     years where I had to go to Hasbro, remind them of this

4     and point out that Winning Moves needed to issue more

5     shares and they were entitled to purchase their

6     prorated share, and their response was no, thanks,

7     proceed as you want.

8     Q.    Do you have any ability to influence Hasbro's

9     decisions?

10    A.    No, I don't.

11    Q.    At this point do you have any ability to influence

12    Winning Moves' decisions?

13    A.    Management would rebel if I did.

14    Q.    Do you presently have any relationships at Hasbro?

15    A.    I haven't had a relationship with a Hasbro

16    executive, a business relationship since Dave Wilson

17    left, which was somewheres around 2007.

18    Q.    So Winning Moves does license some products from

19    Hasbro?

20    A.    Yes.  That new arrangement that I mentioned that

21    really got going around 2006, 2007 continues.

22    Q.    So would you be negatively impacted if Hasbro no

23    longer had the ability to license the classic version

24    of Game of Life to Winning Moves?

25    A.    Yeah, in a minor way.  We love having the game.

1    It's prestigious to have it, but it's the single most

2    expensive game that Winning Moves made when I was

3    running the company.  I assume it still is.  So its

4    profits aren't as strong as other games.

5         Probably just as significantly it's a

6    nonexclusive contract, and we found out at Toy Fair

7    this year that Hasbro in fact licensed the 1960 version

8    of The Game of Life to one of our competitors, the only

9    difference being the packaging.  That has resulted in a

10   significant reduction in the sales forecast, I'm told.

11   **Q.**   Would you let your relationships with Hasbro,

12   Mr. Klamer or Winning Moves impact your testimony in

13   any way?

14   **A.**   No.  My reputation as a reliable expert witness

15   and as a game historian are crucial to me.  Well, I

16   shouldn't say crucial.  They just mean a lot to me

17   personally, so, no, I wouldn't.

18        MR. KRUMHOLZ:  Your Honor, at this point I'm

19   going to move into substance or I'm going to keep going

20   or take a break.

21        THE COURT:  It might be a good time to take our

22   afternoon break so let's do that.  Take about a

23   10-minute break or so.

24        (Recess)

25        THE COURT:  You may proceed.

1           MR. KRUMHOLZ:  Thank you, your Honor.

2    **Q.**   Mr. Orbanes, I'd like to ask you some questions

3    now with regard to issues related to the work-for-hire

4    issue before the Court.

5    **A.**   Yes.

6    **Q.**   I'm going to be asking you to assume a series of

7    facts and then ask you your opinions with regard to

8    those assumed facts.  Okay?

9    **A.**   I understand.

10   **Q.**   So I'm going to start with three.  I'd like you to

11   assume that Milton Bradley asked Mr. Klamer to come up

12   with a game to celebrate its 100th anniversary, okay?

13   Two, after discovering The Checkered Game of Life,

14   Mr. Klamer conceived of a game that would be based on

15   life events that would have a circuitous track, a

16   spinner, and three-dimensional components, and that he

17   retained Mr. Markham and his company to develop a

18   prototype based on those concepts and, in fact,

19   Mr. Markham's company did that.  Okay?

20   **A.**   Yes.

21   **Q.**   Is that a usual or unusual scenario in your

22   experience?  And let's put it in the time frame of the

23   late 1950s or early 1960s.

24           MR. POLLARO:  Objection, your Honor.  Relevance.

25   Foundation.  Same reason that happened to Mr. Carty.

1          THE COURT:  Well, I don't think it's irrelevant.

2          I actually do though have a question about your

3     question.  You've asked him to assume certain facts and

4     now you want to ask him if that's a usual or unusual

5     scenario.

6          MR. KRUMHOLZ:  Yes.  So what I would want to try

7     to establish for the predicate for his testimony is

8     that the kind of scenario where you have somebody

9     acting as an inventor that came up with a concept that

10    then retained a design firm to execute that prototype,

11    that kind of scenario, that that is indeed very common

12    in the industry, and then from that he can offer his

13    views based on his experience about who typically takes

14    the economic risk in that environment, who typically

15    keeps control in the environment.

16         THE COURT:  I'll allow it, so I'll overrule the

17    objection, but why don't you be a little more precise

18    about the way you ask the question, similar to what you

19    just did in explaining it to me.

20         MR. KRUMHOLZ:  Okay.

21         MR. POLLARO:  Could I add disclosure to that?

22    I'm just trying to make sure where that is.

23         MR. KRUMHOLZ:  We talk about this in paragraphs

24    34, 73, and 74; paragraph 149, 154, 155, 157, 158.  I

25    guess apparently more than that.  This is a major part

1    of his disclosure.

2         THE COURT:  All right.  So proceed.

3    **Q.**   So let me ask a couple more predicate questions.

4    Do you still have the assumed facts in your head?

5    **A.**   Yes, I do.

6    **Q.**   So in your experience, what role is Mr. Klamer

7    playing in that kind of scenario?

8    **A.**   Mr. Klamer is the inventor and the client in the

9    development process.

10   **Q.**   And when you say "inventor," is there a meaning in

11   the game industry?

12   **A.**   Yeah, we have a lot of description of the roles

13   that individuals play during the evolutionary process

14   of a new game, and the most important one is that in

15   the industry the person who has the eureka moment is

16   the inventor and that is the person who comes up with

17   the initial idea, coupled with either an opportunity or

18   a challenge.

19         So under the facts that you asked me to assume,

20   the challenge was by Milton Bradley to come up with a

21   100th anniversary game, and when Mr. Klamer was in the

22   archive and saw the 1860 Checkered Game of Life, he

23   came up with an idea that addressed the opportunity and

24   the challenge.

25   **Q.**   Okay.  So that puts him in the inventor bucket.

1    **A.**    Correct.

2    **Q.**    And again working with these assumed facts about

3    the role that Mr. Markham's company played, what

4    bucket, if any, does his company or his work fall into,

5    based on your experience?

6    **A.**    I think I can explain this in some simple terms.

7    In the industry we refer to the phases of invention,

8    design and development as looks like, plays like, works

9    like.  And looks like is the invention; plays like is

10   the development of a plan that will take the idea and

11   turn it into something with mass application; and then

12   the development is actually building the prototype

13   according to the plan.

14           So in this scenario as you've outlined it,

15   Mr. Markham and his team designed and developed the

16   prototype at the instance of Mr. Klamer.

17   **Q.**    And how common is it in your experience to have a

18   scenario where you have this one person who has the

19   eureka moment, who comes up with the idea and the

20   opportunity and retains another to create the

21   prototype?

22   **A.**    In my experience in working with hundreds of

23   inventors, most of them are very good at coming up with

24   ideas and knowing what they want, but they don't have

25   the physical skills to actually design and build.  As a

1    result, it's very common that they need to hire the

2    talent necessary to turn their idea into reality.

