1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF RHODE ISLAND
2

3

4    * * * * * * * * * * * * * *
                                *  CA NO. 15-419-WES
5    MARKHAM CONCEPTS, INC.,    *
     SUSAN GARRETSON, and       *
6    LORRAINE MARKHAM,          *
     individually and in her    *
7    capacity as Trustee of     *
     the Bill and Lorraine      *
8    Markham Exemption Trust    *
     and the Lorraine Markham   *
9    Family Trust               *
                                *
10          VS.                 *  MARCH 6, 2018
                                *
11   HASBRO, INC., REUBEN       *
     KLAMER, THOMAS FEIMAN,     *
12   ROBERT MILLER, MAX         *
     CANDIOTTY, DAWN            *
13   LINKLETTER GRIFFIN,        *
     SHARON LINKLETTER,         *
14   MICHAEL LINKLETTER, LAURA  *
     LINKLETTER RICH, and       *
15   DENNIS LINKLETTER          *
                                *  PROVIDENCE, RI
16   * * * * * * * * * * * * * *

17

18

19           BEFORE THE HONORABLE WILLIAM E. SMITH

20                      Chief JUDGE

21
                    (BENCH TRIAL - VOLUME IV)
22

23

24

25

| | | |
|---|---|---|
| 1 | **APPEARANCES:** | |
| 2 | FOR THE PLAINTIFFS: | ROBERT M. POLLARO, ESQ. |
| | | JOHN T. MOEHRINGER, ESQ. |
| 3 | | DAVID A. COLE, ESQ. |
| | | Cadwalader, Wickersham & Taft |
| 4 | | 200 Liberty Street |
| | | New York, NY  10281 |
| 5 | | |
| | | MARY CAVANAGH DUNN, ESQ. |
| 6 | | Blish & Cavanagh |
| | | 30 Exchange Terrace |
| 7 | | Providence, RI  02903 |
| 8 | FOR THE DEFENDANTS: | JOSHUA C. KRUMHOLZ, ESQ. |
| | Hasbro, Inc. | COURTNEY L. BATLINER, ESQ. |
| 9 | | MARK T. GORACKE, ESQ. |
| | | ROBERT TURNER, ESQ. |
| 10 | | CAMILLE FRAMROZE, ESQ. |
| | | Holland & Knight |
| 11 | | 10 St. James Avenue, 11th Floor |
| | | Boston, MA  02116 |
| 12 | | |
| | Ruben Klamer | ERIKA J. VAN LOON, ESQ. |
| 13 | | Glaser Weil Fink Howard Avchen |
| | | & Shapiro |
| 14 | | 10250 Constellation Blvd. |
| | | 19th Floor |
| 15 | | Los Angeles, CA  90067 |
| 16 | | ERIC E. RENNER, ESQ. |
| | | Renner Law |
| 17 | | 50 South Main Street, Suite 202 |
| | | Providence, RI  02903 |
| 18 | | |
| 19 | Linkletter and Rich | CHRISTINE K. BUSH, ESQ. |
| | Defendants | Hinckley, Allen & Snyder |
| 20 | | 100 Westminster Street |
| | | Suite 1500 |
| 21 | | Providence, RI  02903 |
| 22 | | DAVID B. JINKINS, ESQ. |
| | | Thompson Coburn |
| 23 | | One US Bank Plaza |
| | | St. Louis, MO  63101 |
| 24 | | |
| | Court Reporter: | Denise P. Veitch, RPR |
| 25 | | One Exchange Terrace |
| | | Providence, RI  02903 |

1                          I N D E X

2    DEFENSE WITNESS                                    PAGE

3    PHILIP EDWARD ORBANES
     Direct Examination By Mr. Krumholz (Continues)      6
4    Cross-Examination By Mr. Pollaro                    39
     Redirect Examination By Mr. Krumholz              128
5    Recross-Examination By Mr. Pollaro                135

6

7

8                        E X H I B I T S

9

     DEFENDANT                              FOR ID   FULL
10
     HTX112                                            5
11   HTX113                                            5
      HTX15                                            5
12    HTX17                                            5

13

14

15

16

17

18

19

20

21

22

23

24

25

1    6 MARCH 2018 -- 9:00 A.M.

2              PHILIP EDWARD ORBANES, DEFENSE WITNESS,

3                      RESUMES THE STAND

4         THE COURT:  Good morning, everyone.  So we're

5    ready to proceed with the continued examination of the

6    witness.

7         MR. KRUMHOLZ:  Yes, your Honor, but just a

8    little housekeeping first.  So we need to formally

9    admit HTX15, which is a physical game with a different

10   version with a 1960 copyright date, and HTX17, which is

11   also a physical game of The Game of Life with a 1960

12   copyright date with, again, a different version.  Per

13   your practice or your requests in November we have, in

14   lieu of leaving the games with the Court, we have put

15   in photographs as placeholders and we'll hold on to

16   those games.

17        THE COURT:  I think that's a good idea.  All

18   right.

19        Is there any objection?

20        MR. POLLARO:  No objection.  I assume we've got

21   all five of those in.  We just want to make sure all

22   five are in.

23        MR. KRUMHOLZ:  Yes, all five are in.  The other

24   three --

25        MR. POLLARO:  We had two yesterday and two

1      today, so I don't know if we're missing one.

2              MR. KRUMHOLZ:  Well, no, the first one got put

3      in back in November.

4              MR. POLLARO:  All right.  Then no objection.

5              MR. KRUMHOLZ:  All five are in.

6              THE COURT:  All right.

7              MR. KRUMHOLZ:  We have agreement on the

8      demonstratives so we left you the two copies there that

9      are now marked.  We have HTX112 is the demonstrative

10     set that has the box covers and the boards, and HTX113

11     you should have a copy of, your Honor, that's got the

12     game rules as the demonstratives.

13             THE COURT:  I do have both of those, so the box

14     covers are HTX112, and the rules are -- what's the

15     number?

16             MR. KRUMHOLZ:  HTX113.

17             THE COURT:  113.  Very good.

18             MR. KRUMHOLZ:  And we are ready to proceed.

19             THE COURT:  All right.  Very good.

20             (Defendant's Exhibit HTX15 was admitted in full)

21             (Defendant's Exhibit HTX17 was admitted in full)

22             (Defendant's Exhibit HTX112 was admitted in

23     full)

24             (Defendant's Exhibit HTX113 was admitted in

25     full)

1      THE COURT:  Good morning, Mr. Orbanes.

2      THE WITNESS:  Good morning, your Honor.

3      THE COURT:  You may inquire.

4      MR. KRUMHOLZ:  Thank you.

5      <u>DIRECT EXAMINATION BY MR. KRUMHOLZ (CONTINUES)</u>:

6   **Q.**   So Mr. Orbanes, I want to continue on with the

7   comparison and the analysis that you did and now

8   shifting over to some of the other versions of the game

9   that you looked at.  Okay?

10  **A.**   I understand.

11  **Q.**   And did you, at our request, perform an analysis

12  comparing the prototype to a version of the game that

13  has a copyright of 2015?

14  **A.**   I did.

15      MR. KRUMHOLZ:  And I will state for the record

16  that that's already been introduced as HTX19 and

17  already admitted.

18  **Q.**   If you turn to page 11 of what is now HTX112,

19  which is the demonstrative with the covers and the

20  boards, and I'll represent that those are the two board

21  covers for JTX509 and HTX19, and I've also put those on

22  the -- the posters of the same on the easels there.

23      Do you recognize those two covers as the cover

24  on the left of the prototype and the cover on the right

25  for what I'll refer to as the "new game"?

1    **A.**    I do.

2    **Q.**    Now, before we get into the detail of your

3    comparison, let me just ask some preliminary questions.

4    In your experience, as a popular game like The Game of

5    Life starts to age, what typically happens?  What does

6    a game manufacturer do?

7    **A.**    If a game whose popularity is connected with

8    something that's going on in society or has a

9    fashionable element, it can obsolete itself so the

10   sales of the product will begin to decline as the

11   interest in society changes.

12        By the way, just one thing that I realized is

13   that when The Game of Life came out one of the most

14   talked about topics in the country was the coast to

15   coast, the interstate highway system, and I remember in

16   school in particular we were reading about this in

17   Weekly Reader and publications at the time, so the idea

18   of long highway trip was very fashionable in 1959, but

19   that became more commonplace as time went on, and, in

20   particular, a lot of the elements that were liked in a

21   particular era could become commonplace as time goes

22   on, which means the appeal of the game starts to

23   diminish somewhat.

24        So to answer your question, what a manufacturer

25   does is to see can this game be updated, is it

1    possible.  An example is the comparable game to The

2    Game of Life is the game of Careers, which came out two

3    years earlier in the height of the space race.  It was

4    a very popular theme in 1957, but by 1965 the game was

5    on life support until it was updated to include careers

6    that were more of interest.

7         So in the case of The Game of Life, what I would

8    imagine happened is as time went on Milton Bradley had

9    to challenge its design team to refresh it, to change

10   elements of the game to keep it of interest to

11   consumers.

12   **Q.**   How does a company like Hasbro or Milton Bradley

13   do that?

14   **A.**   Well, nowadays there's a marketing department

15   that's conducting lots of research, it knows trends, it

16   knows what buzz words kids like, and it will offer that

17   information to help designers to update a game.

18        Back in the 1960s and into the 70s the sales

19   department would have played a bigger role in that

20   because they simply would have come back and said, you

21   know, the game looked old compared to what's around it

22   now on the shelves.

23   **Q.**   So looking at the covers for the prototype versus

24   what we've been calling the new game, is the new game's

25   cover consistent with a manufacturer's attempt to keep

1    a game fresh?

2    **A.**    Yes, it is.

3    **Q.**    How so?

4    **A.**    One of the most significant comparisons that I can

5    make is that the concept of The Game of Life in 1959

6    apparently did not need to have a background

7    illustration to bring that theme to life, but by 19 --

8    pardon me, by 2015 the Milton Bradley marketing and

9    graphic people felt that they really had to enliven and

10   create immediacy in recognizing just what was The Game

11   of Life by incorporating this rather lively scene of

12   elements that most likely are incorporated into the new

13   game.

14   **Q.**    So did you do a comparison of the board game

15   covers?

16   **A.**    I did.

17   **Q.**    What similarities, if any, did you see?

18   **A.**    Well, there's really one, and that is the title.

19   But even the title is in a completely new styling.

20   It's a new logo type.  It doesn't carry over this very

21   nice but probably dated idea of four suspended letters.

22   Otherwise everything on the cover of the new package is

23   different from the prototype.

24   **Q.**    And do you understand The Game of Life to be a

25   Hasbro trademark?

1   **A.**   It's a trademark, yes.

2   **Q.**   And why don't you highlight for us the main

3   difference that you see.

4   **A.**   Sure.  Well, another thing that is, if you will, a

5   challenge for the game industry today is this need for

6   immediacy.  Consumers' attention spans are just less

7   than they were back in 1959, and they were pretty short

8   back then, too.

9   So what Hasbro has attempted to do here, as I

10  see it, is to, number one, include a cutout in the

11  cover that shows the most popular element of the game,

12  which is the spinner, and it also reminds people who've

13  played this game before that the feature they love the

14  best is still present; and secondly, this diamond

15  that's been placed in the corner on a yellow traffic

16  sign makes sure that consumers know there's no setup

17  really required and that play is easy.

18  These are two very important demands that

19  consumers nowadays place on deciding which games

20  they're going to play or not.

21  **Q.**   In terms of the imagery, how would you describe

22  the focal point of the new game cover versus the

23  prototype?

24  **A.**   Well, the prototype, clearly the focal point was

25  the title, which was a good idea in 1959.  Here the

1    prototype is the experience, as you see from the

2    illustration --

3    **Q.**    You said the prototype.  You mean the --

4    **A.**    Im sorry.  The commercial version for 2015, the

5    cover communicates the experience.

6          In addition, you'll notice in the lower

7    left-hand corner there's in very, very bold type the

8    age appropriateness, which is now eight and up, versus

9    10 and up when the game was first created.  This

10   basically suggests that the gameplay is now easier.

11   And there's also what's become a universal symbol in

12   modern game marketing of two players over a game table

13   and below it tells you how many players.

14   **Q.**    So in terms of expression, as opposed to ideas or

15   concepts, do you see any overlap of expression between

16   the two covers?

17   **A.**    No, there's no overlap of expression.

18   **Q.**    Have you formed an opinion as to whether or not,

19   with regard to the new game's cover, it is the same as,

20   derivative of, or independent from the cover of the

21   prototype?

22   **A.**    It's independent from the cover of the prototype.

23   **Q.**    Why do you say that?

24   **A.**    Because there's no commonality in its expression.

25   **Q.**    Let's move on to the game boards, which is on

1    slide 12, and I may ask you a couple preliminary

2    questions about that as well.

3         Do you see evidence that Hasbro modernized the

4    game board as well?

5    **A.**    Yes, I do.

6    **Q.**    What elements do you see doing that?

7    **A.**    First, all 3-D elements have been removed between

8    the prototype, the early commercial versions, and the

9    2015 version.  The spinner is still present, although

10   its design is different and it no longer is a permanent

11   part of the board.  As a matter of fact this spinner

12   and the compartments that are built into its molded

13   base are separate and it slides onto the corner of the

14   board before you start play.

15        Of great note is the track no longer

16   communicates gameplay instructions on every space.  You

17   know, I remember that was one of the original criteria

18   that Mr. Klamer came up with is that the instructions

19   be on the space.

20        What Hasbro has done here is to greatly simplify

21   the look of the highway by removing game instructions

22   and instead when you land on specific spaces you draw

23   the card and you follow the instructions on the back of

24   the card.

25   **Q.**    So do you see any similarity in expression between

1    these two boards?

2    **A.**    I see similar concepts present, but I see no

3    similarity in expression.

4    **Q.**    The concepts being what?  What similar concepts do

5    you see?

6    **A.**    I see a circuitous path, I see a spinner, and

7    that's basically it.

8    **Q.**    And in your opinion as a game designer is the way

9    those concepts are -- I'm getting my singles and

10   plurals mixed up.  Are the ways that those concepts are

11   expressed different between the two boards?

12   **A.**    They are.

13   **Q.**    Based on your experience, do you have an opinion

14   as to whether the new game's game board is the same as,

15   derivative of, or independent from the prototype?

16   **A.**    It's independent of the prototype.

17   **Q.**    What's your basis for that?

18   **A.**    Again, because there's no expression in common

19   with what we see or assume to be seen in the prototype

20   given this black-and-white picture.

21        One more thing, too, is that the background of

22   the prototype was similar to the early commercial

23   versions in that it probably depicted the pastel color

24   scene in the countryside, but in the 2015 game Milton

25   Bradley has decided not to rely on that subtlety but

1    rather to have very clear illustrative graphics that

2    reinforce the theme of the game.

3    **Q.**    And these aesthetic differences are, as you

4    testified, the result of Hasbro making judgments about

5    how to modernize the game?

6    **A.**    I think it's everybody benefit associated with the

7    game, and Hasbro would have been included, to have kept

8    the game alive all these years through these updates.

9    In my experience, if they hadn't done this The Game of

10   Life would be a, a very notable game in the game hall

11   of fame and that would be about it.

12   **Q.**    All right.  Let's talk about the Despicable Me

13   version, which is slide 13 and 14, which is the cover

14   and the game board for JTX509 and HTX102.  Do you

15   understand that Despicable Me is a series of movies

16   that have been out?

17   **A.**    Yes, I do.

18   **Q.**    And so that has its own intellectual property

19   associated with that franchise?

20   **A.**    My grandkids love this franchise, so yes, I know

21   it has a very, very specific imagery and nature.

22   **Q.**    So are you familiar with situations where a game

23   manufacturer obtains a license to utilize a third

24   party's intellectual property in connection with one of

25   its board games?

1   **A.**   Yes.  I believe that practice goes back at least a

2   hundred years.

3   **Q.**   And you've been involved with that over your

4   53 years?

5   **A.**   Especially during my Parker Brothers and Ideal Toy

6   days, that was half of our new product revenue.

7   **Q.**   So what are game designers' goals when faced with

8   that kind of assignment?

9   **A.**   First I should say the game designers like these

10  challenges because they are not a given.  In the

11  industry, especially back in 1950s, there was a term

12  that evolved that was called label slapping, and label

13  slapping meant you took a game that already had an

14  identity and then you put a new character license on

15  the same game, like Superman, for example.  But if you

16  recognized the game was just Parcheesi, so what.  So

17  that was called label slapping.  And that didn't really

18  help sales appeal especially over the long-term.

19          But in modern times game manufacturers have

20  gotten smarter and they realize that what consumers

21  would like is to have the essence of a well-established

22  game but with more theme appropriateness in the actual

23  final design.  In other words it's a nice balance

24  between original concept and the theme.

25  **Q.**   So as part of your analysis did you compare the

1    covers and boards of the prototype versus the

2    Despicable Me version?

3    **A.**    I did.

4    **Q.**    And what did you -- let's deal with the board

5    first.  What did you find in terms of similarities?

6    **A.**    I'm sorry, did you say the board first?

7    **Q.**    I'm sorry, the cover first.  What did you find in

8    terms of similarities?

9    **A.**    No similarities except for the inclusion of the

10    trademark The Game of Life.

11    **Q.**    And again, if you can highlight for the Court some

12    of the differences and the significance of those

13    differences.

14    **A.**    You'll notice, again, they include in the

15    illustration the spinner that's found in this game

16    because of its long-standing appeal.  They include a

17    lot of consumer helpful information.  For example, the

18    age rating, the number of players.  That warning, by

19    the way, is for small parts.  They need to let you know

20    that there are parts in this game that could be

21    ingested by a three-year-old or less.  In the bottom

22    right is the Hasbro games logo.  And in the bottom left

23    there's a logo that makes sure the consumer knows that

24    this game is made in the USA.

25    **Q.**    And from an aesthetic perspective, again, what is

1    the focus of the Despicable Me cover versus the

2    prototype cover?

3    **A.**    Here the focus is on the imagery of the

4    Despicable Me licensing, including this very iconic

5    character in the lower right-hand corner.  And by so

6    composing this cover which also, you know, hints at a

7    path that might be a highway in it, it's already

8    communicating to the consumer that this is the heart

9    and soul of the gameplay of The Game of Life, but it's

10   Despicable Me appropriate.

11   **Q.**    So do you see creative elements in the cover for

12   Despicable Me that do not exist in the prototype cover?

13   **A.**    Yes.  By the way, one of the features, once again,

14   there's a cutout in the cover on the right to reveal

15   three of the playing pieces that are inside of the

16   game.  This is another very important means of

17   instantaneous message delivery to the consumer because

18   when you actually see the parts that you're going to be

19   buying it's much more impactful than if you just simply

20   see a photograph with illustrations of it.

21        So the designer of this package, and I'm sure

22   based on the request of the marketing department, added

23   this reinforcement to the combination of the theme and

24   the gameplay.

25   **Q.**    And then just also back to my question.  These

1  changes that you're seeing, would you characterize

2  them as creative contributions?

3  **A.**   Certainly.   There's nothing functional about this.

4  **Q.**   And I should have asked you the same question --

5  **A.**   Except the cutout itself.

6  **Q.**   I should have asked you the same question with

7  regard to the new game board and cover.  Do you have a

8  view as to whether the changes that you see and the

9  differences that you see in the cover and the game

10  board for the new game are the result of creative

11  contributions from Hasbro?

12  **A.**   Yes.

13  **Q.**   So then moving to the board for Despicable Me,

14  which is slide 14 --

15  **A.**   Yes.

16  **Q.**   -- do you see -- so you talked about this label

17  slapping, which was sounds like something you don't

18  want to do.

19  **A.**   No.   That was prevalent in a bygone era.

20  **Q.**   Do you see an effort here in the way that the game

21  board is designed for the Despicable Me version, an

22  effort to integrate the Despicable Me third party

23  intellectual property?

24  **A.**   Yes.

25  **Q.**   And how do we see that?

1    **A.**   All of the graphics on this game are based on the

2    Despicable Me property.  There is a path present, but

3    it's very different from the prototypes.  There is a

4    spinner present, but it's a different design than the

5    prototype.  And it includes a novelty component, which

6    are these Minion movers, these five white plastic disks

7    that you actually put your Minion on and spin during

8    the course of the game to determine which direction

9    you're going to move next.

10    **Q.**   Do you see other similarities between the two

11    boards other than what you just described?

12    **A.**   I do not.

13    **Q.**   And you started to describe the differences, but

14    let me ask more holistically what differences in

15    imagery and aesthetics do you see between the two

16    boards?

17    **A.**   Well, in the big picture once again the prototype

18    work is a pastel background of a countryside.  In the

19    Despicable Me board it's a very vivid illustration of

20    imagery that reinforces the Despicable Me license as

21    applied to The Game of Life.  And once again, instead

22    of having a path that has gameplay instructions on

23    every space, what we see are symbols which are

24    connected to gameplay in this new version, which have

25    no relationship to the gameplay in the original

1    prototype.

2    **Q.**   And do you have a view as to whether these

3    differences that you've described are the result of

4    creative input from the people that work at Hasbro?

5    **A.**   I do.

6    **Q.**   And what is your opinion?

7    **A.**   Yes, it does.

8    **Q.**   And why do you say that?