3    **Q.**    And do you have an understanding, based on your

4    experience in this type of scenario, who typically

5    retains control of the project?

6    **A.**    It's always the inventor because the inventor

7    knows what is necessary in order to satisfy the

8    opportunity that he has been presented with.

9    **Q.**    And I guess, conversely, why not the designer?

10   **A.**    Because the, well, the designer and the developer,

11   is the --

12   **Q.**    Sure.

13   **A.**    The designer is usually a very gifted person who

14   can take that idea and translate it into a plan.  The

15   developer is usually a team of gifted people who have

16   the means to basically look at a specification and then

17   build the model.

18   **Q.**    So let me ask you to assume two more facts as we

19   build out this hypothetical.  Mr. Klamer retained the

20   right to approve the design and to approve the

21   prototype itself --

22   **A.**    Yes.

23   **Q.**    -- and that he visited Mr. Markham's shop

24   approximately twice a week while the project was going

25   on to provide input and to make necessary decisions.

1    **A.**    Yes.

2    **Q.**    Okay.  Are those facts consistent or inconsistent

3    with your experience of these kinds of situations that

4    we've been talking about?

5    **A.**    Yes.  And I've had virtually identical experiences

6    myself.

7    **Q.**    So is it consistent or inconsistent?

8    **A.**    It's consistent.

9    **Q.**    How is it consistent with your experience?

10   **A.**    Would you like to give me an -- would you like me

11   to give you an example?

12   **Q.**    Sure.

13   **A.**    Okay.  When I arrived in New York City in the

14   summer of 1969, soon thereafter my boss said to me on a

15   Monday morning we have a great opportunity to present

16   an astrology game to a promotional firm in Philadelphia

17   next Monday, come up with something.  I didn't know

18   anything about astrology.  With my science background I

19   had studied astronomy, but astrology was something

20   completely different.

21         So I investigated it and realized by Friday that

22   consumers really wouldn't want a game based on

23   astrology.  What they would want would be a device that

24   they could compose their own horoscope with in the

25   privacy of their home.  And on my way home from work

1    that Friday I acquired all the materials that I needed

2    to build a crude working model, which I did over the

3    weekend.

4         I met my boss on the train going to Philadelphia

5    that following Monday, and the company that we showed

6    this to flipped over it because in that era the occult

7    was a very popular trend.  In fact, the Ouija Board was

8    outselling Monopoly almost two to one.  It was the

9    Vietnam War and all the uncertainty.

10        So when we got back to my company in New York,

11   that feedback gave them confidence to say this belongs

12   in our product line.  What they then did was to

13   identify, if you will, a Bill Markham.  This was a firm

14   named Francis Blod & Associates at One East 53rd

15   Street, and they contracted on a work-for-hire basis

16   with Francis Blod.  I, as the inventor of the concept,

17   then ran the project, and we had a kickoff meeting

18   where Francis Blod himself was present and introduced

19   me to the two designers that he would assign to run the

20   project for me.

21        Francis Blod just happened to be a very

22   acclaimed industrial designer instructor at Pratt.  I

23   never saw him again, quite frankly, until the project

24   was done.  But the two designers he assigned me were

25   Fred Feucht and Dan November.  Fred was graphics, and

1    Dan was an industrial designer, which meant he would

2    create the three-dimensional parts.  And during the

3    course of probably six to eight weeks I visited the

4    company twice a week to make decisions to keep the

5    project on track, and eventually we selected a design

6    based on sketches.  Fred then executed the graphics.  I

7    hired a copyrighter because this product had a lot of

8    copy that would have to be done in a very good,

9    professional manner.  Dan designed the

10   three-dimensional very beautiful looking computer-like

11   object that this became; and from time to time, the

12   molding engineer from the Learning Aids Group would

13   accompany me and make sure that Dan's work could

14   ultimately be moldable, in other words, that tooling

15   could be made and the parts that the tooling made would

16   be feasible.

17   Q.   So in this scenario, this example that you're

18   giving, who retained control?

19   A.   I did on behalf of my company.

20   Q.   And your company was the one that had come up with

21   the idea and hired a designer to execute it?

22   A.   I came up with the idea on behalf of my company.

23   Q.   Right.

24   A.   But they selected the design house, and then I

25   took over the -- it was at my instance that they

1    designed.

2    **Q.**   And how, in your experience, how common or

3    uncommon was that example that you gave in terms of who

4    retained control?

5    **A.**   It's almost always the inventor.

6    **Q.**   Can you think of circumstances where the design

7    firm would be the one retaining control?

8    **A.**   Only if the inventor really didn't have an

9    assignment.  I mean, if the inventor didn't have an

10   opportunity and he was looking to spark ideas just for

11   the sake of being able to present them, yeah, in that

12   scenario he might turn to a design house and say do you

13   want to speculate with me; but not when you know what

14   you want and you have time pressure in particular.

15   **Q.**   Okay.  So staying with these same facts that I've

16   asked you to assume, in the game industry when it comes

17   to these kinds of inventions and new game concepts, who

18   typically retains the economic risk?

19   **A.**   The inventor.

20   **Q.**   How common is it for the inventor to be the one

21   retaining the economic risks?

22   **A.**   Well, it's very common, and I can explain why.

23   There's a real difference in the roles played by a

24   service provider and an inventor.  An inventor doesn't

25   get a salary.  He doesn't get a paycheck.  His

1    existence and his financial success is based on

2    royalties, which are speculative.

3         A service provider, especially a design

4    organization, is interested in cash flow and they need

5    to pay their overhead, which means that they need to

6    continually find sources of revenue.

7         There are invention houses that some of whom are

8    successful, but they do not do design work on spec.

9    They do creative work and take the same risk as an

10   individual inventor.

11   **Q.**   So I'm going to ask you to assume a couple more

12   hypotheticals.

13   **A.**   Certainly.

14   **Q.**   And I'll ask you to assume that Mr. Klamer

15   unconditionally agreed to pay Mr. Markham's

16   out-of-pocket costs and the salary for six weeks of

17   Ms. Chambers and Mr. Israel.

18        Are terms like that consistent or inconsistent

19   with your experience in the industry, again, for the

20   totality of these assumed facts?

21   **A.**   Very consistent.

22   **Q.**   How so?

23   **A.**   Work-for-hire is the means by which an inventor in

24   this case normally contracts for services.

25   **Q.**   Let me ask you to assume that Mr. Klamer also

1      agreed to allocate to Mr. Markham 30 percent of the

2      royalty that Link Research hoped to receive if the game

3      was successful.

4      **A.**   Yes.

5      **Q.**   Okay?  How common is it for an inventor to both

6      cover the costs and also pay a royalty?

7      **A.**   It's circumstantial.  And in my experience,

8      because I've done this too, the reason why you give --

9      in the industry it's called points.  The reason why you

10     give points away is because you need something

11     exceptional, perhaps you need a really strong creative

12     contribution or you just need to get it fast.