9    **A.**   Because the amount of originality that had to go

10   into creating this game is a hundred percent.  I'm not

11   talking about the inclusion of the spinner, but the

12   graphics itself and the gameplay is completely

13   different.  So that's creative.  That's not functional.

14   **Q.**   All right.  And do you have a view, an opinion on

15   whether the game board for the Despicable Me version is

16   the same as, derivative of, or independent from the

17   game board for the prototype?

18   **A.**   Both the package and the game board for this game

19   are independent.

20   **Q.**   Why do you say that?

21   **A.**   Because they bear no commonality and expression in

22   any way, shape, or form to the prototype.

23   **Q.**   Thank you.  I now would like to have you take a

24   look at HTX113, which is our demonstrative set for game

25   rules.  I can put them up on the easels, too.  Actually

1    I think it would be useful.

2         MR. KRUMHOLZ:  May I approach, your Honor.

3         THE COURT:  Sure.

4         (Pause)

5    **Q.**    It may be a little easier rather than having to

6    flip back and forth.  What I'd like to do is go quickly

7    through the rules for these various versions, starting

8    with the prototype, versus the early commercial version

9    rules, but again just let me ask some preliminaries.

10        Are you familiar with a creation of rules for

11   board games?

12   **A.**    Yes, very much so.

13   **Q.**    What are the goals for creating rules for board

14   games?

15   **A.**    There are two components to writing rules for, to

16   writing good rules to communicate how a game is played,

17   and I want to start off by saying in my long experience

18   there's actually two types of writers who are employed

19   in the rule writing process.  The first is a

20   promotional copywriter whose mission is to sell, and

21   the second is technical copy writer whose mission is

22   explain.

23        So a promotional copywriter will typically write

24   the copy for the package, would do the copy for print

25   advertising, and would write what we call the flavor

1   copy, which is the introduction to the game, because

2   the flavor copy, you want to excite the user and make

3   them more likely to want to read the rather tedious

4   rules to then follow.

5        The purpose of the technical writer is to write

6   the rules themselves, and the importance of writing to

7   explain is to write completely, you have to cover every

8   situation; to write succinctly, if I can use one word

9   instead of five and I'm a technical writer I use one;

10  and thirdly, to order the rules so that they introduce

11  the concepts of the game in the order that the user

12  expects them to be expressed.

13  **Q.**   So then looking at the first page of HTX113, do

14  you recognize that as the rules from the prototype?

15  **A.**   Yes, I do.

16  **Q.**   And what was your overall impression of looking at

17  those rules?

18  **A.**   The moment I saw these rules I knew that a

19  promotional copywriter had written them, and, by the

20  way, I think a very good one.  The flavor copy at the

21  start here is just about as good as you could hope to

22  expect from someone who was submitting a game from the

23  outside.

24        But once the rules begin, that's where it breaks

25  down.

1    **Q.**    Breaks down in what way?

2    **A.**    The organization is wrong.  The rules do not cover

3    all the situations that can come up in gameplay.  The

4    sequence is not in the order that the user would

5    normally expect them to be.  And, in addition, there's

6    just omissions.

7    **Q.**    So do you recognize the second page of HTX113 to

8    be the game rules from one of the early versions of The

9    Game of Life from 1960?

10   **A.**    I do.

11   **Q.**    And that's HTX14.  Did you at our request do a

12   comparison of those two sets of rules?

13   **A.**    I did.

14   **Q.**    And going to the third page of what we also have

15   up on the screen, did you -- actually the third and

16   fourth page, did you help create those slides to

17   explain what you view as the similarities and

18   differences?

19   **A.**    Yes.  I went through and found the similarities

20   and the differences.

21   **Q.**    So pages 3 and 4 have the lettering for the

22   prototype rules versus the early version rules.  Let's

23   walk through that quickly, and if you can tell us what

24   similarities that you saw.

25   **A.**    Okay.  So --

1   **Q.**   So we start at A, which is the introductory

2   language.  Did you see similarities there?

3   **A.**   Yes.  There's a lot in common between the flavor

4   copy in both games.

5   **Q.**   And B is a little confusing because there's two Bs

6   on page 3 but that's the carryover paragraph.  So in

7   terms of these other letters let's deal with it

8   holistically to the extent that's possible.  What were

9   you seeing in terms of similarities for these other

10  designations?

11  **A.**   Yes.  The letters B through I believe it is H are

12  rules in common between or content in common between

13  both versions.

14  **Q.**   When you say content in common, what do you mean?

15  **A.**   In other words, for example, if we looked at B,

16  we'll start with B which has the start of the game.

17  There's a comparable rule in the commercial version

18  that's called To Start.  We'll get into differences

19  later.

20  **Q.**   Let's actually deal with that right now so we can

21  have some context.  So what is similar and different

22  about that example?

23  **A.**   Well, the writer titles this heading To Start the

24  game, but then inadvertently immediately goes into,

25  under the same heading, how to play the game.  So, you

1   know, a technical rule writer would know never to do

2   that but rather to break these two ideas into separate

3   headings.

4           So if you look at the Milton Bradley rules,

5   that's just what they do.  As soon as the information

6   on how to set up the game and begin it has been

7   explained, the next section of the rules is Playing the

8   Game.  At this point you've done the preliminary; now

9   you're ready to get into it.  And this heading is

10  essential to kick off the actual rules themselves in

11  the game.

12  **Q.**   So in talking about similarities, is it fair to

13  say a lot of the headings overlap?

14  **A.**   Yes.

15  **Q.**   But in terms of the actual expression of the rules

16  themselves, do they tend to overlap or be expressed

17  differently?

18  **A.**   They're expressed differently because the

19  technical rule writer, his mission is to, as I

20  mentioned, explain clearly, concisely, and

21  comprehensively.

22          By the way I think for a prototype these rules

23  did their job.  They were sufficient so that when the

24  game came into Milton Bradley the internal designers

25  could look at it and figure out how the game is played.

1      But there's a big difference between initiating

2  a design staff whose job it is to work on games and how

3  it likely plays versus the job of the final rules,

4  which is to communicate to a consumer who has never

5  seen it before, and make sure they know how to play it.

6      And one of the problems, of course, of rule

7  writing is you have to playtest over and over again to

8  discover all the situations that could come up as a

9  sequence of the rules.  And what happens if you land on

10  a space and you have no money and you can't pay your

11  debt?  You have to explain that.  You can't just leave

12  it for the players to figure that out.  And that comes

13  about because lots of people, in particular consumers,

14  are brought in even in this era to playtest and to

15  determine what's missing.

16      So what's missing in the prototype rules is

17  basically the benefit of all that experience.

18  **Q.**   So let's talk about the differences.  Did you

19  designate the differences on pages 5 and 6 of HTX113?

20  **A.**   I did, yes, in blue.

21      MR. KRUMHOLZ:  Your Honor, if I may put them up

22  on the board.

23      THE COURT:  Yes.

24      (Pause)

25  **Q.**   Let's start walking through those.  We have

1    between the two rules for the early commercial version

2    and the prototype, you have A which is at the end of

3    the prototype rules and at the beginning of the early

4    version rules.  Can you explain that difference.

5    **A.**   This is fundamental.  The first thing that a

6    consumer needs to know is how many players can play the

7    game before you even go into the flavor copy.   In

8    modern times an age rating would be included.  It

9    wasn't back then typically.  But in the prototype rules

10   it's almost the last thing that's expressed.

11   **Q.**   And so is that an important change, from your

12   perspective?

13   **A.**   Sure, because that's one of the first questions in

14   the mind of the consumer when they sit down to read a

15   set of rules.

16   **Q.**   So let's then look at B.  You see B is concerning

17   the spinning wheel to determine the banker and the

18   order.  Can you tell us what differences you see there.

19   **A.**   I'm sorry, where are we at now?

20   **Q.**   The letter B.

21   **A.**   Right.  Okay.  Yup.  This is not really drawn out

22   as a separate important topic in the prototype rules,

23   but because of its importance it is brought out in the

24   production rules.

25   **Q.**   I just want to interrupt you for a second just to

1   make sure we're all oriented, but when we're looking at

2   B in the early commercial version it's referring to the

3   language to the right of the letter?

4   **A.**   Yes -- well, language to the left, isn't it, or am

5   I mistaken?  I'm sorry; I read that wrong.  Thank you

6   for correcting me.  I did put the letters on the left;

7   I'm sorry.  I'm left-handed.

8        Borrowing From the Bank?  That's what we're

9   referring to?

10   **Q.**   Yes.

11   **A.**   Well, Borrowing From the Bank is completely

12   explained in B, which it is not in production game.

13   **Q.**   So that's an addition.

14   **A.**   Yes, it is.

15   **Q.**   Okay.  And what about C?

16   **A.**   C is Betting on the Wheel.  Once again -- there's

17   actually an imbalance in gameplay in the way the

18   prototype rules are written.  The banker, the player

19   serving as the banker has an undue advantage according

20   to the way the prototype rule is read.

21        THE COURT:  Could I just interrupt.  I may not

22   be in the right place, but you just said that borrowing

23   is not in the production game but it is in the

24   commercial version.  But isn't it right next to B in

25   the production?  Am I looking at the right thing?

1           MR. KRUMHOLZ:  Your Honor, let me try to orient

2   the witness a little, but this is a little bit of a

3   challenging thing here.

4           THE COURT:  All right.

5   **Q.**  So with regard to the concept of the spinning

6   wheel to determine the banker and the order, --

7   **A.**  Yes.

8   **Q.**  -- that concept, do you see -- is it expressed the

9   same way or is it expressed differently?

10  **A.**  It's expressed differently.

11  **Q.**  And how is it expressed differently?

12  **A.**  I'm sorry, I'm not sure if I'm on the same page as

13  you're on here.  I don't mean to --

14  **Q.**  Yes, you're right; I have my little challenge

15  here.

16          (Pause)

17          MR. KRUMHOLZ:  I'm getting some consultation

18  here from my associate.  So in the early commercial

19  version the B is referring to borrowing.

20          (Discussion off the record)

21  **Q.**  So the manner in which the Borrowing From the Bank

22  is expressed, is it similar or is it different?

23  **A.**  It's different.

24  **Q.**  And is one an improvement over the other?

25  **A.**  Yes, because I mean in particular this whole

1    concept with promissory notes is sort of inferred in

2    the prototype and it's clearly spelled out.  This is a

3    pretty sophisticated term even for a 10-year-old back

4    in 1959, the idea that you would have a physical

5    component in the game called promissory note.  It's not

6    really included in a prominent fashion in the prototype

7    rule I think because the designers kind of just assumed

8    it.  But, you know, Milton Bradley couldn't take that

9    chance.  They had to be very specific in defining how

10   you record your borrowing, and that is you take a

11   promissory note of the amount of your loan.

12   **Q.**   Okay.  So instead of maybe focusing on the

13   letters, let's talk about some of the other differences

14   that you saw.

15   **A.**   I think that's better.

16   **Q.**   In terms of the Millionaire Acres language, --

17   **A.**   Yup.

18   **Q.**   -- could you explain any similarities or

19   differences there.

20   **A.**   Well, as we spoke, the game has a path from start

21   to finish and finish is Millionaire Acres.  When you

22   reach Millionaire Acres, you're done traveling.  It's a

23   very significant change in the play of the game when

24   you reach this point and it's deserving of attention

25   and specific rules that explain all the possibilities

1    of what happens once you get there.  That's not clear

2    in the prototype rules.

3    **Q.**    So in your view is the expression different?

4    **A.**    It's different and it's much better.

5    **Q.**    How about Day of Reckoning?

6    **A.**    We are at H now.  Day of Reckoning has a very big

7    problem in the prototype rules, again, because of a

8    situations that have not been explained.  What the

9    Bradley writer did is to make sure that all of the

10   possible situations have been numerically stated here

11   and that the impact of Day of Reckoning is made to seem

12   as important as it really is.

13   **Q.**    And the other -- well, sorry.  Go ahead.

14   **A.**    I think that most significantly in these rules is

15   what is present in the production game but is absent in

16   the prototype.  And that would be, in particular, the

17   Share the Wealth cards, which was a component not

18   included in the prototype, Lucky Days, which was a

19   feature of gameplay that was added, and the importance

20   of Pay Day, which is in the prototype rules sort of.

21            These are, based on my experience I believe that

22   these were added to the game to help maintain balance

23   so that one player didn't run away with the game.  One

24   of the criteria that goes into good game design is

25   making sure that every player thinks they have a chance

1    to win until the very end and that really, I think, has

2    benefitted The Game of Life from the beginning.  You

3    can be behind and the odds may not be in your favor,

4    but you can still win.  So Lucky Days is a great

5    addition for that reason.

6          Share the Wealth is directly related to that

7    need because the Share the Wealth cards, which were not

8    in the prototype, enable you to get money from players

9    that have more money than you, so that helps to balance

10   it off.

11         And the concept of Pay Day is very significant

12   in the game because whenever you go past the Pay Day

13   space you collect your salary, which has been

14   determined early in the game when you either go to

15   college or decide that you want a business career.

16   That salary remains fixed throughout the game and is

17   collected every time you pass through or land on Pay

18   Day.  It's easily overlooked if you don't call this

19   out.  In other words you may think intuitively, well, I

20   only collect my pay if I land.  But that's not the

21   case.  You actually collect if you land or pass over

22   Pay Day.

23   **Q.**   Thank you.  Now, in terms of so we see there are

24   images in the early commercial version rules but not in

25   the prototype rules.  What's the significance of any of

1     that to you?

2     **A.**   Well, the significance is great because especially

3     for young kids who have to comprehend a game with this

4     many rules it's very helpful if each concept in the

5     game is accompanied by an illustration that helps to

6     evoke just what the rule is about.  It makes it more

7     fun and enjoyable and it provides some confidence that

8     the reader of the rules knows what to focus on.

9         So if I, for example, I'm reading the rules the

10    first time and I see a tow truck, you know, picking up

11    a broken-down car, okay, that gets the idea for me,

12    I'm not making forward progress, and then I know I'm

13    going to be focused on what happens when I am told to

14    go backwards.  So those illustrations improve the speed

15    by which rules can be comprehended, and they just make

16    the experience less dreary than it otherwise is.

17    **Q.**   How significant are these differences from your

18    perspective as a game designer?

19    **A.**   They're very significant because if you can't get

20    through the game and understand the rules correctly you

21    either give up, or you make up your own rules, which

22    doesn't work because that leads to controversy with

23    players who know how to play, or you make assumptions

24    that later on cause problems in comprehension.

25        I mean I know when I first, for example, played

1    Monopoly I was taught you can't buy any property until

2    you go around the board once.  Well, that's not in the

3    rules; it's just that the aunts and uncles who taught

4    me the game thought that was in the rules.  And as a

5    chief judge I have to correct that very often, by the

6    way.  But no, I don't mean to be diverting here, but my

7    point is when people come together to play the game

8    they really need to understand and follow the rules so

9    that there's common enjoyment, that they all know what

10   they're doing and they're all on the same page.

11   **Q.**   And do you feel that the differences and additions

12   are the result of creative input from whoever created

13   the rules?

14   **A.**   Yeah.  Clearly.

15   **Q.**   So do you have an opinion as to whether the rules

16   for the early commercial version are the same as,

17   derivative of, or independent from the rules from the

18   prototype?

19   **A.**   I believe they're derivative, yes, because there's

20   some similarities, but there is a lot of significant

21   new contributions to the rules; in particular, the

22   organization and the illustrations.

23   **Q.**   Is it a close call for you, or no?

24   **A.**   Between being independent and derivative?  No, I

25   don't think it's a close call between being the same

1    as.  It's derivative.

2    **Q.**   Okay.  How about being derivative and independent?

3    **A.**   I don't think so because, as I say, the flavor

4    copy is well written and similar and some of the rule

5    copy carries over, so I couldn't say -- I know I

6    wouldn't opine that it's independent.

7    **Q.**   If you could turn to page 7, that's the game rules

8    for the new game.  Did you do a comparison for us for

9    that as well?

10   **A.**   I did.

11   **Q.**   And what did you observe in terms of similarities

12   and differences between the rules for the prototype

13   versus the new game?

14   **A.**   There are concepts in common, but the expression's

15   completely different.

16   **Q.**   How so?

17   **A.**   Well, it's just by looking at it you can see that

18   there's all new illustrations.  The layout is

19   different.  They're much simpler.  There is far fewer

20   contingencies that need to be explained in the new

21   rules.  The components are actually and game spaces are

22   actually illustrated.  In the prototype, of course,

23   there were no illustrations.  And even the

24   illustrations that appear here, because they're

25   actually taken from the game itself, differ from the

1    early commercial versions.

2         Again, the cover page that we see on this rules

3    folder includes the trademark The Game of Life, which

4    is in common.  But the rules aren't even called Rules

5    here; they're called Game Guide.  And how to play, the

6    whole flavor copy, if you will, has been replaced with

7    this yellow rounded rectangle that just simply in one

8    sentence explains the game.  This is very much, you

9    know, in keeping with the need in modern times to get

10   the idea of the game across quickly and to make the

11   comprehension of the rules much easier.

12   **Q.**   And do you have a view as to whether these

13   differences that you've just described are the result

14   of creative input from Hasbro?

15   **A.**   Yes, they are.

16   **Q.**   They are.  And do you have a view as to whether

17   the game rules for the new game are the same as,

18   derivative of, or independent from the rules from the

19   prototype?

20   **A.**   Yes.  These are independent.

21   **Q.**   For the reasons that you've just described?

22   **A.**   Yes.

23   **Q.**   Lastly, go to slide 8, which is the rules from

24   Despicable Me, which is HTX102.

25   **A.**   Yes.

1  **Q.**   Did you do a comparison of those rules to the

2  prototype as well?

3  **A.**   I did.

4  **Q.**   What did you find in terms of the similarities and

5  differences?

6  **A.**   Once again just the trademark, The Game of Life.

7  And also a picture of a spinner, just, you know, it's a

8  different spinner, as I said, than the one in the

9  prototype or the early commercial version, but it is a

10  spinner.

11  **Q.**   But there is no spinner in the rules for the

12  prototype, or there is?  Is there an image of a

13  spinner?

14  **A.**   Well, the spinner is mentioned several times, but

15  it's not called out as such, how to use the spinner.

16  You just encounter it in the rules as you need it.

17  **Q.**   So what differences, you know, obviously we can

18  see differences here, but what are the significant

19  differences from your perspective as a game designer?

20  **A.**   Well, let's look at the cover of this folder.

21  After the The Game of Life we see the logo for the

22  license, Despicable Me.  And then, instead of seeing

23  the flavor copy or the How to Play heading, we see The

24  Mission, so this is much more in keeping in what

25  happens in the Despicable Me license.  But here, within

1    a few sentences you know exactly what you're going to

2    do.

3              And by the way, the references in this little

4    description about acquiring bunches of bananas and

5    becoming the favorite Minion, well, that's right from

6    the Despicable Me theme, and you'll notice that the

7    object is to collect bananas, not money, that's a huge

8    difference.

9              And then everything that flows thereafter has

10   different headings.  The illustrations in this

11   particular document come directly from this version of

12   the game, and the copy generally is very succinct and

13   brief in each rule section.  It's completely different.

14   **Q.**   And do you have a view as to whether these

15   differences are the result of creative contribution?

16   **A.**   Yes, they're creative contribution.

17   **Q.**   Do you have an opinion as to whether the rules for

18   Despicable Me are the same as, derivative of, or

19   independent from the rules for the prototype?

20   **A.**   They are independent.

21   **Q.**   Based on all the reasons you've just provided?

22   **A.**   Yes.

23              MR. KRUMHOLZ:  Thank you.

24              I have nothing further, your Honor.

25              THE COURT:  All right.  Thank you, Mr. Krumholz.

1           All right.  Cross-examination.

2           MR. POLLARO:  Thank you, your Honor.

3              CROSS-EXAMINATION BY MR. POLLARO:

4    Q.   Good morning, Mr. Orbanes.

5    A.   Good morning, Mr. Pollaro.

6           MR. POLLARO:  May I approach, your Honor.

7           THE COURT:  Sure.

8           MR. POLLARO:  More documents.  Two for your

9    Honor.

10          THE COURT:  Thank you.

11   Q.   Mr. Orbanes, how old were you in 1959?

12   A.   I was 12 years old in 1959.

13   Q.   And that would make you 13 in 1960.

14   A.   Yes, it would.

15   Q.   And --

16   A.   That's when I first played the game.

17   Q.   First played The Game of Life?

18   A.   Yes.

19   Q.   You were not in the game industry in 1959 or '60;

20   correct?

21   A.   No, I was not.

22   Q.   You talked yesterday about mentors.

23   A.   Yes.

24   Q.   Is it fair to say that any knowledge that you may

25   have related to the game industry as it existed in 1959

1    or '60 was derived from others?

2    **A.**    Yes, with one exception.  The game industry didn't

3    change for about 20 years.  What was going on in 1959,

4    as was explained to me, was the same, pardon me,

5    really continued through the 1970s.  As a matter of

6    fact, when I got to Ideal Toy the management of that

7    company had been around since World War II.  They

8    prided themselves in not changing since the 50s.  So I

9    don't believe it was different in 1959.

10   **Q.**    And that was explained to you by other people.  It

11   wasn't your firsthand knowledge; correct?

12   **A.**    No, it was not.