13         I've had many experiences where typically I

14     would give away what's one-and-a-half points.  That

15     means I give away one-and-a-half percent of a typical

16     5 percent royalty, which just happens to be 30 percent.

17     It's not something that an inventor likes to do, but

18     they realize that at times it's very important to

19     provide motivation.

20     **Q.**   So were there factors that you saw here in looking

21     at the record that would be consistent with creating

22     this economic incentive of giving a royalty while still

23     covering the costs?

24     **A.**   Yes, and there's two reasons that my experience

25     can reap what to bear here on this.  The first is

1    Mr. Taft, as I understand it, had set a date when he

2    would be in Los Angeles and expected to see something,

3    and that happened to be about six weeks, I believe,

4    after Mr. Klamer saw The Checker Game of Life in the

5    library.  As Mr. Carty testified this morning, that is

6    a very accelerated period of time.

7         Secondly, there really wasn't the time to do

8    this project in sequence.  In other words, after the

9    concept that Mr. Klamer came up with was presented,

10   normally you would have a design phase and you would

11   come to a design that you would then with confidence

12   say let's build the model.

13        In this case, Mr. Markham and his team and

14   Mr. Klamer had to compress that schedule, so design and

15   development overlapped, and given that, I think that,

16   you know, royalty sharing was pretty appropriate.

17        I also should add, by the way, that the

18   materials that as I understand it were used to make the

19   prototype for The Game of Life were pretty much the

20   same materials I used just a few years later, cardboard

21   and balsawood.  So you weren't at the mercy, let's say,

22   of having to fabricate plastic parts in order to have a

23   looks-like prototype.  So it was feasible, but it was

24   an accelerated schedule.

25   Q.   And that would be motivation to not only cover

1    costs but give a royalty?

2    **A.**   Yes.

3    **Q.**   While we're on this topic that you just mentioned,

4    you heard Mr. Carty talking about the timeline, excuse

5    me, during his direct exam.

6    **A.**   Yes.

7    **Q.**   And he suggested that that timeline seemed

8    unlikely -- it was unlikely that it could be done in

9    four to six weeks.

10   **A.**   Right.

11   **Q.**   What's your reaction to that testimony?

12   **A.**   Well, I don't think we're talking about apples to

13   apples because the games that Mr. Carty was most

14   familiar with are very rule-intensive.  They require a

15   lot of time to perfect because otherwise the players of

16   these games literally rebel; but in the mass market

17   when you're doing toy-like games, the rules tend to be

18   fairly simplistic and the materials are more

19   significant, let's say, than the need to have very

20   intricate rules that will make a game playable for a

21   long period of time, so that pressure is removed.

22          And I know from experience that sometimes I've

23   given an inventor an assignment and in two weeks I've

24   got a working prototype.

25   **Q.**   So in your experience, is it certainly conceivable

1    that they could have gotten from concept to prototype

2    in this four- to six-week period?

3    **A.**   Yeah.  I would have thought it would be a

4    thrilling process, too, to have this opportunity and

5    the time pressure, you know, you live for this actually

6    and you move heaven and earth to make it happen.

7    **Q.**   And going back to what we were just talking about,

8    in your view based on your experiences, does the

9    presence of a royalty under these circumstances suggest

10   to you that Mr. Markham was sharing in the economic

11   risk?

12   **A.**   No, I think that that's apart from the economic --

13   apart from the work-for-hire.  This was for a special

14   purpose.

15   **Q.**   And you understand that the assignment agreement

16   provided Mr. Markham with 30 percent of whatever

17   royalties that Link Research received?

18   **A.**   Yes.

19   **Q.**   And was that, in your view, based on your

20   experience with these kinds of deals, a fair deal for

21   Mr. Markham?

22   **A.**   I think it was a generous deal because typically

23   inventors earn 5 percent, but because of the presence

24   of Mr. Linkletter in this equation, who had agreed for

25   an entire year he would promote it on his number one

1    children's program, it was rather generous to base the

2    30 percent on 6, which included the promotional up

3    charge instead of the typical 5 percent.

4            MR. KRUMHOLZ:  So unless your Honor has some

5    questions on this topic, I'm going to move to

6    derivative works at this point.

7            THE COURT:  That's fine.

8    **Q.**  So let's talk about the derivative works analysis

9    that you did.  And I want to begin by talking about the

10   process from getting a game from prototype to

11   commercial product like we talked about with Mr. Carty.

12   **A.**  Right.

13   **Q.**  Are you familiar with the general practices that

14   companies employed in 1950s and 1960s for getting a

15   board game from prototype to commercial product?

16   **A.**  Yes, I am.

17   **Q.**  And your familiarity comes from what you talked

18   about before the break in terms of your experience?

19   **A.**  Yes.  The practices didn't change very much during

20   that era, and I had several good mentors whose

21   experience reached back into the mid-1950s.

22   **Q.**  Can you list for us the different departments in a

23   game company like Milton Bradley during 1950s and 1960s

24   that touch upon this process.

25           MR. POLLARO:  Objection, your Honor.  Relevance.

1    Foundation.

2              THE COURT:  Overruled.

3    **A.**   In the R&D Department there would be four groups.

4    There would be preliminary design, which basically

5    comprised inventive people because they had to convert

6    an invention into a commercial invention.

7              There would be graphic design, industrial

8    design, and engineering.

9    **Q.**   This is all within the research and development

10   group?

11   **A.**   All within the first department.  But two other

12   departments that would bear heavily on the decision

13   back then were manufacturing, as Mr. Carty pointed out,

14   as well as sales.

15             In that era, marketing was not powerful.  It was

16   not a separate organization.  Today it's generally the

17   most important department.

18   **Q.**   So let's take each of these in turn.  What role

19   back in that time frame would the Research &

20   Development Department play?

21   **A.**   Well, the most important task of the Research &

22   Development Department is to take the inventor's

23   prototype and make it playable for the target market to

24   make sure that it plays smoothly without controversy

25   and that it has a suggested look and feel that's

1    consistent with the expectations of that market.

2        The Graphic Department will then take the

3    responsibility to prepare what in those days was called

4    camera-ready art.  That would be all of the materials

5    needed to actually produce the printing plates that

6    would make the game, make the printed components on the

7    assembly line.

8        The Industrial Design Department would be

9    responsible for styling and drawing the part drawings

10   for all the dimensional plastics that were in the game.

11       The Engineering Group would be responsible for

12   taking those part drawings and converting them into

13   engineering drawings that could then be sent to an

14   outside mold maker who could build the tools to make

15   those plastic parts.

16   **Q.**   So this is just the R&D Department so far?

17   **A.**   Right.  And in the industry there's a euphemism,

18   which is a product starts off and it's shades of gray

19   but it ends up black and white by the time it ends its

20   journey through product development.  And that just

21   simply means that manufacturing has a specific

22   specification that it can build into a production.