13   **Q.**    As of 1959 or 1960 you had never stepped foot in

14   the manufacturing facility of Milton Bradley; correct?

15   **A.**    No, I had not.

16        THE COURT:  Mr. Pollaro, could you make sure you

17   use one of those microphones.  You're kind of in the

18   middle.  All right.

19   **Q.**    In your experience, Mr. Orbanes, are there always

20   changes made to a prototype before it is

21   commercialized?

22   **A.**    Yes.

23   **Q.**    You testified yesterday that there were aesthetic

24   changes made to the prototype.  Do you recall that

25   testimony?

1    **A.**    I do.

2    **Q.**    You based your testimony on your experience in the

3    game industry; right?

4    **A.**    That's correct.

5    **Q.**    Your experience was not with Milton Bradley but

6    based on the game industry in general; correct?

7    **A.**    That's correct.

8    **Q.**    Do you recall explaining why each of those changes

9    were made?

10   **A.**    Yes, I do.

11   **Q.**    Can you tell me if there were any changes that

12   were made that you simply cannot explain?

13   **A.**    If I saw the specific change that you're referring

14   to I might be able to say if I couldn't explain it, but

15   in general I can explain the changes.

16   **Q.**    Okay.  Well, it sounded like yesterday you had an

17   explanation for every change.  Do you recall any

18   changes that just befuddled you or just didn't make any

19   sense to you?

20   **A.**    No, I don't.

21   **Q.**    And your determination that the 1960 Game of Life

22   board is a derivative work is based solely on the

23   changes that you identified and discussed yesterday;

24   correct?

25   **A.**    Yes.

1    **Q.**   Yesterday you told the Court that it is your

2    opinion that the 1960 version of The Game of Life is a

3    derivative work.

4    **A.**   Yes.

5    **Q.**   Is it your understanding that a derivative work is

6    a work that is based on another work?

7    **A.**   Yes.

8    **Q.**   So is the 1960s version, a derivative work, is

9    based on another work; correct?

10   **A.**   Yes.

11   **Q.**   And can you tell me what that work is?

12   **A.**   The prototype.

13   **Q.**   The prototype.  And if there was -- if it's for a

14   derivative work, any of those changes must be creative;

15   correct?

16   **A.**   Correct.

17   **Q.**   So in other words if we knew in the reverse if

18   there's any changes that were made to the prototype in

19   the commercial version that were not creative, it would

20   be the same work; correct?

21   **A.**   I'm sorry.  I'm not following your question, sir.

22   **Q.**   You just told me that for a derivative work to

23   exist there needs to be creative contributions; is

24   that --

25   **A.**   Correct.

1  **Q.**   -- correct?  Okay.  I guess I'm doing it in the

2  reverse.  If there are contributions that are not

3  creative, it's the same work; in other words, it's not

4  a derivative work.  Correct?

5  **A.**   You mean functional changes?

6  **Q.**   Changes that are not creative.  You talked about

7  creative changes yesterday; right?  You understand

8  that?

9  **A.**   The derivative work, as far as I know, includes

10  changes in modifications.  I'm not sure if I follow

11  your question.

12  **Q.**   So my question is yesterday you talked about the

13  changes that you believe to be in the commercial

14  version that were not in the prototype; correct?

15  **A.**   Right, which would make it derivative.

16  **Q.**   Just changes in general or changes -- do changes

17  have to be creative?  That's what I'm trying to figure

18  out.  Is it your opinion that changes must be creative

19  to transform an original work into a derivative work?

20  **A.**   I think it has to be a modification, an addition,

21  or a deletion.

22  **Q.**   Any modification, deletion or --

23  **A.**   Yeah.  I believe that's where you're going with

24  this.

25  **Q.**   Let's not worry about where I'm going with --

1      THE COURT:  Don't worry about where he's going.

2  Just answer whatever the question is that he asks,

3  okay?

4      THE WITNESS:  Of course, yes.

5  **A.**   Yeah, I believe that a change is a derivative.

6  **Q.**   Any change?

7  **A.**   Unless it's functional, which is not subject to

8  copyright.

9  **Q.**   Unless it's functional.

10 **A.**   Right.

11 **Q.**   I think I'm understanding you.  So let me ask you

12 this way.  Does a change need to be creative in order

13 to transform a work into a derivative work?

14 **A.**   If it's a different expression.

15 **Q.**   If it's a different expression.  Can you tell me

16 what you mean by that.

17 **A.**   Change the wording, change the graphic, change the

18 three-dimensional design, change the position of

19 something that's in context with other things, yeah.

20 **Q.**   So I want to make sure I'm understanding what

21 you're saying.  So are your opinions based on your

22 understanding that any changes made to a work can

23 transform it into a derivative work regardless of

24 whether or not those changes are creative?

25 **A.**   The answer is it can, yes.

1  **Q.**   It can.  So again I just want to make sure that

2  I'm crystal clear on what your testimony is and the

3  basis for your opinions.  So is the basis for your

4  opinions that changes that are not creative can

5  transform an original work into a derivative work?

6  **A.**   I think I'd have to see the specific changes, but

7  in general it can.

8  **Q.**   In general it can.

9  **A.**   In general it can, yes.

10  **Q.**   Yesterday Mr. Krumholz used the word or the

11  phrase, I guess, that creative contributions cannot be

12  mere ideas, they must be physical expressions.

13  Correct?

14  **A.**   That's right.

15  **Q.**   And you identified a number of physical

16  expressions that you believed were different from the

17  prototype to the commercial version of the game;

18  correct?

19  **A.**   I did.

20  **Q.**   One of the expressions that you identified was a

21  transmission tower; correct?

22  **A.**   Correct.

23  **Q.**   Is it your opinion that the removal of a

24  transmission tower amounts to creative contribution?

25  **A.**   No.  This is a good specific.  I would say no,

1    that's not creative.

2    **Q.**    So it's not creative, so therefore if the only

3    change between the prototype and the commercial version

4    of the game was the removal of the transmission tower,

5    we have a derivative work or do not have a derivative

6    work?

7    **A.**    If it was just the removal of a transmission

8    tower, I don't think that would be sufficient to call

9    it derivative.

10   **Q.**    Okay.  Fair enough.  So now if we have the removal

11   of the transmission tower and the removal or the

12   lowering of the mountains, the height of the mountains,

13   if those are the only two changes, do we have a

14   derivative work?

15   **A.**    Now it's derivative because the height of the

16   mountains has an aesthetic quality to it and it also

17   has an association in the minds of the consumer, so

18   this would be derivative.

19   **Q.**    So let's back that out then.  So if the only

20   changes -- let's forget about the transmission tower

21   for a second.  If the only change between the prototype

22   and the commercial version of the game is the height of

23   the mountains, is it your opinion that that work would

24   be a derivative work?

25   **A.**    Yes.

1    **Q.**   You were talking just recently about versions of

2    the game, so I want to understand what you mean.  I

3    believe you used the term modernized or updated.  Do

4    you recall that?

5    **A.**   I do.

6    **Q.**   So in the lifetime of a game, have you experienced

7    multiple versions of the game?

8    **A.**   I have.

9    **Q.**   And when you talk about updating a game, can you

10   tell me a little bit more about what you mean.

11   **A.**   Sure.  It means basically doing a facelift, we

12   call it.  That might mean a package whose graphics were

13   more acceptable to the current consumer.  It could mean

14   adding or changing the graphics on the game board for

15   the same reason.  It could also mean changing the copy

16   so that the copy is more appropriate to what the theme

17   of the game is in the eyes of the current consumer, --

18   **Q.**   And --

19   **A.**   -- among others, yes.

20   **Q.**   And in your experience is that a sequential

21   process?  For example, if a game exists for an extended

22   period of time and there are multiple versions, are

23   each version necessary predicated on the version

24   preceding it?

25   **A.**   Certainly.  You have a lineage, you do.

1  **Q.**   A lineage.  And so if I'm understanding your

2  testimony correctly, there would always be an original

3  version; correct?

4  **A.**   Correct.

5  **Q.**   And then after the original version there would be

6  subsequent changes that have facelifts or

7  modernizations?

8  **A.**   Yeah.  I would say even if the game stays the same

9  it's been my experience that over time the packaging is

10  going to be updated to reflect more modern art taste

11  and requirements, yes.  But at times the game itself

12  has to be changed to stay current.

13  **Q.**   And again, that's kind of a, I don't want to say

14  -- it's a sequential process; right?

15  **A.**   Typically, yes.  It's progressive.

16  **Q.**   It's progressive.  That's a good word.  And so it

17  builds up on the prior version; correct?

18  **A.**   Yes.

19  **Q.**   So now if we talk about the concept that we were

20  just talking about before, which is we were talking

21  about changes and talking about what changes transform

22  an original work into a derivative work, do you recall

23  that?

24  **A.**   I do.

25  **Q.**   And it was your testimony that any change could

1    transform an original work to a derivative work; is

2    that correct?

3    **A.**    That's what I said.

4    **Q.**    So that means you would have to look at the

5    particular changes in question; correct?

6    **A.**    Sure.

7    **Q.**    Okay.

8    **A.**    It has to be visible.

9    **Q.**    It has to be visible.

10   **A.**    Yes.

11   **Q.**    And so going back to the transmission tower, is

12   that why you didn't believe that would be a derivative

13   work because the removal of the transmission tower is

14   not visible?

15   **A.**    It was visible, but it had such an insignificant

16   contribution to the game that its significance would

17   not register whether it was there or not; unlike

18   mountains, which are very visible and whose height has

19   a contribution to the perception of the theme.

20   **Q.**    Okay.  Can you give me a --

21   **A.**    By the way, the transmission towers, if you look

22   at them very carefully, they could be oil derricks.

23   **Q.**    Fair enough.  Can you give me a little more

24   clarity about where that line is drawn between the oil

25   derricks or the transmission towers and the mountains?

1    **A.**   I think it's -- it has to be a matter of judgment.

2    You have to basically see the two to compare.

3    **Q.**   Now, throughout the course of your testimony and

4    in your expert report you reviewed I want to say five

5    versions of the 1960 Game of Life; is that correct?

6    **A.**   I reviewed five versions, yes.

7    **Q.**   Okay.  And I believe they're sitting over there on

8    the table.

9    **A.**   Yes.  I will accept that they are, yes.

10   **Q.**   And they all bear the 1960 copyright date;

11   correct?

12   **A.**   To the best of my knowledge they do, yes.

13   **Q.**   Do you have an opinion as whether or not each

14   version that bears a 1960 copyright date was published

15   or was manufactured in 1960?

16   **A.**   I couldn't know that for a fact, no.

17   **Q.**   Okay.  Why --

18   **A.**   I would think because if the game bore the 1960

19   copyright it was considered to be adequately protected

20   by the 1960 copyright, even if it was published in a

21   subsequent year.

22   **Q.**   Fair enough.  And so is it your understanding that

23   until the game was published in a form that would not

24   be subject to the copyright date, it could be published

25   or manufactured in any year?  Even today, it could be

1   manufactured in 2018, but if it hadn't changed it would

2   still bear a 1960 copyright date; correct?

3   **A.**   It could bear a 1960 copyright date if the

4   changes, if any changes that had occurred were not

5   considered to be significant enough, as you just

6   pointed out.

7   **Q.**   Exactly.  So to the extent there are any

8   differences between any version of the five 1960

9   versions of the game, they are not significant for

10  copyright purposes; correct?

11  **A.**   Well, I don't think so.  I'm not suggesting that I

12  know specifically all the nuances of the copyright law

13  as applies to your question, but in my experience I

14  would say that I have not seen game manufacturers rush

15  to recopyright a game unless it was significantly

16  different.

17  **Q.**   Copyrightedly different; correct?

18  **A.**   Yes.  A new game cover, for example, would require

19  a new copyright and that would go through.  I'm not

20  sure if manufacturers typically do that if there was

21  minor changes in the rules, for example, or maybe small

22  inclusion or deletion on the game board.  In practice,

23  is what I'm really referring to here through my

24  experience.

25  **Q.**   I want to look at a couple of those games, if we

1    can.  I'd like to look at HTX14 and HTX18.

2           MR. POLLARO:  May I approach, your Honor.

3           THE COURT:  Yes.

4           (Pause)

5    **Q.**  I'm going to hand you what is HTX14.  It is a 1960

6    version of the The Game of Life.

7           MR. KRUMHOLZ:  Your Honor, is it okay if I come

8    around to get a better view.

9           THE COURT:  Yes.

10    **Q.**  Please take a moment to look at this.  In

11    particular I want you to focus on the stop here

12    square --

13    **A.**  Uh'huh.

14    **Q.**  -- and the blue square above the spinner that says

15    Stop.

16    **A.**  Right.  Just that blue square?

17    **Q.**  Yes, the blue square and the stop here for now.

18    **A.**  Okay.

19    **Q.**  Have you reviewed that game board before?

20    **A.**  I have, yes.

21    **Q.**  And now what I'd like to do --

22           MR. POLLARO:  May I approach, your Honor.

23           THE COURT:  Yes.

24    **Q.**  -- is have you looked at what's marked HTX18,

25    which is also a 1960 version of the game, --

1    **A.**    Yes.

2    **Q.**    -- and I want you to compare those two portions

3    that we were talking about before --

4    **A.**    Sure.

5    **Q.**    -- and tell me what you see.

6    **A.**    Can I turn this board around a little bit.

7    **Q.**    Sure.

8    **A.**    Just looking at these portions, there is

9    differences here.  The original game, the starts here

10   start space is a circle that in white copy says Start

11   Here with $2,000 and car.

12           In the version that I'm holding in my hand the

13   circle is now divided into a top and a bottom.  The top

14   says Start Here with $2,000 and car.  The bottom says,

15   If you want auto insurance pay $500, and the word

16   Option appears below that.

17   **Q.**    Okay.

18   **A.**    In addition, the blue space on the path that

19   Mr. Pollaro pointed out to me -- I'm not sure again;

20   could you show me which blue space you were referring

21   to?  I want to make sure that I compare the right ones.

22   **Q.**    The blue stop sign here, the Stop right before the

23   Pay Day, and that one.

24   **A.**    This one, okay.  Yes.

25   **Q.**    And isn't it true that the version HTX18, the

1    space that you're looking at no longer says Stop?

2    **A.**    That's correct.

3    **Q.**    And isn't it also true that the space that we're

4    talking about on HTX18 also says the word Option next

5    to it?

6    **A.**    Flanking it, yes, it does.

7    **Q.**    Okay.  So that's different.  And my question to

8    you is in your opinion, based on your testimony thus

9    far, are these changes creative in nature?

10   **A.**    These changes are beneficial to enhance the

11   definitiveness of what you do on these spaces, so these

12   are creative changes that are probably an improvement.

13   I'm sure this was done for that reason.

14   **Q.**    And would you also call these changes aesthetic

15   changes?

16   **A.**    Well, the addition of the wording and the

17   separation of the Start Here in the two colors is

18   aesthetics clearly.

19   **Q.**    Is it safe to assume that one version of the game

20   came before the other version of the game?

21   **A.**    I believe that, yes.

22   **Q.**    And whichever version came first, is it your

23   opinion that the second version would have been built

24   upon the first version, at least directly or either

25   indirectly?

1  **A.**   It appears that way, yes.

2  **Q.**   Sitting here today do you have any idea whether --

3  let me back up.

4        So you -- we agree, or you have testified, that

5  one of these versions came first; correct?

6  **A.**   Correct.

7  **Q.**   And the other version came second.

8  **A.**   Correct.

9  **Q.**   Whichever one that might be; correct?

10  **A.**   Yes.

11  **Q.**   Okay.  Do you have any idea if there would be any

12  intervening versions of the game?

13  **A.**   Well, based on the two that you showed me, I

14  couldn't tell you that.  I'd have to see the

15  intervening version.

16  **Q.**   You can't say for certain; right?

17  **A.**   No.  But it seems logical, based on the small

18  changes that you have identified.

19        MR. POLLARO:  I'm going to have to put these

20  things together.

21        Thank you.

22        MR. KRUMHOLZ:  I don't think I'm the person for

23  that job.

24  **Q.**   I want to make sure I understand your testimony.

25  So sitting here today, you have no idea if there's one

1    version, two versions, 10 versions, or no versions

2    between the two versions; correct?

3    **A.**   No; I can say that there is a change between the

4    two versions.

5    **Q.**   A creative change?

6    **A.**   A creative change, yes.

7    **Q.**   And also an aesthetic change for an improvement;

8    correct?

9    **A.**   Yes.  Correct.

10   **Q.**   And if I understood your testimony before, you

11   acknowledged that they all bear the 1960 copyright

12   date; correct?

13   **A.**   They do.

14   **Q.**   Okay.  So let's back up a little bit.  You do

15   understand that work to be based on another --

16   derivative work has to be based on other work; correct?

17   We talked about that.

18   **A.**   Yes, we did.

19   **Q.**   So whenever there's a derivative work there's an

20   underlying original work; is that correct?

21   **A.**   Correct.

22   **Q.**   If you created derivative work, if you have a

23   derivative work, do you have any rights to the original

24   work?

25   **A.**   You do not.

1    **Q.**    You only have rights to the --

2    **A.**    The changes.

3    **Q.**    -- the changes.  Okay.

4    **A.**    Yes.

5    **Q.**    So would you consider the two versions, HTX14 and

6    HTX18, to be derivatives of one another?

7    **A.**    The changes that are in the latter are derivative

8    of the one that didn't have the changes.

9    **Q.**    Okay.

10    **A.**    The base game, if you want to call it that.

11    **Q.**    Whichever one it was.

12    **A.**    Yes.

13    **Q.**    Sitting here today do you have an opinion which

14    one that might have been?  Which one did you believe,

15    in your industry experience, would have been the

16    improved version and therefore the later version?

17    **A.**    In my review of the five games, I believe that the

18    one that you showed me first to be the original.

19    **Q.**    The one with the stop sign and without the option

20    on the --

21    **A.**    That's correct.  Other one appears to be the

22    benefit of publication of the prior one.

23    **Q.**    Have you -- do you have any idea who at Milton

24    Bradley is making those changes?

25    **A.**    Well, I can tell you from hard-earned experience

1    that when you publish a game, especially one where you

2    have a compressed period of time between the completion

3    of the design and the need to have that game available

4    at Toy Fair, that you have lots of people who are

5    interested in contributing to telling you what's wrong

6    with it.

7         You have the retailers, you have consumers who

8    -- by the way, having been in charge of consumer

9    relations at Parker Brothers, I can tell you the worse

10   thing you want is a rule defect because then you get

11   hundreds of letters, every one of which, if you want

12   your consumers or customers happy you have to write

13   back; and so the consumer research department is

14   probably the first line of defense to the company when

15   it comes to recognizing why enhancements or changes

16   need to be made.

17        In addition, the designers themselves, having

18   had a chance to catch their breath and look at what

19   they've done may very well say, you know, we should

20   have done this.

21        And, in addition, it's my practice or my

22   experience in practice that the inventor, as soon as he

23   gets his hands on it, if he's an interested party,

24   he'll come back and say, you know, I have a suggestion;

25   I think you should have done this.

1              So the number of people who come to bear to

2       bring about an improvement like this is pretty

3       substantial.

4       Q.    I think I understood your answer.  But I think I

5       heard you say the inventor, if he's interested, would

6       be one person likely to provide suggestions; is that

7       correct?

8       A.    Yes.  An inventor is one of the several parties

9       that would be contributing, and you would encourage

10      that.

11      Q.    And you would expect that in your experience in

12      the industry that if an inventor was interested in the

13      game that they would provide suggestions to the

14      manufacturer; correct?

15      A.    Sometimes the letter that comes from the inventor

16      is why did you ruin my game?  Why did you do this?  And

17      then we have to justify.  Other times the inventor

18      says, you know, I really appreciate what you did, I've

19      got some thoughts; here's my suggestions.

20      Q.    And the manufacturer in this case, Milton Bradley,

21      may or may not incorporate those suggestions; is that

22      correct?

23      A.    Well, I think what a good manufacturer will do is

24      to collect all of the input, especially from the

25      consumer and the trade because they're so dependent on

1    the trades, you know, carrying the game, that they will

2    then say, okay, what are the most important ones and

3    which ones don't really count.  And a good manufacturer

4    will make a revision, in particular, if there's time to

5    do it before the fall selling season -- because the

6    majority of games, especially in that era that were

7    sold at retail came in the last four months of the

8    year -- so if there's a chance that you can improve a

9    game prior to that season, it behooves the manufacturer

10   to do that, again, just to cut down on the number of

11   complaints that would come in from consumers with

12   questions and to make the trade happy.

13   Q.    And I appreciate that.  Now, back to the changes

14   that we were talking about, in particular the space

15   with the option, --

16   A.    Yes.

17   Q.    -- just because I remember that one more clearly.

18   Is it correct that your testimony was that that was an

19   improvement?

20   A.    That was an improvement, I believe.

21   Q.    Did you like that change?

22   A.    I liked it.  I did.

23   Q.    And it helped -- what would be the right phrase --

24   the game play better?

25   A.    Yeah.  Something different happens on that space

1    and it's pretty good that you actually call it out.

2    **Q.**   And so is it your testimony that -- let me strike

3    that and start over.

4         Have you reviewed any evidence in this case to

5    suggest where any changes were made to the game board

6    at any time?

7    **A.**   Yes.  I think I saw a letter from Mr. Markham to

8    that effect.