23   **Q.**   All right.  So then let's shift to manufacturing.

24   What role back -- so when I ask you these question I'm

25   talking about the late 1950s, early 1960s.

1    **A.**    Correct.

2    **Q.**    During that time frame, what role did the

3    Manufacturing Department in a company like Milton

4    Bradley play in bringing a product from prototype to

5    commercial?

6    **A.**    In the words of the R&D people who are familiar,

7    they were the wet blanket.  And by that --

8    **Q.**    Usually the role of lawyers.

9    **A.**    Pardon me?

10    **Q.**    Usually the role of lawyers.

11    **A.**    They were the restraining factor.  They had to

12    know that this game and all the pieces that went into

13    it could actually be physically produced on an assembly

14    line.

15    They had to know that the game board, the

16    printed components, the cards, decks, any boxes and

17    trays actually could be physically made given their

18    sizes on their preexisting equipment.

19    They really didn't like the idea, let's say, of

20    a new game board size because that meant whole new jigs

21    and fixtures.  And the other thing they needed to do

22    was to make sure that the nature of the design actually

23    could be made on an assembly line.

24    In addition to those restraints, the Sales

25    Department -- I need to jump ahead at this point -- had

1    come forth and provided input on how big the package

2    had to be and the retail price point to satisfy the

3    interests of the trade.  If the box was not big enough

4    for the price point, the trade would be resistive

5    because they had so many other competitive products

6    that a price point associated with packet size that

7    they would be concerned.  Let's say if it was, if you

8    package it to look like Monopoly, it better cost the

9    same as Monopoly.  Well, The Game of Life was far

10   bigger, so the actual package ended up being bigger and

11   the price point determined on which you could afford to

12   spend to make this game, so that again figured into

13   manufacturing's equation when they would impose their

14   wet blanket.

15   Q.    So you started talking about sales.  Have you

16   covered the relevant sales play?

17   A.    Yes.  Sales in those days was the company's eyes

18   and ears.  They knew what was happening in the retail

19   marketplace.  They knew what retailers were happy with.

20   They knew what competitive products were selling, and

21   that feedback was coming into the company not just

22   about new games under development but also about games

23   that were already in the line that perhaps had some

24   deficiencies and needed to be fixed.

25   Q.    So how important was this process to getting from

1   a prototype to a commercially successful product?

2   **A.**   Well, it's critical.  You don't have a commercial

3   product when the prototype comes in.  The inventor has

4   completed his task when he presents as I said before

5   what's generally called the sizzle model, but now you

6   need the talent of all of these groups within R&D to

7   convert the promise of that prototype into a

8   commercially feasible product, which means it could be

9   made, it could be made for a cost, and it has the

10  aesthetic considerations necessary for it to appeal to

11  the target market.

12  **Q.**   Let's talk about that last point, the aesthetic

13  considerations.  What do you mean by that?

14  **A.**   That's the look, feel, and the specific design of

15  all the components in the game, be they printed or be

16  they molded.

17  **Q.**   And how important are the aesthetics, getting the

18  aesthetics right by, you know, the development team?

19  How important is that to a commercially successful

20  product?

21  **A.**   It's generally the difference between success and

22  failure because if you miss your target market's

23  expectations in the visual appeal of the product, it

24  won't leave the shelf.

25  **Q.**   And in your experience, how often are aesthetics

1   changed when, you start with a prototype, to get to the

2   commercial product?

3   **A.**   Often.

4   **Q.**   Okay.  Could you elaborate?

5   **A.**   A lot of times the inventor tries very hard and

6   submits a prototype that just is too cluttered and

7   there's just too much going on, and it achieves the

8   purpose, the purpose being to gain attention, but

9   generally it's been my experience in the development

10   process that the excess gets stripped away and what's

11   left is better tailored to satisfy the feat.  In other

12   words, you don't want to have a lot of nongame

13   composition to distract from the actual play of the

14   game, but whatever you have needs to trigger in the

15   game player's mind imagery that brings to life that

16   theme.

17   **Q.**   Can changes in design that may seem small to

18   somebody like me be important to somebody like you?

19   **A.**   One of the best subjects -- I'll answer it this

20   way.  One of the best subjects that I studied in

21   college was called The Psychology of Design and Color,

22   and what I learned in that course is that small changes

23   and small modifications of design elements have

24   overwhelming impact at times.

25       A lot of the consumer products that you see in

1    the marketplace then as well as now have been subjected

2    to testing in which very small changes are presented in

3    a series of alternatives, and the one that has the

4    highest rating in consumer testing is often not that

5    much different from the ones that are number two,

6    three, and four.

7    Q.    But the difference --

8    A.    Is critical.

9    Q.    -- matters?

10   A.    Yes.

11   Q.    At our request, have you done an analysis

12   comparing the photos from the prototype to various

13   commercial versions of The Game of Life?

14   A.    I have.

15   Q.    So let's spend a little time talking about that.

16   We have -- I think everybody should have and you should

17   have, I think hopefully the Court still has the images

18   for the demonstratives that we put together.

19        MR. KRUMHOLZ:  With the Court's permission, I'll

20   put some posters on the board.

21        THE COURT:  Yes.

22   Q.    Okay?

23   A.    Okay.

24   Q.    And this is also pages 7 and 8 from the

25   demonstratives that we previously provided.

1          So obviously the first thing I'd like to ask you

2     about are the box covers between The Game of Life

3     prototype and some early versions of the commercial

4     game version that have a 1960 copyright.

5     **A.**   Yes.

6     **Q.**   Before I get to those images, let me ask just a

7     little background on the role of box covers.

8          What role does a box cover play in the overall

9     success of a game?

10    **A.**   It is typically the first contact that the

11    consumer will have with the product that's packaged

12    inside the box; and the importance, therefore, is to

13    accurately and in an appealing fashion communicate the

14    game, its name and its nature, so that the consumer

15    knows what it is without confusion and hopefully will

16    find it to be of interest to pick it up and look

17    further.

18    **Q.**   And how important is a box cover to a game's

19    commercial success?

20    **A.**   Well, you know, if you talk to a lot of people

21    that I did in the industry after every game fails, they

22    often said it was a lousy package, even though at the

23    time it may have been something that somebody favors.

24    So the answer is the package is very, very significant,

25    especially in the early takeaway, as we call it, of the

1    product at retail.

2    **Q.**   What do you mean by "takeaway"?

3    **A.**   In other words, evoking a sale.  Typically, games

4    are put on the shelf before there is a promotional

5    campaign in the fall, and what you want to see is the

6    consumer is attracted to the package in order to get

7    the game moving at retail, which provides confidence to

8    the retailer to carry it in-depth come the fall selling

9    season.