9    **Q.**   Okay.  Have you reviewed any evidence from anybody

10   else that made any suggestions to modifications of the

11   game board or the rules?

12   **A.**   No.  I believe that's the only document that I've

13   seen that addresses that.

14   **Q.**   Have you seen any evidence, like the letter that

15   you're referring to from Mr. Markham, from Milton

16   Bradley discussing any modifications or changes?

17   **A.**   Yeah, I remember seeing a letter from Mel Taft

18   where he said, well, thanks very much for your

19   suggestion but the game has bigger problems; it's too

20   much dependent on luck and we really need to add more

21   skill in the game.  I do recall that one.

22   **Q.**   Fair enough.  And in that letter do you recall any

23   specific modifications that were made or suggestions?

24   **A.**   In the Mel Taft letter?

25   **Q.**   Yes.

1  **A.**   If I saw the letter I can tell you.  I don't

2  remember the details right now.

3  **Q.**   Okay.  But I'm just trying to get your

4  understanding as you sit here right now.

5  **A.**   Yup.

6  **Q.**   Because it sounded like you identified maybe an

7  issue that Mel Taft may have had, but I want to talk

8  more specifically about actual changes or suggestions.

9  Is your testimony that your recollection of that letter

10  is that there were actual changes suggested in that

11  letter?

12  **A.**   From Bill Markham or from Mel Taft?

13  **Q.**   I'm talking about the Mel Taft letter now.  Let me

14  back up and I'll try to make it a little easier.

15  **A.**   Okay.

16  **Q.**   We've used the term "expressions" before; correct?

17  **A.**   Correct.

18  **Q.**   And we've discussed or you've discussed with

19  Mr. Krumholz this idea of concepts; correct?

20  **A.**   Right.

21  **Q.**   And so I guess what I heard your testimony to be

22  was you heard Mel Taft identify concepts that may or

23  may not need to be addressed; correct?

24  **A.**   Well, without the letter in front of me I believe

25  you're correct.  But he was talking about the overall

1    nature of the game and what feedback he was getting

2    that suggested its deficiencies.

3    **Q.**    And if we go to the next part of that equation, in

4    my mind anyway, that there were no specific

5    expressions, as you sit here today, do you recollect

6    any -- do you recall any specific expressions that were

7    identified in this letter?

8    **A.**    In the Mel Taft letter I don't recall any.

9    Without the letter being in front of me I can't verify

10   that, but I don't recall any.

11   **Q.**    And can you tell me who that letter was sent to?

12   **A.**    I don't recall if it was sent in response to

13   Mr. Markham or if it was sent to Mr. Klamer.

14   **Q.**    Can you tell me why Mel Taft would have been

15   sending a letter to Bill Markham?

16   **A.**    Probably in response to his letter.

17   **Q.**    You testified earlier relatively recently about

18   the rules.  Do you remember that?

19   **A.**    Yes.

20   **Q.**    Are you aware of any evidence that Mr. Markham

21   provided revisions to the rules to Milton Bradley?

22   **A.**    I'm sorry; I couldn't hear couple of the words you

23   said.

24   **Q.**    Are you aware of any evidence that Mr. Markham

25   provided revisions of the rules to Milton Bradley?

1    **A.**   I don't think so.

2    **Q.**   You don't think so.  Okay.  And the analysis that

3    we heard from you a little while before didn't, because

4    you don't recall that, would have necessarily not

5    included any revisions from Bill Markham to the extent

6    there were any; correct?

7    **A.**   Correct.

8    **Q.**   So if we, you know, talk about -- actually it's

9    still on the easel to your right -- any differences

10   that might have been in the rules from the prototype to

11   the commercial version of the game, you're not aware of

12   any evidence that any of the changes in the rules from

13   the prototype to the commercial version of the game

14   came from Bill Markham, are you?

15   **A.**   No, I'm not.  But again, during the process of

16   development very often the development team will

17   continue to play the game if they have a second copy,

18   and they might find things that they missed in the

19   rules and it would be good business for them to suggest

20   it.  So I'm not saying he did or he didn't, based on

21   what I reviewed, but it's possible, sure.

22   **Q.**   Okay.

23   **A.**   That would behoove him.

24   **Q.**   It would behoove Bill Markham to suggest --

25   **A.**   And Reuben Klamer, yes.

1    **Q.**   But as you sit here today, I just want to be

2    clear, are you aware of any evidence of either one of

3    those individuals providing specific suggestions to the

4    Milton Bradley?

5    **A.**   I don't believe I reviewed any, no.

6    **Q.**   Okay.  I want to back up and you touched on it

7    slightly there.  I believe your testimony was when you

8    looked at the prototype rules, I'm talking about the

9    rules, it sounded like, as someone in the industry

10   based on your experience, you knew exactly what to do

11   to make them better.  Is that correct?

12   **A.**   I knew principles that are instinctive in me by

13   this point to make them better, yes.

14   **Q.**   And you based that testimony on your experience in

15   the industry; correct?

16   **A.**   Well, and also -- yes.  And not just my own rule

17   writing, which has been extensive over the years, but

18   my admiration for how technical writers in particular

19   approach this requirement and how they do it.

20   **Q.**   And your experience is not specific to Milton

21   Bradley; it's based on the industry in general?

22   **A.**   Yes.  Heavily influenced by Parker Brothers, which

23   was very comparable to Milton Bradley.

24   **Q.**   Very comparable.  And any reason that either one

25   of those wouldn't have been comparable to the industry

1    at large?

2    **A.**    No.  And as a matter of fact a lot of the same

3    people who worked at Milton Bradley came to Parker

4    Brothers in product development and vice versa, so

5    there was cross-fertilization.

6    **Q.**    Is it a rather incestuous field?  Would you say

7    that?

8    **A.**    Well, it's a small industry.  At least it was

9    until modern times.

10    **Q.**    Until modern times.

11    **A.**    Yeah.

12    **Q.**    And people have different views of modern times.

13    What are you considering modern times?

14    **A.**    I would say the modern era began in fits and

15    starts the early 1980s with the introduction of

16    electronics and, more importantly, work stations and

17    automated typesetting machines, but it really got going

18    with the Internet age when the competition from apps

19    and instant gratification games had a significant

20    impact on how manufacturers approached the design and

21    development of board games.

22    **Q.**    Okay.  You mentioned two concepts there,

23    typesetting and the Internet age.  I know you mentioned

24    more, but those are two that --

25    **A.**    Well, those are two bright points, because in the

1    beginning of the 1980s the game industry was seriously

2    impacted by the advent of video games, and the video

3    game industry just took a lot of money away for a while

4    from board games and manufacturers knew they had to

5    respond with something.

6         In addition, and this to me was a miracle,

7    suddenly you didn't need to do graphics with your

8    hands; you could do graphics on a monitor, a computer

9    monitor.

10   **Q.**   And that made things easier?

11   **A.**   Oh, it certainly did.  But it didn't mean that it

12   happened all at once.  You know, artists had to learn

13   how to use these things.  I remember the first

14   investment that Parker Brothers made in a word

15   processing system, my God was it expensive, tens of

16   thousands of dollars, so it was not something that a

17   company did just because the technology was available.

18   It took time before the cost became favorable and more

19   people accepted the notion that graphics and

20   typesetting should be done on computers.

21   **Q.**   Fair enough.  And once that occurred then things

22   became easier; right?

23   **A.**   They did.

24   **Q.**   And it continues.  I mean maybe it's an

25   overgeneralization, and you can tell me if you

1   disagree, but people can do that almost nowadays on

2   their own computers; right?

3   **A.**   Yes.  Well, clearly they can.

4   **Q.**   And that makes things easier; correct?

5   **A.**   Yes.

6   **Q.**   And faster.

7   **A.**   Still requires talent.  But you can do it, and I

8   can do it, and so can a graphic artist.

9   **Q.**   I appreciate that.  I'm not sure I could it, but I

10   appreciate your confidence.

11          So I do want to go back to the rules.  You

12   talked specifically about moving the, I believe it was

13   the number of players from the bottom to the top; is

14   that correct.

15   **A.**   Yes.

16   **Q.**   And I believe you described that change as a

17   fundamental change; is that correct?

18   **A.**   I did, yes.

19   **Q.**   Can you tell me why that is?

20   **A.**   Because the, one of the first questions that needs

21   to be answered for a consumer is how many players can

22   play this game.  You don't want to find that out at the

23   end of the rules.

24   **Q.**   And you're basing that testimony based on your

25   experience in the game industry; correct?

1   **A.**   Yes.

2   **Q.**   Not specific to Milton Bradley; just the game.

3   **A.**   Correct.

4   **Q.**   And so when you saw those rules, if you would have

5   seen the prototype rules, and you did see the prototype

6   rules, you would have immediately said I can fix that;

7   correct?

8   **A.**   Yeah.  Sure.

9   **Q.**   Okay.  And basically someone --

10   **A.**   That's fair.

11   **Q.**   I'm sorry for cutting you off.  So someone in the

12   industry would know let's take that off the bottom and

13   put that on the top?

14   **A.**   Correct.

15   **Q.**   And it's fundamental, I believe; right?

16   **A.**   Yes.

17   **Q.**   Are you aware that Milton Bradley entered into a

18   license to manufacture The Game of Life; correct?

19   **A.**   Correct.

20   **Q.**   You've reviewed that license?

21   **A.**   I have.

22   **Q.**   Now, I guess I want to make sure I understand your

23   testimony.  So your testimony is -- and the earlier

24   commercial version of the game, the rules are sitting

25   on the easel to your right.

1           Your testimony is and your opinion is that those

2      rules sitting right there that accompany the games

3      behind me are independent works; is that correct?

4      **A.**   No.  I didn't say independent.

5      **Q.**   You believe those are derivative works?

6      **A.**   I said derivative, yes.

7           THE COURT:  Mr. Pollaro, we need to take a

8      break.  Let's go off the record for a moment.

9           (Discussion off the record)

10          (Recess)

11          THE COURT:  Mr. Pollaro, you may proceed.

12          MR. POLLARO:  Thank you, your Honor.

13     **Q.**   A couple more quick questions, Mr. Orbanes, and

14     then we'll switch gears.

15     **A.**   Okay.

16     **Q.**   You are aware that Milton Bradley entered into a

17     license to manufacture The Game of Life; correct?

18     **A.**   I am.

19     **Q.**   And you have reviewed that license?

20     **A.**   I have.

21     **Q.**   Now, am I correct that your testimony yesterday

22     and today includes at least some portions that are, of

23     the game or the rule, whatever it might be, that you

24     believe are independent works; is that correct?

25     **A.**   I don't think -- I'm sorry, I'm lost.

1     **Q.**   It was a terrible question.  Let me start again.

2     **A.**   Yup.

3     **Q.**   Let's use the Despicable Me, for example.

4     **A.**   Yes.

5     **Q.**   I believe it was your testimony earlier that you

6     believe that that was an independent work; correct?

7     **A.**   Yes.

8     **Q.**   And also, for example, let's use the current

9     version of The Game of Life, and I believe it was your

10    opinion that it was an independent work; correct?

11    **A.**   Correct.

12    **Q.**   On all three fronts:  The board, the box, and the

13    rules; correct?

14    **A.**   Correct.

15    **Q.**   Okay.  And so I want to make sure I have your

16    testimony correct.  Is it your understanding and is it

17    your testimony Milton Bradley would not require a

18    license to produce those products that you believe are

19    an independent work?

20            MR. KRUMHOLZ:  Objection, your Honor.

21            THE COURT:  Grounds?

22            MR. KRUMHOLZ:  He's asking his legal opinion as

23    to whether the enforcement of a license agreement on

24    what could be cover or trademark issues or other IP

25    issues.  The problem with the question is it assumes

1    that copyright is the only basis for whatever the

2    rights may be under the license agreement.

3          THE COURT:  Well, he can rephrase the question

4    to accommodate that portion which is objectionable and

5    direct him only to copyright issues.  I think it's an

6    important issue.  I'm interested in it myself.  Whether

7    the witness can answer it or not we'll find out.

8          Why don't you try to rephrase your question.  Do

9    you understand what he's getting it?

10         MR. POLLARO:  I do, your Honor, thank you, and I

11   think that's appropriate.

12   **Q.**   Mr. Orbanes, my question to you is -- let's try to

13   simplify it if I can.  Let's talk about the current

14   version of The Game of Life; correct?

15   **A.**   Yes.

16   **Q.**   Okay.  Now, the current version of The Game of

17   Life, as I understand your testimony, is, with respect

18   to the three copyrights in this case, an independent

19   work; correct?

20   **A.**   Yes.

21   **Q.**   So now let's assume that we care for the purposes

22   of this question only about the copyrights; correct?

23   **A.**   Right.

24   **Q.**   In other words we don't care about trademarks, we

25   don't care about trade address, trade secret, anything

1    else; okay?  We're just talking about the copyrights.

2         Now, is it your testimony and your understanding

3    that based on your -- how many years experience?

4    **A.**    Fifty-three.

5    **Q.**    -- fifty-three years experience in the industry,

6    that Milton Bradley can sell the current version of The

7    Game of Life without a license?

8    **A.**    You mean if the --

9         MR. KRUMHOLZ:  Objection.  I don't think that

10   solves the problem.  I mean if we just isolated it to

11   copyright questions, I get that.

12        THE COURT:  I understand your objection.  I

13   think that in formulating your question you need to

14   separate from the license for now, okay, and just focus

15   on copyright and then maybe you can move to a question

16   about the license.

17   **Q.**    I'll try again, Mr. Orbanes.  Bear with me.

18   Again, focusing on the current Game of Life, correct,

19   it's your testimony that the current Game of Life is an

20   independent work with respect to the three copyrights

21   at issue in this case; correct?

22   **A.**    Yes.

23   **Q.**    Based on that testimony, is it your understanding

24   that the copyrights at issue in this case don't cover

25   the current version of the game?

1    **A.**    Yes.

2    **Q.**    And as a result of that -- you testified you

3    reviewed the license in this case?

4    **A.**    I did, yes.

5    **Q.**    Okay.  And you understand that license as someone

6    in the industry?

7    **A.**    Yes.

8    **Q.**    And so now my question is just with respect to the

9    copyrights, is it your understanding that Milton

10   Bradley is free to sell the game irrespective of that

11   license?

12          MR. KRUMHOLZ:  Same objection, your Honor.

13          THE COURT:  I'm going to sustain the objection

14   as to the application of the license.  Although this is

15   a valid question that you're raising, I intend to ask

16   that question of you and of Mr. Krumholz, but I don't

17   think it's an appropriate question for this witness.

18   You've covered what you need to cover with respect to

19   the copyright.

20          MR. POLLARO:  Thank you, your Honor.

21   **Q.**    Switching gears.  Yesterday you made some opinions

22   based on certain assumptions Mr. Krumholz gave you.  Do

23   you recall that?

24   **A.**    I do.

25   **Q.**    I'd like to give you some assumptions now and see

1   your opinions.

2   **A.**   Okay.

3   **Q.**   I believe Josh said that you would be willing to

4   do that.

5   **A.**   I believe that I'm receptive.  Okay.

6   **Q.**   Let's assume the following facts.

7   **A.**   All right.

8   **Q.**   Reuben Klamer and Bill Markham had an ongoing

9   relationship whereby Markham created products and

10   Klamer sought to sell those products through his

11   company to various publishers.  That's fact one.

12   **A.**   Okay.  I'm assuming that.

13   **Q.**   You with me?

14   **A.**   I'm with you.

15   **Q.**   Bill Markham had been working on a

16   three-dimensional game with a spinner that could be

17   folded.

18   **A.**   I understand that assumed fact, yes.

19   **Q.**   Okay.  We'll get to that.  Fact three, Klamer,

20   through his industry contacts, learned of an

21   opportunity to license a game to Milton Bradley.

22   **A.**   Okay.  I assume that.

23   **Q.**   You understand all three of those facts?

24   **A.**   I do.

25   **Q.**   Would that situation be unusual in your

1    experiences in the industry?

2    **A.**   Based on my knowledge of the individuals involved,

3    or just in general?

4    **Q.**   You can give me both.

5    **A.**   I would like you just to sum up the three facts

6    for me so that I can give you the benefit of my wisdom

7    here.

8    **Q.**   You'd like me to go through the facts again?

9    **A.**   Just name the three facts.  Thank you.

10   **Q.**   Sure.  No problem.

11        Fact number one, Klamer and Markham had an

12   ongoing relationship whereby Markham created products

13   and Klamer sought to sell those products through his

14   company to various publishers.

15   **A.**   Okay.  So Klamer in this case is acting as an

16   agent, is that what you're saying, on behalf of

17   inventions by Bill Markham?

18   **Q.**   I'm asking you to assume those facts.  If you

19   interpret those facts to be --

20   **A.**   Well, it makes it easier for me to get a grip on

21   what you're assuming here.  So I think that's what

22   you're saying.

23   **Q.**   Is that, based on your experience, what you

24   understand, based on the assumed fact I gave you?

25   **A.**   Well, if an inventor who doesn't have either the

1    interest in selling his own ideas or doesn't really

2    have industry contacts relies on an intermediary, that

3    intermediary is very often called an agent.  The agent

4    in particular is of value to the inventor because he

5    does have the industry contacts and he is good at

6    selling.  So if that's your assumption, then I'm with

7    you.

8    Q.    Let's start from there.  Fact number two, I'm

9    going to go over it again.  Bill Markham had been

10   working on a three-dimensional game with a spinner that

11   could be folded.

12   A.    I'll assume that.  Okay.

13   Q.    Okay.  Fact three, Klamer, through his industry

14   contacts, learned of an opportunity to license a game

15   to Milton Bradley.

16   A.    Okay.  Got it.

17   Q.    You with me?

18   A.    I'm with you.

19   Q.    Okay.  Would that situation be unusual with your

20   experience in the industry?

21   A.    Agent, inventor, opportunity, in the order you

22   presented, that happens, certainly.

23   Q.    Is it common?

24   A.    Not as common as -- in my experience, especially

25   during my Ideal and Parker Brothers days, it was

1   uncommon because typically agents, inventors, and

2   opportunity do not all line up at the same time.  But

3   I'm with you, and it has happened, so let's just assume

4   that I'm with you.  Okay?

5   **Q.**   Okay.  Maybe I'm not following you, because I just

6   want to make sure I understand your answer there.

7        So the first fact assumes there's an ongoing

8   relationship with Klamer and Markham; correct?

9   **A.**   I got it.

10   **Q.**   And so I think you used the term "agent."  That's

11   how you interpret that fact?

12   **A.**   It's a handle.

13   **Q.**   It's a handle.  Okay.  So now --

14   **A.**   Then Markham had this idea.

15   **Q.**   That's where I was going.

16   **A.**   Right.  And then there was an opportunity that

17   Mr. Klamer was aware of?

18   **Q.**   Uh'huh.

19   **A.**   Okay.  I got it.

20   **Q.**   Now, you said it happens; correct?

21   **A.**   It happens, sure.

22   **Q.**   But I thought you then said it was unusual, and I

23   guess I want to explore that.  Why is it unusual?

24   **A.**   Because most of the contact that I had with idea

25   people was inventors coming to me with their ideas that

1   they had other people work on their behalf.  They were

2   agents, but they were not necessarily significant.

3   There were some, yeah.

4   **Q.**   Okay.  Now -- but it happens, based on your

5   experience; correct?

6   **A.**   It happens, sure.

7   **Q.**   And I mean, again --

8   **A.**   I mean three guys in Canada who were news -- I

9   mean sports writers came up out of the clear blue with

10  Trivial Pursuit.  It happens.  They were not even in

11  the industry.

12  **Q.**   And this would have happened in 1959, 1960;

13  correct?

14  **A.**   Yes.

15  **Q.**   Would that situation be consistent with an

16  inventor and an agent working together to license a

17  game to a company?

18  **A.**   As you described it, yes.

19  **Q.**   Okay.  So based on that hypothetical, you say it

20  happens and it would be consistent; correct?

21  **A.**   It would be consistent.

22  **Q.**   Now let's back up.  Before I started asking you

23  the hypothetical you said am I basing that on your

24  knowledge of Reuben Klamer, the parties.  Is that what

25  you said?  Did I mishear you?

1   **A.**   I'm not sure I follow you.

2   **Q.**   I thought you were telling me that -- you asked

3   for a qualification on am I going to answer this

4   hypothetical based on the assumed facts or based on my

5   understanding of the parties involved.

6   **A.**   I think what you're asking me is to assume this

7   alternate these set of facts and then to offer you my

8   opinion on it.

9   **Q.**   Okay.  And you used the word "alternate."  Can you

10  explain that to me.

11  **A.**   Well, the facts that I was asked to presume in

12  this case are in conflict with the facts that you've

13  just given me.

14  **Q.**   So the facts that I gave you, you said, are not

15  the facts that you were asked to assume; correct?

16  **A.**   That's correct.

17  **Q.**   Okay.

18  **A.**   I can certainly comment on this set of facts that

19  you're asking me about.  I have enough experience to do

20  that.

21  **Q.**   And again just so I'm clear, did you just comment

22  on that, or do you have other comments?

23  **A.**   I'm waiting for you to ask me what's next.

24  **Q.**   Well, okay.  You said you have comments on these

25  assumed facts, so I want to know what those --

1    **A.**    I didn't say I had comments on them.  I said I can

2    comment on them when you're ready.  I don't know where

3    you're going with this yet, but I will help you if I

4    can.