10   **Q.**   Okay.  So let's jump in and talk about what

11   similarities and differences you found and the

12   conclusions that you drew with regard to them.

13          We have on the left, which is page 7 in the

14   demonstrative package, it says, Prototype and Early

15   Commercial Version Box Cover Similarities.  Do you

16   recognize the upper left as the prototype box cover?

17   **A.**   I do.

18   **Q.**   And the other two images are the top and the side

19   of one of the 1960 copyright versions?

20   **A.**   Yes, it could be the first version.

21   **Q.**   And we have this lettering on here, A, A, B, B.

22   Do you see that?

23   **A.**   Yes, I do.

24   **Q.**   Is that something you created to just help us walk

25   through the similarities?

1    **A.**   Yeah, I thought this might be a good way to

2    compare apples to apples, if you will.

3    **Q.**   I'm going to actually ask you open up page 7 from

4    your -- because I'm concerned you're looking that way

5    and the judge is that way, so maybe let's try and work

6    from --

7    **A.**   Okay, page 7.  Okay.  I've got it.

8    **Q.**   So let's start walking through.  What similarity

9    is reflected by the letter A?

10   **A.**   It's the background color for the two respective

11   packages.

12   **Q.**   Which is white?

13   **A.**   White in both cases.

14   **Q.**   And what do we see -- so we have the B there that

15   seems to be at or over the "L" for "Life"?

16   **A.**   It's the word "Life" and how it appears in both.

17   **Q.**   So there's similarity there?

18   **A.**   There is.

19   **Q.**   And then C looks like it's referring to the side

20   of the box.

21   **A.**   It's referring to whatever copy appears on the

22   side, which we can see in the prototype L-I-F-E, but we

23   can't read anything else.

24   **Q.**   And what does D represent?

25   **A.**   D is the endorsement by Art Linkletter.

1    **Q.**   And E, what's the similarity that that represents?

2    **A.**   D?

3    **Q.**   E.

4    **A.**   I'm sorry.  E is the descriptive headline for the

5    game, which is the same in both cases except for a

6    bolder type font.

7    **Q.**   Okay.  We'll get to the differences in a moment.

8    **A.**   Yes.

9    **Q.**   And F?

10   **A.**   F is the call-out to commemorate the 100th

11   anniversary game for Milton Bradley.

12   **Q.**   So those are similarities that you found between

13   the two box covers; correct?

14   **A.**   Correct.

15   **Q.**   So if we go to page 8, did you identify for us

16   differences between the box covers?

17   **A.**   I did.

18   **Q.**   So we have four images here.  We have the

19   prototype in the top left and the cover that we just

20   looked at in the top right.

21          MR. KRUMHOLZ:  I will represent that the images

22   at the bottom are two other versions with a copyright

23   of 1960 that we've premarked as HTX16 and HTX18, and we

24   have the physical games.  We'd like to move those into

25   evidence at this point.

1            THE COURT:  Any objection?

2            MR. POLLARO:  No objection.

3            THE COURT:  All right.  So 16 and 18, the two

4    games, will be full.

5            (Defendant's Exhibit HTX16 was admitted in full)

6            (Defendant's Exhibit HTX18 was admitted in full)

7    **Q.**   And we seem to have a different approach here.  We

8    have colors and geometric shapes to help us orient

9    ourselves, so why don't we start walking through that.

10   **A.**   Yes.

11   **Q.**   And as we go through each, I'll also be asking you

12   to explain to the Court what significance, if any, do

13   you place on these differences.

14   **A.**   Right.

15   **Q.**   So first we have the yellow oval which circles The

16   Game of Life in the four different versions.  Can you

17   explain to the Court -- we can all see the difference,

18   but explain to the Court the difference and then the

19   significance of that difference to you.

20   **A.**   It actually, Josh, just circles the three words,

21   "The Game Of."

22   **Q.**   Oh, I apologize.  Thank you.  Yes, it circles just

23   "The Game Of"?

24   **A.**   Right.  So the differences are it has a minor

25   presence in the prototype package, whereas in the

1   commercial versions it's superimposed appropriately

2   over the title.  The significance of this is in the

3   prototype package the title seems to be 100 Life.  It

4   could cause that confusion in the eyes of the consumer.

5   You don't want confusion at all at retail if you can

6   help it.  So what the Milton Bradley designers did is

7   move the three words "The Game of Life" above the

8   title, increased the weighting of the font, so that

9   when a consumer sees this package they read correctly

10  the title of the game all in one, The Game of Life.

11  Q.   And how significant a decision is that from your

12  perspective as a game designer?

13  A.   It's fundamental.  You must make sure the first

14  thing the consumer knows is is it a game, a toy, a doll

15  or whatever, so you want to promote the word "game" in

16  strong juxtaposition to the name of the game.  In this

17  case you create unity by saying "The Game of Life" in

18  the way you see it on the three production packages.

19  Q.   And let's keep moving.  So we then have the green

20  in the lower right hand one.  It's circling nothing so

21  we see that difference, but tell us what the difference

22  is in the terms of the 100th designation and the

23  significance of that.

24  A.   I'm going to call this the 100th anniversary game

25  seal.  It's a call-out so that the consumer knows that

1    this game is the -- has significance.  That is, in

2    fact, the 100th anniversary game published by Milton

3    Bradley, which says two things.  Number one, the game

4    has a certain distinction; and number two, Milton

5    Bradley has been around for a hundred years.

6    **Q.**    So what's the creative contribution in moving

7    it -- well, let's deal with both the shape and deal

8    with the change in location.

9          So let's deal with the shape first.  Is there a

10   creative contribution in changing the shape from a

11   diamond to a squiggly oval, if that's the correct term?

12   **A.**    And again, something that I've known since my

13   college days.  A diamond is much more

14   attention-getting.  A diamond with sharp corners is

15   typically more appealing to a male, and the typical

16   consumer for a family game is actually a female.  It so

17   happens that an oval is equally liked by both sexes.

18          By putting the message inside of an oval and

19   making it somewhat subservient in location to the title

20   The Game of Life, it registers in the consumer's brain

21   at the appropriate time, which is after you figured out

22   the name of the game, what it is according to the

23   headline and then you've got the supportive message

24   that this game is, in fact, special.

25   **Q.**    And what's the significance of the change of

1    location?

2    **A.**   Well, when it was over top of the word "Life" it

3    created the confusion that the title was, as I say,

4    100 Life because, you know, when you're walking down

5    the shelf 20, 30 feet away, what do you see?  You see

6    "100" and you see the name "Life."  In the production

7    game you see "The Game of Life," and then you notice

8    appropriately that it is the 100th anniversary game.

9    **Q.**   So let's then talk about the red rectangle here

10   where we have this band.  The band is in the commercial

11   versions but not in the prototype.  What's the

12   significance of that, from your perspective as a game

13   designer?