5    **Q.**    Okay.

6           THE COURT:  I'm getting very confused.  Let's

7    try to keep this simple.  You've asked him to assume a

8    certain set of facts.  You asked him if that was usual

9    or unusual, and he said it was not common.  You asked

10   him if it was consistent with an inventor and an agent

11   licensing a game, and he said it is.  So let's get to

12   the next; whatever it is that you want to get to, let's

13   get to it.

14          MR. POLLARO:  Thank you, your Honor.

15   **Q.**    You indicated that these were alternate facts;

16   correct?

17   **A.**    Yes.

18   **Q.**    And my understanding of your testimony is that you

19   believe they are alternate facts because they were not

20   the facts that you were asked to assume; is that

21   correct?

22   **A.**    That's correct.

23   **Q.**    My question is what did you do to investigate

24   whether or not the assumed facts you were given were

25   accurate?

1    **A.**    I don't think that was my job.  I was asked to

2    assume these facts and then to offer my opinions.

3    **Q.**    So is the answer nothing?

4    **A.**    In the narrow context of my expert report, I only

5    relied on the facts that I was assumed to rely on, and

6    I compartmentalized anything else that I may know that

7    could have been brought to bear because that's not my

8    task.

9    **Q.**    Okay.  I want to explore that.  So is the answer

10   no?

11   **A.**    I'm sorry, the question again is?

12   **Q.**    The question is did you do anything to determine

13   whether or not the assumed facts you were given were

14   accurate?

15   **A.**    I accepted the assumed facts.

16   **Q.**    And again, I just want to make sure I'm getting an

17   answer to my question.  And so you did nothing to

18   determine whether or not those facts were indeed

19   accurate?

20   **A.**    That wasn't my mission.

21   **Q.**    So is the answer no, then?

22   **A.**    I'll say no for the sake of what you're asking.

23   **Q.**    Thank you.

24   **A.**    Okay.

25   **Q.**    Now, you also testified that you compartmentalized

1    information you may know.  Is that fair?

2    **A.**   Yes, that's fair.

3    **Q.**   And so what do you mean by that?

4    **A.**   Any knowledge that I may have had about the

5    participants or prior knowledge that I had about the

6    history I had to compartmentalize because I had to

7    focus on the assumed facts.

8    **Q.**   When you say compartmentalize, you're saying you

9    had knowledge about the participants in my

10   hypothetical; correct?

11   **A.**   Yes.

12   **Q.**   And you did not utilize any information in

13   answering my question or in answering the assumed facts

14   that you were --

15   **A.**   No.  If you look at my report, I based all of my

16   opinions on the facts and the law that I was asked to.

17   **Q.**   I'm going to switch gears.

18   **A.**   Okay.

19   **Q.**   The term -- I believe it was your opinion, pardon

20   me, I don't recall if it was yesterday or today, but I

21   believe that you opined that the terms in the

22   assignment agreement are reasonable.  Is that correct?

23   **A.**   Yes.

24   **Q.**   And you believe that to be true?

25   **A.**   I do believe that to be true.

1 **Q.** And all the terms of the assignment agreement;

2 correct?

3 **A.** Yes.

4 **Q.** And you reviewed that assignment agreement?

5 **A.** I did.

6 **Q.** Was it your testimony that the royalty in the

7 assignment agreement was reasonable for Bill Markham?

8 **A.** I think the royalty is, based on my experience,

9 generous.

10 **Q.** Can you tell us again why you believe it is

11 generous.

12 **A.** Because his share was not based on the product

13 component of the royalty, it was based on the entire

14 royalty, which included an extra percent for

15 Mr. Linkletter's contribution. Now I cannot comment on

16 what that was worth in 1959 or '60, but I can tell you

17 that in subsequent years that would have been worth up

18 to 10 percent, not 6 percent total. So it was a good

19 deal for Milton Bradley and it was a good deal for

20 Mr. Markham because he received 30 percent of the

21 total.

22 **Q.** And is that unusual in your experience, that

23 someone like Bill Markham would get that amount of

24 royalties?

25 **A.** Typically in my experience, as I mentioned

1    yesterday, a point-and-a-half based on 5 percent would

2    be standard or one point.  So 1.5 percent of 5 is

3    30 percent of 5, not 30 percent of 6.

4    **Q.**   Is that because -- I believe it was your opinion

5    that was because a design firm would typically not be

6    paid that much in royalties?  Is that correct?

7    **A.**   No.  What I'm saying here in specific is the

8    design firm normally wouldn't share in the promotional

9    component of a royalty.  The design firm that had

10   creative and time pressures on it would be entitled

11   fairly to 1.5 percent of 5, yes.  I've done deals like

12   that, and the parties have very happy to get that.

13   **Q.**   Is it typical in your experience -- let me start

14   again.  What is your understanding with respect to Bill

15   Markham -- let me start again.

16        Have you used the term "design firm" to apply to

17   Bill Markham's company?

18   **A.**   Yes.  To the best of my knowledge his firm was an

19   advertising design agency at the time that Ruben Klamer

20   was employing him through the late 1950s.

21   **Q.**   And just so I'm clear, and we're going to talk

22   about that in more detail, is that an assumed fact that

23   you were given?

24   **A.**   Well, I know individuals who were there at that

25   time who knew that to be a fact.

1    **Q.**   Can you tell us who those individuals are?

2    **A.**   In particular a gentleman named Rene Soriano, who

3    is probably about 85 years old.  Rene, after he came

4    out of the military, went to the same design schools

5    that both Grace and Leonard did, according to their

6    testimony.  He worked initially at Allen & Shaw, which

7    was one of the design firms that Ruben Klamer had

8    indicated on the note that he wrote on the flight back

9    from New York.  He knew the Markham agency as a result

10   because they were competitors.  He also became a game

11   inventor, and Reuben Klamer worked with him on game

12   inventions.

13        Rene then worked for Eddy Goldfarb, which was

14   the second leading toy and game firm in the area, he

15   was located in southern California, and he knew Bill

16   Markham's advertising agency.

17        I got to know Rene because he then became a

18   designer at Ideal Toy and ultimately came to work at

19   Parker Brothers.

20   **Q.**   I appreciate that.  Is it typical in your

21   experience for a design firm to be credited on the

22   cover of a box as the game designer?

23   **A.**   In that era it was not even uncommon, it never

24   happened.  Which is a bone of contention, by the way, I

25   should just add, with a lot of inventors.  Sid Sackson,

1    for example, who Mr. Carty mentioned yesterday, you

2    know, companies in that era promoted themselves, they

3    promoted their companies as a brand, and they were very

4    reluctant to recognize that anybody outside of the

5    company actually was responsible for the creative

6    content of their games.

7          The first time that I encountered this was

8    actually in the early 1970s, and then in fits and

9    starts it began to become more accepted in the 80s and

10   thereafter.

11   **Q.**   Is it typical in your experience for a game

12   designer to be credited on the cover of the box?

13   **A.**   Nowadays it's more common.  It was not done at all

14   in 1959.

15   **Q.**   And in your experience and your understanding,

16   that doesn't mean that was because game designers

17   didn't try; correct?

18   **A.**   They tried.  I'm sure they did.

19   **Q.**   Would you expect that type of term to be in an

20   agreement?

21   **A.**   Well, I don't think it would be in an agreement

22   between an inventor and a manufacturer because the

23   manufacturer back then just would have X'd it out; it's

24   a nonstarter.  And I don't know if anything else counts

25   because if that agreement, let's say, was between

1    subservient parties it would be a kind but empty

2    gesture.

3    **Q.**    Okay.  And to the extent an agreement contained a

4    provision about identifying a game designer on the box,

5    would that be, in your experience, reasonable and

6    customary?

7    **A.**    No.  As I said, no manufacturer in that era had

8    that policy.  They would have never put that clause

9    into a contract.

10         It began, by the way, in the 1970s when an

11   organization named the Marvin Glass Company, which was

12   by far the hugest game inventing and toy inventing firm

13   in the country, basically said we want our logo on your

14   package if you want to license this, and that was met

15   with -- you know, that was a tipping point in the

16   industry when they finally, when their wishes were

17   ceded to; so that came later.

18   **Q.**    You've talked about -- you've referred to

19   contracts with the manufacturer.  Are you familiar in

20   your experience with contracts between other parties in

21   the industry?  For example, an inventor and an agent?

22   **A.**    Sure.  I was, you know, taught the ropes on this

23   by Alice Nichols and Felicia Parker when I was quite

24   young.

25   **Q.**    Would a provision that identified an inventor as

1    the designer on the box be a reasonable term in a

2    contract between an inventor and an agent?

3    **A.**   Well, I can tell you in specific that they

4    represent Sid Sackson, the inventor that we spoke of a

5    lot yesterday, and Sid really wanted to have credit for

6    his inventions on the packages of the games that they

7    were selling for him.  I would imagine that they would

8    have said to him, either in verbiage or in writing,

9    we'll do our best.

10   **Q.**   So if I understand your testimony, Sid Sackson

11   wanted his name on the box as a designer; correct?

12   **A.**   Sure.  Like many designers -- pardon me, not

13   designers -- like many inventors of the era they wanted

14   recognition, yes.

15   **Q.**   And by virtue of his name being on the box, people

16   would identify him as the inventor; correct?

17   **A.**   Certainly.  It would be a great source of pride,

18   I'm sure, if the name appeared on the package.

19   **Q.**   And the industry would know that Sid Sackson was

20   the inventor; correct?

21   **A.**   That's what the purpose of it would be, yes.

22   **Q.**   Let's look at -- do you have the binder that I

23   handed you earlier?

24   **A.**   I do.

25   **Q.**   I want to talk about your report.  If you turn to,

```
 1    it should be Tab 1.  Do you see your expert report in

 2    there?

 3    A.   I'm sorry what tab are we on?

 4         MR. POLLARO:  May I approach, your Honor.

 5         THE COURT:  Yes.

 6         (Pause)

 7         MR. POLLARO:  We'll come back to that.

 8         THE WITNESS:  Okay.

 9         (Pause)

10         MR. POLLARO:  May I approach, your Honor.

11         THE COURT:  Yes.

12         MR. POLLARO:  I'm going to hand you a binder of

13    your reports.

14         Your Honor, two copies.

15         THE COURT:  I think you gave me the reports

16    yesterday, so I think I have them.

17         MR. POLLARO:  I can take them off your hands.

18         THE COURT:  Yes, go ahead.

19    Q.   I apologize, Mr. Orbanes.

20    A.   That's okay.

21    Q.   If you look at the first tab, you see your expert

22    report?

23    A.   I have it here, yes.

24    Q.   Do you identify that as your expert report?

25    A.   I do.
```

1   **Q.**   That's your signature on the bottom?

2   **A.**   It is.

3   **Q.**   Now, I do want to explore some of these concepts

4   we've been talking about.  So at the time you first

5   formed your opinions in this case, it looks like on

6   December 18, 2017, you had reviewed the documents on

7   Appendix B of your opening report; is that correct?

8   **A.**   Appendix B?

9   **Q.**   Appendix B.

10   **A.**   I see Appendix A twice.  Am I missing something?

11   Would you like to look at this again?

12           MR. POLLARO:  May I approach, your Honor.

13           THE COURT:  Yes.

14           (Pause)

15           THE COURT:  Maybe to -- we can go off the record

16   for a minute.

17           (Discussion off the record)

18           MR. POLLARO:  Your Honor, we can come back to

19   that.  I don't want to waste everybody's time.  Are we

20   on the record?

21           THE COURT:  Yes.

22   **Q.**   You testified that the board, the box, and the

23   rules of the current Game of Life are independent

24   works; correct?

25   **A.**   I did.

1    **Q.**   And in forming that opinion you looked at the

2    current version of The Game of Life and compared it to

3    the prototype; correct?

4    **A.**   I did, yes.

5    **Q.**   I'd like to show you the current version of the

6    game.

7            MR. POLLARO:  May I approach, your Honor.

8            THE COURT:  Yes.

9    **Q.**   I'm handing you what's identified as HTX019.  Now,

10   have you seen that game before?

11   **A.**   I have.

12   **Q.**   And based on your testimony yesterday as I

13   understand it, in determining that the current Game of

14   Life which you're holding in your hand, HTX019, is an

15   independent work, you compared it against the

16   prototype; correct?

17   **A.**   I did that this morning.

18   **Q.**   This morning.  I apologize.  And that was a

19   comparison you did.  That was the extent of the

20   comparison you did and you identified what you believed

21   to be differences; correct?

22   **A.**   Yes.

23   **Q.**   And just so we're clear, that opinion applied to

24   the rules, the board, and the box cover?

25   **A.**   That's correct.

1  **Q.**   So yesterday we talked about some of the

2  differences between the prototype box cover and the

3  early version of the game.  Do you recall that?

4  **A.**   I do.

5  **Q.**   And you had certain colors, circles.  You remember

6  that?

7  **A.**   I do.

8  **Q.**   One of the circles that you had and you discussed

9  was the product code.  Do you remember that?

10 **A.**   You mean the product number?

11 **Q.**   Yes.

12 **A.**   I do, yes.

13 **Q.**   And so do you see the product number on the

14 current version of the game, HTX019?

15 **A.**   Let's see here.  We did see it on the front cover

16 of the early commercial version and --

17 **Q.**   At the bottom?

18 **A.**   This here?

19 **Q.**   No.  That's the back.

20     THE COURT:  Mr. Pollaro, my recollection is that

21 the questions about the product number, the SKU was

22 objected to and I sustained that objection, I thought,

23 as not relevant.

24     MR. POLLARO:  That was before he brought it up

25 after, your Honor.

1         THE COURT:  Well, if it was irrelevant before,

2    it's still irrelevant.

3         MR. POLLARO:  Your Honor, he referred to it

4    yesterday as a functional addition to the game, and I'm

5    just asking him if he can identify it on this box.

6         THE COURT:  Okay.

7    **A.**    Could you do me the favor of showing it to me?

8    I'm sorry, I'm at a loss to find it.  I'm sure you know

9    it's here.

10        MR. POLLARO:  May I approach.

11        THE COURT:  Yes.

12   **A.**    That would help.  Oh, wait, is that it?  Is that

13   what you're referring to right here, the proof of

14   purchase.

15   **Q.**    Yes.

16   **A.**    I have it now, yes.

17   **Q.**    Can you tell me what that product code is.

18   **A.**    04000.

19   **Q.**    And what is your understanding, based on your 53

20   years of experience, of what a product code is?

21   **A.**    That would be the number assigned by the

22   manufacturer to this product for recordkeeping

23   purposes, which would also include the number that the

24   retail trade would order against.

25   **Q.**    Okay.  Now, in your experience, when do you change

1    a product code?

2    **A.**   You don't change it if you can help it -- I'm

3    sorry.

4            MR. KRUMHOLZ:  Your Honor, excuse me.

5    Objection.  We're not claiming it's an aesthetic change

6    to this functional piece.  Whether they're changing

7    codes or not changing codes has nothing to do with the

8    issues --

9            MR. POLLARO:  I'll withdraw the question, your

10   Honor.

11           THE COURT:  All right. Thank you.

12   **Q.**   Can you tell me the product code for the 1960

13   version of The Game of Life.

14           MR. KRUMHOLZ:  Same objection.

15           THE COURT:  Mr. Pollaro, the product codes are

16   not going to decide this case, I can guarantee you

17   that.

18           THE WITNESS:  Your Honor --

19           THE COURT:  No, no, you don't have to explain

20   anything.  Stick to the question.

21           THE WITNESS:  All right.

22   **Q.**   We'll switch gears.  You can put that aside,

23   Mr. Orbanes.

24   **A.**   Are we done with this for a while?

25   **Q.**   We are done.

1    **A.**    Okay.   I'll put this down here out of the way.

2    Okay.

3    **Q.**    Is it common for game inventors to use an

4    independent game agent?

5    **A.**    No.   It's uncommon.   Game inventors who use agents

6    are typically amateurs who have no real credentials in

7    the industry and are trying to get in and no idea of

8    just what companies' policies are, and they're rather

9    intimidated by the thought.   And secondly, amateurs are

10   really not welcome to come directly to game companies

11   because there's been so much -- there's a body of

12   inadvertent litigation that comes from unknowing

13   vendors who think their ideas may have been copied.

14   That's why agents are important to amateurs.

15        There's also a small number of really good

16   inventors, of which Sid Sackson was the perfect

17   example, who rely on an agent because they're just not

18   comfortable selling.   Sid was a phenomenal game

19   inventor, but he stammered, he made excuses, he was shy

20   when it came to trying to present his own ideas.   I

21   remember it was very frustrating to deal with him on

22   that level.   But the agents did that work for him, so

23   they serve that valued purpose.

24   **Q.**    Thank you for that.   So did you say it was common

25   for inventors to use game agents?   It sounded like you

1    did, and I thought you said no to --

2    **A.**    No.  I said if you were a professional who was not

3    comfortable with your sales skills you were, you were

4    benefitted by having an agent; and if you were an

5    amateur who had never really had any contact with game

6    companies before but you thought you had some game

7    ideas an agent was a very help -- was a big help to you

8    to get your ideas in front of companies.  Those are the

9    only two reasons to use an agent.

10   **Q.**    Agents typically have better contacts in the

11   industry than designers; correct?

12   **A.**    Those two categories of inventors that I just

13   pointed out benefit from having an agent who has that

14   industry contact, yeah.

15   **Q.**    So you would agree with that statement?

16   **A.**    Restate it, please, so I make sure I'm on the same

17   page.

18   **Q.**    Agents typically have better contacts in the

19   industry than designers; correct?

20   **A.**    No, that's not correct.  Most designers have

21   direct contact with companies.  Most game inventors do.

22   They don't need an agent; that's my point.

23   **Q.**    Let's -- I don't believe my question was inclusive

24   of that concept.  I'm talking about agents versus

25   designers.

1    **A.**   Now, if we're talking about designers, we mean

2    people who actually build prototypes?

3    **Q.**   I would say inventors, inventors, designers,

4    creators --

5         MR. KRUMHOLZ:  Objection.

6    **A.**   Let's I think --

7         MR. KRUMHOLZ:  Objection.

8         THE COURT:  Well, first of all, you need to not

9    talk over each other.

10        What's your objection?

11        MR. KRUMHOLZ:  He just has now lumped inventors,

12   designers, creators.

13        THE COURT:  Okay.  I think that is going to get

14   clarified.  Start your question again, and let's be

15   clear about whether you're talking about an inventor or

16   a designer or a combination of the two.

17        MR. POLLARO:  Thank you, your Honor.

18   **Q.**   My question was agents typically have better

19   contacts in the industry than designers; correct?

20   **A.**   Game designers take their marching orders from

21   inventors.  That's the second phase of the process in

22   bringing about a prototype.  Looks like, plays like,

23   works like.

24        So if you're taking about the plays-like stage,

25   designers are relying on inventors to give the ideas to

1    develop.  That's why they're called designers.

2         THE COURT:  I think the question was whether

3    agents have better contacts in the toy industry than

4    designers.

5    A.   And the answer to that -- thank you, your Honor --

6    would be yes because designers are not inventors.  So

7    if the designer had an idea, yeah, he would need an

8    agent.

9    Q.   Is it your testimony that designers would

10   typically not be given credit for game designs?

11   A.   In that era in particular, yes, never.

12   Q.   Never?  Game designers never received credit

13   for --

14   A.   In that era, no.

15   Q.   In that era would game designers receive a

16   royalty?

17   A.   They could, sure.

18   Q.   They could.

19   A.   Yeah.

20   Q.   Game agents are able to find opportunities to sell

21   games to game manufacturers; correct?

22   A.   Well, that answer requires a little bit of

23   explanation.  The average agent could care less about

24   opportunity.  They'd simply gather up all the ideas of

25   the inventors they represent and arrange meetings to

1    present them to manufacturers in the hopes that

2    something actually matches up with an opportunity.

3         However, there are a group of very proactive

4    people in the industry who start from the other end.

5    They ask for opportunity first and then they hire

6    designers to create product to match that opportunity.

7    **Q.**   Thank you.  And as you recall, we discussed that

8    concept at length at your deposition.  Do you recall

9    that?

10   **A.**   I do, yes.

11   **Q.**   And do you recall identifying Reuben Klamer as,

12   you used the term "concept agent"?

13   **A.**   Yes.  If you were to try to characterize Reuben

14   Klamer in this scenario, he would not be a passive

15   agent.  He would be the one who saw opportunity and

16   then hired designers to fulfill the opportunity.

17   **Q.**   That's your understanding of Reuben Klamer's role

18   in this case; is that correct?

19   **A.**   My understanding of Reuben Klamer's role in this

20   case is that he was at Milton Bradley, was given the

21   opportunity to visit the archive, had the eureka

22   moment, came up with the basis of what The Game of Life

23   would be, and then hired Mr. Markham as the designer,

24   and his team, to design and develop and bring about the

25   fruition of his idea.  Yes, that's what I understand.

1   **Q.**   And you understand that, like we were talking

2   earlier, based on the facts that you were assumed to

3   assume (sic)?

4   **A.**   Right.  The facts that I was asked to assume on

5   this case, yes.

6   **Q.**   And what you just recited to me regarding Reuben

7   Klamer are some of the facts you were asked to assume;

8   correct?