14   **A.**   Well, the gray band, as it was known in the trade,

15   was Milton Bradley's standard corporate identity on the

16   cover of all their games during that era and for many

17   years to come.  And Milton Bradley, the man himself,

18   started his business as an -- because he was an

19   educator and he actually made educational products.  He

20   got into games because he favored educational games, so

21   it became traditional for Milton Bradley to carry

22   forward this educational message by including this MB

23   key design.  So that appeared on every game.

24        And underneath of that we see the age rating.

25   Now, this is one of the most essential pieces of

1    information to put on the cover of a box because,

2    again, the person who is going to purchase this game

3    needs to know is it appropriate to me if I'm the

4    consumer, or is it appropriate to my children, and so

5    if so what age children would be able to play this

6    game.  So that's why that's included.

7            Down below at the bottom, that information is

8    the product number, made in USA, and that's there for

9    the trade.

10   **Q.**   So let's walk through the rest of these.  You have

11   the box, the actual word "Life"?

12   **A.**   Yes.

13   **Q.**   Why did you do that?  What's the significance?

14   **A.**   Well, it's moved.  It's now more toward the right.

15   It's not centered.  I think the proportion of the

16   letters may be a little different.  We also can't tell

17   in the black and white picture of the prototype what

18   the four colors are that are in the background of the

19   name "Life," but they seem in tone to be comparable.

20   **Q.**   Okay.  So we have the orange circle of the full

21   3-D action game.

22   **A.**   Yes.

23   **Q.**   What's the -- obviously in the last one the words

24   are changed entirely to "a family game"?

25   **A.**   Yes.

1    **Q.**    Is that the main difference between those?

2    **A.**    Well, the subhead, as we call it, its intent is to

3    provide a descriptor of the nature of the game.  And in

4    the prototype and in the early versions, they, Milton

5    Bradley, elected to preserve that wording as full 3-D

6    action.  But by the time we got to the third version, I

7    think they were getting enough feedback from interested

8    parties to know that maybe the game really wasn't a

9    full 3-D action game and that a family game had a more

10   positive appeal to the consumer.

11   **Q.**    All right.  And let's deal with this last one

12   where we box off the endorsement for Mr. Linkletter to

13   the significance of the differences there.

14   **A.**    Yes.  The endorsement of Mr. Linkletter in the

15   prototype just shows his picture.  The significance of

16   the endorsement in the production version is that he is

17   seen playing the game, which means he's connected to

18   it, which does a much better job of reinforcing his

19   message, which is I heartily endorse this game.  And it

20   also includes his signature, which is another

21   reinforcement to his endorsement.

22   **Q.**    So there are obviously a lot of similarities

23   between the prototype and the commercial version box

24   covers; correct?

25   **A.**    Yes, there were.

1   **Q.**   And you're not suggesting, are you, that they're

2   totally independent works?

3   **A.**   No, I'm not.

4   **Q.**   But you've identified some of the -- you've

5   identified the differences that you saw; correct?

6   **A.**   Correct.

7   **Q.**   And in your view as a game designer, are these

8   creative contributions?

9   **A.**   Absolutely.

10  **Q.**   And can you explain why you view them as creative

11  contributions.

12  **A.**   Because every element of design helps to

13  contribute to a product's success or failure.  Good

14  design may not seem to be that different from bad

15  design, but in my experience little things count.

16  **Q.**   And which in your view has a better look and feel

17  to it for purposes of creating the aesthetic appearance

18  that enhances the best chance of success?

19  **A.**   Well, the prototype box is a really nice box, but

20  the commercial qualities needed for the package at

21  retail are superior in the commercial versions.

22  **Q.**   So do you have an opinion as to whether the

23  commercial version box covers are the same as,

24  derivative of, or independent from the prototype box

25  cover?

1    MR. POLLARO:  Objection, your Honor.  Calls for

2  a legal conclusion.

3    THE COURT:  Overruled.  I'm going to allow it.

4  **A.**   They're derivative.

5  **Q.**   Okay.  And is that based on the difference that

6  the contribution that you've just described in terms of

7  the changes?

8  **A.**   Yes.

9  **Q.**   All right.  So let's move over and talk, move to

10  page 8, I mean page 9 of the demonstratives, which also

11  comes from JTX509 and HTX14.  And do you understand

12  that the black and white photos are again from the

13  prototype and the color is from an early commercial

14  version of The Game of Life?

15  **A.**   I do.

16  **Q.**   And again, are we using the same methodology here

17  of having letters help understand where the

18  similarities are?

19  **A.**   Yes.  I use letters to show comparable elements on

20  each one.

21  **Q.**   And then we'll talk about the differences after

22  that.

23  **A.**   Certainly.

24  **Q.**   Let's do that.  Let's talk about the similarities.

25  What does the A represent?

1    **A.**    The A represents the circuitous track on the board

2    of the prospective games.

3    **Q.**    What does the B represent?

4    **A.**    The B represents the spinner found in each

5    version.

6    **Q.**    So both have spinners and both have circuitous

7    tracks?

8    **A.**    That's correct.

9    **Q.**    And what about C?

10    **A.**    C is the background graphic, the underlay, if you

11    will, of the textured countryside, I'll assume is what

12    is present in the prototype and it's certainly present

13    in the commercial version.

14    **Q.**    What are you saying is similar there?

15    **A.**    The use of a model patchwork quilt countryside you

16    would assume to be around a highway.

17    **Q.**    Even though we can't actually see the colors in

18    the prototype?

19    **A.**    No.  We know something is there.  We just don't

20    know the colors, so maybe I'm making a little bit of a

21    leap of faith.

22    **Q.**    We see different shades.

23    **A.**    I see different shadings, yeah.

24    **Q.**    And what is the similarity that's represented by

25    the D?

**A.**   D is the three-dimensional elements in the game,
the buildings and the mountains.

**Q.**   So similarities so far are they both contain a
circuitous track, a spinner, they both have a kind of
patchwork background, and they both have
three-dimensional elements?

**A.**   They do.

**Q.**   And what is E?

**A.**   E is the actual gameplay instructions that appear
on every space of the commercial version and that
appear to be present on every space in the prototype.

**Q.**   And so for the commercial version, we can see the
actual words?

**A.**   Yes.

**Q.**   We have the game itself.  Are you able to see the
words that are on the prototype's path?

**A.**   No, and I've tried using every technique that I
have in my graphic program to resolve them, but I
can't.

**Q.**   So at least from your perspective there's no way
of knowing whether Milton Bradley actually used any of
the words from the path of the prototype?

**A.**   No, we can't be conclusive.

**Q.**   Well, I mean, do we have any idea?

**A.**   We know there's words there.  And when we get to

1    the rules we can infer a few things, but we just can't

2    know for sure.

3    **Q.**    Okay.  What does F represent?

4    **A.**    F is the separate component called the number

5    board.

6    **Q.**    And both have a number board?