9   **A.**   That's correct.

10   **Q.**   Game agents do not maintain or have need for staff

11   or employees; correct?

12   **A.**   Typically not, no.  I mean Alice Nichols and

13   Felicia Parker had a secretary, so there was three

14   people in that agency.

15   **Q.**   But typically not; correct?

16   **A.**   Typically not, yeah.

17   **Q.**   If a game company adopts a pitched game, then the

18   inventor and the independent agent share in the

19   royalties; correct?

20   **A.**   I'm sorry, what do you mean by "pitched game"?

21   **Q.**   The game that was submitted.

22   **A.**   A submitted game.  So say that one more time and

23   use the word "submitted" and I think I can grasp it.

24   **Q.**   Fair enough.

25   **A.**   Okay.

1    **Q.**   If a game company adopts a submitted game --

2    **A.**   Means they licensed a submitted game?

3    **Q.**   Okay.  Let me start again.  If a game company

4    adopts a license, a submitted game, then the inventor

5    and independent agent share in the royalties; correct?

6    **A.**   Yeah.  If an inventor is represented by an agent

7    they will share in the royalties, yes.

8    **Q.**   And based on your experience that would be the

9    case; correct?

10   **A.**   If that's the relationship, that's my, that

11   coincides with my experience, yes.

12   **Q.**   Nothing unusual about that.

13   **A.**   No.

14   **Q.**   I think I have Appendix B, finally, so let's go

15   back and I want to just clarify what you looked at when

16   you initially formed your opinions in this case.

17   **A.**   I see it.

18   **Q.**   Do you recognize this as Appendix B to your

19   opening expert report, December 18, 2017?

20   **A.**   Yes.  I mean I take your word for it.  I don't

21   actually see Appendix B per se, but I assume this is

22   from it, yes.

23   **Q.**   I will represent to you that it is.

24   **A.**   Okay.

25   **Q.**   And is December 18th, 2017 the first time you

1    formed your opinions in this case?

2    **A.**    It's the date of my report.

3    **Q.**    And would that be the first date upon which you

4    formed your opinions in this case?

5    **A.**    It's the first date that I submitted them, yes.

6    **Q.**    Was there an earlier date that you formed the

7    opinions?

8    **A.**    No; I just worked on this document for quite some

9    time.  This was the date of completion.

10   **Q.**    Okay.  And now we were starting to talk about this

11   before.  We talked about Appendix B at length at your

12   deposition; correct?

13   **A.**    Yeah.  Okay.  Yes.

14   **Q.**    You made it crystal clear to me that at that time

15   you first disclosed your opinions in December, you had

16   reviewed only the material listed on Appendix B and

17   nothing else; correct?

18          MR. KRUMHOLZ:  Objection.  Characterizing a

19   deposition and not asking a question.

20          THE COURT:  All right.  I'll overrule it for

21   now.  Go ahead.

22          MR. POLLARO:  Thank you, your Honor.

23   **Q.**    Isn't it true that you told me at your deposition

24   that you reviewed the materials on the Appendix B and

25   no other materials?

1    THE COURT:  Wait a second.  Now I'm going to

2    sustain the objection.  If it's just background it's

3    one thing, but that's not a proper approach to using

4    the deposition.  You can ask him the question now and

5    if it's inconsistent with what was said at the

6    deposition then you can impeach him with the

7    deposition.

8    MR. POLLARO:  Thank you, your Honor.

9    **Q.**    In forming your opinions on December 18, 2017,

10   Mr. Orbanes, did you review the materials identified in

11   Appendix B and only the materials identified in

12   Appendix B?

13   **A.**    Yes.

14   **Q.**    Thank you.  Now, if you look on your screen you

15   can see a couple of items with different categories.  I

16   want to direct your attention to Item Number 4.

17   **A.**    Production documents?

18   **Q.**    Yes.

19   **A.**    Okay.

20   **Q.**    It looks like there's 21 documents listed there.

21   Do you see that?  I'll represent to you there are 21.

22   **A.**    Yes.

23   **Q.**    I'll move it up so everyone can see.

24   **A.**    Yes.

25   **Q.**    And did you review those 21 production documents?

1    **A.**    I did.

2    **Q.**    Can you tell me why -- I'll represent to you that

3    seven of those documents are not cited in your report.

4    Can you tell me, confirm for me that you did, in fact,

5    review all the documents listed in Appendix B?

6    **A.**    Yes, and what are the seven that you're

7    referencing?

8    **Q.**    I don't think it's important.  I was just curious.

9    I was curious -- I want to make sure if you didn't cite

10    it in your report but yet it made it on your list that

11    you, in fact, reviewed it.

12    **A.**    I'm sure if it's on this list that I reviewed it.

13    **Q.**    So you reviewed all 21 documents.

14    **A.**    Yes.

15    **Q.**    Okay.  Now, if you look at Item 5 there, there's a

16    category called Miscellaneous Sources.  Do you see

17    that?

18    **A.**    I do.

19    **Q.**    And those are a few books?

20    **A.**    No.  The first one is an article from *Barron's*.

21    **Q.**    Okay.  And then there's handwritten notes from a

22    meeting with Mel Taft?

23    **A.**    Yes.

24    **Q.**    And who is Mel Taft?

25    **A.**    Mel Taft was the head of Research and Development

1    at Milton Bradley from the late 1940s to probably

2    sometime in the early 1980s, I would think.

3    **Q.**   And with respect to the handwritten notes, you

4    didn't rely on those notes in forming your opinions?

5    **A.**   No.  I disclosed them because I felt it was my

6    duty to disclose them, but I did not rely on them in

7    forming my opinion.

8    **Q.**   Can you tell me why you felt it was your

9    obligation to disclose those handwritten notes?

10    **A.**   Because at that meeting which was specifically on

11    The Game of Life, Mel Taft at Toy Fair that year -- who

12    had rented an office near the Toy Fair -- asked me to

13    consider helping him in developing an electronic

14    alternative to the spinner in The Game of Life.  And at

15    that same meeting at the end of it, as a game historian

16    I thought this was a great opportunity for me to ask

17    the man who was there in 1959 how did it come about,

18    because I didn't really know until that point.  So I

19    jotted down my notes from Mel, and that's what this is.

20    **Q.**   And just so we're clear, you had a discussion with

21    Mel Taft, the then-president of Milton Bradley;

22    correct?

23    **A.**   No, no, not the president.  He was retired at this

24    point.

25    **Q.**   Former president?

1    **A.**   No.  He was the former -- he basically had my job

2    at Milton Bradley earlier.  He was in charge of

3    research and development.  I'm not sure if he was

4    vice president or senior vice president, but he was the

5    R&D leader.

6    **Q.**   And you talked to him about The Game of Life;

7    correct?

8    **A.**   I just asked him out of curiosity, you know,

9    because I'm a game historian and we were talking about

10   The Game of Life.  I thought it would be pretty

11   appropriate to get his input.

12   **Q.**   And at the time you wrote your reports did you

13   have the memory of your conversations with Mel Taft in

14   your head?

15   **A.**   Well, I certainly disclosed this, so it was in my

16   head, but I didn't rely on it.

17   **Q.**   You didn't rely it in forming the opinions;

18   correct?

19   **A.**   No.

20   **Q.**   Okay.  I just want to show you a couple more items

21   on Appendix B.

22   **A.**   Yes.

23   **Q.**   Do you recognize those publications?

24   **A.**   I do.

25   **Q.**   And isn't it also, isn't it true you're not

1    relying on those publications in forming your opinions

2    as they existed on December 18, 2017?

3    **A.**    You mean in specific in regards to The Game of

4    Life and its origins?

5    **Q.**    Basically -- well, my question would be are you

6    relying on these publications in forming your opinions

7    that are detailed in your expert report and expressed

8    to the Court today?

9    **A.**    Yes.  Well, the answer is in the specific book *The*

10   *Toy and Game Inventors Handbook*, I do rely on that

11   because it provides verification of my description of

12   the process required to develop a game from prototype

13   to manufacture.

14   **Q.**    Okay.  And so you --

15   **A.**    And also there's a fact in *A Toy is Born* that

16   actually pertains to your question earlier about

17   professional inventors.  This author, Marvin Kaye,

18   contemporaneously points out that, I believe, if I

19   remember correctly, that something like 90 percent of

20   all the toys and games that are published come from

21   professional inventors.

22   **Q.**    Okay.  So generally I'm hearing that you did rely

23   on --

24   **A.**    Those two, yes.

25   **Q.**    -- those two publications in forming your

1    opinions; correct?

2    **A.**    Correct.

3    **Q.**    Now I'd like to turn to your report, and I

4    apologize in advance; I'm going to try to do this as

5    quickly as possible, but I want to be crystal clear

6    that I understand your testimony regarding the

7    assumptions you made in forming your opinion.

8         I'd like you to turn to page 34 of your opening

9    report.  Okay?  Do you see paragraph 109?

10   **A.**    I do.

11   **Q.**    Do you see in paragraph 109 where it starts with,

12   (Reading)  Klamer provided CPD with instructions for

13   the development of the prototype.  He instructed

14   Markham, Chambers, and Israel to, *inter alia.*  And then

15   there's A, B, C, D.

16   **A.**    Correct.

17   **Q.**    Now, if you look at paragraph 109 there are no

18   citations to any documents; correct?

19   **A.**    No, there's no citation here.

20   **Q.**    So I just want to make sure I understand that this

21   an assumption that you -- let me start again.  Is

22   paragraph 109 a fact that you assumed in forming your

23   opinions?

24   **A.**    This is a fact that I was told to assume.

25   **Q.**    You were told to assume paragraph 109 was as

1    described and formed your opinions based on that;

2    correct?

3    **A.**    That's correct, yup.

4    **Q.**    And did you do any analysis whatsoever to

5    determine whether or not those facts were accurate?

6    **A.**    I was not asked to do that.

7    **Q.**    You were not asked to do that?

8    **A.**    I was asked to assume these facts.

9    **Q.**    And again, maybe I'm stuck on the no, but I'd like

10   to hear you say that you did not do any analysis to

11   determine whether or not those facts were correct.   I

12   understand you were not asked to do that, but you

13   understand as lawyers, even though you were asked, not

14   asked, you may still have done it.   So I would like to

15   know whether you did or you did not do any analysis to

16   determine whether or not those facts were accurate.

17   **A.**    I did not.

18   **Q.**    I want to identify a couple of other ones so I'm

19   crystal clear these are, in fact, the assumptions that

20   you relied on.   Let's turn to paragraph 170.   It looks

21   like it's on page 56.

22   **A.**    Okay.

23   **Q.**    And I'll read the sentence into the record because

24   it's short: (Reading)  Israel included the descriptive

25   phrase "a full 3-D action game end" beneath "The Game

1    of Life" on the prototype's box.

2         Did I read that correctly?

3    **A.**   Yes.

4    **Q.**   And there's no citation to any evidence or

5    documents; correct?

6    **A.**   No.

7    **Q.**   Again, would this be a fact that you assumed --

8    **A.**   Yes, it would be.

9    **Q.**   -- and formed your opinions based upon?

10   **A.**   Yes, it would be.

11   **Q.**   Okay.  And, more generally, obviously you said you

12   spent a lot of time writing this report.  To the extent

13   there are other facts such as the two that I've

14   identified that have no citation to evidence, my

15   question to you is are those facts that you assumed to

16   be true and formed your opinions based upon?

17   **A.**   I'm sorry?  They're based upon -- go ahead, you

18   better say that again.  I don't want to put words in

19   your mouth, Mr. Pollaro.

20   **Q.**   No, fair enough, fair enough.  That was probably

21   not a great question.

22        So my question is I've given you two examples of

23   facts that you assumed and based your opinions on;

24   correct?

25   **A.**   Correct.

1   **Q.**   And I'm trying to identify them because they are

2   facts but there are no notations to evidence, and so

3   I'm asking you more generally to the extent your report

4   contains facts with no citations to evidence, is it

5   fair to say that that is an assumption that you made in

6   forming your opinions?

7   **A.**   That would be fair.

8   **Q.**   Thank you.  Now my question is then if the Court

9   were to find that your assumptions were incorrect,

10  would you be able to rely on your opinions?

11  **A.**   If the -- I'm sorry, one more time just to make

12  sure I'm clear on what you're saying.  Go ahead.

13  **Q.**   So if your Honor determines that your assumptions

14  are incorrect, are your opinions incorrect?

15  **A.**   My opinions would have to change.

16  **Q.**   Would have to change?

17  **A.**   Yes.

18  **Q.**   Okay.  And again I apologize for maybe this

19  sounding redundant, but to the extent that there are

20  facts that you assumed, you did no analysis to

21  determine whether the facts were accurate; correct?

22  **A.**   That's correct.

23  **Q.**   And you were not asked to do that; correct?

24  **A.**   No, I was not asked to.

25  **Q.**   So switching gears slightly, or not so slightly.

1    You already testified about the Despicable Me Game of

2    Life.  Do you recall that?

3    **A.**    Am I done with this for the moment?

4    **Q.**    You are currently done with that.  Thank you.

5    Sorry.

6    **A.**    Okay.

7    **Q.**    I want to talk about your analysis with respect to

8    the Despicable Me Game of Life.  Do you recall that?

9    **A.**    I do, from this morning.

10   **Q.**    I believe your testimony was the Despicable Me

11   Game of Life is an independent work.

12   **A.**    Yes.

13   **Q.**    Okay.  And my question to you is and -- I'm

14   sorry -- and you compared the Despicable Me to the

15   prototype of The Game of Life; correct?

16   **A.**    That's correct.

17   **Q.**    And that was it?  No other versions, no other

18   iterations, no other games in between those games;

19   correct?

20   **A.**    No.  It was singular, just that one game.

21   **Q.**    Did you make that determination, or did the

22   lawyers tell you that's the analysis you need to do?

23   **A.**    The attorneys asked me to in specific compare that

24   version to the prototype.

25   **Q.**    You know Reuben Klamer; correct?

1    **A.**    Yes.

2    **Q.**    Would you say that you have a friendly

3    relationship with Reuben Klamer?

4    **A.**    I think I should really help the Court if I point

5    out that the answer to that is I have, I've had an

6    effective business relationship with Reuben Klamer

7    probably beginning in 1984, as I have with probably

8    approximately a hundred professional inventors and 24

9    of whom I would consider to be top inventors, including

10   Reuben Klamer.  So I have an effective business

11   relationship.

12        As I mentioned yesterday, your term "business

13   friend" is not a term that I'd used before, but I

14   defined it as an external person with whom I'm

15   comfortable in conducting transactions on behalf of my

16   employer based on prior experience, and in that case

17   Ruben would be among a hundred plus business friends

18   that I have.

19   **Q.**    So you would call him a business friend?

20   **A.**    In that definition.  I used your term.  It's not

21   one that I've used before.

22   **Q.**    So we're clear, you defined that yesterday for the

23   first time; correct?

24   **A.**    Well, I reflected on your introduction of that

25   term because it's not common in my business.  We are --

1    it behooves a person in my position, if you're at

2    Parker Brothers or Ideal Toy in specific, to maintain

3    an effective relationship with all the top inventors in

4    the country because you're in competition with lots of

5    other firms that they're showing ideas to, so it's

6    essential in my capacity that I have an effective

7    relationship.

8    Q.   So you wanted an effective relationship with

9    Reuben Klamer; correct?

10   A.   Well, yeah, it was my job.  If I didn't have

11   effective relationships with this cadre of productive

12   inventors, I would probably be out of a job.

13   Q.   Fair enough.  And so if I heard you correctly

14   you've used the term "inventor" to describe Reuben

15   Klamer.

16   A.   Yes.

17   Q.   And previously when we were talking about concept

18   agents you used the term concept agent to apply to --

19   A.   No.  You were asking me if he went in an agent

20   what type of agent would he be, and so I answered as

21   correctly as I could if he was in that scenario.

22   Q.   So is your testimony here today that Reuben Klamer

23   was not a concept agent?

24   A.   No.  And I'll give you an example.  I didn't know

25   Reuben Klamer directly until 1994 when we accidently

1    met at an industry function.  At that time I had just

2    taken over inventor relation responsibilities, thanks

3    to my promotion, and I mentioned to Ruben, as I did

4    many other inventors that, you know, I would be making

5    a trip to southern California and did you have anything

6    to show.  And Ruben immediately said to me, What are

7    you looking for?  Now, I knew enough from Ruben from

8    the past that I knew he had placed several best-selling

9    toys in the marketplace.  I didn't know it at the time,

10   but my sisters, who were younger than me, happened to

11   have some of these toys, so I could connect to them.

12        And I said to Ruben, I'm really looking for

13   something that brings electronics to Nerf and I really

14   need a line of Nerf vehicles; because Nerf originated

15   at Parker Brothers, it was a key brand of the company

16   at the time and we were struggling with how do we grow

17   it.

18        When I saw Ruben a few months later, along with

19   many other inventors in California, he had two working

20   prototypes that addressed those two needs.  So that was

21   my first experience with him.

22   Q.   That meeting, was that your first meeting with

23   Reuben Klamer?

24   A.   At that industry gathering, yes.  I didn't have

25   a -- I didn't have any prior personal contact.  I'd

1    never been introduced to him before.

2    **Q.**   Can you give me the context when you first were

3    introduced to Reuben Klamer.

4    **A.**   I wasn't introduced to him.  We were at an

5    industry -- a cocktail party and we both reached for

6    the same shrimp, and I looked up and --

7          THE COURT:  What are we doing here?  This is

8    driving me crazy.  I mean can't we get through this?

9    What does any of this have to do with anything?  Not

10   you, I mean this story, the whole thing?  I mean just

11   get -- everybody needs to get focused here.

12         MR. POLLARO:  Thank you, your Honor.  I

13   apologize.

14   **Q.**   Do you recall yesterday when Mr. Krumholz read to

15   you a letter that you wrote, or an e-mail, sorry, that

16   you wrote to Reuben Klamer?

17   **A.**   Yes.

18   **Q.**   And in that e-mail you described him as engaging,

19   straightforward, clear thinking.  You recall that?

20   **A.**   I sure do.

21   **Q.**   And in that e-mail, if I recall correctly, he had

22   provided you a manuscript for his book; correct?

23   **A.**   Two chapters from a book that he was hoping to get

24   published.

25   **Q.**   Okay.  So what was your business connection to

1    that book?

2    **A.**   I think prior to that topic coming up I hadn't

3    seen or worked with Reuben Klamer maybe in 20 years, so

4    there was no business relationship.  Ruben, like

5    several other game inventors, knew I was a published

6    author and thought I might provide him with some advice

7    that would help him to get published.

8         I'm sorry, is there something further that you

9    would like to ask me about that?

10   **Q.**   Yes.  I'm trying to figure out if you were going

11   to get credit in the book or if you were going to get a

12   portion of the royalties or if you were going to be a

13   co-author.

14   **A.**   Oh, no.  This was a friendly gesture --

15        THE COURT:  So the answer is no.  That's all we

16   need.  Go ahead.  Next question.

17   **Q.**   Is it your opinion that Reuben Klamer is honest?

18   **A.**   I've always had honorable relationships with

19   Reuben Klamer.

20   **Q.**   Is it your opinion that Reuben Klamer is

21   trustworthy?

22   **A.**   Yes.  This came up in our deposition and I really

23   dwelled on that, and I would say I had no indication

24   that he would not be trustworthy, other than some

25   exchanges of letters in this case where maybe through

1    puffery he had inflated his relationship in the eyes of

2    Milton Bradley vis-a-vis Mr. Markham but which he very

3    quickly retracted.

4    **Q.**   And you discounted those letters based on your

5    personal experience with Reuben Klamer?

6    **A.**   Of course.  Everybody has some occasion in my

7    field where there is an attempt to look perhaps a bit

8    more significant than you really are.  Why?  Because

9    you're working to improve the relationship not just for

10   yourself but for your partner.

11   **Q.**   Have you ever met Leonard Israel?

12   **A.**   I have.

13   **Q.**   When did you meet Leonard Israel?

14   **A.**   On that same trip in 1994 to Los Angeles.

15   **Q.**   Did you discuss The Game of Life?

16   **A.**   When I met him he was --

17          THE COURT:  Just the question was did you

18   discuss The Game of Life.  That's a yes or no question.

19   **A.**   The answer is no, I did not bring it up.  He

20   brought it up.

21          THE COURT:  Next question.

22   **Q.**   What did Leonard Israel -- let me rephrase the

23   question.  Leonard Israel brought up The Game of Life

24   to you; is that correct?

25   **A.**   No, no, no, no.

1  **Q.**   Did you bring up The Game of Life with Leonard

2  Israel?

3  **A.**   Oh, I'm sorry, obviously he brought it to me.  Do

4  you mean did he bring up The Game of Life?

5  **Q.**   Did he discuss The Game of Life with you?

6  **A.**   In that conversation when I was trying to get to

7  know just who are you, one of the things that I asked

8  him is what have you done that I might know?  And he

9  was there with his partner Perry Grant and he said in

10  specific, I did the box cover for The Game of Life.

11  **Q.**   I'm not trying to cut you off, but I think we want

12  to move along, so I just want to know if you discussed

13  The Game of Life.  I don't really want to know what you

14  discussed about The Game of Life, quite frankly.  I

15  just want to know -- I'm not going to instruct you how

16  to answer, but specifically I'm asking if you discussed

17  The Game of Life with Leonard Israel when you met with

18  Leonard Israel.

19  **A.**   Yes.  He brought it up, and I listened.