7    **A.**    They both have a number board.  They both have the

8    numbers 1 through 10 on them.

9    **Q.**    So let's move to page 10.  We don't have any --

10   nothing edited here.  It was too hard to try to lay

11   that out --

12   **A.**    Yeah.

13   **Q.**    -- clearly.

14            So let's walk through what differences you see

15   with regard to the board.  And let me ask you before

16   that, we talked about the importance of the box cover

17   and the aesthetics of the box cover.  Are the

18   aesthetics of a game board generally, are they

19   important?

20   **A.**    They certainly are.  Yes, they certainly are.

21   **Q.**    And in what way are they important?

22   **A.**    They need to clearly communicate the actual play

23   elements inherent on a board, and they also need to

24   enhance the theme with the choice of background

25   graphics and any non-gameplay elements that are

1     included to reinforce the theme.

2     **Q.**   And is the look and feel of the game board

3     important?

4     **A.**   Sure, because you want to make it look exciting

5     and interesting to first-time players in particular.

6     **Q.**   And how important is it for a game company to get

7     the look and feel of a game board right in selling a

8     successful commercial product?

9          MR. POLLARO:  Objection, your Honor.  We're

10    getting outside the scope of his report.  There's no

11    look and feel disclosed in his report.

12         MR. KRUMHOLZ:  There's aesthetics, paragraph

13    172.

14         THE COURT:  Overruled.  I'll allow it.  Go

15    ahead.

16    **A.**   That's why companies employ talented designers is

17    because their skills and their experiences contribute

18    to refining an initial prototype into a design that has

19    just those qualities, just the right balance of

20    gameplay and the right balance of image or

21    game-enhancing graphics and components.  So it's

22    essential to the success of the product.

23    **Q.**   Let's talk particularly about paths in the game

24    boards.  Are there particular -- generally speaking,

25    are there particular kinds of paths that are used?

**A.**   Yes.   Game boards typically are based on one of

three path models.   You have a grid board, which you

can use chess as an example.   The Checkered Game of

Life had a grid even though you actually moved on it

circuitously.

A game like Monopoly is emblematic of what's

known as a continuous path board.   The advantage of a

continuous path is you go around the board as many

times as required until the victory conditions are met,

which means that the number of spaces on the path are

somewhat irrelevant because you're going to cover X

number of spaces when a condition is reached.

A circuitous path is a very common type of game

board in the 18th -- 19th century, especially early in

the 20th century because back then players tended to

like a beginning and an end space, which is what a

continuous path is.

If you look at a game like Milton Bradley's

Uncle Wiggily from the 1920s, there's a long line of

continuous paths game.

The Game of Life utilizes a continuous path

game.

**Q.**   What kinds of considerations go into developing a

continuous path like we see in The Game of Life?

**A.**   Well, the biggest consideration is consumers

1    expect the game to take a particular length of time to

2    play; and unlike a continuous path game where the

3    number of spaces don't really matter, in a continuous

4    path game you need to have enough spaces to go from

5    start to finish in approximately in this era 45 to

6    60 minutes.

7    **Q.**    Okay.  And what kind of, like, spacial constraints

8    are there that a designer would have to deal with?

9    **A.**    Well, certainly you're going to have to wind the

10   path -- if you need to achieve that playing length,

11   you're going to need to wind your path to have enough

12   spaces within the geometry of this game board to go

13   from start to finish in the desired period of time.

14   **Q.**    When we talk about the differences, let's start

15   with the path itself.  You've identified -- there's

16   obviously similarity here, to be sure, between the two

17   paths, but have you identified differences that you

18   find to be meaningful?

19   **A.**    I think that the number of spaces on both paths is

20   slightly different but it's not significant.

21        The major difference, of course, which we can

22   pretty much see in the prototype version is the number

23   of spaces in the prototype are elevated, whereas in the

24   production game they're all printed on the game board

25   label, with the exception of four -- pardon me, three

1    -- no, four areas that are slightly raised in

2    dimensional plastic components.

3    **Q.**   Let me ask you about that.  From an aesthetic or a

4    look and feel perspective, what's the significance of

5    having the path printed on the board versus having it

6    raised on the board?

7    **A.**   Well, there's two important considerations, one of

8    which Mr. Carty actually hit upon this morning, which

9    is that the more elevated spaces you have on the board,

10   the greater your chances of breakage.

11        In addition, it's very, very challenging to make

12   this on an assembly line.  So I think the first

13   consideration that the designers inside of Milton

14   Bradley had was to, yes, bring the cost down by

15   printing it; but, secondly, to eliminate the danger of

16   the game actually breaking during use.

17   **Q.**   Okay.  And does it create a different look, or is

18   it a similar look from your perspective?

19   **A.**   Well, when you take away the three-dimensional

20   highway look, you have a different look.  You have a

21   different expression.

22   **Q.**   All right.  So let's talk about what other

23   differences, if any, you saw with regard to the path.

24   **A.**   Sure.  In the prototype, the mountains are

25   background scenery, whereas in the production they

1    integrated the mountains into the ramps, as I call

2    them, that are part of the path.  And I think the

3    significance here is that if you're playing this game,

4    especially if you are a child you actually have the

5    satisfaction of going through a mountain road.

6    Q.    So Mr. Carty suggested that these kinds of changes

7    were just for cost purposes.  But do you agree with

8    that with regard to, you know, building the mountains

9    into the path itself?

10   A.    No.  I think that this is a very fine aesthetic

11   expression that is very nicely linked in the gameplay.

12   I admire this design.

13   Q.    Let me also ask you about something we talked

14   about with Mr. Carty, which is this white bridge there

15   with the river underneath it.  Do you see what I'm

16   looking at?

17   A.    Yes.

18   Q.    What's the significance of that from an aesthetic

19   standpoint, from a look and feel standpoint in your

20   opinion?

21   A.    Well, first the toll bridge is known as a very

22   significant event when it's crossed in the game.  It's

23   very important that you know which player gets across

24   that bridge first because he becomes the toll keeper

25   and he earns special privileges.  By making it look

1   like a bridge and making it in a contrasting color,

2   white, it's very attention-getting, which it needs to

3   be.  And when you cross over it, the first player who

4   crosses over it, it's very easy to tell they made it

5   across the bridge.  By adding the river below, it

6   reinforces the notion that this is indeed a bridge.

7   **Q.**   So I mean your answer is often talking about both

8   aesthetic and functional play.

9   **A.**   Yes.

10   **Q.**   Is that a common thing that different factors are

11   coming into decisions like this?

12   **A.**   Yeah, it goes hand-and-glove, and it's a desired

13   outcome on the part of designers.  They want to bring

14   aesthetic considerations into, to bear on what

15   otherwise might just be simply functional elements.  A

16   functional element is something that really doesn't

17   matter how it's styled.  It's there.  It serves a

18   purpose.  It doesn't draw attention to itself, but when

19   you marry function with aesthetics you have

20   serendipity.