20  **Q.**   But you did discuss it; correct?  I don't care

21  what the content was, but you did discuss The Game of

22  Life and the creation of The Game of Life with Leonard

23  Israel when you met him in --

24  **A.**   Not the creation of the game.  Just the box cover.

25  **Q.**   I'm going to show you a demonstrative.  Switch

1    gears.

2          MR. POLLARO:  May I approach, your Honor.

3          THE COURT:  Yes.

4    **Q.**   Mr. Orbanes, I want to ask you about your company,

5    Winning Moves.  Now, can you tell me when the company

6    was formed?

7    **A.**   I believe we started business in January of 1995.

8    **Q.**   And can you tell me who the founding shareholders

9    were of Winning Moves in 1995.

10   **A.**   There were five:  Tom Kramer, who I mentioned

11   yesterday, K-r-a-m-e-r, Alex Randolph, Michael Meyers,

12   Philip Orbanes, and Hasbro.

13   **Q.**   Those were the founding members of Winning Moves?

14   **A.**   That's correct.

15   **Q.**   And can you tell me how Winning Moves was funded

16   when it was founded?

17   **A.**   Yes.  The concept that Mr. Kramer came up with was

18   that in return for seed capital we would associate

19   ourselves with one of the major toy or game companies

20   and provide new product ideas that would be proven out

21   through specialty retailing to that partner, making

22   them available for that partner to consider licensing

23   from us to take into the mass market.

24   **Q.**   And did that seed funding come from Hasbro?

25   **A.**   It did.

1    **Q.**   Were there any other seed funding funds received

2    at Winning Moves?

3    **A.**   Not initially, but more capital was raised as time

4    went on.

5    **Q.**   As time went on.

6    **A.**   Right.  Not initially.  I mean we the founders

7    all, of course, put money into the Winning Moves to

8    establish Winning Moves.

9    **Q.**   So based on my understanding -- well, let me ask

10   this question.  Can you tell me, tell the Court why you

11   refused to produce documents that would let me

12   determine the financial details of Winning Moves?

13         MR. KRUMHOLZ:  Objection.  There's a -- they

14   have raised in their motion papers for the first time a

15   discovery dispute which involves whether or not Hasbro

16   has a duty to turn over documents that Winning Moves

17   possesses, even though it is a minority shareholder

18   with no management control, no day-to-day operations.

19   This is a witness who had never received a subpoena,

20   has no control of Winning -- this is a discovery

21   dispute that he's asking the witness to be opining

22   about that we've briefed in our papers.

23         THE COURT:  All right.  Why is it appropriate

24   for him to testify about what's effectively a discovery

25   dispute between counsel?

1          MR. POLLARO:  Well, I would not characterize it

2    as effectively a discovery dispute between counsel, but

3    we have provided a subpoena to Mr. Orbanes and we have

4    not received that information, and therefore I'm having

5    to ask him these questions versus just having that

6    information, and so that's why I'm setting up this line

7    of questioning.

8          MR. KRUMHOLZ:  And I should correct myself.  He

9    did receive an individual subpoena, but there was never

10   a subpoena issued to Winning Moves, it was just him

11   individually, so I misspoke.

12         THE COURT:  All right.  Isn't the important

13   thing for you that you want to establish is the

14   financial relationships; right?

15         MR. POLLARO:  Yes, your Honor, but I want to be

16   crystal clear that I don't have the documents that I've

17   requested.  The relationship, the financial

18   relationship was not disclosed until his deposition so,

19   you know, whether there was a subpoena sent before

20   that, well, would never have happened because other

21   than the deposition subpoena.  So all this has

22   transpired since his deposition when we first found out

23   that Hasbro was affiliated with Winning Moves.

24         MR. KRUMHOLZ:  No.  First of all, we disclosed

25   it in his report in December, that Hasbro had a

1    financial interest.  Specifically as soon as we found

2    this out and we disclosed it in his report

3    specifically, so they took the discovery they wanted.

4    They knew way before that that Winning Moves had been

5    licensing Hasbro products, including The Game of Life.

6    They at that time asked for the license agreement,

7    which we provided.  They asked for financial data with

8    regard to sales of Winning Moves -- I mean for the

9    licensing for Winning Moves, and we provided that.

10          We provided everything that Hasbro has.

11   Mr. Orbanes has provided everything that he has.  If

12   there was a real dispute here, if they really wanted

13   something they could have long ago subpoenaed Winning

14   Moves to get these records, but this is just something

15   that came up in their motion *in limine*.

16          THE COURT:  Let's go off the record for a

17   minute.

18          (Discussion off the record)

19          (Recess)

20          THE COURT:  You have until 12:30.  Go ahead.

21          MR. POLLARO:  Thank you, your Honor.  May I

22   approach.

23          THE COURT:  Yes.

24   Q.   Mr. Orbanes, have you had a chance to review my

25   terribly-created demonstrative?  I apologize for the

1    ugliness of it, but I would like you to look at it and

2    let me know if there's anything, based on the

3    information that I have, that is inaccurate.

4    **A.**   It's a good chart, and the only thing that's

5    missing is that Mike Meyers is the Chairman of Winning

6    Moves.

7    **Q.**   Chairman.  Thank you for that.  And so if we look

8    at the Board of Directors, there are only three members

9    of the Board of Directors; correct?

10   **A.**   That's correct.

11   **Q.**   And you are on that board, and it looks like your

12   son is on that board; correct?

13   **A.**   That's correct.

14   **Q.**   On the ownership side, you told me you had

15   30 percent ownership.  Is that still correct?

16   **A.**   All the percentages are accurate.

17   **Q.**   So now let me ask you this.  For the 41 that I

18   don't know about, are you the largest shareholder?

19   **A.**   The other 41 is owned by six employees of the

20   company.

21   **Q.**   Okay.  So are you largest shareholder of Winning

22   Moves?

23   **A.**   Yes, I am.

24   **Q.**   Can you tell me the largest ownership percentage

25   of the remaining six employees that you just referred

1    to?  Ballpark number.

2    A.   I can't off the top of my head.  Probably about

3    even between them, maybe.  If you take 41 and you

4    divide it by six you get seven for an average.

5    Q.   Okay.  That's pretty good.  So then I guess my

6    question would be is Hasbro the second largest

7    shareholder?

8    A.   Hasbro is.

9    Q.   Okay.  Now, does Winning Moves have a license to

10   sell The Game of Life?

11   A.   It has a license to sell the 1960 version of The

12   Game of Life, that is correct.

13   Q.   The one that looks like these five games that

14   we've been talking about?

15   A.   Yes.

16   Q.   What is Winning Moves' revenue for the sales of

17   the 1960 Game of Life?  Is that accurate on my --

18   A.   Well, it's accurate for last year, but it won't be

19   accurate for this year.

20   Q.   So it's accurate for last year, so you sold

21   $500,000 worth of The Game of Life last year in 2017?

22   A.   Yes.

23        MR. POLLARO:  And I'll let Josh handle that.

24   Q.   Winning Moves received last year, derivatives last

25   year for Winning Moves were approximately $900,000; is

1    that correct?

2    **A.**   No, no.  That's not the revenue.  That's the

3    profit number I gave you.

4    **Q.**   Sorry; I misspoke.  The profit numbers; correct?

5    **A.**   Yes.

6    **Q.**   If Winning Moves lost the license to The Game of

7    Life, would it lose the revenue associated with the

8    sale of The Game of Life?

9    **A.**   Well, the profit number for Winning Moves based on

10   the sales forecast this year would go down by $30,000.

11   **Q.**   Did I just hear you correctly that you went from

12   $500,000 in 2017 to projecting 30,000 next year?

13   **A.**   No.  We're projecting $300,000 this year because

14   Hasbro has licensed our closest competitor to make a

15   comparable version of the 1960 Game of Life.  We don't

16   have an exclusive.  The only difference between us and

17   the one that's made by Winning Solutions, whose name is

18   even confusing and who Hasbro put in business as well,

19   is the box.  So our revenue, when we learned this last

20   month at Toy Fair, the projection for sales of this

21   item came down by 36 percent.

22   **Q.**   Did you personally sign the license to the

23   copyrights in suit?

24   **A.**   No, no, did I -- to the what?

25   **Q.**   To the copyrights in this case.

1    **A.**   I signed the license for The Game of Life.

2    **Q.**   The one you've been referring to, the 1960 Game of

3    Life that when you --

4    **A.**   I believe I signed that --

5        THE COURT:  Don't talk over each other.  Answer.

6    **A.**   I believe I signed that in 2012 while I was still

7    president of the company.

8    **Q.**   And pursuant to that license Winning Moves sells

9    the 1960 version of The Game of Life; correct?

10    **A.**   I believe we began to sell it in 2013 about the

11    time that I retired.

12    **Q.**   Okay.  You currently sell The Game of Life

13    pursuant to that license; correct?

14    **A.**   Yes, Winning Moves currently does.

15        MR. POLLARO:  Your Honor, I have no further

16    questions, as long as you don't give my time to Josh,

17    or Mr. Krumholz.

18        THE COURT:  I won't.  I promise.

19        <u>REDIRECT EXAMINATION BY MR. KRUMHOLZ:</u>

20    **Q.**   Good afternoon, --

21    **A.**   Yes, it is afternoon.

22    **Q.**   -- Mr. Orbanes.  I want to clarify a little bit

23    your testimony with regard to inventors, designers, and

24    developers.  Okay?

25    **A.**   Yes.

1   **Q.**   Do you recall explaining yesterday your views that

2   Mr. Klamer was acting as an inventor and Mr. Markham's

3   company was acting as designer and developer?

4   **A.**   Yes.

5   **Q.**   And you explained to the Court at least based on

6   your experience how those relative roles typically

7   handle the control of the project and the economic risk

8   for the project?

9   **A.**   Yes.

10  **Q.**   So I just want to explore with you a couple more

11  facts and see how that supports or doesn't support the

12  views you gave yesterday with regard to Mr. Klamer

13  being the inventor and assuming control and economic

14  risk versus Mr. Markham not doing that because he was a

15  designer and developer.  Okay?

16  **A.**   Uh'huh.  Yes.

17  **Q.**   And I'd like to refer you to the assignment

18  agreement, which is JTX2 and a couple of provisions

19  I'll use the ELMO for.

20       You recall there were questions with regard to

21  credits.

22  **A.**   Yes.

23  **Q.**   And you had some discussion about what was

24  accepted in the industry and not with regard to credits

25  back in the day.

1    **A.**    Yes.

2    **Q.**    So this is page 5 -- page 4, excuse me, of the

3    assignment agreement and it's got a provision on

4    credits, and I want to read it aloud and ask you if

5    that's consistent or inconsistent with the conclusions

6    you've otherwise drawn.  It says, "Link shall request

7    the manufacturer to display the name of Bill Markham as

8    designer on the package in which the game is sold, and

9    if approved by the manufacturer will include the fact

10   that Bill Markham is the designer of the game in all

11   publicity releases made and controlled by it."

12          The fact that Mr. Markham negotiated that Link

13   Research requested he be identified as the designer, is

14   that inconsistent with your opinion that, in fact,

15   Mr. Markham was playing the role of a designer?

16   **A.**    No.  It's consistent.

17   **Q.**    To carry this over a little bit, if we look at

18   paragraph three, that's Design Changes, and it says,

19   "Markham recognizes the right of the manufacturer to

20   make design changes in the game and its component

21   parts.  However, he desires to learn of any changes

22   that may be contemplated" --

23          MR. POLLARO:  Objection, your Honor.  This is

24   beyond the cross.

25          THE COURT:  I don't think it is.  Go ahead.

1    Overruled.

2         MR. KRUMHOLZ:  Thank you.

3    **Q.**   "However, he desires to learn of any changes that

4    may be contemplated and the reasons therefor in order

5    that he may communicate such ideas as he may have in

6    that regard to the manufacturer.  To that end Link will

7    notify the manufacturer of Markham's desire and Link

8    will advise Markham of any information it may receive

9    concerning contemplated design changes, it being

10   understood that" -- great drama because it's this part

11   that I want to get to -- "the final decision regarding

12   such changes shall rest with either Link or the

13   manufacturer."

14   **A.**   Yes.

15   **Q.**   Okay.  Is that language consistent or inconsistent

16   with your view that Mr. Klamer was acting as the

17   inventor here and keeping control and bearing economic

18   risk?

19   **A.**   It's consistent with that.

20   **Q.**   How so?

21   **A.**   Because all of the approvals required for any

22   suggestion that Mr. Markham may have come up with was

23   subject to Mr. Klamer's approval and/or Milton

24   Bradley's approval.

25   **Q.**   Okay.  Now I'm going to show you the royalty

1   provision from that agreement, and in the second

2   sentence -- well, let's do it for completeness.  It

3   says, "For his design and development of the game," in

4   the first sentence, "Link hereby assigns to Markham

5   30 percent of the total royalties to be received by it

6   from the manufacturer and sale of the game.  Upon

7   execution of this contract, Link will pay to Markham,

8   receipt of which is hereby acknowledged, the sum of

9   $3196.21, which represents a reimbursement to Markham

10  of his cost for the model in the sum of $2,423.16, and

11  the further sum of $773.05 representing 30 percent of

12  the balance of the $5,000 deposit received."

13        In your experience is it consistent or

14  inconsistent that Link and Mr. Klamer would be assuming

15  the economic risk if indeed he agreed to

16  unconditionally pay the cost as set forth in this

17  agreement?

18  **A.**   No.  This is proof of it.

19        MR. POLLARO:  Objection.

20        THE COURT:  Overruled.

21  **Q.**   You can answer.

22  **A.**   I said this is proof of that work-for-hire

23  relationship.

24  **Q.**   How so?

25  **A.**   Because it's unconditional that the cost

1    associated with Mr. Markham's efforts of his company is

2    reimbursed, and nowhere in here does it say as a

3    consequence of having received a royalty advance; but

4    it further mentions that of the balance of the royalty

5    advance, Mr. Markham will then in addition get his

6    30 percent of that remainder, which is consistent with

7    the agreement.

8    **Q.**    I'm going to hand you -- I'm not going to hand

9    you -- I'm going to show you what is previously

10   admitted as JTX46,  --

11   **A.**    Uh'huh.

12   **Q.**    -- and this is a letter from Mr. Taft.

13   **A.**    Yes.

14   **Q.**    And you understand him to be the Taft we've been

15   talking about from Milton Bradley.

16   **A.**    Yes, the one I meant.

17   **Q.**    And it's to Mr. Klamer dated August 29, 1960.

18   **A.**    Right.

19   **Q.**    In the first paragraph he says -- it's not

20   terribly focused, go back -- "The comments which we

21   received for possible improvement on The Game of Life

22   from Bill Markham were helpful, but in view of some of

23   the comments that we are receiving from friends and

24   general consumers who have bought the game, it seems to

25   show that we need even further improvements; therefore,

1      since you are as much interested in making a staple of

2      this item as we are, I am writing at this time to see

3      if you people have any suggestions that would correct

4      the following," and then he goes on to list various

5      questions that he has or concerns he has.

6             Is Mr. Taft's requesting that help from

7      Mr. Klamer consistent or inconsistent with your views

8      that he was the mentor that bore the economic risk and

9      retained control?

10     **A.**   Well, it's consistent, and I've done much the same

11     with inventors myself when we --

12            THE COURT:  You answered.  It's consistent.

13     That's all we --

14            THE WITNESS:  I'm sorry, sir.

15     **Q.**   Well, okay.  With the Court's permission, can you

16     explain why you believe that it's consistent.

17            THE COURT:  Go ahead.

18     **A.**   The answer it's consistent is because I know from

19     experience with many inventors over the years that if

20     there's some hiccups in the acceptance of the game

21     after it's first published they may want to offer

22     suggestions but they could be insignificant compared to

23     larger issues, and you have to bring that to their

24     attention, and you say, well, don't worry about the

25     colors or the inclusion of a few more words of game

1  board; you have to change the whole thinking that you

2  have right now from one of a game of chance to one of a

3  game of skill, so give me your ideas on how to make the

4  game different.

5  Q.   Let me ask you one more question.  I want you to

6  assume that Mr. Klamer testified that when Milton

7  Bradley encountered trouble getting the game from

8  prototype to commercial product, they reached out to

9  him and he visited Milton Bradley to help them solve

10  their problems.  With that, if you assume that to be

11  true would that be consistent with Mr. Klamer playing

12  the role of the inventor that assumed the economic risk

13  and retained control of the project?

14  A.   Yes, that's consistent.

15      MR. KRUMHOLZ:  I have nothing further, your

16  Honor.

17      THE COURT:  Thank you.  Since you didn't use all

18  your time, Mr. Pollaro, I'll give you just a couple of

19  minutes if you want it for recross on any of those

20  topics.

21      MR. POLLARO:  Thank you, your Honor.

22      RECROSS-EXAMINATION BY MR. POLLARO:

23  Q.   I have one question.  Hopefully I'll be very

24  brief, very brief.

25      MR. KRUMHOLZ: I still have that letter up there.

1    Sorry.

2    **Q.**   This is from the same agreement that Mr. Krumholz

3    was just showing you.  I want to direct your attention

4    to number 3, and I'll read it into the record:  "At the

5    request of Link, Markham has invented, designed, and

6    developed a game tentatively known as The Game of Life,

7    hereinafter called The Game, which Link has licensed

8    for manufacture and sale to the Milton Bradley Company

9    of Springfield, Massachusetts."

10        Do you see that?

11   **A.**   I do.

12   **Q.**   Is this statement consistent or inconsistent with

13   your view of Bill Markham's role in The Game of Life?

14   **A.**   It's consistent.  I can't tell you what was going

15   through the minds of Mr. Klamer and Mr. Markham when

16   they put those terms or labels into the agreement.  I

17   can only tell you how those three terms are applied in

18   the industry, and in the industry definition of the

19   word "inventor" Mr. Markham would not be the inventor.

20        MR. POLLARO:  No further questions, your Honor.

21        THE COURT:  Okay.  Thank you.

22        Mr. Orbanes, you may step down.  Thank you very

23   much.

24        THE WITNESS:  Thank you, your Honor.

25        THE COURT:  Defense rests?

1          MR. KRUMHOLZ:  We do, your Honor, subject to the

2     deposition designations.

3          THE COURT:  Right, subject to the deposition

4     designations.  Okay.

5          And I just want to be clear; none of the other

6     Defendants have any evidence.  Is that correct?

7          MS. VAN LOON:  We rest, your Honor.

8          MR. JINKINS:  We rest, your Honor.

9          THE COURT:  Let's go off the record for a

10    minute.

11         MR. POLLARO:  Your Honor, sorry, your Honor, I

12    would like to make a motion for a directed verdict

13    judgment as a matter of law.

14         THE COURT:  I should ask you before you do that,

15    I take it you do not have any rebuttal evidence.

16         MR. POLLARO:  We do not have any rebuttal

17    evidence.

18         THE COURT:  So go ahead, make the motion.

19         MR. POLLARO:  The Markham parties, respectfully,

20    have proven their third claim for relief.  The

21    Defendants have failed to prove any defense.  Evidence

22    or contemporaneous documents is all in agreement that

23    Bill Markham was the sole physical creator of The Game

24    of Life.  Evidence includes the assignment agreement,

25    Bill Markham's testimony that he already had a game in

1       the works, and the 1965 letters.  The only evidence to

2       the contrary is modern evolving testimony by

3       inconsistent and biased witnesses.

4              The Markham parties, as his heirs, have a right

5       of termination, not a work-for-hire for Klamer, because

6       Bill Markham reserved his rights.  Bill Markham was not

7       an employee, and the expense test, to the extent it

8       applies, was not met.  Not a work-for-hire by Bill

9       Markham employees because no credible evidence that he

10      did anything creative on the actual game, no Game of

11      Life products or derivative works.  The evidence shows

12      all changes are not the agreement.

13             Thank you, your Honor.

14             THE COURT:  Let's go off the record for a few

15      moments.

16             (Discussion off the record)

17             THE COURT:  First I'll put on the dates that are

18      agreed to.  The parties have agreed to file post-trial

19      briefs with proposed findings of fact and conclusions

20      of law by -- what was the date again?

21             MR. KRUMHOLZ:  April 12th, your Honor.

22             THE COURT:  April 12th, and with a page limit of

23      briefs not in excess of 30 pages; correct?

24             MR. KRUMHOLZ:  Yes.

25             THE COURT:  All right.  And then replies --

1          MR. KRUMHOLZ:  May 4th.

2          THE COURT:  -- will be filed by May 4th, and

3     oral argument will be May 10 at 10:00 a.m.

4          MR. KRUMHOLZ:  And the reply is not to exceed

5     15 pages.

6          THE COURT:  And the reply is not to exceed

7     15 pages.  Okay.  Very good.

8          All right.  Let me throw a couple things out

9     that I'm not entirely clear on and let you just give me

10    your thoughts or arguments on them.  So I guess the

11    first point is if I were to conclude that Hasbro is

12    correct that Markham and Klamer are either joint

13    authors or that Markham and/or Mr. Israel and Ms. Falco

14    created the prototype on a work-for-hire-basis, then

15    you're in agreement, I take it, that the Section 304(c)

16    does not allow for termination of the assignment.