21   **Q.**   Just one more thing on the path.  It's a little

22   hard to tell on this, but do you see those arrows

23   between the box?

24   **A.**   It's very easy to tell that the graphic on the

25   path of the prototype has straight lines that separate

1    each space.  What the Milton Bradley designers did,

2    which is very helpful to game players, is they styled

3    the dividers between each space as forward-pointing

4    arrows, and that means as you're traveling on the path

5    especially when you come to intersections there's no

6    confusion; you know which way to go next.

7    Q.    Let's now talk about the three-dimensional objects

8    on the board.  Was that a significant addition from

9    your perspective, from a look and feel perspective?

10   You know, just kind of conceptually using

11   three-dimensional objects.

12   A.    Well, first, I believe all the three-dimensional

13   objects in the prototype were placed on the board.  In

14   the production game --

15   Q.    Hold on.  I want to back up a second.  I just want

16   to understand whether you think that it was a

17   significant addition having three-dimensional

18   components.  Was that a factor in the success of the

19   game?

20   A.    You mean in the prototype?

21   Q.    No, no.  Just generally in the game having

22   three-dimensional --

23   A.    Yeah, very enhancing of the idea you're traveling

24   on a live highway through a countryside, yeah.

25   Q.    And the prototype had three-dimensional components

1      in the form of buildings, towers and mountains;

2      correct?

3      **A.**   Yes, it did.

4      **Q.**   And did Milton Bradley deal with the expression of

5      the three-dimensional objects differently?

6      **A.**   Well, it did.  First, as I mentioned, it

7      integrated the mountains into the gameplay, which is

8      very aesthetically pleasing.  Secondly, it selected a

9      subset of the buildings that were present in the

10     prototype and positioned them so that they actually tie

11     into the events that are taking place on the game path.

12     **Q.**   For example?

13     **A.**   Well, you have a college where college takes

14     place.  You have an office building where the path

15     depicts business events.  There's a house where you're

16     getting married, you know.

17     **Q.**   So are there less buildings?

18     **A.**   Yes, there seem to be less buildings, several less

19     buildings.

20     **Q.**   Mr. Carty suggested that that is for cost reasons.

21     Obviously, one would assume it's cheaper to have less

22     buildings, but are there other reasons that you would

23     have less buildings?

24     **A.**   Well, Mr. Carty is right, there's certainly a cost

25     consideration here, but if you have too many

1    non-gameplay-related elements, it adds to confusion and

2    distraction, and a lot of consumers will say, well,

3    they must have some association with gameplay, why are

4    they here?  And then when you find out that they don't,

5    it's not only confusing but it's disappointing.

6         So what I admire about the selection of the

7    buildings here is that they are thematically related to

8    the position on the path where they're located.

9    **Q.**   Did you hear Ms. Ross this morning say that she

10   believed that the 3-D elements in the prototype were

11   larger than in the commercial version?

12   **A.**   Yes, I heard her say that.

13   **Q.**   Is making them smaller just a function of cost, or

14   is there a creative element to that?

15   **A.**   Cost is certainly a factor.  You need this -- one

16   of the things that I'm baffled by in the prototype is I

17   can't figure out how it folded; and when you fold a

18   game board, you need to make sure that it fits in a

19   fairly traditional depth of package because if you have

20   a box that's too deep the retailer can't put as many on

21   the shelves.

22        So by having a more economical height to all of

23   these components, you preserve a reasonable package

24   depth.  But in addition, the scale of the components is

25   more commensurate with the gameplay.  In other words,

1  the buildings are too big, the mountains are too big,

2  they overwhelm, and aesthetically they cause confusion.

3  **Q.**   Fair to say we can't compare the color because we

4  have a black and white?

5  **A.**   Correct.

6  **Q.**   Although you heard Ms. Ross indicate that, at

7  least in her deposition, she thought the colors were

8  different?

9  **A.**   Yes.

10  **Q.**   And as we talked about, we can't compare the

11  copy --

12  **A.**   By the way, if the colors were indeed more

13  colorful in the prototype, I think one reason why the

14  Milton Bradley designers muted them is because you

15  don't want them jumping out.  You want the path to jump

16  out.

17  **Q.**   All right.  So what are your thoughts about how

18  Milton Bradley did in creating the color of the path

19  versus the color of the background?

20  **A.**   Well, black is the color of a highway so it makes

21  sense to use black.  I'm pretty sure the prototype used

22  black, too, and to contrast the copy in most cases you

23  want to use white copies so that stood out, but a

24  countryside that the path goes through is typically

25  shades of green and earth tones, you know, maybe

1    occasionally something in the yellow family if it's a

2    field.

3    **Q.**    So Mr. Carty indicated his belief that all these

4    changes we've just talked about were kind of rogue

5    changes that didn't require creative contribution.  Do

6    you agree with that?

7    **A.**    In my experience, no, I do not.

8    **Q.**    Can you explain why you don't or in what way you

9    don't agree with that.

10   **A.**    Because every alteration that takes place

11   especially in the preliminary design portion of a

12   project inside a company is first and foremost intended

13   to perfect gameplay and to perfect the look of the

14   components to reinforce and not confuse gameplay.

15   **Q.**    So which board in your view has a better look and

16   feel to it from the perspective of creating a

17   commercially successful game?

18   **A.**    I think I would answer that by saying the

19   commercial version is just that.  It's commercially

20   advantageous for all the reasons we've just talked

21   about.

22          THE COURT:  Let's go off the record for a

23   moment.

24          (Discussion off the record)

25          THE COURT:  Back on the record.

1    **Q.**   So do you have an opinion whether the --

2    obviously, there are a lot of similarities.  You're not

3    suggesting that it's an independent work.

4    **A.**   No.

5    **Q.**   Do you have an opinion as to whether the

6    commercial version game board from 1960 is the same or

7    derivative of the prototype board?

8    **A.**   It's derivative.

9    **Q.**   And did you also look at the other -- so in total

10   there were I think five boards that have 1960 copyright

11   date; is that right?

12   **A.**   Yes.

13   **Q.**   And did you look at all of them?

14   **A.**   I did.

15   **Q.**   And are all these differences that you explained

16   in those other versions as well?

17   **A.**   Yes, plus a few additional differences.

18   **Q.**   Okay.  And we have a couple of those to admit, but

19   we can do that tomorrow morning or after we're done.

20         MR. KRUMHOLZ:  Now is a logical time, your

21   Honor.

22         THE COURT:  Okay.  Very good.  We'll break for

23   the day.  We'll be off the record.

24         (Discussion off the record)

25         (Adjourned)

C E R T I F I C A T I O N

      I, Denise P. Veitch, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.


/s/ Denise P. Veitch
Denise P. Veitch, RPR


March 13, 2018
Date