17         Is that something you agree on, assuming that I

18    were to find that?

19         MR. POLLARO:  Your Honor, if I may, the only

20    issue with that, if it's a work-for-hire for Bill

21    Markham, I believe we agree that there would be no

22    termination rights.  However, you started that question

23    off with the joint authorship between Klamer and Bill

24    Markham and obviously I mean that's --

25         THE COURT:  I guess I was giving you two

1    scenarios, one was joint authorship, one was

2    work-for-hire; but in either case, if I understand

3    Hasbro's position to be there's no right of

4    termination.

5         MR. POLLARO:  Again, you know, without getting

6    too much in the weeds, Mr. Klamer has an abandoned any

7    joint authorship argument by making clear that he made

8    no physical contributions.  Joint authorship requires

9    physical contribution and that's off the table, as far

10    as we're concerned.  That's the only point I'm making.

11         THE COURT:  But they don't agree with that.

12    That's just your argument.  Well --

13         MS. VAN LOON:  Right, we do not agree with that.

14    That is still in play.

15         THE COURT:  I understand you all disagree on

16    lots of things here, but I'm just trying to clarify if

17    you assume certain things, okay, just like with the

18    experts, all right?  If you assume either one of those,

19    then there's no right of termination.

20         MR. KRUMHOLZ:  I would modify the joint

21    authorship a little bit and deal with the caveat that I

22    think we have to look at it, and I'm not a hundred

23    percent on this, but I would say on the joint

24    authorship Mr. Markham could terminate to the extent of

25    his interest, but he can't obviously terminate

1    Mr. Klamer's interest so Hasbro and Mr. Klamer could go

2    on unimpeded.  He may then have independent rights,

3    having terminated his transfer, that would impact the

4    relationship, it would impact Hasbro's rights with

5    Mr. Klamer's rights any other way.

6         MR. POLLARO:  Your Honor, if I may, I tend to

7    agree with that.  The joint authorship, it is a little

8    more complicated, as Mr. Krumholz pointed out.

9         THE COURT:  All right.  So then let's take that

10   example.  Let's assume that that is what I find.  Then

11   you say Markham could terminate the assignment to the

12   extent of his interest.  How does that get figured out?

13   I mean what is that?

14        MR. KRUMHOLZ:  Well, that would mean that they

15   would have coextensive rights, Mr. Klamer and

16   Mr. Markham.  So he can, as a practical matter he stops

17   potentially getting any royalties because he's

18   terminated the assignment agreement, but he in theory

19   could go off and find somebody else that might be

20   interested in licensing those copyrights, whatever

21   likelihood of success he may have, but from Hasbro's

22   and Mr. Klamer's standpoint we go on as we always have

23   before, you know, there's a license agreement in place

24   and life goes on.

25        THE COURT:  Okay.  So your point, your position

1    would be the effect of that would be termination of any

2    royalty stream that currently exists --

3            MR. KRUMHOLZ:  To Mr. Markham.

4            THE COURT:  -- to Markham.

5            MR. KRUMHOLZ:  Yes.

6            THE COURT:  But a right to license the

7    production to some other --

8            MR. KRUMHOLZ:  The right to license the

9    copyrights, how far that extends.  I wouldn't say

10   production because there's a lot more IP in the product

11   than just the copyrights.

12           THE COURT:  Okay, to the copyrights.  And then

13   that leads to another question which is then, which

14   overlaps to some of my other questions, what is that,

15   that right, that copyright right?  What is it?

16           MR. KRUMHOLZ:  Well, from our standpoint it's a

17   *de minimus* thing because we don't know what the actual

18   materials are that are the subject of the copyright

19   registration.  But if we assume that it's some

20   commercial version, you know, there's some expression

21   in there that they otherwise may be able to license to

22   somebody else and have them use that expression in the

23   same way that, for instance, Winning Moves is.  But

24   they could not, for instance, use The Game of Life

25   because that's a trademark owned by Hasbro.

1      This is, at the risk of digressing a little,

2   this is I think a little bit of what we were getting

3   into when you were raising potential questions about

4   the license agreement and how that impacts or plays

5   into the copyright interest.

6          THE COURT:  And I want to get to that in a

7   minute, but go ahead.

8          MR. KRUMHOLZ:  So I was going to get to that

9   now.

10         THE COURT:  Go ahead.

11         MR. KRUMHOLZ:  So I don't think there's any

12  dispute that Mr. Markham's company played a role in

13  creating some intellectual copy.  Copyright issues

14  aside, that would probably be best described as a trade

15  secret, and in fact when we see the kind of disputes

16  between companies and inventors it's usually a trade

17  secret claim, some idea is disclosed under a

18  confidential arrangement and then you ever the legal

19  principles that flow from that.

20         So when Mr. Klamer signed the license agreement

21  with Milton Bradley he certainly did need to get an

22  assignment of whatever IP Mr. Markham's company owned,

23  and we know there was IP because they later both

24  mutually applied for a patent, which was allowed.

25         So, you know, broadly speaking there was IP that

1    was created by Mr. Markham's company that needed to get

2    assigned to Link Research so that it had all full

3    rights and interest that it could license to Milton

4    Bradley.

5         But what we're dealing with is a sliver of the

6    umbrella or penumbra of potential IP rights.  So the

7    issue here of course is, the threshold question is did

8    Mr. Markham or his company have any copyright rights

9    that were created through the work that they did;

10   right?  If that is the case then we have all these

11   waterfall questions, the work-for-hire, et cetera.

12        THE COURT:  Uh'huh.

13        MR. KRUMHOLZ:  So when we get to the reservation

14   of right question and you look at Section 4, I think,

15   of the agreement, it's a very broad -- you know, to the

16   extent that you, Mr. Markham, somewhere down the road

17   at our request file a copyright, seek a patent, seek a

18   trademark application, you have to assign it to Link

19   Research, and then down the road as the agreement

20   terminates that application will revert back.

21        It doesn't say anywhere in the agreement what

22   Mr. Markham's IP interests are, whether he has any, and

23   if he does what the extent are.  It is just the

24   hypothetical future behavior, which never took place.

25        THE COURT:  Okay.  I think you're getting,

1    you're sort of getting afield --

2          MR. KRUMHOLZ:  I may be.

3          THE COURT:  -- of what I want to know about

4    right now, so let me just keep on with my series of

5    questions.

6          So back to the joint authorship scenario, then I

7    think everybody agrees that generally what you

8    expressed would happen if on the Markham side and on

9    the Klamer and Hasbro side you said life would just go

10   on as is; right?  So there wouldn't be any change on

11   that side.

12         Backing up to the work-for-hire scenario, I

13   think everyone agreed that if I found it were a

14   work-for-hire either at one level or two levels with

15   respect to Markham and/or Markham employees, Israel and

16   Falco, that that would end the inquiry because there's

17   no right to terminate the assignment so the assignment

18   agreement continues as it is right now.  Right?

19   Everybody is in agreement on that?

20         MR. KRUMHOLZ:  Yes.

21         MS. VAN LOON:  And just one further thought.

22   Also, if the commercial version is deemed to be

23   derivative work, then that also cuts off the right of

24   termination.

25         THE COURT:  Right.  I'll get to that in a

1    minute, okay?  But I don't -- so since you brought that

2    up, so I don't need to get to the issue of derivative

3    works unless I find that it's not joint authorship or

4    not work-for-hire, and then I go on this analysis, this

5    derivative work analysis; right?

6            MR. KRUMHOLZ:  Yes.

7            THE COURT:  Everybody agrees on that?

8            MS. VAN LOON:  Yes.

9            THE COURT:  If I get to the derivative work

10   analysis, then one thing that is very confusing to me

11   is, I mean I could rule in a variety of ways; but just

12   assume for a minute that I find that in the early

13   versions of the game there are some expressions that

14   are derivative, that the early versions of the game are

15   not independent, they maybe are minor expressions that

16   are created and therefore derivative, but there are

17   many aspects of the game that are the same as the

18   prototype.  Does any of that matter, or does it only

19   matter as to what the current version of the game and

20   the Despicable Me version of the game is, whether it's

21   independent or derivative?

22            And the reason I'm asking is I assume that the

23   real money here is in the royalties of the current

24   version that flow from the sale of the current versions

25   of the game, that these old versions of the game aren't

1    in the market, except maybe with respect to companies

2    like Winning Moves that might be selling them to

3    collectors or something.

4            MR. KRUMHOLZ:  It's certainly true that the

5    lion's share of the money is in the modern version of

6    the game; but from Hasbro's standpoint they are still

7    licensing it, you know, in two different companies, the

8    classic version of the game, and they would want a

9    ruling from the Court that in our view it's a

10   derivative work and therefore we can continue to sell

11   that product under the termination statute --

12           THE COURT:  Well, what if it's not totally a

13   derivative?  I mean I guess that's my question.  Is

14   something --

15           MR. POLLARO:  No, no.

16           THE COURT:  Does something have to be completely

17   derivative?  Do I look at it as a totality, or are

18   there aspects of it?  There's the board, there's the

19   cover, and then there are a whole variety of things

20   within that, and some of them seem derivative and some

21   of them seem not.

22           MR. KRUMHOLZ:  I think we're using the terms a

23   little incorrectly here, because the definition of

24   derivative work, it has two components to it.  It has

25   work from the original work, --

1          THE COURT:  Yes.

2          MR. KRUMHOLZ:  -- so it carries over some of the

3     same work, but it also has some modicum of originality

4     that's been added to it.  So if it has both of those

5     components it would be deemed a derivative work because

6     it derives from the first work, but it has some

7     differences to it.  As opposed to being the same work,

8     where everything would be the same and there would be

9     no differences.  And under the termination statute, you

10    know, just a policy judgment that was made to balance

11    out these interests, that if a derivative work was

12    created prior to the termination of the transfer of the

13    copyright, then the company that licensed it, that

14    created it, that derivative work, could continue to use

15    it.  They could continue with all derivative works that

16    they already created.

17          The restriction under the statute is that they

18    can't create any more or new derivative works, which is

19    why we also for these other works have asked for a

20    finding that these other works are indeed independent

21    works.  That would give us guidance going forward in

22    this, in our view worse case scenario, of what

23    constitutes an independent work in the eyes of the

24    court so that we avoid creating future derivative

25    works.

1       THE COURT:  All right.  So is it possible -- do

2  you agree with that?

3       MR. POLLARO:  I mean I guess I thought your

4  question was slightly more directed to what's the

5  difference between what the derivative work will cover

6  versus what the original work covers, and we tried to

7  talk a little bit about that today with the witness.

8  But to the extent there are any changes that are deemed

9  to be made that are creative and turned into derivative

10  work, the right there would be only to that delta, to

11  that very small --

12       MR. KRUMHOLZ:  No, that's completely wrong on

13  your point.

14       THE COURT:  All right.  That is part of what I'm

15  getting at, and if you're right about that that seems

16  like a very confusing -- I don't know what I would, how

17  would figure that out.

18       MR. POLLARO:  I mean --

19       THE COURT:  Let me take a more blatant example

20  and talk to me about this.  So let's say that the, so

21  you have the board and you have the cover, okay, let's

22  say hypothetically, okay, say I concluded that the

23  cover was a derivative work or say I concluded the

24  cover was independent but the board was still the same

25  game.  How do you deal with that?  Is it one work, or

1    are they separate?

2        MR. KRUMHOLZ:  There are three registrations,

3    one for cover, one for rules, one for board, so --

4        THE COURT:  Could it can be different

5    conclusions for each.

6        MR. POLLARO:  Yes.

7        MR. KRUMHOLZ:  Right.  Now, you can easily

8    conclude that one cover is one thing and for that same

9    game one board is something else, and we would, you

10   know, have to deal with whatever that is.

11       THE COURT:  Okay.  So just hypothetically what

12   if a conclusion is different as to those three things?

13   How does that play out?

14       MR. KRUMHOLZ:  For instance, if you concluded

15   that the 1960 cover was the same, the board was

16   derivative, the rules were independent, so -- and we're

17   assuming the scenario that you have ruled against

18   Hasbro on these other pieces, --

19       THE COURT:  Yes.

20       MR. KRUMHOLZ:  -- we couldn't use the cover

21   anymore.  That's the same work, so that gets pushed to

22   the side.  We just couldn't use it.

23       The derivative board we could continue to use in

24   its totality.  It's not just the things that we added,

25   that would make no sense because we don't need a ruling

1    about the things we added.  That didn't come from them

2    to begin where.  The way the law has shaped this

3    balancing is that, okay, you, you know, author/creator,

4    after 56 years, yes, you have the right to terminate

5    and all that comes with that, but we're going to give

6    some protections to the licensee that whatever work,

7    derivative work they created in the interim they could

8    continue to sell, they just can't make new ones.  So

9    it's the entirety of the work.  So we could still sell

10   that board game as it is.  The rules --

11        THE COURT:  Can't make new ones in new

12   derivative works?  Is that what you mean?

13        MR. KRUMHOLZ:  We can't create a new derivative,

14   so we can't work from the original prototype, so --

15        THE COURT:  So you couldn't go out and create, I

16   mean I remember, I've done a lot of Hasbro cases over

17   the years, so you couldn't go out and create Spiderman

18   Game of Life using the Spiderman license.

19        MR. KRUMHOLZ:  Not if we're taking it from the

20   prototype.  So there still has to be enough similarity

21   from the prototype that you would conclude that it was

22   a derivative work, all right?  So this is distinct from

23   if it gets far enough way it becomes independent; so

24   there's no overlapping expression, it doesn't look like

25   the prototype anymore in any substantive meaningful

1    way.  So it would, could -- one could easily envision a

2    scenario where you would have to rule on some future

3    work as to whether it's derivative or not or whether

4    it's an independent work.  There would be no dispute if

5    it was the same; we just couldn't do it.

6         Does that make sense?

7         THE COURT:  Yes.  All right.  I think that makes

8    sense.

9         Do you want to add anything?

10         MR. POLLARO:  I would agree on the flip side of

11    that, which was mentioned before, is the Markham

12    parties could go and do what they do with their rights.

13         MR. KRUMHOLZ:  If it's joint authorship.

14         THE COURT:  And I also want to understand the

15    current relationship is, if I understand this

16    correctly, that royalties have continued to be paid

17    over all these years on these evolving versions of the

18    game.  That original license agreement with Milton

19    Bradley, the parties have continued to function under

20    that even though you're taking the position that really

21    what's being sold on the shelves now is really a

22    completely different game.

23         MR. KRUMHOLZ:  And that gets to what I was

24    inarticulately expressing before.  The answer is yes,

25    Hasbro is continuing to pay because when you're paying

1    an inventor you're paying for the concepts they brought

2    to the table.  So we agree, as you probably can surmise

3    from these days of questioning, we agree that there are

4    still some core concepts and core ideas that date back

5    to 1959 that are still in the game.  So Hasbro's -- and

6    because all the IP was licensed, including those ideas,

7    Hasbro still has an obligation to continue paying the

8    royalties, and whether or not who owns the copyright,

9    whoever owns the copyrights will not impact that

10   because there's other IP that's the core ideas and

11   concepts that carry through it and remain.

12          So that's where I think this all got very

13   confusing.  I mean I feel like I understand these

14   issues well and I got confused by it.  It is this kind

15   of differentiating between ideas and expression.  They

16   licensed ideas to us, they're in the product, they're

17   in Despicable Me, in the Despicable Me version, the

18   idea of life events and the spinner and what have you.

19   Those core ideas are still there.  But when you get to

20   a copyright question --

21          THE COURT:  What governs the idea?

22          MR. KRUMHOLZ:  Trade secret.

23          THE COURT:  I mean there's trademark.  I mean,

24   okay, there's patents.  Those are expired; right?

25          MR. KRUMHOLZ:  No; it would be trade secret.

1          THE COURT:  Trade secret.

2          MR. KRUMHOLZ:   Typically, and I've handled many

3     of these for Hasbro, when you get into a dispute

4     between a game manufacturer like Hasbro and an inventor

5     the dispute is usually, hey, I disclosed this game or

6     toy idea to you and now a year later I'm seeing that

7     concept in a toy; you have to pay me.  And typically

8     our fight is about whether we used their idea or it

9     came through a third party, all those issues.

10         THE COURT:  Right.

11         MR. KRUMHOLZ:  But the cause in action is almost

12    always a trade secret claim.

13         THE COURT:  Trade secret.  Okay.

14         All right.  So you continue to live under this

15    royalty agreement for all of these years and it's still

16    generating a lot of money, right, I take it?

17         MR. KRUMHOLZ:  Enough to fight about.

18         THE COURT:  Enough to fight about.  But the

19    result here could terminate that, if I understand you

20    correctly; right?

21         MR. KRUMHOLZ:  In our view, no.  It would modify

22    it.  In the worse case scenario we would be frozen,

23    Hasbro would be frozen selling the products that it has

24    today and be able to create future independent versions

25    of the copyright.

1           See, what's really tricky here and why we keep

2    periodically bringing up the fact they made no attempt

3    to identify the deposit materials with the copyright

4    office --

5           MR. POLLARO:  Your Honor, that's not true.

6           THE COURT:  You'll be able to respond.

7           MR. KRUMHOLZ:  Yeah, that was unnecessary; I

8    didn't mean to cast aspersions.

9           But why the deposit materials are important as a

10   practical matter is, let's assume our worse case

11   scenario and you conclude that there's a termination

12   here, and now Mr. Markham has the right to -- he owns

13   all the rights of the copyright.  We're out there

14   selling, you know, any version of the game.  They would

15   have to bring an infringement action because now it was

16   unauthorized; right?  Okay.  If you bring an

17   infringement action you have to show what is the actual

18   copyrighted material, all right?

19          So that's what would happen down the road.  So

20   we would be frozen in time.  We could sell anything

21   that we have that we've already created.  If we create

22   a game down the road, they would have to bring an

23   infringement action alleging that that later version

24   infringes the original copyright, but without the

25   materials I'm not sure how you do that.

1          THE COURT:  Okay.  I think I understand that.

2          MS. VAN LOON:  Your Honor, I just want to make

3     one small point to add to Josh's point.  It wouldn't

4     just be a trade secret action, but there would also be

5     a breach of contract action because under the license

6     agreement -- and remember, the license agreement is

7     between Link and Milton Bradley now Hasbro.

8     Mr. Markham was never a party to that agreement.  And

9     what that agreement says is that Mr. Klamer has an

10    approval right of all new versions of the game, and

11    because of that every time one of these new versions of

12    the game is added to the line, the original license

13    agreement is amended, and there are several amendments

14    that are, you know, have formed a part of that original

15    license agreement.  So it wouldn't just be a trade

16    secret issue; it would be a breach of contract issue as

17    well.  I just wanted to clarify.

18         MR. KRUMHOLZ:  I wasn't trying to limit their

19    future claims.

20         THE COURT:  Right.  Okay.

21         Did you want to add to anything he said?

22         MR. POLLARO:  If you need, if your Honor needs

23    anything for me to add.  I'm not sure -- if you have

24    questions I'm happy to address them from the Markham

25    side.

1          THE COURT:  No, I think this is all helpful and

2     I guess that's half of the answer.  The other half of

3     the answer is if I rule for Hasbro on either

4     work-for-hire or joint, well, if I rule for Hasbro and

5     find they're joint authors, then the ball is sort of in

6     the Markham parties' court; right?  They could do

7     nothing and life could just go on for everybody, or

8     they could exercise, continue with the exercising of

9     the right of termination, to the extent they could do

10    that, and then where it goes from there would be sort

11    of an open question.

12          MR. KRUMHOLZ:  They would have the ability to go

13    out on the street with their rights and the copyrights

14    and see if anybody is interested in licensing them.

15          THE COURT:  Right.  But that would no doubt lead

16    to more litigation and I would think, I mean it's --

17          MR. KRUMHOLZ:  Not necessarily, not necessarily.

18    Well, I mean there's also the practical reality whether

19    they can get anybody to bite.  But that aside, if

20    that's the way it shakes out, then as long as they're

21    not -- you know, they show up with a game that says The

22    Game of Life on it you're going to have a trademark

23    case.

24          THE COURT:  That's what I'm saying.  So to make

25    those rights valuable I would think you would have to

1    put a product out in the market that stood a high risk

2    of inviting a trademark or other action.  So that's

3    just -- but the Markham parties could also at that

4    point just do nothing and continue to go on with life

5    as it has been; just as that would continue to, that

6    would continue to be the case if I were to determine

7    that they hadn't met the burden of proof and this was

8    work-for-hire; --

9            MR. POLLARO:  That's correct.

10           THE COURT:  -- right?  Okay.

11           All right.  I think that those are my questions.

12           MR. KRUMHOLZ:  I guess I would invite -- we

13    would be happy if questions came up as you're

14    evaluating all of this to submit or come in for a

15    hearing if that would be helpful.

16           THE COURT:  Yes.  Well, we can go off the record

17    now.

18           (Discussion off the record)

19           (Adjourned)

20

21

22

23

24

25

1        C E R T I F I C A T I O N

2

3

4

5

6        I, Denise P. Veitch, RPR, do hereby certify

7   that the foregoing pages are a true and accurate

8   transcription of my stenographic notes in the

9   above-entitled case.

10

11

12

13                      /s/ Denise P. Veitch
                        Denise P. Veitch, RPR
14

15

16                      March 13, 2018
                        Date
17

18

19

20

21

22

23

24

25