```
                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF RHODE ISLAND



* * * * * * * * * * * * * *
                              * CA NO. 15-419-WES
MARKHAM CONCEPTS, INC.,       *
SUSAN GARRETSON, and          *
LORRAINE MARKHAM,             *
individually and in her       *
capacity as Trustee of        *
the Bill and Lorraine         *
Markham Exemption Trust       *
and the Lorraine Markham      *
Family Trust                  *
                              *
        VS.                   * MAY 10, 2018
                              *
HASBRO, INC., REUBEN          *
KLAMER, THOMAS FEIMAN,        *
ROBERT MILLER, MAX            *
CANDIOTTY, DAWN               *
LINKLETTER GRIFFIN,           *
SHARON LINKLETTER,            *
MICHAEL LINKLETTER, LAURA     *
LINKLETTER RICH, and          *
DENNIS LINKLETTER             *
                              * PROVIDENCE, RI
* * * * * * * * * * * * * *




                BEFORE THE HONORABLE WILLIAM E. SMITH

                           CHIEF JUDGE


                   (BENCH TRIAL - VOLUME V)
```

 1 | **APPEARANCES:**

 2 | FOR THE PLAINTIFFS:          ROBERT M. POLLARO, ESQ.
   |                              JOHN T. MOEHRINGER, ESQ.
 3 |                              DAVID A. COLE, ESQ.
   |                              Cadwalader, Wickersham & Taft
 4 |                              200 Liberty Street
   |                              New York, NY  10281
 5 |
   |                              MARY CAVANAGH DUNN, ESQ.
 6 |                              Blish & Cavanagh
   |                              30 Exchange Terrace
 7 |                              Providence, RI  02903

 8 | FOR THE DEFENDANTS:          JOSHUA C. KRUMHOLZ, ESQ.
   | Hasbro, Inc.                 COURTNEY L. BATLINER, ESQ.
 9 |                              MARK T. GORACKE, ESQ.
   |                              ROBERT TURNER, ESQ.
10 |                              CAMILLE FRAMROZE, ESQ.
   |                              Holland & Knight
11 |                              10 St. James Avenue, 11th Floor
   |                              Boston, MA  02116;
12 |
   | Ruben Klamer                 PATRICIA GLASER, ESQ.
13 |                              ERIKA J. VAN LOON, ESQ.
   |                              Glaser Weil Fink Howard Avchen
14 |                              & Shapiro
   |                              10250 Constellation Blvd.
15 |                              19th Floor
   |                              Los Angeles, CA  90067
16 |
   |                              ERIC E. RENNER, ESQ.
17 |                              Renner Law
   |                              50 South Main Street, Suite 202
18 |                              Providence, RI  02903

19 | Linkletter and Atkins        CHRISTINE K. BUSH, ESQ.
   | Defendants                   Hinckley, Allen & Snyder
20 |                              100 Westminster Street
   |                              Suite 1500
21 |                              Providence, RI  02903

22 |                              DAVID B. JINKINS, ESQ.
   |                              Thompson Coburn
23 |                              One US Bank Plaza
   |                              St. Louis, MO  63101
24 |
   | Court Reporter:              Denise P. Veitch, RPR
25 |                              One Exchange Terrace
   |                              Providence, RI  02903

1    10 MAY 2018 -- 10:00 A.M.

2         THE COURT:  Good morning, everyone.  We're here

3    in the matter of Markham Concepts, Inc. v. Hasbro,

4    Inc., et al, and we're here for closing arguments on

5    the bench trial in this matter.  Let's have counsel

6    identify themselves for the record, and let's begin

7    with the Plaintiffs.

8         MR. POLLARO:  Robert Pollaro, Cadwalader

9    Wickersham & Taft, here for the Markham parties.

10        MR. MOEHRINGER:  John Moehringer, Cadwalader,

11   Wickersham & Taft, Markham parties.

12        MR. COLE:  Good morning, your Honor.  David

13   Cole, Cadwalader, Wickersham & Taft, here on behalf of

14   the Markham parties.

15        MS. DUNN:  Good morning, your Honor.  Mary Dunn,

16   local counsel on behalf of the Markham parties.

17        MR. KRUMHOLZ:  Good morning, your Honor.  Josh

18   Krumholz from Holland & Knight on behalf of Hasbro.

19        MS. BATLINGER:  Good morning, your Honor.

20   Courtney Batliner from Holland & Knight on behalf of

21   Hasbro.

22        MS. GLASER:  Good morning, your Honor.  Patricia

23   Glaser for Ruben Klamer.

24        MS. VAN LOON:  Good morning, your Honor.

25   Erica van Loon from Glaser Weil for Mr. Klamer.

1          MR. RENNER:  Good morning, your Honor.  Eric

2    Renner for Mr. Klamer.

3          MR. JINKINS:  Good morning, your honor.

4    David Jinkins on behalf of Linkletter and Atkins.

5          MS. BUSH:  Good morning, your Honor.  Christine

6    Bush on behalf of the Atkins and the Linkletter

7    Defendants.

8          MR. TURNER:  Robert Turner on behalf of Hasbro,

9    your Honor.

10          MS. FRAMROZE:  Camille Framroze on behalf of

11    Hasbro.

12          MR. GORACKE:  And Mark Goracke on behalf of

13    Hasbro.

14          THE COURT:  Very good.  Thank you all very much.

15          All right.  So we have a lot to cover and a lot

16    of folks who want to argue.  I think there was an

17    exchange of some e-mails about argument.  Frankly I

18    can't remember exactly what I said; I'm sure I gave you

19    plenty of time, but so I think Plaintiffs will go

20    first.  And how much time did I give you?

21          MR. POLLARO:  An hour-and-a-half.

22          THE COURT:  Total, right?

23          MR. POLLARO:  No.  Two hours total.  I think an

24    hour-and-a-half initially.

25          THE COURT:  You don't need to use it all, all

1    right?

2           MR. POLLARO:  I appreciate that.

3           THE COURT:  Okay.

4           All right.  And you all are going to divide

5    something like that among yourselves; right?

6           MR. KRUMHOLZ:  Yes.  What you said specifically

7    or what Mr. Jackson said was an hour-and-a-half, and we

8    would do an hour before lunch, we'd have a lunch break,

9    we'd have another half hour to an hour, and they would

10   have rebuttal up to a half hour.

11          THE COURT:  All right.  Well, let's try to keep

12   it as concise as possible, okay?

13          All right.  Mr. Pollaro.

14          MR. POLLARO:  Thank you, your Honor.  I have

15   copies of the presentation for the Court.

16          THE COURT:  Okay.

17          MR. POLLARO:  May I approach?

18          THE COURT:  You may.

19          (Pause)

20          THE COURT:  I just want to take a moment so you

21   all know we have a visitor today, Judge Paul Howard,

22   who is sitting over there in the jury box.  He's a

23   federal district court judge in Australia, and he's

24   visiting the United States for a period of about six

25   months, was it?

1          JUDGE HOWARD:  Three months.

2          THE COURT:  Three months, working down at the

3     federal judicial center in Washington and preparing

4     some reports and recommendations regarding how the

5     federal judiciary in Australia can work more

6     effectively with its executive and legislative

7     branches, and he's visiting us here in Rhode Island for

8     a couple of days doing a variety of things, and we

9     thought this would be a nice thing for him to observe.

10    He's read your briefs, and he may have questions; who

11    knows.

12          JUDGE HOWARD:  Thank you.

13          THE COURT:  So go ahead.

14          MR. POLLARO:  Thank you, your Honor.

15          May it please the Court, the operative facts and

16    events in this case occurred nearly 60 years ago, yet

17    the record from that era remains largely intact, and

18    that record uniformly identifies Bill Markham as the

19    creator of the Game.  To believe the evolving stories

20    told by the Defendants at trial requires this Court to

21    ignore the contemporaneous written record as well as

22    the prior conduct of all the relevant participants in

23    favor of these newfound revelations of three

24    coordinated witnesses.  In effect, what this case boils

25    down to is what is more trustworthy:  The written and

1   contemporaneous claims of the parties, or 60-year-old

2   mustered recollections understandably schooled for the

3   trial.

4        The Markham parties respectfully submit that the

5   evidence shows that Bill Markham is the author of the

6   Game, the work was not a work-for-hire, and that the

7   Markham parties have established their entitlement to

8   the right of termination to be exercised at their

9   discretion.

10       The two most percipient witnesses in this case

11  left no doubt about their representative understandings

12  and intentions in this case, no doubt at all.  In 1965

13  Ruben Klamer was erroneously identified as having

14  designed The Game of Life in an industry periodical.

15       And your Honor, I believe I did not give you the

16  exhibit binder that I have for you as well.

17            THE COURT:  Okay.  Pass it up if you have it.

18            (Pause)

19            MR. POLLARO:  May I approach, your Honor.

20            THE COURT:  Sure.

21            MR. POLLARO:  We have copies for Defendants as

22  well.

23            MR. KRUMHOLZ:  Are these all admitted exhibits?

24            MR. POLLARO:  I believe these are all admitted,

25  although you'll notice they don't all have JTX numbers.

1      MR. KRUMHOLZ:  Correct.  Some were admitted that

2  were not JTX.

3      MR. POLLARO:  Your Honor, rather than having

4  everybody leaf through their giant binders, we tried

5  our best to make it easier for everyone.

6      THE COURT:  Sure.

7      MR. POLLARO:  So if you turn to Tab 25, I was in

8  the process of telling you about an exchange that

9  happened in 1965.  We refer to this as the 1965

10  Exchange.  And what happened in 1965 was very clear,

11  and it's very important in this case because it is a

12  snapshot of what the parties believed their

13  representative roles and understandings were in this

14  case.  We don't have to go 58 years, 60 years and try

15  to remember what happened.  This is what happened.

16  This is what the parties wrote clearly in the record,

17  and this is what I would like to talk about.

18      So in 1965 Klamer was erroneously identified as

19  having designed The Game of Life in an industry

20  periodical.  So if you turn to Tab 25, Toy & Hobby

21  World from 1965, and on the very last page you'll see

22  the very small print -- and we highlighted it, tried to

23  make it easier for everybody -- that Ruben Klamer was

24  identified as having designed The Game of Life.  That

25  was published in 1965.  That was a big deal because

1    when Markham saw that he was furious.  He immediately

2    wrote to Ruben Klamer and demanded that he retract the

3    statement.  And if you turn to Tab 24 you'll see the

4    first letter that Bill Markham wrote to Ruben Klamer to

5    that effect.

6         So upon seeing that Ruben Klamer was publicly

7    declaring that he designed the Game, Bill Markham

8    called him out.  And what did Klamer do?  He complied,

9    and he informed the publication, quote, "Be sure any

10   publicity concerning me in your publication or anywhere

11   else does not refer to The Game of Life."  He didn't

12   describe what his role is or he didn't describe the --

13   he said do not associate me with The Game of Life.

14   That's what occurred in 1965.

15        Yet today, since Bill Markham has passed and

16   he's not here to defend himself, we see examples like

17   this.  Copies of the game today bear the picture of

18   Ruben Klamer on them, and what I'm holding right now,

19   your Honor, is PTX270.  And I'm happy to bring it up; I

20   don't think there's any dispute that this game is in

21   evidence.  But it's a picture of Ruben Klamer and it's

22   got a description of his contributions to the Game.  In

23   1965 this wouldn't have stood, and it shouldn't stand

24   today, even though Bill Markham is not here.

25        So what he's done since, he's enlisted help to

1    help finish his quest of minimizing Bill Markham.  And

2    as we'll discuss today, the facts as they've existed

3    for the past 58 years show otherwise, and this Court

4    should now allow his legacy to be destroyed.

5         No issues -- we don't believe there's any real

6    issues regarding the outstanding issues that this Court

7    needs to be resolved (sic).  We categorized them as

8    authorship, work-for-hire, and derivatives.  There's a

9    couple of subcomponents of that, but we'll talk about

10   that.  We talked about this at the last, at the end of

11   the last hearing.  It appears that the parties are all

12   in agreement that your decision here will not

13   immediately impact the status quo.

14        Turning to authorship, there's no apparent

15   dispute among the parties with respect to the

16   applicable law.  The parties agree that the author is a

17   person that creates --

18        THE COURT:  I'm not sure I understand that last

19   statement you made when you say my decision won't

20   immediately impact the status quo.  Could you --

21   exactly what do you mean?

22        MR. POLLARO:  What I mean by that is Hasbro will

23   continue to sell the game and the royalties will still

24   continue to be paid, and basically your decision will

25   impact the -- basically, you know, we view it as

1    leveling the playing field or rebalancing the

2    negotiation decisions of the parties.

3         THE COURT:  You mean it won't influence the

4    status quo in terms of the ability to market the Game?

5    Is that what you're saying?

6         MR. POLLARO:  That is what I'm saying, because

7    what we're talking about here is the right to

8    prospectively seek termination.  So your decision

9    today -- and again, Defendants may have a slightly

10   different take, but based on what we talked about last

11   time at the hearing --

12        THE COURT:  Would you put the microphone just a

13   little closer to you.

14        MR. POLLARO:  Sure.  My apologies.

15        THE COURT:  So what you're saying is it affects

16   the rights, but nobody -- until somebody, assuming you

17   win, until there's an exercise of that right to

18   terminate the status quo is not affected.  Is that what

19   you're saying?

20        MR. POLLARO:  That's exactly what I'm saying.

21        THE COURT:  Okay.

22        MR. POLLARO:  And again, that's how I

23   interpreted what the Defendants said at the end of the

24   last hearing, and we agree with that; and so to the

25   extent they have any disagreement with that I'm sure

1    they'll let you know that.

2            THE COURT:  All right.

3            MR. POLLARO:  So turning to authorship.  Again,

4    no real dispute about what the law is here.  It's

5    pretty black letter law.  The parties agree that the

6    author has to be the person that actually creates in a

7    tangible medium of expression the work at issue.  The

8    parties also agree that copyrights do not under any

9    circumstances extend to ideas or concepts.  As you

10   would guess, the application of those seemingly

11   straightforward requirements has led to significant

12   dispute amongst the parties, and that's what we're here

13   to talk about.

14           So where do we begin?  So typically, in your

15   typical situation the authorship analysis begins

16   directly with, well, it's written on the registrations

17   themselves.  However, in this case all the parties

18   agree that the registrations were wrong, and I cited

19   portions of the brief there.

20           The registrations identify Milton Bradley as the

21   claimant.  They can't be the claimant.  They have a

22   license.  So we know that's wrong.  They've been

23   identified as the author.  We believe that's wrong

24   because Bill Markham should be there.

25           And you can see there we know the registration

1    is wrong because Bill Markham had assigned his rights

2    to Link, and Link should have been identified as the

3    claimant.  So where does that leave us?  And your

4    Honor, quite frankly, based on the cases, that happens

5    fairly regularly.

6         THE COURT:  That happens what?

7         MR. POLLARO:  Fairly regularly.  It's not an

8    uncommon occurrence that the registrations are in fact

9    incorrect.

10        THE COURT:  So does it have any bearing?  If

11   both parties believe that the actual registration of

12   the copyright is incorrect, I mean it seems like kind

13   of an odd situation to me, frankly.  There's no -- the

14   original, it doesn't appear that the original was

15   deposited with the copyright office.  I think we agree

16   on that; right?

17        MR. POLLARO:  That's correct.

18        THE COURT:  Or nobody can find it.

19        MR. POLLARO:  Right.  It was, but it was lost,

20   which again is not an uncommon occurrence.

21        THE COURT:  All right.  So it's lost.  If it was

22   deposited, it was lost.

23        MR. POLLARO:  Yes.

24        THE COURT:  If it was deposited, it was

25   deposited by Milton Bradley; is that right?

1      MR. POLLARO:  That is correct.  The publisher.

2      THE COURT:  And the registration is to Milton

3  Bradley.

4      MR. POLLARO:  They filed the registration.

5  Again, you know, there was some testimony about this,

6  which is the common practice, because under the

7  1909 Act the publisher, you couldn't get copyrights

8  under the old 1909 Act until the work was published.

9  So I think everybody knows today, you know, as soon as

10  you create a work, if you create a work or if I create

11  a work it's copyrighted and we have rights

12  automatically.  That wasn't the case under the

13  1909 Act.  There was some small exceptions for

14  performances and things like that, but that's not what

15  we're talking about.

16      So under the 1909 Act you had to publish, the

17  publisher had to publish the work and then seek

18  registration.  And that's why all those cases from the

19  1909 Act, the *Kirby* cases, all those cases, the

20  publishers were the ones filing the work because

21  they're in charge of the publication and they have the

22  resources and things like that.  So, you know, in

23  99 percent of these case it's the publisher that's

24  filing the registration.

25      THE COURT:  So it's Milton Bradley that then

1    publishes the work when they market the game, then they

2    register it, and it remains registered in Milton

3    Bradley until today; right?

4            MR. POLLARO:  There were renewals in 1988, or

5    '88 or '89.  I think it was --

6            THE COURT:  I mean it's Hasbro now, but --

7            MR. POLLARO:  Yes.  And the registrations, quite

8    frankly, changed.  It's interesting your Honor brings

9    that up because the registrations changed from the 1960

10   registrations to the renewal registrations, which is

11   also an oddity.  Link's name is not mentioned anywhere

12   on any of those registrations in the renewals, so

13   something changed that we don't know about.

14           THE COURT:  Okay.

15           MR. POLLARO:  You know, maybe they got --.  But

16   back to your Honor's question, which is a good one,

17   does it matter?  The short answer is no.  In the

18   situation where the registrations are challenged or

19   potentially correct, all that does is give you the

20   starting point of where the analysis begins.  In other

21   words what the evidence, what -- you know, where you

22   start the analysis.  And so I think your question is

23   also a good one because ultimately your Honor is going

24   to determine who should be the author on these

25   registrations.  It doesn't mean these registrations get

1   refiled or anything like that.  You basically stop with

2   your decision, so there's nothing that needs to be

3   corrected or fixed or anything like that.  So clear as

4   mud, your Honor?

5        THE COURT:  It just seems odd to me that, you

6   know, a lot of things seem odd to me about this, but it

7   does seem strange that the registrations are with

8   entities that everybody seems to agree are incorrect

9   and that that has existed for 60 years.

10        MR. POLLARO:  Exactly.  You're absolutely right,

11   and obviously, you know, we lay out in our briefs why

12   we think that's the case.  I mean we were cut out of

13   the conversations, and had we been part of the

14   conversation we believe it would be different.

15   Obviously they disagree with that.  But that is

16   certainly an excellent observation.

17        THE COURT:  So where you are is that whoever is

18   the appropriate owner of the copyright is not, it

19   wasn't Milton Bradley, they're a licensee, and you were

20   taking off from there.

21        MR. POLLARO:  Yes, your Honor.  I was basically

22   trying to level-set the Court on where we should start

23   this analysis.  But again, back to your question, we

24   could start with the registrations and we can say it

25   says Milton Bradley, but, you know, it wouldn't change

1       the result.  Ultimately the result would be the same.

2       The evidence shows that they are not the author and

3       therefore we continue it and have the decision from

4       your Honor who the author is.

5            So I thought I would start at the assignment,

6       but I didn't want to just start at the assignment

7       because we put that in our briefs, and so I wanted to

8       give you a little more context about how that

9       assignment came to be, what was happening, why was that

10      assignment entered into.  And so, you know, there were

11      a lot of facts that weren't in dispute.  You know,

12      there's no dispute that Ruben Klamer contacted Bill

13      Markham in the summer of 1959.  No issues there.

14           There is a dispute about whether or not Bill

15      Markham had an undeveloped game at the time.  Again, it

16      doesn't change the analysis.  We believe it's evidence

17      that it makes the story make much more sense.  Bill

18      Markham was working on it; that's how it was able to be

19      completed so quickly, and that's why he believes in

20      part why -- and then it's borne out in the documents --

21      why like in the 1965 exchange why he is the inventor,

22      the creator, the designer, and the developer of the

23      Game.

24           THE COURT:  Well, okay.  So I thought this was

25      actually a critical factual dispute from your client's

1    point of view because, if I understood it correctly,

2    it's the so-called undeveloped game that gives rise to

3    the spinner and to the circuitous path, and I thought

4    your contention was that those were concepts that were

5    in the undeveloped game.

6         MR. POLLARO:  And they are, and that's spelled

7    out in the Bill Markham deposition, but it is by no

8    means critical.  It is part of our story.  It is just

9    another piece of evidence in the last 58 years trying

10   to go back -- if undeveloped, now we're going 60 years,

11   we're going a little bit further back -- just evidence

12   in the evidentiary record that Bill Markham is the one

13   that does this.

14        THE COURT:  Well, those are two things that, if

15   they're true, make him an author at least of part of

16   the game; right?

17        MR. POLLARO:  Yes.

18        THE COURT:  And then you contend there's more.

19   You contend there's -- and I want you to explain this

20   to me, something about the board, the bonding of the

21   board or whatever it was.

22        MR. POLLARO:  Absolutely.  And I think those are

23   excellent questions, your Honor.  But ultimately our

24   point is Bill Markham created this entire thing, and

25   that's what the documents show, that's what the

1    testimony shows, that's what all the evidence up until

2    probably about October 2017 when this new theory came

3    into the case and --

4         THE COURT:  But the testimony of Israel and

5    Chambers was pretty clear that it was those two that

6    were doing all of the work on creating the buildings

7    and the overpasses and designing the cover of the box

8    and the sketches.  I mean I'm sure you're going to

9    touch on all this evidence, but -- and they were very

10   clear that Markham was never really in the room other

11   than occasionally.  It was the three people that were

12   in the room when all that creative work was being done

13   were Israel, Chambers, and Klamer.

14        MR. POLLARO:  Exactly, your Honor, and, quite

15   frankly, that is exactly it in a nutshell because that

16   is completely 180-degrees different than the evidence

17   up until this new defense in the case.

18        And in fact, as your Honor is well aware, all

19   three of those parties submitted declarations in this

20   case, in this very case in December of 2015 and January

21   of 2016, and none of them said that.  In fact, Ruben

22   Klamer in that declaration, and I can't remember if it

23   was January 6, 2015 or '16, referred to it as the

24   Markham prototype.  I mean their story changed

25   overnight.  Leonard's and Grace's declaration in this

1    case said nothing that they testified to at trial.

2    They said nothing at the deposition that I took of them

3    in the summer of 2017.  The story they told you was

4    simply nowhere else.  It's nothing but a story, and

5    that's ultimately what I intend to talk about today.

6         THE COURT:  Okay.  Well, have at it.  I'll try

7    not to throw you off here.  Go ahead, tell me why I

8    shouldn't believe it, I guess.

9         MR. POLLARO:  So there's no dispute that the

10   Game was completed and shown to Milton Bradley at

11   Chasen's restaurant in Hollywood, California, in the

12   week of August 10th.  Milton Bradley loved it.  No

13   issues there.

14        So this is where it gets interesting.  So again,

15   going back to kind of what I was attempting to do, I'm

16   trying to give you some context about why this signed

17   agreement happened.  So they had the fancy dinner,

18   lunch, whatever you call it.  Milton Bradley said

19   they'll take it.  And what happens?  Ruben Klamer takes

20   the prototype and he immediately walks it over to his

21   attorney, and the attorney writes a letter.  We all

22   know the letter.  It says the Game is proper copyright

23   subject matter.  So we know that letter, that occurred

24   on August 14th, 1959.

25        The problem is he didn't tell Bill Markham about

1    that.  Bill Markham had no idea that his prototype had

2    been determined to be copyrightable.  So what happens

3    next?  Klamer sends the Game to Milton Bradley on

4    August 19, 1959.  We talked about that at length.  That

5    is the letter where Ruben Klamer misrepresented that he

6    had an exclusive contract.  I'm sure the Court is well

7    aware of that.  But with that letter were certain

8    attachments, one of which was the Game and one of which

9    was this opinion of counsel that showed that Bill

10   Markham's prototype was copyrightable.

11           So again, all this is kind of happening fast,

12   all really fast.  Milton Bradley wants to come out with

13   a game for their hundred year anniversary.  So what

14   happens?  Unbeknownst to Markham, Ruben Klamer enters

15   into a license agreement with Milton Bradley, and we've

16   seen that.  When Markham found out about this, he was

17   livid.  He was absolutely beside himself.  And as

18   evidenced in his deposition testimony from 1999, he

19   almost walked away.  He was going to take his game and

20   walk away.  And so what happened?  And actually I don't

21   believe that's in dispute because Ruben Klamer

22   testified about that at trial as well.

23           So what happens?  The parties negotiate the

24   assignment agreement.  They negotiate an assignment

25   agreement.  It goes back and forth.  We know there were

1    multiple versions.  It wasn't a take-it-or-leave-it, it

2    wasn't anything like that.  It went back and forth, and

3    they negotiated the terms of this agreement.

4          And Klamer needed Markham's rights.  There's no

5    dispute there.  Later, in the 1989 litigation, he

6    describes Bill Markham's rights as imperative.  So

7    here's the agreement, and that is kind of the backdrop.

8    That's where we are.  And so this is the negotiated

9    agreement that came up.  So you've seen the language

10   before, so I'm not going to focus on it.  I'm not going

11   to reread it for you.  Obviously "At the request of

12   Link" portion, we'll deal with that in the

13   work-for-hire issue.

14         So there's no question that Ruben Klamer is

15   saying here at my request Markham invented, designed,

16   and developed the game.  So Bill Markham invented,

17   excuse me, designed, and developed the game.  That's

18   what this agreement said.

19         Now, with respect to all the intellectual

20   property, you can see it there:  Upon the request of

21   Link, Markham will pursue any copyrights, any

22   trademarks, any patent applications anywhere that he is

23   entitled to as the inventor, designer, and developer.

24   No question about who the designer and developer and

25   inventor of this game is.  And interestingly, at the

1    time this agreement was signed the Game was

2    copyrightable, but Bill Markham didn't know it.

3          Now, while Klamer referred to Markham's rights

4    as imperative, what's also important -- consistent with

5    your questions before -- if he was in the room and he

6    knew exactly what Leonard and Grace were working on, he

7    would have sought their rights as well.  He didn't.  He

8    sought Bill Markham's rights.  And that's why this is a

9    piece of evidence that as we'll go through this you'll

10   see that this is just a story that came up in October

11   of 2017 when they realized that their work-for-hire

12   defenses were not working out so well.

13         THE COURT:  Doesn't that assume that he has a

14   fairly sophisticated understanding of copyright law

15   when you say he would have, should have and would have

16   sought the assignments from Chambers and Israel?

17         MR. POLLARO:  I wouldn't say sophisticated.

18   Obviously, you know, there's no secret Ruben Klamer has

19   hired many lawyers throughout his time, and we'll talk

20   about some of those that he hired subsequently.  But

21   given the fact that he had a conversation certainly

22   with his patent attorney or copyright attorney or

23   intellectual property attorney, whatever it is, you

24   know, on August 14th, 1959, there's certainly a certain

25   level of understanding that Mr. Klamer has.  He

1    certainly knew enough to take it to an IP attorney in

2    1959.

3           THE COURT:  So is what you're arguing -- I just

4    want to be clear about the point you're making here.

5    Are you saying that because Klamer did not seek an

6    assignment from Israel and Chambers in 1959, that that

7    suggests, that implies that the testimony of Israel and

8    Chambers in 2017 is incorrect?

9           MR. POLLARO:  I am, your Honor.

10          THE COURT:  And you're saying that's evidence of

11   that fact because had it been -- if what Israel and

12   Chambers said was actually true, Klamer would have

13   sought an assignment from them; he would have known

14   enough to do that?

15          MR. POLLARO:  Absolutely.  And your Honor, going

16   back to your point, I want to reach on my desk real

17   quick because I have a case directly on this point.

18          THE COURT:  Sure.

19          (Pause)

20          MR. POLLARO:  I am reading, your Honor, from the

21   District Court opinion in *Picture Music*, it is

22   314 F.Supp. 640, and I'm reading from page 653, and

23   I'll just read it just because it goes exactly to the

24   question you just asked, your Honor.  "Both Disney and

25   Berlin were sensitive and sophisticated on the need to

1    procure an assignment of copyright interest before

2    proceeding with publication except where no factual

3    situation existed for a claim of retained ownership or

4    an interest therein, by a writer, adapter or arranger."

5         So, your Honor, he knew enough to get an

6    assignment agreement from Bill Markham.  If he was in

7    the room over their shoulder after just having talked

8    to his patent attorney, he would have done the same

9    thing with Leonard and Grace.

10        THE COURT:  Okay.

11        MR. POLLARO:  Again, so just to kind of keep it

12   in perspective, I'm going to march you through the

13   58 years of the highlights of where their story falls

14   apart, where their broad pronouncements have no support

15   and are nothing but a story that was told by -- you

16   know, I'm sure the Court is aware they're all

17   represented by the same counsel and they've all been

18   represented by the same counsel since 2015.

19        So we call these the "Credit Letters."  Shortly

20   before the assignment was signed, Link asked Milton

21   Bradley to display the name of Markham on the box as

22   the game's designer.  So in other words Ruben Klamer

23   sent a letter to Milton Bradley and said Hey, listen,

24   can you put Bill Markham's name on the box.

25   Milton Bradley unfortunately had a company policy that

1    they couldn't do that, they said it was confusing so

2    they didn't do that, but not because they didn't think

3    Bill Markham was the designer.  So, but I mention that

4    again; another situation, Ruben Klamer purportedly in

5    the room, one of the two most percipient witnesses in

6    this case, didn't say can you put Bill Markham's,

7    Leonard Israel's, and Grace Falco's name on the box.

8    He said Bill Markham.

9          So "Manufacturing Suggestions."  Again, we

10   talked about the importance.  I mean the authorship,

11   you have to create, you have to actually fix the work

12   into a medium.  So what happens here is Bill Markham is

13   being asked to provide Milton Bradley -- Milton Bradley

14   obviously, you know, there's no dispute; they liked the

15   prototype, they loved it, they wanted to mass produce

16   it.  So in that process they reached out to, well, I'll

17   save this for later, but they reach out to Klamer

18   because Klamer had misrepresented that he had an

19   exclusive contract with Bill Markham.  He had expressly

20   told Milton Bradley if you have any issues you contact

21   me directly, do not contact Bill Markham; everything

22   needs to go through Link.  And we have that evidence in

23   the record where that distance was being created over

24   and over and over again.

25         So what we see here is Markham was asked to

1   prepare suggestions for how the Game might be

2   manufactured.  Again, understand this is September now,

3   1959, and things are happening quickly.  Milton Bradley

4   originally wanted the Game on the market by January.

5   That obviously didn't happen.  But things were

6   happening quick, and so they said Bill, you made this

7   game; what can you do for us?  What can you help us out

8   with?

9           And Bill being, you know -- and he testified to

10  this in 1989 -- a genuine guy said, Listen, I don't

11  understand their process.  I can tell you what I did,

12  and I can just tell you what I did; maybe it's helpful,

13  maybe it's not, I have no idea.  And so what he did is

14  he put together an entire sheet, you know, a couple

15  pages of manufacturing suggestions that went to

16  Milton Bradley through Link, and they were step-by-step

17  of what he did from all the way from plastics and how

18  you can make these things efficiently, or how he made

19  them efficiently, and the molding and things like that,

20  all the -- as Mr. Orbanes testified, those are the

21  things that the creators do.  Finding is one of those

22  things.  That's what creators do.  You need to

23  understand how not only to create it and what to

24  create, but how to put it all together.

25          And so ultimately to your question, your Honor,

1   you know, that's how we view the testimony that

2   occurred in LA.  It was nothing but the preliminary

3   models, routine tasks that Bill Markham gave to these

4   staff attorneys -- sorry -- staff artists.  I'm around

5   too many attorneys recently.

6        But there's no evidence that they did anything

7   but routine.  They submitted a declaration, and I would

8   encourage the Court0, if I can find the cite I'll

9   provide it -- but the declarations that were provided

10  by these very witnesses in this case before this

11  defense came in are stark and they read nothing like

12  this testimony.  And so ultimately what you see is they

13  were doing nothing but the routine tasks.

14       And I don't think I mentioned it, but the names

15  Leonard Israel and Grace Falco do not appear anywhere,

16  anywhere in the contemporaneous record.  There was one

17  passing reference to them on the invoice that says six

18  weeks staff artists, is the only reference to these two

19  individuals in the record.  That's it.  And you'll here

20  later about the timing of the invoice.  The invoice was

21  October 12th.  They haven't even established -- we

22  haven't even seen any evidence at all that they worked

23  on the actual prototype.  There were copies made.  They

24  couldn't tell the Court, they couldn't tell us if they

25  worked on the prototype or the copy because they didn't

1    know.  They didn't know they were copies, they didn't

2    know, so it's quite -- we have no idea, and it's

3    speculation.  And so what the documents show is Bill

4    Markham did this.

5         So "Correspondence," I pulled these out, and

6    again, I'm mindful of the Court's time so there are

7    remarkably a lot of documents that exist from this time

8    frame, but I'm pulling out the ones that I think

9    encapsulate the point we're trying to make, which is

10   everybody thought Bill Markham was the inventor.  The

11   most knowledgeable people in this area, including Ruben

12   Klamer, said repeatedly Bill Markham created it.

13        So the top layer there I had was Milton Bradley

14   understood it.  And again, you know, it kind of -- I

15   put in "short note" there because Milton Bradley was

16   told not to communicate with Markham, so he puts a

17   short note and what you see is very short notes to Bill

18   Markham cc'd to Ruben Klamer to make sure there was no

19   issue; and they're not substantive.

20        All substantive communications go through Ruben

21   Klamer and Milton Bradley, not cc'd to Bill Markham.

22   That's a pattern.  And he says there you have done a

23   wonderful job; another piece of evidence.  Milton

24   Bradley understands it was Bill Markham.  Milton

25   Bradley understood that there was nobody else involved.

1        THE COURT:  But all Milton Bradley knows is

2   based on their very limited information that either

3   what they've been told or what they read in letters

4   during that time and what they saw at Chasen's

5   restaurant during the presentation; right?  I mean no

6   one from Milton -- there's no evidence that anyone from

7   Milton Bradley was ever in the workshop or ever kind of

8   watching what was going on or talking to anybody about

9   who is actually doing the work.  If they saw documents

10  that said Markham created it, or if they went to a

11  meeting and Markham presents it and says I did it, then

12  I mean that's what they know.

13        MR. POLLARO:  Exactly, your Honor, and that's

14  exactly the point.  They were in meetings with Ruben

15  Klamer, and Ruben Klamer was telling them Bill Markham

16  did it.  Didn't say Leonard Israel, didn't say Grace

17  Falco.  He didn't say "your team," he didn't say "you

18  and your posse," whatever he might have said.  He said

19  "you."  That's the point.  That's what he was being

20  told, and that's the consistent story for 58 years that

21  was being told until this case.

22        So, and this next letter is one of my favorites,

23  actually.  It's now we're not between Milton Bradley

24  and Markham, or Link and Markham, we're between Milton

25  Bradley and Link.  So this is a completely unconnected

1    conversation that doesn't involve Bill Markham, but

2    it's about Bill Markham, but he's not cc'd.  Again, the

3    pattern is he's been cut out.  So what does it say?  It

4    says, you know, it's not a very exciting letter, but it

5    says, "In reply to Link's letter of July 19th on the

6    subject of the Life game of Bill Markham;" okay?  That

7    came from Link to Milton Bradley.  Those two parties

8    understood it was Bill Markham's game.

9        And again, the last point there, "The idea that

10   you created through Bill Markham is really quite

11   exceptional," is completely consistent with our theory.

12   Completely consistent with the facts.  Ruben Klamer

13   told Milton Bradley that he had an exclusive contract

14   with Milton Bradley -- sorry -- with Bill Markham.  And

15   as he testified at trial rather emphatically, Milton

16   Bradley always took him at his word.  So that's what

17   happened.

18       So the "1965 Exchange."  Again, there are lots

19   of other issues in here, so again I'm not going to go

20   through it.  I think you understand the general concept

21   there, but it's important because when we first started

22   this in the kind of opening of the opening, there was a

23   reference to a letter to a trade publication.  Well,

24   there was also a description from Ruben Klamer to Bill

25   Markham what his contributions were to the Game.

1    So basically just to kind of back up a little

2    bit, Bill Markham sees the Toy & Hobby World page 17.

3    He sees that Ruben Klamer has been designated as the

4    designer of the Game, the designer of the Game.  Can

5    you imagine what Bill Markham would do if he saw Ruben

6    Klamer's face on the box?  He probably would have had a

7    coronary.

8    So what happened was when he wrote that letter

9    and he said Listen, you got to fix this, you have to

10   fix this, this is not okay.  And Ruben Klamer said I'll

11   fix it, I'll fix it.  And he did fix it.  So he wrote a

12   letter to the publication and said by the way -- he

13   didn't say by the way please describe me this way.  He

14   said don't associate me with The Game of Life at all.

15   In other words, he's acquiescing to what Bill Markham

16   and his party --.  These were the two most

17   knowledgeable witnesses in this case, and this is what

18   their understanding is.

19   And so but I do want to point out that what

20   Ruben Klamer said was he described his own

21   contributions, and that's what we referred to earlier.

22   He said Listen, don't forget, I'm the one that told you

23   about The Checkered Game of Life and said wouldn't it

24   be a great idea to update it.  That was it.  That was

25   it.

1    And the last part there is, again, in the letter

2    Markham is very clear:  I'm the inventor, I'm the

3    designer, I'm the developer; this is me.  It's not you;

4    you need to fix this.  Klamer acquiesced, and in doing

5    so -- and now I'm talking about the middle of the

6    letter from Klamer, from Klamer to Markham.  He said

7    it's you, it's all you; it's you did a good job, you

8    came up with a top-notch product.  You, at my request

9    -- and he loves to throw in that language, and we'll

10   deal with that in the work-for-hire.  You, at my

11   request, were the inventor, designer, developer, you,

12   Bill Markham.  And again, he didn't say come on, Bill,

13   it could have been -- I know, you and I know Leonard

14   did it, you and I know Grace did it.  He didn't say

15   that.  He said "you."  And as he told you, your Honor,

16   he was there.  He says he was there.  Okay.  We'll have

17   some dispute about that, but he says he was there.  So

18   he knows purportedly who did what, and he didn't say in

19   this letter come on, Bill, pipe down, it was Leonard

20   and Grace that did it for you.  He didn't say that.  He

21   said you, you, Bill Markham.

22       And that's what this, this evidence, this

23   58 years will say, the exact same thing.  And quite

24   frankly it gets better; the story gets a little better,

25   your Honor.  If it's dragging along I'll speed it up.

1        So now we're in "1997."  So what do we have?

2   Bill Markham passed.  Bill Markham passed I think in

3   1992.  So we have a letter written from Ruben Klamer to

4   Mr. Hassenfeld, and I think by this point it might even

5   be Hasbro, and he says Listen, this is what happened in

6   1997; Bill Markham reduced my ideas to practice in

7   concrete form of a three-dimensional prototype.  That's

8   creation.  Bill Markham did this.  Not anybody else;

9   not Leonard Israel, not Grace Chambers.  Bill Markham.

10  This is 1997.  This is Ruben Klamer telling it like it

11  is.

12        I put it there, won't spend a lot of time on it.

13  Ironically, like in 1965, Ruben Klamer was a little

14  hurt that he wasn't getting credit for being associated

15  with The Game of Life, so clearly things had changed

16  since Bill Markham had passed.  So once Bill Markham

17  had passed, Ruben Klamer had nobody that was going to

18  call him out and was willing and able to tell everybody

19  in the industry what his role was and to minimize Bill

20  Markham and which, again, is why his picture is on the

21  box.

22        So, okay, "1989 Litigation."  So I guess I put

23  that out of order.  Obviously we've talked about that

24  before.  That was a dispute primarily related to

25  international royalties.  Both of the parties were

1   deposed.   Ruben Klamer repeatedly testified during his

2   deposition that Markham, again that same language --

3   and quite frankly that might be where the language from

4   the '97 came from -- reduced to concrete form the high

5   level concepts and ideas, the creator, Bill Markham, in

6   1989 said Bill Markham.   Again, another opportunity

7   under oath to say it could have been somebody else, but

8   didn't.   Said Bill Markham.   And that was the

9   litigation, your Honor, where Ruben Klamer identified

10  as imperative Bill Markham's rights; no one else's,

11  Bill Markham.

12        So now I've kind of already touched on this, but

13  so in the "Current Litigation," it's quite remarkable.

14  In this case these witnesses have submitted

15  declarations that sound nothing like what their

16  testimony was.   And again Ruben Klamer on January 16 in

17  this case, "Mr. Markham produced a prototype."   Do you

18  think he would say that today?   I doubt it.   He didn't.

19  He's saying the opposite.   He's saying Markham didn't

20  do anything.   He is now an absentee employer.   That's

21  what this new thing is.

22        THE COURT:   Well, I've been waiting to sort of

23  ask you this, but the simple sort of reconciliation of

24  all this business is that, you know, Markham was very

25  aggressive about claiming credit during his active

1    years, it was very important to his business

2    reputation, and he was very pushy about that and Klamer

3    accommodated him and that resulted in all these

4    documents that you've cited.  And in his declaration I

5    think he -- you know, everybody's testimony seems to

6    be, the basics of it are Klamer goes to Milton Bradley,

7    looks in the archives, he sees The Checkered Game of

8    Life, he gets an inspiration, he sketches a bunch of

9    things out, he says himself I'm not a toy designer, I

10   don't know how to build models and things like that; I

11   got this partnership with Markham, he's got a company,

12   he's got people who work for him who are actually

13   artists and actually went to art school and do that

14   sort of thing.  He hires Markham's company to do the

15   prototype, and the prototype gets built in the

16   workshop.  I mean, it's like any other company;

17   Markham's the boss, he's got Chambers and Falco

18   working, Israel and Chambers or Falco, whatever we call

19   her, working for him; and they do the grunt work, he's

20   the boss, and ultimately a prototype is built and it's

21   presented, you know, they present it and it's

22   successful.

23        I mean all of that is not really inconsistent

24   with the documents that you've put forward, and it's

25   not really inconsistent with the testimony that's been

1 presented.  The thing that makes all these things

2 arguably inconsistent is if you have to have one person

3 who did it, and it looks to me like there were a lot

4 more than one person involved in creating this

5 prototype.

6 　　　　　MR. POLLARO:  Your Honor, I appreciate the

7 point.  I think it's a great question.  But it is

8 inconsistent because -- and we'll get into some of the

9 inconsistencies of the testimony.  For example, in LA,

10 as you may recall, in 1989 Ruben Klamer said he did not

11 have firsthand knowledge of who worked on the

12 prototype.  He didn't know.  He had to be told.  He was

13 told.  Did Leonard Israel work on it?  Bill Markham

14 told me that he did.  He had no firsthand knowledge.

15 He wasn't there.  That's not what happened.  There are

16 so many inconsistencies in this story, and we've poured

17 them out in our brief, and I don't want to be --

18 　　　　　THE COURT:  Well, I don't really understand then

19 why would Israel and Chambers fabricate that?

20 　　　　　MR. POLLARO:  Ultimately what I'm trying to do

21 is --

22 　　　　　THE COURT:  They don't have a stake in this.

23 They're not getting anything out of it.

24 　　　　　MR. POLLARO:  We don't know that.  I absolutely

25 don't know that.  There are certainly, you know --

1          THE COURT:  There's no documents that say they

2     have any arrangement with anyone to get anything out of

3     this, and there's no testimony that says that.  There's

4     no evidence to suggest that they have a stake in the

5     outcome of this.

6          MR. POLLARO:  Your Honor, I believe I asked

7     Chambers, and it's the first time and I hope the last

8     time, I'm pretty sure she objected to my question --

9     she, the witness.  When I was asking her questions like

10    that she objected to my questions at least a dozen

11    times, so I don't know, I just don't know.  It never

12    went anywhere from that.

13          But it is inconsistent, but, your Honor, I want

14    to put it in perspective because what you see here is a

15    lot of work on routine aspects.  You know, Bill

16    Markham, when he testified -- and again, it wasn't the

17    crux of that case.  It was listen, this is what I was

18    working on.  Nobody had done that before.  They didn't

19    talk about -- it worked like clockwork, according to

20    Leonard and Grace; right?  You didn't hear about, oh,

21    my God, there's no part, I don't have this material,

22    I've never done this; how high are the mountains?

23    Where do the mountains go?  How does this fold work?

24    None of that, because it had already been done.  And

25    they literally were doing routine things.  They didn't

1    talk at all about Hey, listen, you know, it was a real

2    bugaboo about this mountain and fold.  Nothing.

3         So what they testified, and I think it's clearer

4    in Israel's testimony, is I did thumbnails and then I

5    was out; I don't know what happened.  And that's the

6    big, you know, that's the big -- okay, who created the

7    final box?  Well, you did the thumbnails, the tiny

8    thumbnails that you thought might work.  What happened

9    at that?  Grace did it.  Ask Grace:  What happened?

10   You know, you did the final box.  Leonard did it.

11   That's exactly what they did.  They worked on

12   preliminary, draft, routine things.  That's it.

13        Bill Markham is the only one in this case that

14   has the knowledge, the skill, the training, and the

15   evidence.  That's the only person that can be the

16   author of this thing.

17        And just one last point, your Honor.  I don't

18   mean to cut you off.  That's what Leonard Israel

19   testified at his deposition.  That's what he said:  I

20   did routine tasks for Bill Markham.  Routine, that's

21   his word.

22        THE COURT:  Well, the evidence, that unless you

23   read it into the record as prior inconsistent

24   testimony, which you may have, but I mean just so we're

25   clear, the evidence of their testimony is what they

1    testified to in court; --

2         MR. POLLARO:  Yes.

3         THE COURT:  -- right?

4         Okay.  So what is the evidence that Markham

5    himself actually did any of these things other than the

6    sort of negative inferences that you're asking me to

7    draw from sort of the gaps and the positive inferences

8    from the documents?  Is there any other evidence?  So

9    for example, I don't recall, and maybe it's there and I

10   just don't recall it, but for example -- well, let's

11   start with this.  What is Markham's skill and training

12   for making boxes and molding mountains and all that

13   kind of stuff?

14        MR. POLLARO:  That's an excellent question, and

15   that actually supports the fact that Markham would do

16   that.  Unfortunately there's no documents, there's no,

17   you know, one thing that says this is Bill Markham's

18   CV.  There's nothing of that.  But that's exactly what

19   he did.  He went to Hong Kong all the time to work out

20   new molds and figure out what to do.  I mean that's who

21   Bill Markham was.  That's what he was doing.  And

22   that's why -- I mean, you know, there's a little bit of

23   testimony about, a little bit of evidence about some of

24   the other things that he was creating, dolls and other

25   things like that.

1     And unfortunately the Markham parties are at a

2     little bit of a disadvantage because Bill Markham is no

3     longer here.

4          THE COURT:  Okay.  Why don't you keep going.

5          MR. POLLARO:  Thank you, your Honor.

6          So I've alluded to this and so I won't spend a

7     lot of time on it, but everything changed in October of

8     last year.  Obviously your Honor would know much better

9     than I do, but in my experience on the eve of trial a

10    knew theory that becomes a focus is generally an

11    indictment on the other theories in the case.  And

12    again, what we're talking about here is unsupported

13    sweeping pronouncements without any documents, with no

14    documents.  I mean they're asking your Honor to elevate

15    Leonard and Grace as authors when their names are not

16    even in the record.  And in fact, if I remember

17    correctly Grace testified that The Game of Life was not

18    on her resume.  It was that unimportant.  And along

19    those lines, that's also part of the story.

20         They testified in LA that they knew what the

21    arrangement was with Ruben Klamer, Milton Bradley and

22    Art Linkletter, whatever the parties were, and they

23    knew it was roughly a third, a third, a third.  They

24    didn't see contracts, but Grace Chambers testified in

25    LA that she knew what that was, and she testified that

1    Leonard knew what that was.  And you know what?  They

2    didn't say anything.  They didn't say anything for

3    58 years.  They never said why does Bill Markham keep

4    getting a royalty?  Why does everybody think Bill

5    Markham did this?  Never, never said that.  And that's,

6    again, just another piece and it just puts a

7    perspective to the story they're trying to sell you

8    right now.  It doesn't add up.

9        So the good news is I think we've touched on a

10   lot of this so we can probably go relatively quickly

11   here.  What I was attempting to do here was say listen,

12   the universe of people that we're talking about is

13   small, it's five people; they're listed there.

14       And Klamer, I'm curious to see what they have to

15   say.  As far as we're concerned, he cannot be an

16   author.  I mean adamant, I didn't create anything; I'm

17   out.  So we'll see what they have to say.

18       Sue Markham is similar, similar.  You know,

19   people like to throw her name out; yeah, she was the

20   one typing up the rules; she was the scrivener; she was

21   the one that had the typing skills; she was the one

22   that could put the rules down on paper.  And there's

23   plenty of evidence where Bill Markham referred to her

24   as his secretary.  That's what she was.  She was a very

25   important secretary, but that's what she was doing.

1   No evidence that she did anything substantive, and that

2   is just mere speculation; again, inconsistent with the

3   58 years of record evidence.

4        So I'll go over these relatively quickly.

5   Chambers said nothing on the cover, nothing at all on

6   the cover.  And then what Israel testified about was,

7   yeah, I did sketches, that's it, and then I was out.

8   He testified very clearly:  I didn't do the final

9   cover; I have no idea; I don't know the size, don't

10  know how it looked; nothing.  The testimony is not

11  reliable because, I refer to it, they each pointed to

12  each other when the question came up, Who did it?

13  Where did it go from there?  They each obviously, for

14  whatever reason, pointed at each other.  Nobody is

15  left.

16       Bill Markham.  Bill Markham is the one that did.

17  Bill Markham is the one that testified -- and I'll skip

18  over those.  Those are just the cites of the testimony.

19  And obviously if I put it in red it's super important.

20       So here, Bill Markham's testimony.  He was

21  testifying about the things that you expect somebody

22  who did this, like yeah, you know, it was a pain in the

23  butt; I had to make the top of the board an inch

24  shorter so you could see all the accoutrements, the

25  pieces in the game; right?  These are the things you

1   would expect somebody that created it to testify about,

2   and that's what he did.  None of that came out in LA.

3         Similar thing on the gameboard, and I tried to

4   do this in, you know, kind of a summary fashion to not

5   get bogged down, so I'll just go relatively quickly.

6   Israel -- again, similar thing.  Israel didn't work on

7   the gameboard.  Chambers says she worked on the

8   gameboard.  You know, obviously from her declaration to

9   her deposition, you know, she certainly wasn't in

10  charge of it at that point.  The most I got out of her

11  was she worked on balsa wood buildings, and then at

12  trial becomes the mastermind or the purported manager

13  of that thing.  And so again, the gameboard doesn't add

14  up.  And then the specifics, too.  There's no testimony

15  at all from the witnesses about creation of the

16  spinner.  They say, yeah, it's Bill's thing; they

17  wanted it noisy.  You know, they just avoid it, they

18  just avoid it, the track, things like that.

19        Bill Markham created the gameboard and all the

20  component parts.  And I'll jump to the -- yeah, Markham

21  testified in his deposition that was in my board,

22  already had that.

23        Again, putting it in perspective, it's this idea

24  that they were doing the routine tasks.  They were

25  staff artists.  They were -- I can't recall the dates

1  right offhand, but I'm pretty sure they were a year or

2  two in.  They were really junior, very junior.  And so

3  I think it was Mr. Israel's first job and I think, I

4  think it might have been Grace Chambers' first job as

5  well.  These guys were doing routine tasks at the

6  direction of Bill Markham.  And again, you know, they

7  haven't shown that he was working on prototype.  We

8  just don't know.  We just don't know.

9          Now, the creation, okay, so a lot of talk about

10  binding.  Binding is important.  Binding is how the

11  game came together.  And there's no dispute it's a

12  three-piece board and it's got multiple parts and

13  things like that, and all those things had to work.

14  But it's interesting because, you know, when we asked

15  Grace about it she had no idea, no idea; you know,

16  looked at the invoice and said yeah, it's on here, we

17  must have done it.  We must have done it.  "We" is

18  Bill; because Leonard hadn't done it, and Sue wasn't in

19  that business.  So again, you know, there's some

20  argument in the Defendant's papers that we're saying

21  that's (unintelligible) arguable.  Absolutely not.

22  Absolutely not.  We're saying that's evidence that Bill

23  Markham is the one that's creating.  He's the one

24  that's creating.

25          And so it's interesting Mr. Orbanes testified

1    that that's exactly what you would expect about

2    binding.  He knew what binding was.  He said yeah, I

3    would expect somebody who did binding to be the

4    creator -- sorry -- a creator to understand binding.

5    That's the way he said it.

6         So the gameboard summary, you know, meant to

7    just kind of knock out the parties?  It's Bill Markham.

8    Bill Markham is the creator.  And the rules, similar

9    thing; you know, they try to throw it out there that

10   Sue Markham did this so there's simply no credible

11   evidence or no evidence at all that Bill Markham did --

12   or, I'm sorry, that Sue Markham did.

13        And so then underlying all of this is this

14   inconsistent testimony.  So in 1989, excuse me, as we

15   talked about in LA, Ruben Klamer said I didn't have

16   direct knowledge of those, of who was working on it; I

17   was told by Bill Markham that Leonard Israel and Grace

18   Falco worked on it.

19        Fast-forward to this case.  He's apparently

20   hovering over Grace Chambers and Leonard Israel knowing

21   everything they did.  And so this is the big problem

22   with the new story, is if the Court believes that Ruben

23   Klamer was in that room twice a week hovering over

24   Leonard and Grace, then in 58 years he didn't mention

25   their name.  He didn't mention their name.  He said

1    Bill Markham, okay?  And so if he wasn't in that room

2    and he didn't know what happened, and Grace and Leonard

3    did that, did the work, then they misrepresented that

4    he was there twice a week.  Somebody is getting thrown

5    under the bus, which it's either Mr. Klamer or it's

6    Leonard and Grace.  Those stories cannot reconcile.

7    And so that's the point of this slide.

8         So to kind of summarize the authorship, you

9    know, we have a remarkable record from the

10   contemporaneous time that says Bill Markham is the

11   creator, designer, developer, inventor, the maker, the

12   reduction of practice, whatever term you want to use,

13   for almost 60 years without exception, and even in this

14   case.  And the story they're selling right now is

15   inconsistent, and it's mere speculation about what it

16   was.

17        But interesting, we don't need to speculate

18   about how it was created because we know.  We know when

19   the Game was completed, and that was at Chasen's in the

20   week of August 10th, 1959.

21        So their story doesn't add up; mere speculation.

22   Our story, 58 years of record.  And you know what?  We

23   even have that pinnacle moment when Bill Markham

24   testifies, and Ruben Klamer as well, Bill Markham put

25   the track on the board, glued it down for the first

1  time, the first time that game was complete.  Bill

2  Markham --

3      THE COURT:  So I'm glad you brought that up

4  because I wanted to ask you about that.  So is that the

5  critical moment?  Let's say that Leonard and Grace

6  worked on various components, you know, the houses,

7  getting the spinner to make noise, whatever.  They did

8  various things.  But they also testified that a lot of

9  the pieces had to go out to be molded.  I think they

10 said it went to the plastic company or whatever.

11     MR. POLLARO:  Exactly.  What I interpreted their

12 testimony, they didn't know.  They were just doing kind

13 of their routine tasks and they didn't know, and then

14 obviously we showed them the invoices that showed

15 plastics and things like that; so yeah, that's where

16 that came from.

17     THE COURT:  So there's all this work kind of

18 going on and sketches and maybe models, little parts of

19 it, but there is this testimony from Markham that it

20 was all put together there at Chasen's when the track

21 was put on the board and everything was put into place.

22     So you seem to be saying that's when the

23 prototype was actually complete and that was the first

24 time it was complete, that it was a bunch of components

25 up to that point, --

1      MR. POLLARO:  Absolutely.

2      THE COURT:  -- and that's when it's complete and

3   it was Markham that presented it.  Right?

4      MR. POLLARO:  Correct.

5      THE COURT:  Okay.  So I guess what I'm trying to

6   get to is, you know, there is this theory of joint

7   authorship out there, and is it sort of critical when

8   it finally comes together as a prototype, is that some

9   great event in terms of its copyrightability versus

10  when lots of the pieces are being made that come

11  together?

12     MR. POLLARO:  It can be.  But yes, yes, the

13  short answer is yes.  And so with respect to I think

14  you're referring to the joint authorship argument of

15  Klamer.  And so the first element of that -- by the

16  way, everybody always kind of skips to the second part

17  about that, but the first element is that the parties

18  intended for the work to be a joint work, and so

19  clearly that prong, I mean the 1965 Exchange would bear

20  that, would shoot that down immediately.  There has to

21  be an intent to be joint authors.

22     But even the joint authors, they have to do the

23  creation of the final thing, and so just doing routine

24  components isn't enough.

25     THE COURT:  Okay.

1        MR. POLLARO:  So now I'm going to move on to

2    this statutorily-protected work.  So the Defendants

3    argue that it is unknown what was deposited in the

4    copyright office.  I mean quite frankly, your Honor,

5    I'm a little bit surprised that we're arguing that.

6    That's simply not the case.  It's irrelevant which

7    version of the Game bearing a 1960 copyright date was

8    deposited.  It simply doesn't matter; for copyright

9    purposes they are all the same, copyrightably

10   indistinct, and Mr. Orbanes testified to that.

11   Hasbro's corporate witness knows that.  If it's got the

12   same date, it's the same game for copyright purposes,

13   so any changes, any distinctions, there are none for

14   copyright purposes.

15        And this idea, and I'll just mention it briefly,

16   I'm terrible with analogies but the The Sword and the

17   Shield, the way I understand Hasbro's argument is if

18   it's unknowable what was in the copyright office, they

19   could never pursue an infringement claim against

20   anybody; and I know that's not what they're arguing

21   because there's only three registrations to the game.

22   So it just kind of puts it into perspective that that's

23   not what the law says.

24        As we just marched through, Bill Markham is the

25   creator of this game, and the work that was deposited

1    was a copy of Bill Markham's prototype.  That's what

2    happened.  They took his game and copied it for

3    commercialization, and that's what you have.

4         Did they make economic or changes?  Yeah, they

5    made some changes.  And you know what happened?  That

6    happens in every single case, every single case.

7    There's no situation where you can go from the

8    prototype to the commercial mass market without some

9    changes.  Both experts said that.  I don't think

10   anybody disagrees with that.  But that's the whole

11   point; the changes can't be trivial.  The cases say

12   they can't.  Yes, there's a low bar, but they can't be

13   trivial.  You can't lower mountains.  There's cases

14   that say you can't take something seven inches and make

15   it five and expect that to be copyrightable.  It's not.

16   It's different.  It's a change, yeah, it's noticeable,

17   but that's not what the law is.  And it's not the

18   intent of the parties.

19        Bill Markham created this game, always held

20   himself out to be the inventor, the designer,

21   developer.  That's what this summary is.

22        And then this whole idea about aesthetics.

23   Again, attorney argument; no evidence of that

24   whatsoever.  That showed up for the first time.  Again,

25   going back to the Ruben Klamer declarations, he in very

1    detailed fashion tells what the economic changes were;

2    they were, you know, I took the 3-D mountains or I

3    suggested the 3-D bridge come down and I printed the

4    thing.  He had, you know, three or four suggestions

5    that he provided.  No mention of aesthetics.  No

6    mention of spinner.  It's just remarkable how different

7    those declarations are from what we heard in LA.

8        And just another example is what Mr. Orbanes was

9    testifying to.  The substance of Mr. Orbanes' testimony

10   was yes, I see differences and as someone in the

11   industry those are aesthetic changes and that's why you

12   do them, because we know men like ovals, or I forget

13   the exact situation.  I think Bill Markham had put a

14   diamond on there or something like that, and Orbanes,

15   in his training in the industry says, you know what,

16   ovals are more pleasant to both sexes so we want to put

17   an oval there.

18       Those are exactly the rote, common, uncreative

19   things.  Every change that he talked about, he said

20   they're all aesthetic.  But you know what?  When I

21   asked him if they were all based on any particular

22   individual at Milton Bradley, which has never been

23   identified, any particular thing about Milton Bradley

24   why that would be done?  He said no, I know that

25   because I'm in the industry.  In one he even told me he

1   knew that since college.  He was taught that in

2   college.

3        That's exactly the point.  And he said everybody

4   knows, if you look at rules and you got certain things

5   in the back, you move that up front, whatever that

6   scenario was.  All plug-and-play, all not creative.

7   That's what Mr. Orbanes testified about, and that's

8   happened.

9        And your Honor, I apologize, I didn't bring the

10  prototype of the Game, but I think you get the point

11  that this was a very well-developed prototype.  I mean

12  I appreciate Mr. Klamer's age, and so I'm kind of half

13  joking but, you know, he doesn't tell the difference.

14  Twice he told me that it was the commercial version of

15  the Game.  You know, he's the one that knows the most.

16  It is a spitting image, and there's evidence in the

17  record, it is a faithful interpretation of Bill

18  Markham's prototype.

19        I just want to point out the case I mentioned

20  about moving the seven inches to five inches.  This is

21  that *Batlin* case, which is 536 F.2d 486.  It says they

22  can't be trivial; the changes have to be meaningful and

23  creative.

24        THE COURT:  You've got about 15 minutes left.

25        MR. POLLARO:  I will speed it up.

1             All right.  Work-for-hire, you know, that's

2       their defense.  We think it's their issue; we'll let

3       them tell you differently.

4             It's very simple on the work-for-hire.  It's bad

5       law.  It's bad law.  I'll do that last just to kind of

6       get to the point, but it's bad law.  And you don't have

7       to take my word for it.  The Eleventh Circuit has said

8       it's bad law.  Nimmer has said it's bad law.  Lots of

9       people much smarter than me have said it's bad law.

10      And the rationale, quite frankly, for Supreme Court is

11      remarkably simple.

12            The second reason is the expense is not

13      satisfied.  And then the third is even if the bad test

14      is applied and satisfied, it's rebutted.  So they have

15      to get over all these hurdles in order to win their

16      work-for-hire, quite frankly, which is why I think they

17      hired the work-for-hire for Leonard and Grace.

18            So the expense prong, I'll just be very simple

19      on this.  It is in the record.  It is in the license

20      agreement and, your Honor, I'm not going to point you

21      to it but I think Tab 1, the $5,000.  So the whole crux

22      of the expense prong is who bore the financial risk of

23      the endeavor?  Who was on the hook?  Who was on the

24      hook for this?  And so what we see is under any, you

25      know, accounting, math, or whatever you do, Ruben

1    Klamer is the only one that never goes negative.  He

2    never loses; right?  I mean Milton Bradley coughed up

3    the $5,000, gave it to Ruben Klamer, and all these

4    documents are there:  We've signed the agreement, we

5    are sending the $5,000.  Thank you; I have received the

6    $5,000.  Bill Markham, here is the 2400 for your

7    prototype.

8         But we see all that; and in the license

9    agreement, it's remarkable.  It says I am paying you

10   out of the 5,000 I received from Milton Bradley.  He

11   simply did not bear any risk.  He is the only party

12   that didn't reach into his pockets, the only party.

13   And the only party, quite frankly, that lost on this

14   was Bill Markham because he had to pay -- although he

15   got his costs back -- he had to pay it out of his next

16   royalty check so, quite frankly, he's the one that paid

17   for it.

18        THE COURT:  But he used the $5,000 to pay

19   Markham for creating the prototype; correct?

20        MR. POLLARO:  When he passed -- he got the

21   $5,000 from Milton Bradley.

22        THE COURT:  Right.

23        MR. POLLARO:  And then --

24        THE COURT:  And then he got invoiced from

25   Markham.

1          MR. POLLARO:  Exactly.  And again, the

2     contract -- I want to make sure we're crystal clear.

3     The license agreement says I am paying you with the

4     $5,000 I received from --.  Okay.  I just want to make

5     sure that -- I'm not just saying that.  That is what is

6     in the agreement.  It say I have received $5,000 from

7     Milton Bradley and of which I am paying you, yeah.

8          THE COURT:  All right.

9          MR. POLLARO:  But again, we don't dispute that.

10    But again, going back to -- your Honor, I don't mean to

11    cut you off.  I am trying to hurry a little bit, but

12    the whole crux of that prong of this bad test is who

13    bore the financial risk of the endeavor.  And it wasn't

14    Ruben Klamer.  It couldn't be.  He didn't reach into

15    his pocket.  I mean maybe he put the 5,000 in his

16    pocket and pulled it out again, but he didn't reach

17    into his own pocket.

18          THE COURT:  Well, he did when he paid out a

19    portion of the $5,000 to Markham to create the

20    prototype, and theoretically if it costs more money to

21    create the prototype than he had received as an

22    advance, he would have had to pay that out of his own

23    money; right?

24          MR. POLLARO:  Absolutely no evidence of that

25    whatsoever.

1          THE COURT:  Well, I mean it just stands to
2     reason, doesn't it?
3          MR. POLLARO:  If the prototype would have been
4     more than $5,000?  Your Honor, I don't think -- he
5     reached -- I'm trying to follow your question.  So in
6     the hypothetical, if the prototype was more than
7     $5,000?  That's speculation.
8          THE COURT:  Well, but it's also speculation that
9     Markham bore any economic risk.
10          MR. POLLARO:  And just to be clear, and your
11     Honor, I'm glad you brought that up.  It doesn't
12     matter.  By the way, I shouldn't have thrown that in as
13     an aside because it doesn't matter, by the way, that
14     Bill Markham actually paid for this.  It just doesn't
15     matter.  It's just kind of an aside.
16          What matters is who bore the financial risk of
17     the endeavor, and that was Milton Bradley.  So I
18     apologize if I confused or threw you off.  Don't worry
19     about Bill Markham because it doesn't matter.  It's
20     just kind of an extra to say, you know, in fact he's
21     the one that lost.  But it doesn't matter.  Legally
22     it's irrelevant.  The whole analysis is who bore the
23     financial risk of the endeavor, and it was not Ruben
24     Klamer.  It simply was not.
25          THE COURT:  Okay.

1          MR. POLLARO:  Now, the agreement to the -- so

2     again, bad law; not met.  If for some reason those two

3     hurdles get passed, it's rebutted.  They cite no cases

4     that come anywhere close to a reservation of rights.

5     And quite frankly I'm not even sure I understand what

6     their reservation of rights argument is.

7          All of the cases that talk about this

8     reservation or this instance and expense test say if

9     there's a reservation of rights in the author there is

10    no work-for-hire.  And the whole premise of these

11    cases, which by the way -- I have to say this -- only

12    existed for a short period of time.  The *Marvel* case

13    has a fantastic summary the first 50 years of the Act,

14    independent contractors out, never work-for-hire, and

15    then the '76 Act you have to actually say this is a

16    work-for-hire, so out after that.  So it was literally

17    this window of 10 or 15 years where this silly test was

18    being applied, and almost as soon as it came Congress

19    started changing it.  So these cases are just literally

20    an anomaly.

21         But the whole point is if the author retains --

22    it's about the intent of the parties at the time of the

23    agreement and so it doesn't matter what -- we could

24    agree that pigs will fly.  It doesn't matter if pigs

25    will fly.  If I retain the rights to whatever I

1    assigned you when pigs fly, that's the point.  It's not

2    a work-for-hire.  That's the whole point.  So to the

3    extent I understand it, this idea of when rights -- it

4    doesn't matter.  The whole point is the intent of the

5    parties.

6         And there's the agreement.  I don't think

7    there's any dispute about what it says.  But I want to

8    get to the actual evidence of what this meant and what

9    it meant to Bill Markham.  He said in his deposition in

10   1989 -- and this was talking about the negotiation with

11   respect to the assignment agreement -- I put in one

12   clause and I insisted on some kind of qualifying clause

13   in there that in case Link Research did not perform as

14   per their agreement with me, the whole game would

15   return to me.

16        That's what that provision means.  That's

17   exactly a reservation of rights.  Let them tell you

18   it's not, and we can go from there.  But Bill Markham

19   had every intention of reserving the game.  And

20   honestly, that's the way he did it.  You know, there's

21   testimony in his deposition; he said Listen, I don't

22   design games for any particular company because then I

23   got a dead game if that company doesn't want it.  I

24   design stuff that I want to design and I can take it

25   where I want to take it if they don't want it.  That

1    was his MO, and he's got it here.

2         Just one quick point on the instance and

3    expense, and your Honor probably appreciates this more

4    than me.  These are the smart people, by the way, that

5    have said that it's no good anymore.  But it hasn't

6    been decided in this circuit, the way I understand it.

7    It's been used, we don't dispute that, it's been used,

8    but it's never been challenged.  So as far as we're

9    concerned, our understanding of the law is that has not

10   been decided, and so I'll just leave it as that.

11        Joint authorship, I think I'm very interested to

12   see what the defense has to say on this, so I could

13   probably do that.

14        And then the derivative exception, this is going

15   to be interesting.  You know, we had very clear

16   testimony from Mr. Orbanes that, you know, I think we

17   went back and forth, like any change, you know,

18   removing a transmission tower could be derivative; you

19   know, any change.  And so that doesn't add up when you

20   talk about this analysis that they did.  They did this

21   on the derivatives; they looked at the most current

22   version and the prototype.  That doesn't make any sense

23   because, as Mr. Orbanes testified, it's a progressive

24   process.  Every game is built on the game before it,

25   upon the game before it, upon the game before it.  And

1    so what you have is you can't just look at the

2    differences between the first and the last.  You have

3    to look at every one, and Orbanes said that.

4         And what the cases say is a work or works, so

5    they don't spell it out, but that also makes common

6    sense.  If every change -- if any change, removing a

7    transmission tower is not derivative, then you can't

8    just look at the last one that says that it's not there

9    and therefore it's a derivative.  You have to look at

10   each version.

11        THE COURT:  But let's say you're right about

12   that and you look at each version and you do it in a

13   progressive fashion.  It's not unreasonable to conclude

14   that at some point along the way in a 60-year evolution

15   of a game like this that some of the changes are going

16   to qualify as creative and there is going to be some

17   aspect of derivative work that filters through that

18   60-year history.  Now maybe it's not everything that

19   Hasbro contends, but even so, maybe it's half of the

20   changes are derivative, maybe it's a quarter.  Whatever

21   it is, then what do you end up with at the end?  I mean

22   it's kind of like you have to kind of follow the chain

23   down, don't you?

24        MR. POLLARO:  I understand.  Hypothetically I

25   think that's absolutely right.  And so the problem we

1      have in this case is I've asked multiple times for all

2      the versions -- I haven't gotten them -- for the Game,

3      so, you know, we can't do that analysis.  They just

4      haven't turned them over.  They can't tell me what they

5      are.  I mean -- so it sounds like you'll be hearing

6      about that.

7              MR. KRUMHOLZ:  Yes.

8              MR. POLLARO:  But you're absolutely right, your

9      Honor, and ultimately, if I understand your question

10     correctly is that what you do is you have to look at

11     the starting point, yes, you absolutely do.  And so I

12     mean the funny -- the way I understand it, if I

13     understand your question, is you can do the reverse.

14     You can say there are -- let's just hypothetically say

15     you decide we're entitled to terminate some rights for

16     the spec.  Let's just hypothetically say that.  I don't

17     need to go through every version to determine if I can

18     terminate the spinner in the current version, because I

19     can see this is what I'm entitled to, and I see it

20     there.  You see what I'm saying?  But you can't do the

21     reverse.  You can't say that's derivative, that's

22     derivative, that's -- I mean, sorry, you have to go

23     through each version to determine whether or not it's

24     derivative, and they simply have failed to do that.

25             THE COURT:  Well, I may not understand this

1    quite right, and all of you will tell me if I don't,

2    but it seems to me there's several ways that you can

3    look at this, and I don't know which one is right.  But

4    one way is to compare the current commercial versions

5    to the original and ask the question are there creative

6    changes that make the current commercial versions

7    derivative works?  And I think you're saying that's

8    what they are saying, and I'm just --

9            MR. POLLARO:  And that's wrong.

10           THE COURT:   -- so that's one way to look at it.

11           MR. POLLARO:  Yeah.

12           THE COURT:  Another way to look at it is the one

13   you suggest which is, I think, that you have to take

14   every successive version and compare each one to the

15   one before it and determine on a game by game and maybe

16   even a component by component within each game by game

17   version whether the next work is derivative.  I think

18   that's kind of what you're saying.

19           MR. POLLARO:  Exactly.  But it sounds like, and

20   again I don't want to cut you off, but it sounds like

21   you're making it a little bit too complicated; right?

22   I mean basically at each version you look and see what

23   the delta is, like what's the delta, and then you look

24   at those things and say, okay, that one is derivative

25   of, or there are no deltas, that's not derivative;

1      right?  It's as simple as that; right?

2              THE COURT:  Sure.  But there has to be something

3      at the end of all that because other than this boutique

4      gamer site where they sell the old versions, the real

5      money is in the commercial sale of the games, what's

6      out there now selling; right?

7              MR. POLLARO:  Uh'huh.

8              THE COURT:  That's where the money is.

9              MR. POLLARO:  Yeah.

10             THE COURT:  So even if you do what you suggest,

11     there has to be some way to put that all together at

12     the end of the chain and say, okay, what is this thing

13     that's on the shelf?  Is it fully a derivative work, or

14     is it partially a derivative work, and how do you get

15     there?

16             MR. POLLARO:  Well --

17             THE COURT:  So that's the second way of doing

18     it.  And it seems to me there's like a third way that's

19     sort of maybe in the middle, which is kind of like sort

20     of looking at it holistically in some way, whether

21     something is, you know, whether a work is, the majority

22     of it is new, there's enough new stuff in there that's

23     creative that it becomes a derivative work; you don't

24     have to break it down by component, you don't have to

25     look whether it's the spinner or the track or whatever;

1    it's just there's enough there to make a derivative

2    work, so it's a derivative work.  And I don't really

3    know which of those, if any of them, is the way to do

4    this.

5         MR. POLLARO:  And your Honor, quite frankly, I

6    think I'm a little confused myself.  But I think what

7    I'm hearing is I think it's related to the way I said

8    you can do one versus the other, because depending on

9    what you're looking for; right?  If you're looking for

10   -- say we got termination rights, and we got

11   termination rights and prototype.  Just use that as a

12   hypothetical.  I can go to each, any version at any

13   point and figure out, okay, that's out; right?  That's

14   the same, that's out, that's out; right?

15        But if I'm starting from, okay, is this game

16   different, okay, Orbanes testified very clearly that

17   it's a progressive process, every game is built on the

18   one before it.  Like they didn't say the new game's

19   based on prototype.  They could have said that; right?

20   Then that would be the right analysis.  They didn't do

21   that.  Orbanes said the opposite, that each game is

22   built on the one before that, and so because of that

23   you have to go through each version.

24        And again I think ultimately the confusion, if I

25   understand it, again with that caveat, is it depends on

1    what you're looking at it for.  And the point you said

2    about, you know, yes, you can look at the similarities

3    and things like that, that is the other flip side of it

4    for the different reason, more the termination, you

5    know what I mean, that side.

6         THE COURT:  Okay.  I think you're at the end of

7    your presentation.

8         MR. POLLARO:  I am, so I'll spare you -- so we

9    believe on the weight of the evidence we win.

10        And then I do want to say this just very

11   quickly.  The Defendants told you last time we met that

12   I believe they used the word *de minimus* and they say,

13   you know, it's not that important, it doesn't matter.

14   It's very important to the Markham parties, extremely

15   important to the Markham parties, and that's why we're

16   here.  And I think Linda Mack Ross is just another

17   example of that.  She upset her world, you know, she

18   ended up being sick for two weeks after here.  She

19   describes it as almost dying with this never heard of a

20   bomb cyclone before.

21        But it is very important to the Markham parties,

22   and that's why we're here.  And if there are attendant

23   benefits that are, that we received because we're here

24   for the right reasons, so be it.  But we're here for

25   the right reasons.  We're here to stop what happened in

1      1965, like Bill Markham did, and what's happening

2      today, your Honor.

3              Thank you, your Honor.

4              THE COURT:  Thank you, Mr. Pollaro.

5              All right.  I think it would make sense to take

6      a break, so let's take a 10-minute break.  Let's go off

7      the record for a moment.

8              (Discussion off the record)

9              (Recess)

10             THE COURT:  Mr. Krumholz.

11             MR. KRUMHOLZ:  Thank you, your Honor.  So I

12     first will be guided by what the Court wants to talk

13     about, but my intention is to make two high-level

14     observations, talk about some of the specific points

15     raised by you, by Mr. Pollaro, and then launch into

16     some of the other items I want to talk about in the

17     PowerPoint and in my outline.  So two high-level

18     observations; one is --

19             THE COURT:  Do you have a hard copy of the

20     PowerPoint?

21             MR. KRUMHOLZ:  Yes.

22             (Pause)

23             THE COURT:  Thank you.  Go ahead.

24             MR. KRUMHOLZ:  So first high-level observation

25     is quite candidly there were an extraordinarily large

1    amount of misstatements of the record and the law that

2    were made during that presentation.  I'm going to cover

3    some of them, but I can't cover all of them.  One of

4    them I have to waste 30 seconds on, and it is a waste

5    because it doesn't bear on the issues before the Court;

6    but Mr. Pollaro made the statement we did not, Hasbro

7    did not make all versions of the Game available to him.

8    In fact, Mr. Pollaro himself was in a warehouse where

9    every version of the Game was made available to him.

10   He and Mr. Cole physically took pictures of all of

11   those versions and at one point was seeking to admit

12   them into evidence.  So, just a patently false

13   statement.

14        The other high-level observation is since the

15   beginning of this case and to the present they still

16   haven't tried this case for what it is.  It is a

17   copyright case.  It is not a case about expression --

18   about ideas, it is not a case about whether Mr. Markham

19   thought that a spinner was a good idea or a circuitous

20   track was a good idea.  We dispute that that evidence

21   is credible; but even if we credit it, the issue is did

22   he physically create an expression of an idea, and they

23   have not tried that case from the beginning through

24   now.  And we'll talk about that in a little more

25   detail.

1          So some of the things I want to talk about in

2     particular, just to get them off the table, as it were.

3     There was discussion about the registrations and a

4     representation made we don't dispute that the

5     registrations are wrong.  That's not correct.

6          So the relevance of the registrations could be

7     this, that what is listed in the registrations creates

8     a presumption.  It's a rebuttable presumption.  So we

9     could have gone into this case and said there is a

10    presumption that Milton Bradley is the author and the

11    owner, based on the registrations.  We didn't because

12    we don't really have -- because there's nobody else

13    from Milton Bradley; we didn't have the evidence to

14    support that.

15         But there is a very logical explanation as to

16    why they registered it in the manner in which they did,

17    which is that Milton Bradley believed that the work

18    done was done as a work-for-hire for it.  It asked

19    Mr. Klamer to do something.  Mr. Klamer then hired

20    somebody else to do something.  It was a -- that's the

21    most logical reason as to why they registered as they

22    did.  It's to a large degree neither here nor there

23    because, as I said, we didn't have the evidence to

24    support the presumption, as it were; but I don't want

25    the Court to think that there's an illogic to it.

1          And just to put a bow on that, the reason that

2     Mr. Klamer or Link was listed as the author for the

3     cover is most likely because it had Mr. Linkletter's

4     picture on it and they were very protective of

5     preserving that right.  So there are answers for all

6     that; I just want to make sure the Court is clear about

7     that.

8          A couple of points raised by Mr. Pollaro.  He

9     said if the testimony of Ms. Chambers and Mr. Israel

10    were true, Mr. Klamer would have sought an assignment

11    from the two of them.  That's makes no sense under the

12    law because there's no dispute that they were employees

13    of Mr. Markham's company.  And I think there is still

14    an open evidentiary question as to whether that was a

15    corporation and who owns their actual rights.

16         But if we credit the point, if we credit that

17    they worked for Mr. Markham individually, he was their

18    employees (sic), nobody disputes that.  Anything they

19    created would have inured to him on a work-for-hire

20    principle.  There would be no reason for Mr. Klamer to

21    seek to get anything from them.  So that's not

22    inconsistent at all with our position.

23         They also, Mr. Pollaro also raised the point why

24    would Mr. Markham get a royalty and not Ms. Chambers

25    and Mr. Israel if indeed they contributed.  It's the

1    same answer.  That's the life of an employee.  What

2    they do is they get a salary, and in exchange for the

3    salary the company gets the fruits of their work.  So

4    again, a perfectly logical explanation for that.

5         A third -- oh, one other thing on the

6    registration which I should point out, and we see this

7    on page 26 of the slide, is they have made this

8    argument in their papers and made the argument again

9    today that Mr. Markham was duped, that he was never

10   told about the registrations; indeed, they say, this is

11   the great vindication that they've come here for to

12   correct the wrong about what was put on the

13   registrations for the copyrights because he was lied to

14   by Milton Bradley and by Mr. Klamer.  But he was asked

15   at his deposition in 1989 about this, even though it

16   wasn't relevant to that case.  He was asked:

17        "Do you recall asking" -- and this was referring

18   to Mr. Klamer -- "whether such protection was

19   available?

20        "Answer:  No.  I just assumed that the

21   manufacturer would take out the copyrights on it."

22        So nobody -- and I will say that that reflects a

23   further point, which I'll get to in more detail in a

24   little bit, as to who was acting like the copyright

25   owner.  But here he's aware or assumes that Milton

1    Bradley is going to be taking out copyrights.  There is

2    no evidence in the record that he objected to such a

3    thing.  There's no evidence in the record that he

4    suggested that that was wrong.  He was not acting like

5    he owned the copyrights.  And he certainly wasn't duped

6    by anybody, as has been alleged here.

7         The unfinished board argument, your Honor asked

8    about that.  There's two -- so in that 1989 deposition

9    he talks somewhat amorphously about having created an

10   unfinished board or a board game, and I think there are

11   two aspects I think the Court needs to think about with

12   regard to that.  One is this:  When he was asked to

13   describe how finished it was, at his deposition, he

14   said -- the question:  "What was unfinished about the

15   game at the time that you had your discussions with

16   Mr. Klamer?"  "Answer:  Almost everything."

17        All right.  That's not the whole answer, but

18   that's sum and substance for purposes of this.  The

19   reason I raise that is because we're back to the idea

20   versus expression concept.  Again, if we want to credit

21   the testimony, the testimony at best establishes that

22   he had some ideas, but there's nothing in there -- if

23   we want to talk about the spinner -- there's nothing in

24   the record to suggest that whatever spinner he planted

25   on there looked anything like the spinner that showed

1    up in the prototype and showed up in the commercial

2    version which, by the way, looked different between the

3    two of them; right?

4         So the best we can credit is that he came up

5    with the idea of the spinner, and the best we can

6    credit is that he came up with the idea of the

7    circuitous track.  But those are ideas.  He needs to

8    have had, he needs to have physically created the

9    expression that shows up in the prototype in order to

10   have a copyright right, and there's zero evidence in

11   the record in that regard.

12        But we would also submit that there's, that the

13   evidence in the record is clear that those claims are

14   not credible, because if he had done what he said he

15   did, somebody must have known.  He must have told

16   somebody; right?  But we asked the living people that

17   we could ask about it; right?  We not only asked

18   Mr. Israel, and I'll talk about his credibility as we

19   go along, and we not only asked Ms. Chambers, and I'll

20   talk about her credibility as well; but we also asked

21   Ms. Ross, which is their witness that the flew in from

22   Arizona who was close to Mr. Markham.  Apparently they

23   had a relationship where it's the kind of thing he

24   would have said to her, because she seemed to idolize

25   him when she was a teenager.  All three of them made

1    clear that they had no idea what we were talking about.

2    Nobody ever said such a thing.

3          So we don't have the benefit of being able to

4    cross-examine Mr. Markham, which is why we had filed

5    our motion that this testimony shouldn't come in.  But

6    the only evidence we have from the actual live

7    witnesses makes his story not credible.

8          One of the other points raised by Mr. Pollaro

9    was that the declarations from Ms. Chambers and

10   Mr. Israel were I think -- sound nothing like their

11   testimony.  I think he used the word "starkly" in

12   describing the difference between the declarations and

13   their testimony, and he kept kind of muttering about

14   the fact that he would show it to you.  I'd like to

15   show them to you.  They're in their exhibit binder,

16   Tab 20, if the Court will indulge me.

17         So Tab 20 is JTX56, and it's the declaration of

18   Ms. Chambers, and if we refer to paragraph 5, and I'll

19   read it, she stated in her declaration:  "Another

20   artist who was working for the advertising agency at

21   the time, Leonard Israel, also worked on the game

22   project.  He and I worked on the game board model,

23   which was based on the ideas and instructions that

24   Mr. Klamer had provided to Mr. Markham.  Mr. Israel was

25   responsible for designing the packaging for the game.

1    While we were working on the project, Mr. Klamer

2    frequently visited the office to oversee the game's

3    progress and approve elements of the design along the

4    way."

5         I would respectfully submit that that is a

6    hundred percent consonant with her testimony, which

7    obviously elaborated but is entirely consistent with

8    that.

9         If we go to Tab 21, which is JTX57, that's the

10   declaration of Mr. Israel, and if we go to paragraph 7

11   in that document here's what he stated in the

12   declaration:  "I was responsible for designing the

13   packaging for the game.  I would prepare sketches of

14   ideas I had about the different ways the packaging

15   could look.  I would then present the sketches to Ruben

16   and Bill and we would discuss them and decide which to

17   use.  It was my idea to make the box white.  Everyone

18   else thought it should be red, which was the prevailing

19   color for toys at that time.  I thought it would make

20   the game stand out from other games on the store

21   shelves."

22        I respectfully will submit that Mr. Pollaro's

23   characterization is false, that the declarations are

24   entirely consistent with their testimony.

25        Actually while we have the binder out, they

1    point to Tab 24 as proof of Mr. Klamer's concession

2    that Mr. Markham, you know, did everything.  You had

3    observed earlier that the testimony taken as a whole

4    would suggest that Mr. Markham was very aggressive

5    about preserving his legacy, as he saw it, and that

6    Mr. Klamer was the kind of person that would

7    accommodate that.  So it's PTX20 which is at Tab 24,

8    which is a back and forth of letters dated September 4,

9    September 21, and September 24, 1965.  The last letter,

10   which is the letter to the publisher that Mr. Pollaro

11   characterized as capitulating the point that

12   Mr. Markham did everything, essentially, and I'll read

13   from that letter.  He said:  "Although I know what my

14   contribution was in the project, I want to eliminate

15   any hassle with this particular individual because of

16   the annoyance or irritation that could possibly be

17   involved."

18        I would respectfully submit, again, that piece

19   of evidence is entirely consonant with the observation

20   that your Honor has made with regard to how Mr. Klamer

21   and Mr. Markham interacted with each other.

22        You also asked about Mr. Markham's skill set,

23   and Mr. Pollaro gave you an answer about Hong Kong and

24   this and that.  The honest answer is we have no idea

25   what his skill set was because there's nothing in the

1   evidence or the record to tell us what his skill set

2   was.  And I'm not going to represent that he didn't

3   have skills, but I'm also not going to represent that

4   he did have skills.  But this is their burden of proof,

5   and there's no evidence in that regard.

6        He also, Mr. Pollaro also said that, you know,

7   since 1959 there had been no discussion at all with

8   regard to Ms. Chambers and Mr. Israel playing a role in

9   the creation of the Game.  That's a representation that

10  he made.  Well, this is Mr. Markham's deposition:

11       "Question:  All right.  I think you testified

12  previously that among the people that worked on the

13  Game was Grace Falco Chambers and Leonard Israel?

14       "Answer:  Yes.  And my wife."

15       Mr. Klamer, for his part in the 1989 deposition,

16  which is June 26, 1989, on page 111, lines 4 through 8,

17  says:  "With Leonard Israel and Grace Sarreras"

18  (phonetic) -- that was her name, it changed over the

19  years -- "and Bill Markham, I knew their capacity

20  because they worked under the agreement I had with them

21  as an agency for eight or nine years, and I knew

22  graphics would reduce it down to a concrete form."

23       So indeed, they are mentioned and they were

24  mentioned by the two main people involved here.

25       You also asked the question, your Honor, about

1    whether the moment of creation was at the time that the

2    final piece was put in at the restaurant; and we would

3    submit that that is not the time of creation.  Both

4    sides agree that rote actions do not constitute

5    creative conduct.  They seek to extrapolate beyond what

6    the evidence shows.  But the physical act of taking the

7    last piece and plunking it on the track is the

8    quintessential rote act that could not remotely allow

9    one to have the status of author.  It was when they had

10   put down, you know, the idea, you know, fully expressed

11   on the board is when it happened, and we don't know

12   exactly what that date was.

13          You also asked about, well, what happens if the

14   prototype costs were more than $5,000, wouldn't they

15   have to pay that amount, and I'll talk about this a

16   little bit more in my presentation.  But I think the

17   answer is off course yes on the record, based on the

18   record and based on the evidence, because the

19   fundamental fact on the expense prong is that it is

20   undisputed that at the outset of the project Mr. Klamer

21   unconditionally agreed to pay the costs.  That's where

22   the risk began.  The risk began when work was started

23   without knowing whether Milton Bradley would buy the

24   Game; right?  And the undisputed evidence from

25   Mr. Klamer is that he unconditionally agreed to pay as

1    of that time, which was consistent with what he had

2    done with the girls' cosmetic deal which was I think a

3    year earlier.  And it was consistent with other

4    projects of the time where he was paying, he was

5    agreeing to run the royalty but also agreeing to

6    unconditionally pay the cost.  That's the risk; right?

7    I mean it's --

8              THE COURT:  Well, wouldn't you say that the risk

9    -- so that's one risk, and I think you probably agree

10   the other risk is Milton Bradley decides to take the

11   game and produce it and at that time they're bearing

12   the risk if nobody buys it; right?

13             MR. KRUMHOLZ:  Right, that is their risk kind of

14   down the road.  But the quintessential risk, well,

15   first of all it matters greatly the risk between -- so

16   right now we're trying to figure out -- let's back up a

17   little bit.

18             We're trying to figure out who owns the

19   copyrights before they get transferred to Milton

20   Bradley.  Once Milton Bradley gets them and by virtue

21   of the license agreement they're off and running.  So

22   we look at, you know, our position has been

23   work-for-hire; right?  Work-for-hire, let's look at

24   that to determine who owns the copyrights at that

25   moment.  What the law tells us is we look at the

1  instance and expense test to make that determination;

2  right?  So when we look at the expense, the expense is

3  who is bearing the risk; right?

4          THE COURT:  Right, and I'm with you all the way.

5  So your contention is that the only person who is not

6  bearing risk is Markham, and Israel and Falco because

7  those two were employees so they're getting paid by the

8  hour, and Markham is getting paid based on his invoice

9  to Klamer, --

10          MR. KRUMHOLZ:  Right.

11          THE COURT:  -- so there's no risk to that.  And

12  I don't think there's any evidence to this, unless he

13  agreed to do it for a fixed price and his expenses

14  might have exceeded that.

15          MR. KRUMHOLZ:  Right.  And there's no evidence

16  of that; right?  I mean there's always a kind of

17  theoretical risk that, you know, Mr. Klamer goes

18  bankrupt and can't pay.

19          But in terms of the understanding between them,

20  what the understanding was between them, which is what

21  you look at, there is no dispute in the record as to

22  what that was.  It was Mr. Klamer unconditionally

23  agreed to pay the cost; right?

24          And so what I was trying to get to, and I backed

25  up probably a little too far, is the period of time of

1    risk between the two of them is the time where somebody

2    begins to do work and the time when a decision is made

3    that actually bears the fruit.  So we look at the, you

4    know, the first day of the action by his company up

5    until the moment when Milton Bradley says we're going

6    to give you money.  Who bears the risk that that work

7    will be for naught?  There's no dispute on the record

8    on that.  It is Mr. Klamer, because he has agreed to

9    pay.

10        The case law that we have cited, and I'll

11   hopefully have time to get to this in the slide deck,

12   is unequivocal on this.  Every case where there is a

13   promise to pay the cost has always found that the

14   expense prong is satisfied, regardless of whether

15   there's an additional benefit of a running royalty.

16        So with that I'd like to back up, if I could,

17   and talk a little bit more about authorship.  So I mean

18   the good news is we do have areas of agreement between

19   us.  We do agree that they have the burden of proving

20   authorship, that work-for-hires are expressly excluded

21   from Section 304(c), and therefore the only way that

22   they can prove authorship in this case is to prove that

23   Mr. Markham physically created something; that the

24   supplying of ideas, direction, even describing the work

25   is not in and of itself enough to make somebody a

1    copyright author.  They may have other rights.  And I'm

2    just going to digress for a second because you had

3    asked about this at the last day of trial, and

4    Mr. Pollaro talked a little bit about this.

5         The assignment agreement and the license

6    agreement carries with it a bundle of rights.  Whatever

7    those rights may be, a very standard practice not just

8    there but everywhere is I don't know what rights you

9    have, I don't need to parse out all the rights you

10   have; but whatever rights you have, you're going to

11   give them to me, whether by license or assignment, so

12   that I know I have all the rights I need to go forward

13   and sell and make this product.

14        And we know that there were some rights that

15   Mr. Markham had because he and Mr. Klamer together

16   applied for a patent.  Now, that's entirely consistent

17   with all the evidence because all the evidence suggests

18   that Mr. Markham played probably a meaningful role in

19   this process and his contributions were ideas and

20   suggestions and direction.  That's what you get a

21   patent for.  You get a patent for ideas; right?

22        So whether he -- he might have some trade secret

23   rights, he might have some other rights.  The point is

24   that that all -- and Mr. Klamer himself did not only

25   receive Mr. Markham's rights, but presumably had rights

1   of his own because he contributed ideas.  He was an

2   inventor on the patent.  All of that got bundled in the

3   license agreement to Hasbro.  So it's not a copyright

4   license; right?  This license agreement doesn't get

5   terminated, you know, if, even if Mr. Klamer didn't own

6   the copyrights because there's a whole bundle of rights

7   there.  So I just want to be clear on that with the

8   Court in case the Court has any concerns about that.

9       But the last point I want to raise here is not

10  only does Mr. Markham need to have physically created

11  something, but that something that he created needed to

12  be the subject of statutory protection under the 1909

13  Copyright Act.  He's wrong under the law in terms of

14  how that could be created.  He said that the only way

15  it could be created is by publication.  That's true,

16  that is one way of creating statutory protection; if

17  you published a work with the proper copyright notice

18  under the 1909 Act you do get statutory protection.

19  But the other way is to deposit the materials with the

20  copyright office and get it registered.  They're

21  disjunctive; you can do either one.  And what the

22  copyright registrations tell us is the materials were

23  deposited.  All right.  It gives a date, so there's a

24  presumption that that actually happened.

25      You had asked the question about, well, you

1    know, kind of what's the status of that deposit

2    material, and here's where we get into a best evidence

3    rule problem I know seldomly invoked, but here I think

4    legitimately invoked because it creates all kinds of

5    problems about not knowing what was actually there.

6         One thing we know we don't have is a copy of

7    what was deposited.  That's the best evidence.  And the

8    best evidence rule applies to works like this.  I think

9    the *Seiler* case said that, but we've cited the case in

10   our brief.

11        So we start with what the best evidence is.  Go

12   to the copyright office, get a copy of what was

13   deposited, then we know what we're talking about.  We

14   don't have that.

15        Now, in the best evidence rule, 1002 and 1004,

16   you can overcome that, but to overcome that you have to

17   show to the Court's satisfaction that the materials

18   were lost, okay?  Well, that's, that shouldn't be that

19   hard to do.  You go to the copyright office, you make a

20   request for the deposit materials, and you find out

21   what you get back.  You either get back the deposit

22   materials, or they tell you that they don't have them

23   anymore, or they tell you they're not going to give

24   them to you, or whatever.  You've done your diligence

25   to find out.

1          Very, very late in this game, i.e., at the time

2     of their briefing, post-trial briefing, they represent

3     for the first time that they made that effort.  Now

4     we've been asking about this all along because we've

5     known this is a problem.  We inquired ourselves just to

6     find out what would be involved and, you know, we went

7     no further.  But we knew that this was always going to

8     be an issue, and we told them this many times.  We put

9     out an interrogatory where we asked them what steps

10    they took.  They invoked the privilege.

11          There is no evidence in the record that they

12    actually made the requisite effort to find out if those

13    materials are lost.  And I know, you know, I would

14    assume the Court doesn't want to be deciding this on

15    what may be perceived as a technicality, but this is

16    their obligation, this is their burden, and the

17    evidence is just insufficient; and it does matter,

18    right, because this entire case we've been trying to

19    understand are you saying the prototype was registered

20    and deposited?  Are you saying that a commercial

21    version was?  Which commercial version was it?

22          We understand that each of the commercial

23    versions had a 1960 copyright.  And Mr. Orbanes

24    certainly testified that with regard to those different

25    versions, unless they were substantially different you

1    probably were not going to get -- put a new copyright

2    notice on it.  But it's also entirely possible that

3    they were derivatives of each other, and that matters

4    when we're trying to figure who, what rights, what is

5    in which.  I mean, these things matter.

6         And it matters for another reason.  I honestly

7    still don't have my arms totally around this, your

8    Honor, but here's what they have to prove.  The only

9    thing that they've claimed is that Mr. Markham created

10   the prototype.  But they do not assert that the

11   prototype was what was statutorily protected.  It was

12   some commercial version.  It's not reasonably disputed

13   that there are differences between them.  We had the

14   testimony from Mr. Orbanes about that.

15        For them to prevail they have to show what in

16   the prototype Mr. Markham physically created and then

17   show that that also shows up in what was registered and

18   deposited with the copyright office.  They can't win

19   their case unless they connect those dots; right?  And

20   that's why Mr. Pollaro actually pushed back when you

21   were helping him out a little bit saying, well, didn't

22   he potentially create the spinner?  Well, okay, but we

23   don't know whether -- there's no proof of physical

24   creation of the expression that shows up in the

25   statutory version.  That's why he said to you no,

1   Mr. Markham created everything; because unless they can

2   say that Mr. Markham created everything they can't

3   connect the dots.  They just can't prove their case.

4   And it is patently absurd to suggest that Mr. Markham

5   created everything.

6        THE COURT:  So let me just make sure I

7   understand this.  It seems like an important point.  So

8   what we don't -- the problem is we don't know exactly

9   what the prototype looked like; right?  There's no

10  evidence that shows us what the prototype looked like.

11       MR. KRUMHOLZ:  Well, we have some photos.  We

12  have the imperfect photos of the prototype.

13       THE COURT:  Are those of the actual prototype?

14       MR. KRUMHOLZ:  Yes.

15       THE COURT:  Okay.

16       MR. KRUMHOLZ:  But they -- for instance, we

17  can't see the text on the board.

18       THE COURT:  And what exhibit numbers are those?

19       MR. GORACKE:  JTX509.

20       MR. KRUMHOLZ:  JTX509, Mr. Goracke is saying,

21  yes, and he's given me a thumbs-up.

22       THE COURT:  509.  And then what we have in

23  evidence are the earliest versions of the actual

24  commercial game, which I think the earliest version, I

25  forget what exhibit it is, but I think it was like a

1        1960 version; right?  '60 or '61; I can't remember.

2                MR. KRUMHOLZ:  So there are five versions in the

3        record, all of which have a 1960 copyright notice date,

4        all slightly different from each other.  There's

5        nothing in the evidence that tells us which one was

6        first.

7                THE COURT:  All right.  So that's part of my

8        question was of those various versions what order, and

9        we don't know the order?

10               MR. KRUMHOLZ:  There's some speculation, but

11       it's no more than that.

12               THE COURT:  All right.  So we have these five

13       early versions, they all have the 1960 copyright date,

14       and what you're saying is that there's just no way to

15       know which one of those versions or some other version

16       was the one that was deposited at the copyright office;

17       so there's this missing link in the chain between the

18       photos of the prototype and the earliest versions;

19       right?  And that's where we are to start.  And so if we

20       assume that, can't I at least look at or do a

21       comparison between the prototype photo and the early

22       versions and do a derivative analysis, a derivative

23       works analysis as to those two?

24               MR. KRUMHOLZ:  Yeah, and that's what we've done.

25       And that's fine as far as it goes on the derivative

1    side.  But it doesn't help them sign the authorship

2    problem, right, because -- so let's kind of even raise

3    this a little higher up.

4         They're seeking to terminate a transfer.  That

5    would be the, whatever is the subject of the assignment

6    agreement as it applies to copyrights.  They're saying

7    it's the three copyrights that were registered.

8         But the only thing that they can terminate is

9    what he physically created that was transferred.  He

10   could have -- from a contractual matter, because he

11   owned the work done by Ms. Chambers and Mr. Israel as a

12   matter of copyright law as work-for-hire, so when he

13   transferred -- if he had copyrights to transfer,

14   copyright interest to transfer, he transferred that

15   whole bundle; right?  It would have been what they

16   created plus what he created, to the extent they could

17   prove he created something.  But the only thing he

18   could claw back is what he physically created because

19   the copyright statute tells us that the work-for-hire

20   contribution does not apply; right?  So the only thing

21   that could be the subject of this whole termination

22   action is whatever sliver that Mr. Markham physically

23   created and that he subsequently transferred.

24        And this is where their case fundamentally falls

25   apart because they want you to look at the documents

1    and say look at all these documents that show he was an

2    inventor, a designer, whatever, developer; that means

3    that he was the author.

4         But that hardly means that he physically created

5    anything.  An analogy, an example I give is this

6    PowerPoint.  I hope you find this PowerPoint useful.  I

7    also hope that Mr. Turner, who works fro Hasbro, finds

8    it useful, and I hope that he says to me afterwards you

9    did a great job on this PowerPoint.  Now, I can

10   volunteer that Ms. Framroze actually created the

11   PowerPoint, or I can take the credit for myself.  All

12   those exchanges are no different than Mr. Turner

13   telling me, as the head of the team, that I did a good

14   job on this PowerPoint.

15        It never gets to the question of whether

16   Mr. Markham physically created anything.  So what they

17   have to say is he created everything, as evidenced by

18   the fact that he has this status as inventor, designer,

19   developer.  And that is absurd.  I'm sorry, but it's

20   completely absurd.  It's absurd in part because their

21   own expert says everything was done in six weeks.  How

22   in the world is one person getting everything, all this

23   done in six weeks, when they say even everybody working

24   together it's unlikely to get done in six weeks.

25        It's also absurd because, and I think we showed

1    this already, because Mr. Markham himself said that

2    other people worked on it.  It is also absurd

3    because -- oh, and these are just some examples, but in

4    our brief we talk about all the times in his deposition

5    and documents that Mr. Markham talks about the work

6    that "we" did.  He speaks in the plural.  He doesn't

7    suggest that he did everything.

8          And it's also absurd, and we get this, oh, they

9    said, you know, Mr. Israel and Ms. Chambers were

10   mentioned in passing in the invoice.  This Slide 10 is

11   a portion of the invoice.  They weren't just mentioned

12   in passing.  Mr. Klamer paid for six weeks of their

13   full salary for the work that was done on this.  He

14   paid for their entire time.  The Markham parties sit

15   here and tell this Court that, oh, they only did rote

16   stuff in the part-time.  They literally used the word

17   "part-time."  Okay.  Well, then Mr. Markham committed

18   fraud because he told them that they worked full-time,

19   and Mr. Klamer paid full-time.

20         So we know beyond doubt that Ms. Chambers and

21   Mr. Israel played a meaningful role here; right?  The

22   question then becomes can they show that Mr. Markham

23   did some physical contribution.  And you asked the

24   question of Mr. Pollaro where is the evidence that

25   shows that Mr. Markham physically created something?

1   And there's nothing.  There just --

2          THE COURT:  Well, the evidence, I mean the

3   evidence that I get from Plaintiffs' case is that it's

4   two things, may be related; it's documentary,

5   contemporaneous documents in which statements are made

6   that they say reflect what the reality was at the time,

7   which is that he designed, created, and all the words,

8   and it's the, sort of the gaps in the sort of negative

9   inferences that you can draw from the lack of evidence

10  that anyone else did.  So the way I get their case is

11  they put these two things together and say, look,

12  there's a lot of documents that say he created

13  everything and there really isn't anything else besides

14  this testimony of Israel and Chambers and Klamer, which

15  they say is completely fabricated and inconsistent, and

16  if you put all of that together there's nothing else to

17  show that anybody else did it and never any documents

18  that said he did it, and that's the theory, I think.

19         MR. KRUMHOLZ:  I agree with all of that.  I

20  think that is their theory.

21         What the documents show is entirely consistent

22  with somebody who played a meaningful role, a

23  meaningful enough role to get a patent, a meaningful

24  enough role to be acknowledged as inventor, designer,

25  developer, and a meaningful role in supervising,

1    providing input, providing information, providing

2    thoughts, providing direction.  I mean what he did is

3    unknowable, you know, 60 years later, but all the

4    evidence suggests that he did play a role and it was a

5    role of that nature.  All the documents are a hundred

6    percent consistent with that.

7           But that's not the question for the Court.  The

8    question before the Court is whether he physically

9    created something.  And there is nothing -- you know,

10   if he physically created, if he did a sketch, you know,

11   where is it; right?  I mean if we want to go with a

12   negative inference, you know, this is his baby, this is

13   the thing that has paid him millions of dollars, and he

14   said out of nowhere, you know, I had this unfinished

15   board; where is the board?  I don't have the cite on

16   hand, but in 1989 he said yeah, I think I have some

17   sketches in my attic or in my garage or wherever.

18   Well, where are they?  They haven't been produced in

19   this case; right?

20          There is no -- if we're going to go with the

21   negative inference, this is their burden.  They have to

22   show that there was physical creation on his part.  And

23   the documents are consistent with somebody who's played

24   a role, but not consistent with or inconsistent with

25   somebody who physically created something.  And so then

1    we look at the other evidence, right, the other

2    contemporaneous documents and testimony, and we have

3    the invoice, as we talked about.  We have each of their

4    testimony in 1989.  We know that Ms. Israel --

5    Ms. Chambers and Mr. Israel played a meaningful role,

6    six week full-time.  And then we have their testimony;

7    right?  And their testimony, right, the Court has

8    already acknowledged this, but their testimony could

9    not have been clearer:  "I was assigned to come up with

10   what the box cover should look like."  That's

11   Mr. Israel.

12        And who did the packaging?  And then from

13   Ms. Chambers:

14        "Question:  And who did the packaging?

15        "Answer:  Leonard Israel did it."

16        And from Ms. Chambers, "Question:  What role, if

17   any, did Ms. Chambers" -- oh, from Mr. Israel:

18        "What role, if any, did Ms. Chambers have in

19   connection with the creation of the game board?

20        "Answer:  She put it all together and did the

21   final art work on it."

22        The question to her:

23        "Who did the actual hands-on work of building

24   the prototype game board?

25        "Answer:  Well, I did a fair amount of it.

1    Leonard helped somewhat and whenever he could cause he

2    had other projects that he was working on.

3         "Question:  So just to be clear, you built the

4    houses of the prototype; is that correct?

5         "Answer:  I did, yes.

6         "Question:  Did you build the mountains on the

7    prototype?

8         "Answer:  Yes.

9         "Question:  Did you construct the elevated track

10   physically on the prototype?

11        "Answer:  Yeah, I'm sure.  Yeah, it's many years

12   ago, but I do, I do recall working with the different

13   materials and the cardboard and forming it and so on."

14        So for the Court to conclude anything else, as

15   Mr. Pollaro has said, they really have to -- your Honor

16   has to conclude that they were lying.

17        And they go through a significant exercise in

18   trying to show inconsistencies to the Court in their

19   testimony to make that case, and this is where frankly

20   things gets a little troubling.  Troubling in terms of

21   advocacy because they, for instance, say in finding of

22   fact 99, they state that Mr. Israel did not physically

23   create anything.  And below that are the cites that

24   they rely on to have the Court adopt that finding of

25   fact.  The first one is Mr. Israel saying that he was

1    assigned to come up with the box cover and what it

2    should look like.  Doesn't seem like it supports that

3    statement.

4         The next one is just a discussion about what

5    Ms. Chambers did, which is not inconsistent.  The next

6    two are what Sue Markham did, not inconsistent.  And

7    the last one is the discussion about the fact that

8    Ms. Chambers took the sketches, the art work that

9    Mr. Israel created and did what would indeed be a rote

10   process of enlarging it into a box cover.  So we can

11   dismiss that fabrication.

12        Findings of facts 102 and 103.  They claim that

13   Mr. Israel said that Ms. Chambers created the cover,

14   and Chambers said that she did not.

15        All Mr. Israel said in the cite that they

16   reference is what I just talked about; Ms. Chambers did

17   the physical process of enlarging the art work that was

18   created by Mr. Israel.  And then Ms. Chambers

19   truthfully said, to the question of who did the cover,

20   it was Mr. Israel, because the creation of the cover

21   was the art work that he did in the sketch.  Nothing

22   inconsistent there.

23        And then they claim that Mr. Israel and

24   Ms. Chambers performed only routine tasks, and they say

25   both of them.  There is not a single cite that

1    discusses Ms. Chambers at all, but they threw her name

2    in there and asked the Court to adopt that as finding

3    of fact.

4         And they cite to Mr. Israel's deposition.  What

5    Mr. Israel was talking about, and this is in our brief,

6    is his first year on the job.  He was not talking about

7    the work that he did.  Again, not an accurate

8    representation.

9         Your Honor asked about this, their claim that

10   Ms. Chambers didn't know what "binding" was, findings

11   of fact 104 through 106.  When you go -- first of all,

12   not remembering about binding is hardly a reason to

13   believe that she got up to the Court and lied.  But

14   independent of that, when you look at the testimony,

15   she didn't understand the question which came out of

16   the blue from Mr. Pollaro in that context.  Asking

17   about binding, she didn't connect the dots.  When she

18   was shown the invoice it was clear that there was

19   recognition, saying Oh, you're talking about the

20   binding for the work on the board, sure, that makes

21   sense.  So it doesn't even support the proposition that

22   they claim.

23        Then they have a whole independent finding of

24   fact that says that Mr. Israel and Ms. Chambers didn't

25   know important facts.  Again, the cites don't mention

1   Mr. Israel at all, yet they make that statement.  And

2   all they're doing is citing to the binding cite that I

3   talked about above.

4        And the last one, they claim that it's not clear

5   whether Mr. Israel and Ms. Chambers worked on the

6   prototype.  Their entire support for that is

7   Mr. Markham's testimony that he created multiple

8   prototypes, and from that apparently they want the

9   Court to infer that it's not clear that they worked on

10  a prototype.  And by the way, with that testimony, to

11  go back to producing the best evidence, where are all

12  those prototypes that Mr. Markham created?  What effort

13  have they made to find those and produce those?

14  Because we haven't seen those either.

15       So I guess in sum, you asked the question is

16  there any reason not to believe them.  What is their

17  skin in the game?  The answer is they have no skin in

18  the game.  I mean we asked them whether they had any

19  skin in the game, and they said they didn't.  But we

20  also asked them more particularly, you know, about

21  their relationship with Mr. Markham because maybe they

22  hold a grudge.  I mean we affirmatively asked.

23  Mr. Israel said he enjoyed his time working there.

24  Ms. Chambers said, you know, she had good relations

25  with them, it was just time for her to move on.

1          You know, they had the opportunity to

2     cross-examine these witnesses.  They had the

3     opportunity to test out these theories and allow the

4     Court the opportunity to see the demeanor of the

5     witnesses and to see whether, you know, there was any

6     reason to question.  They frankly just wasted our time

7     in cross-examination and then come up here with all

8     this nonsense and challenge their integrity.

9          They talk about this being a legacy issue.  Now,

10    none of that matters for the Court, but I would say

11    that there's a great deal of irony in pretending that

12    this is a legacy issue for them when Mr. Markham knew

13    that copyrights were being registered and didn't care.

14    And they actively frankly for no other reason than

15    greed wanted to totally subtract not only Mr. Israel's

16    contribution, not only Ms. Chambers' contribution, but

17    Sue Markham, his own wife's contribution.

18         They said that the status quo does not change.

19    And again, I'm not going to pretend that this matters

20    for your decision-making, but I think it's just

21    important to get out.  The reason they say the status

22    quo does not change is because if the Court somehow

23    rules in their favor, they don't intend to terminate.

24    They intend to go and try to hold this up.

25         This is not about legacy.  This is about

1    Mrs. Markham, the Plaintiff, who lives in LA, not even

2    showing up to sit in the back of the courtroom about

3    this critical case about her late husband's legacy,

4    can't even come to the courtroom to see what these

5    witnesses have to say, the people that knew her late

6    husband personally.

7           So with that, I'd like to talk about

8    work-for-hire.  So the first question is burden.  Who

9    has the burden of proof on the work-for-hire.  We

10   certainly acknowledge all the cases they cite stand for

11   the proposition that defendant has the burden of proof

12   on work-for-hire because it's an affirmative defense.

13   But all those cases are infringement cases.  That's not

14   what we're dealing with here.

15          This is a matter of first impression.  As far as

16   I know, I think we give one compare cite which does

17   suggest that it's the defendant's burden, but I don't

18   think that issue was addressed with that court; I think

19   they just kind of jumped in.

20          But we would submit this, that the reason I have

21   the statute up here is this is a statutory claim.  You

22   need to satisfy all the elements in the statute in

23   order to prove your claim.  One of the elements in the

24   statute clearly is that they have to show that the

25   copyright is other than a copyright in a work-for-hire.

1    And, in fact, as you'll see in the bottom of this slide

2    they accidentally admit as much in their brief.  On

3    page 5 of their memorandum they say:  Termination

4    rights under Section 304(c) require that certain

5    conditions be met.  Of those conditions, only two are

6    in dispute...The second is that the copyright at issue

7    must not be a copyright in a work made for hire.

8         They kind of gave it away there because they

9    have that burden.  I mean I don't think it matters at

10   the end of the day because I think the evidence is

11   clear on work-for-hire, but it is, I think, a threshold

12   question that the Court is going to need to decide in,

13   you know, whatever written opinion comes out of this.

14        They also have made the point in their papers,

15   they made the claim in their papers that the instance

16   and expense test does not, does not -- has been

17   abrogated.  They don't cite a case for that.  They did

18   in the reply cite an Eleventh Circuit case, the *MGB*

19   case that Mr. Pollaro alluded to.  That case does not

20   stand for that proposition remotely.  It's a 1976 Act

21   case that talks about the Supreme Court case only to

22   talk about it in that context.

23        But what we do know, and they've acknowledged

24   now after their initial briefing, is that the First

25   Circuit applies the instance and expense test and has

1    done it on numerous occasions; not just the District

2    Court of Massachusetts, but the First Circuit post-*CCNV*

3    has applied consistently the instance and expense test,

4    and it's clear why.  When you look at the opinion from

5    the Supreme Court, it's clear that they're just giving

6    a -- it's a 1976 Act case.  They're just giving a

7    historical discussion about the 1909 Act.  So I don't

8    think there can be any reasonable doubt that it still

9    applies.

10        So we have then the application of the test.

11   The instance prong they don't dispute.  There's

12   actually nothing in their papers to suggest that they

13   disagree that the instance prong is satisfied.  As we

14   have here on Slide 20, the standard is that "'Instance'

15   refers to the extent to which the hiring party provided

16   the impetus for, participated in, or had the power to

17   supervise the creation of the work."

18        And, you know, the undisputed facts are as you

19   described them, your Honor.  Mr. Klamer brought the

20   opportunity to Mr. Markham's company.  He was their

21   client.  He supervised, instructed, provided

22   parameters, approved the prototype.  I don't think --

23   there is no question because they haven't disputed it.

24        So the only real issue is whether the expense

25   prong is met, and we've talked about this a little bit.

1    The standard for that is that under the expense prong,

2    "the focus is not on who bore the costs or expense in

3    physically creating the work itself (the money spent to

4    purchase the paper...the typewriters...the pencils and

5    ink...etc.)  Instead, the focus is on who bore the risk

6    of the work's profitability;" right?

7         So at the risk of repeating myself, we need to

8    look at Mr. Klamer and Mr. Markham and the moment in

9    time when the work was to begin, and the question is

10   who is going to bear the risk that this becomes a

11   profitable endeavor.

12        THE COURT:  So that window runs from the point

13   where Klamer reaches out to Markham and hires him

14   essentially to produce this prototype through to the

15   point where I guess Markham bills Klamer for the work;

16   right?

17        MR. KRUMHOLZ:  I would say there are two points,

18   two end points.  I wouldn't say that's the end point.

19        THE COURT:  Okay.

20        MR. KRUMHOLZ:  I would say it arguably -- the

21   first potential end point is when Milton Bradley signs

22   the license agreement and agrees to pay money, because

23   we know some money is now being paid for this work.

24   But I would argue that that's not really the end point

25   because, one, from Mr. Klamer's standpoint he doesn't

1    know how big the bill is going to be.  He doesn't

2    know -- most of that money that they're going to get up

3    front is going to go to the cost.  He's, of course,

4    incurred his own expenses; you know, the record talks

5    about him making trips and the like.  So whether he

6    ever sees anything beyond his costs, whether he gets a

7    profit is not going to be known until we see whether

8    there are any sales here and how significant the sales

9    are.

10         So I would say Mr. Klamer's risk really runs

11   through until you start aggregating enough sales to put

12   him out of the red and into the black, and we don't

13   know specifically when that date was.  We know that

14   date happened because they made millions of dollars.

15   But his risk period runs until then.

16         THE COURT:  Well, just for terms of doing the

17   expense side of the instance and expense test, you're

18   saying it runs all that way out?

19         MR. KRUMHOLZ:  Well, yes, because I think we --

20   if we're going to look at the risk between the two of

21   them, it's two different paragraphs; right?  What

22   Mr. Klamer has agreed is I'm going to pay all your

23   costs, I'm going to have my own expenses, and I'm

24   taking the risk that this is ultimately going to be

25   sold to Milton Bradley and make enough money beyond

1    your cost and my cost that I'm going to make a profit.

2        THE COURT:  But doesn't -- I don't mean to

3    interrupt you.

4        MR. KRUMHOLZ:  No, that's okay.

5        THE COURT:  Doesn't that end, as far as at least

6    Markham goes, doesn't that end when they license things

7    to Milton Bradley?

8        MR. KRUMHOLZ:  Well, for Mr. Markham it never

9    began, so it can never end, because he was told at the

10   outset that he would get his costs paid for.

11       THE COURT:  That part I understand.

12       MR. KRUMHOLZ:  Okay.

13       THE COURT:  But in terms of, I mean I'm just

14   trying to figure out, you know, the issue is the

15   creation of the copyrightable thing, --

16       MR. KRUMHOLZ:  Right.

17       THE COURT:  -- and that seems to me that kind of

18   runs from the point of when the, the running up to the

19   point where the prototype is created up to an end point

20   when it's handed off to Milton Bradley, they reach a

21   license agreement and they're off and running.

22       MR. KRUMHOLZ:  So I guess where I'm struggling a

23   little bit, I totally get where you're coming from.

24   We've been trying to figure this out, too.  I think we

25   can talk about an abstract block of time for risk.  You

1    were asking or I think what I interpreted you asking

2    is, you know, Mr. Klamer's risk, Mr. Markham's risk.

3         If we talk about the abstract time of risk,

4    there's no question when it begins.  It begins when the

5    first piece of work is done on the project, right,

6    because there's work being done.  We don't know the

7    increments.

8         The abstract time when it ends, that's why I

9    still say it's to, because we know we made some money

10   with this $5,000 advance, but not necessarily enough to

11   cover everybody's cost.  So it's mitigating the risk,

12   but it hasn't eliminated the risk of profitability

13   because I'm not making any profit; right?

14        THE COURT:  Klamer did testify that I think he

15   made -- this is your point, I guess -- that he made

16   several trips back to Milton Bradley to consult with

17   them as they were developing the production model --

18        MR. KRUMHOLZ:  Right.

19        THE COURT:  -- and some changes had to be made

20   and whatnot; right?

21        MR. KRUMHOLZ:  Right.  I mean frankly we were

22   tempted to go back to see how much it cost to fly TWA

23   back in 1959.  It was a lot more expensive, relatively

24   speaking, than today.  But we don't have it in the

25   record.  We know that there were costs.  We don't know

1    the extent of those costs.  But he bore the risk of

2    profitability because until and unless enough games

3    were sold, even with whatever little bit he got left of

4    the advance, he still wasn't in the black.  I mean

5    that's --

6         THE COURT:  Let me ask you this.  I think I

7    asked you this at the close of the evidence, but I want

8    to make sure that I understand this.  So if I decide

9    that this was work made for hire and that both Israel

10   and Chambers were work-for-hire for Markham and Markham

11   was work-for-hire for Klamer, and it encompasses the

12   whole copyrightable block, I mean that's really the end

13   of the case, isn't it?

14        MR. KRUMHOLZ:  Yes.

15        THE COURT:  I mean there's no need to go through

16   the -- I mean there's a need to analyze the documents

17   with respect to that, to the relationship between

18   Klamer and Markham, and they may have relevance to the

19   question of whether it was work-for-hire.  But if

20   that's the conclusion, a lot of these factual disputes

21   about who made what and, you know, did Markham create

22   the whole thing, did he do the spinner, did

23   Falco-Chambers and Israel do this piece or that piece,

24   I mean it all doesn't matter.

25        MR. KRUMHOLZ:  Right.  That's a hundred percent

1     correct, and I'll try and put a fine point on that.  If

2     the Court concludes that the work done by Mr. Markham,

3     Ms. Chambers and Mr. Israel was all done as a

4     work-for-hire for Mr. Klamer, then we don't care who

5     did what.  It doesn't matter.  Because if it's a

6     work-for-hire, under 304(c) it's not subject to

7     commission.  So yes, you can answer that narrow

8     question and then everything else falls off the table.

9          THE COURT:  Okay.

10         MR. KRUMHOLZ:  A couple of other points on the

11    expense prong.  They raised two points; one is the

12    money paid out of a royalty advance, and the other,

13    that there was a running royalty.

14         On the royalty advance, I mean money is

15    fungible.  He could have paid that out of whatever, so

16    I don't think the point really matters.  But it also

17    shows, you know, reflects a lack of understanding of

18    the actual risk, because if the actual risk is not as

19    of that day, it's when the work started, and who bore

20    the risk at that time.  So it's, to me, a red herring.

21         As to the running royalty, we have cited some of

22    the cases there, and I think we have others in our

23    brief that make very clear that, yes, a running

24    royalty, as you would expect, is one indicia that maybe

25    there was a shared risk, right, because if you just

1   have a pure running royalty and you don't get paid but

2   for the success of the product, sure, that's one factor

3   that you need to look at.  All of the cases say that

4   that is not dispositive.  And, more to the point, what

5   those cases say, and we have cited them, is that if you

6   have a running royalty and you agree to pay costs --

7   which is something that Mr. Orbanes said is not

8   atypical in this space, particularly when you have to

9   get things done quickly.

10          If you agree to do both of those things, all the

11   cases that we've seen support that the exception prong

12   is satisfied because -- and again, it's pure logic;

13   right?  The fact that you decide to give them extra

14   incentive because we need more creativity here or we

15   need you to work faster is neither here nor there.  The

16   question is, you know, what risk did you take and if

17   you were paid.  If you're going to be paid regardless,

18   then you didn't take risk.  You start looking more like

19   an employee.  You start looking more like Ms. Chambers

20   and Mr. Israel; I'm going to get paid for my time, I'm

21   not taking the risk.  Sure I'd like to make a lot more

22   money and it's great that you're incentivizing me to do

23   that, you know, work harder and faster, but gosh, I'm

24   not going to get -- I am going to get paid here.  So

25   you don't then get rewarded with ownership on top of

1    that.

2              THE COURT:  I think you're close to being out of

3    time.

4              MR. KRUMHOLZ:  I was afraid of that.  So the

5    express agreement -- maybe I'll get awarded little time

6    for derivative after the break.

7              The express agreement -- I'll skip over

8    collateral agreements.  They make the point, well, they

9    make two points.  The first is this assignment

10   agreement implies that Mr. Markham must have owned the

11   rights in the first place because he's giving them

12   away.  Well, first of all, as we have on Slide 24, and

13   I'm not going to read it for lack of time, but that has

14   been, that concept has been expressly rejected by a

15   number of courts, and we haven't seen a court that says

16   to the contrary.  I'm getting confirmation over there.

17             And again, it makes sense because these kinds of

18   agreements are belt-and-suspenders agreements; whatever

19   you got you're giving to me.  But there's nothing here

20   that tells us that he owned copyrights.  There's

21   nothing here that tells us that he owned trademarks.

22   We don't know -- and this is kind of a standard

23   agreement.

24             What they then point to is something that

25   actually works against them.  They point specifically

1    to Section 4 of the assignment agreement, which is a

2    provision concerning application.  It says, basically,

3    upon the request of Link Research, Mr. Markham will

4    apply for a copyright, a trademark, or patent.  And

5    then what they point to is later on they say if the

6    agreement is terminated whatever they applied for goes

7    back to Mr. Markham, and they say that's kind of the

8    reversion, as it were.

9          But this provision only actually supports our

10   position because they never asked for a copyright

11   application from him.  If anybody thought that a

12   copyright application was necessary from him it would

13   have been because he was the owner and the author, and

14   they would have asked him to do it; but they never did.

15   And we know that this provision was not ignored because

16   they did ask him with regard to a patent and he did

17   comply with regard to a patent.  So all this really

18   tells us is the opposite, really.  It tells us it's one

19   more indication that he did not believe and did not act

20   like he was a copyright owner.

21         And this is what I talked about earlier, which

22   is Mr. Markham acknowledging that he knew that

23   copyrights were being applied for and did not act like

24   a copyright owner by objecting.

25         And they point to this letter or letters back

1    and forth between Mr. Klamer and his lawyer about

2    whether the prototype was copyrightable and say that

3    that's some evidence of wrongdoing; but it's pretty

4    ambiguous to me.  But again, it's the opposite proof.

5    It is Mr. Klamer acting like a copyright owner.  He's

6    out there paying his lawyer to find out whether there's

7    a copyright right in this prototype.  I doubt he was

8    doing that out of the goodness for his heart for

9    Mr. Markham.  It's evidence as to what he believed at

10   the time, which was he owned the prototype interest.

11   And he did this before the assignment agreement, all

12   right?  So they can't even point to that.

13          And we have here two other letters, JTX37 and

14   JTX23, over time of Mr. Klamer again acting like

15   somebody who has a copyright interest.  He's on

16   Milton Bradley to make sure that they're doing their

17   copyright notices correctly, that they're renewing

18   properly.  He's acting like the guy who has skin in

19   this copyright game, and we see nothing like that from

20   Mr. Markham.

21          Okay.  What do I have left for time?

22          THE COURT:  It depends how much Ms. Glaser is

23   giving you.  Let's go off the record.

24          (Discussion off the record)

25          MR. KRUMHOLZ:  All right.  So I will use that

1    time to talk about the derivative and independent

2    works, and don't let me talk too fast because I could

3    easily do that now.

4           So we do have agreements on the law.  I will

5    start out by saying I think there's a really

6    problematic practice that went on here.  They say it's

7    our burden on derivative works.

8           Paragraph 83 of their amended complaint or third

9    amended complaint, whatever it is, they asked for a

10   declaratory judgment on derivative works as well, and

11   then they put in no evidence.  And then we put in

12   evidence on our DJ request, and they say we have a

13   burden.  I'm not sure, frankly, how the Court sorts

14   that all out, but it's just really inappropriate to not

15   put in any evidence on something you asked the Court to

16   do; we do it, and then say we have a burden.  But

17   that's an area of disagreement.

18          Areas of agreement is that termination does not

19   apply to pre-termination derivative works.  We agree on

20   that.  We agree that a derivative work is defined as

21   one or more pre-existing works but adds new, original

22   content.  We agree that the degree of creativity in the

23   original contract needs to be -- can be extremely low,

24   and we agree that you need to look at both similarities

25   and differences between the works when doing that

1    analysis.

2           Now, there was some discussion about this whole

3    intervening works and whether we needed to look at

4    everything in between.  I guess I would make two

5    observations.  One I think is consistent with the

6    observation you made, your Honor, which is it doesn't

7    matter.  I mean whether it was contributed, whether the

8    particular material was contributed at that moment in

9    time or some prior version, there's no dispute that

10   Mr. Markham didn't play any role -- played no role in

11   those prior versions.  The only role he played would

12   have been in the prototype, so where it came along the

13   chain is irrelevant to the analysis from just a logic

14   standpoint.

15          But also their position is consistent just with

16   the language of the statute.  304(c)(6)(A) tells us

17   that when we're trying to figure out if a work is

18   derivative or not, we look to see whether it's based

19   upon the copyrighted work covered by the terminated

20   grant; right?  So we have to go back, and this becomes

21   our problem again of going back, figuring out what

22   Mr. Markham physically created in the prototype, seeing

23   if it's in whatever was deposited with the copyright

24   office that we don't know, and seeing if there's enough

25   similarity that it's based on the prior work, and

1    looking at the differences to see if there's enough new

2    original work.  I mean that's what the statute tells us

3    to do.  So I think either by logic or law you end up at

4    the same place.

5         They have made the argument that by finding that

6    the, I think the 1960 versions are derivative, that

7    results in the loss of authorship for the original

8    author.  But that's just wrong as a matter of law.  The

9    authorship of the original work carries through into

10   the derivative work and remains the same.  There's no

11   limit on that scope.  The only difference is that

12   there's a new author for whatever was original that was

13   added, so it's not an argument that is correct in the

14   law.

15        They also argue that if small changes result in

16   the derivative work it will eviscerate the termination

17   provision itself.  I'm not even sure what they're

18   asking of this Court.  I mean the law is the law.

19   Congress balanced and decided that derivative works are

20   accepted.  The standard for derivative work is clearly

21   established in the law.  I don't know if they're

22   somehow asking the Court to apply a different standard,

23   but if they are, I don't know what it is.

24        And the reality is Mr. Orbanes made clear in his

25   testimony that small changes matter in this business.

1       They may not in other businesses, I don't know, but

2       we're focused on the facts of this case.

3             So when we look at -- I'm not going to spend the

4       time to go through all of these, but what we've

5       attempted to do just for the Court's convenience is

6       summarize the differences and the references in the

7       record for those differences between the various

8       versions that we asked the Court to look at.

9             We asked the Court to look at one 1960 version,

10      and we see there that we have, you know, material

11      differences.  I think -- I'm not going to pretend that

12      they are hugely different differences, but they are

13      differences of an aesthetic nature, of a creative

14      nature that were made to create a better product.

15            I mean you can't reasonably claim that the

16      prototype as created was as aesthetically pleasing and

17      therefore would result in the same amount of sales as

18      the commercial version.  They made changes that made

19      it, in their view, better; and given that we're here

20      60 years arguing about it, they were probably right.

21            The box cover, the same thing.  You know, they

22      used their expertise and experience to say, no, we

23      don't want this shape; we want a different shape.  We

24      don't want the logo here; we want it over here.  We

25      don't want to just focus on the word "Life;" we want

1    "The Game of" to be prominent.  These are all judgments

2    that experienced people make to improve the chances of

3    success, and it makes it a derivative work.

4         The same with the rules.  The rules, frankly, we

5    were going to say is a completely independent work

6    because they're so different, but at a minimum they're

7    clearly derivative works; I mean just the images

8    themselves.  You don't even have to get into any of the

9    words.  But the words, basically they did a nice job,

10   as Mr. Orbanes talked about, with their kind of

11   introductory language, and Milton Bradley kept some of

12   their introductory language, so we can call it a

13   derivative work, and that's what Mr. Orbanes testified

14   to.  But the differences are material, as we highlight

15   there.

16        And this is the testimony that I was talking

17   about from Mr. Orbanes about whether these, you know,

18   incremental changes matter, and he testified that these

19   small changes and modifications, as he says, have an

20   overwhelming impact at times.  You know, paraphrasing,

21   these are the kinds of changes that are a difference

22   between having a successful product and not having a

23   successful product.

24        And I don't know if the Court remembers this,

25   but Mr. Carty, on direct, tried to claim that all of

1    these changes were economic or cost motivated; except

2    at his deposition he had admitted the opposite, that

3    these were aesthetic changes and in fact there

4    typically are aesthetic changes like this made.  He

5    completely flipped from his direct examination and

6    acknowledged the truth of the matter, which that these

7    changes are aesthetic changes.  And Mr. Orbanes, of

8    course, confirmed that as well.

9         And Ms. Ross herself, and these are just some of

10   them.  We don't even have the color sync here.  But

11   Ms. Ross herself, when Ms. Batliner brought a

12   commercial version of the Game, acknowledged 60 years

13   later that it was different than the prototype that she

14   looked at.  So the changes were enough that 60 years

15   later she can tell there were differences.

16        Oh, and this shows up in their brief, and

17   Mr. Pollaro made a little reference to this in his

18   argument.  This is a portion of a letter from

19   Mr. Markham to Mr. Taft at Milton Bradley, and it's the

20   so-called "faithful interpretation" letter, and in that

21   last sentence he says, "And I concur.  The over-all

22   product is a most faithful interpretation of our

23   mock-up."

24        Well, I would submit if you use the word

25   "interpretation" you're impliedly saying that there's

1    creative input.  It doesn't say a faithful

2    reproduction.  It says "faithful interpretation."  So

3    in our view this document only supports the proposition

4    that creative and material changes were made.

5          You know, I will go really fast through the new

6    version.  So what we've been calling the new version is

7    the version presently being sold.  And we also looked

8    at a representative third party branded Despicable Me

9    version.  And I have to say I don't even need to spend

10   much time because they are so different that I don't

11   know how you can credibly say that they're, frankly,

12   not independent works.

13         And this really kind of goes to where they don't

14   understand that they're in a copyright case.  You know,

15   what they keep coming back to and saying is look, they

16   both have spinners.  I know they both have spinners.

17   But the spinners are expressed differently; right?

18   Using a spinner is an idea, a good one, a really good

19   one, but it's an idea.  Oh, look, they both have

20   circuitous tracks.  Yeah, circuitous tracks existed

21   before The Game of Life, they'll exist -- I don't know

22   when the end of The Game of Life is, but it will

23   presumably exist, if such a thing exists, afterward.

24   But that's an idea.  That's not an expression.  How you

25   do the circuitous track is what matters.  There's no

1    3-D components on here at all.  There's no text on the

2    tracks at all.  I mean I could spend an hour-and-a-half

3    going through the differences, but the only

4    similarities are ideas.

5        And here are some of the differences that I was

6    just talking about.  The cover, I mean here's where

7    we're at with these guys.  They're saying that an

8    overlap is the use of the trademark The Game of Life.

9    It's not a trademark case.  They don't get credit for

10   the fact that Hasbro came up with The Game of Life and

11   is using it, you know, with the trademark.  Everything

12   here is different.  The only thing that is the same is

13   the franchise and the trademark, The Game of Life.

14       And here's the Rules.  If we go back -- well,

15   I'm not going to use my little time left tying to find

16   that.  But these rules look radically different in

17   every respect from the rules that were associated with

18   the prototype.

19       Despicable Me, I mean, again, yes, we have a

20   spinner.  Yes, the -- well, I don't even know if the

21   track would even be considered circuitous at that

22   point, but even if I concede that, the expressions are

23   fundamentally different.  I mean it doesn't really

24   matter legally whether it's a derivative work or

25   independent work because we keep getting to do it, but

1   I think it does matter in this sense.  If the Court

2   gets to this part of the case -- which, as we talked

3   about, it doesn't necessarily need to -- the reason we

4   did this is because we would want some guidance.  I

5   mean if the Court thinks this is derivative, that

6   affects how we make the next game or the next version

7   because, you know, we're going to make more versions.

8          In our view, you know, this is so different that

9   it has to be viewed as independent, and we would need

10  -- we would ask, it's not our position to tell you what

11  we need, but we would ask that the Court give us some

12  guidance that this indeed is an independent work so

13  that we can understand going forward that we can do;

14  you know, it just gives us some guidance as to what

15  later versions should look like.  The same with the

16  cover.

17         THE COURT:  Okay.  I think I'm going cut you off

18  there.  So let's just take a very short break and we'll

19  come back and we'll have Ms. Glaser, and then

20  Mr. Pollaro will have his rebuttal.

21         (Recess)

22         THE COURT:  Ms. Glaser.

23         MS. GLASER:  May I proceed.

24         THE COURT:  You may.

25         MS. GLASER:  Good afternoon, your Honor.  I just

1     want to make a few points because my very able

2     co-counsel, counsel for Hasbro, has done an excellent

3     job dealing with many of the issues.

4           Your Honor, credit which has generally been

5     given to Mr. Markham does not equate to copyright

6     ownership, which is not true of Mr. Markham and to

7     which Mr. Markham is not entitled.

8           This case is not -- it's about a lot of things,

9     but it's not about restoring Mr. Markham's legacy.

10    Ruben Klamer has consistently recognized Markham's

11    contributions to the creation of The Game of Life for

12    60 years, starting when he asked Milton Bradley to

13    credit Markham on the box cover as the Game's designer,

14    and that's in Ruben Klamer's supplemental post-trial

15    proposed findings of fact, your Honor, at

16    paragraph 111.

17          Instead, this case boils down to the greed of

18    Mr. Markham's second wife, Lorraine Markham, married to

19    him for a year before he passed away and her, in our

20    view, very transparent attempt to bring more money from

21    a relationship that has already been highly

22    remunerative for her and all the parties involved.

23          To say that Mr. Markham was not the copyright

24    author of this game doesn't tarnish his legacy even

25    slightly; rather, it accurately states the nature of

1    his contribution to the game under the copyright act of

2    1909 and controlling case law.  Plaintiffs attempts to

3    prove otherwise, in addition to being unsupported by

4    evidence, are nothing more in our view than a cash grab

5    and an attempt to wrongfully steal credit from

6    Mr. Klamer and diminish his contributions to and his

7    financial interest in the Game.

8           Just as an aside, because we've been talking

9    about this little spinner a couple of times this

10   morning earlier today, I direct your Honor to

11   Footnote 4 of our post-trial reply brief where it's

12   quoting Mr. Klamer's testimony.  The spinner, this

13   famous spinner comes from The Checkered Game of Life.

14   It doesn't come from Mr. Markham.  It came -- it was

15   picked up and lifted from the prior Checkered Game of

16   Life, and there's no testimony to the contrary.

17          I want to talk about the First Circuit, not

18   always a comfort area for me because I'm from the

19   Ninth Circuit, but I will tell you that I've read the

20   cases and tried to be as informed as I could be,

21   knowing I'm in front of a First Circuit and not a

22   Ninth Circuit judge.  And I'm quoting from the

23   *Forward v. Thorogood* case, 1993.  This is after the

24   case that Plaintiffs cite for their authority, and I'm

25   quoting:  "Although initially confined to the

1      traditional employer-employee relationship, the

2      doctrine" -- that's the work-for-hire doctrine -- "has

3      been expanded to include commissioned works created by

4      independent contractors, with courts treating the

5      contractor as an employee and creating a presumption of

6      copyright ownership in the commissioning party at whose

7      "instance and expense" the work was done."

8              That's the law in the First Circuit as we

9      understand it, your Honor.

10             I don't know if your Honor has our PowerPoint,

11     but we have a set for you and that happened to be, that

12     particular cite is at page 15 of our PowerPoint.

13             THE COURT:  I don't have that.

14             MS. GLASER:  It's right there.

15             THE COURT:  Thank you.

16             MS. GLASER:  Under the instance and expense

17     test, a court will presume copyright ownership in the

18     commissioning party where instance and expense are both

19     proven.  Defendants have shown that the development of

20     the prototype game by Markham and his employees was

21     done at the instance and expense of Link.

22             The instance portion of the test examines

23     whether the commissioning party was a motivating

24     factor.  That's the law.  Behind the creation of the

25     work, Plaintiffs appear to have conceded that the Game

1     was developed at Klamer's instance, in their post-trial

2     briefs.  The evidence supports such a finding as well.

3     All the testimony has shown that Mr. Klamer brought the

4     project to Mr. Markham on behalf of Link and not the

5     other way around.

6              Your Honor, may I approach my little timeline.

7     I would just like to go through it, some of which --

8              THE COURT:  Actually I'll get you a microphone

9     to use so everybody can hear you.  We've got a

10    portable.

11             (Pause)

12             MS. GLASER:  I think I can keep my voice up.

13             THE COURT:  It's important to get it on the

14    digital recording.

15             MS. GLASER:  Sorry.  Am I digital?

16             THE COURT:  You're good.

17             MS. GLASER:  I'm going to try not to put my back

18    to your Honor.  What we did here is, and some of which

19    has been repeated by your Honor this morning, we start

20    with Mr. Klamer visiting Milton Bradley and is asked to

21    create a hundredth anniversary product.  Mr. Klamer

22    sees The Checkered Game of Life in the Bradley archives

23    and is inspired by the term "Life."  He pens notes for

24    a family board name, The Game of Life, and considers

25    hiring Bill Markham, among others.

1          Then you have Mr. Klamer hiring Mr. Markham and

2    his employees on behalf Link on a work-for-hire basis

3    to begin work on the prototype of The Game of Life.  In

4    July -- August of '59, Mr. Klamer oversees and directs

5    all work performed by Bill Markham and his employees on

6    the prototype, The Game of Life, including its

7    packaging and instructions.

8          Mr. Klamer submits a prototype of The Game of

9    Life to Milton Bradley in August of '59.  A little

10   later in August Milton Bradley asked Mr. Klamer to make

11   changes to the prototype of The Game of Life to make

12   its production commercially feasible.

13         Mr. Klamer visits Milton Bradley to help

14   substantially redesign.  They haven't made a decision

15   yet to go forward.  He goes back to Milton Bradley to

16   help substantially resign the three-dimensionality,

17   the track, the spinner, and other elements of the Game.

18   In September of '59 there's a '59 license agreement

19   between Link and Milton Bradley.

20         The '59 agreement between -- that's in October

21   of '59.  And the '59 agreement between Link and Bill

22   Mr. Markham, doing business as California Product

23   Development.  And then in March of 1960 The Game of

24   Life is first published noting Link as the copyright

25   holder on the cover.

1          In December of 1960 copyright registrations

2    issue for The Game of Life cover as to Link, and the

3    board game and instructions as to Milton Bradley.

4          From 1960 to 1988 we go forward, everything is

5    operating as it's supposed to.  In 1988 there's a

6    copyright registration renewal issued for The Game of

7    Life cover, game board, instructions, listing Milton

8    Bradley as the proprietor of a copyright in a work made

9    for hire; and on July 9, 1989 there's a settlement

10   agreement entered into materially altering

11   Mr. Markham's royalty interest and setting up an escrow

12   account.  It goes up; it doesn't go down.

13         Another factor that courts examine when

14   determining whether a work was created at a party's

15   instance is the extent to which the party had the right

16   to control or supervise the artist's work.  All the

17   testimony supports a finding that Mr. Klamer is the one

18   who controlled and supervised the development of the

19   prototype game, not Mr. Markham.  Ms. Israel (sic)

20   testified that it was as if Klamer worked at Markham's

21   studios, he was there so much, and Chambers said that

22   Klamer visited twice a week during the development

23   period to check in on their progress and suggest

24   changes or modifications.  If you look at slide --

25   that's on Slides 17 and 18.

1      If you look at Slide 19, Chambers and Israel

2  both testified that they considered Klamer to be the

3  client and that Klamer had the final say over changes

4  made to the prototype, including when it was ready to

5  be shown to Milton Bradley.

6      If you go to Slides 20 through 23, your Honor,

7  the expense portion, which has been covered in large

8  part by other counsel, so I'll try to be brief.  The

9  expense portion of the instance and expense test looks

10  at who paid for the work.  Here the evidence is crystal

11  clear Mr. Klamer promised Mr. Markham that he would

12  reimburse him for all the costs he incurred in

13  developing the prototype game, and Mr. Markham invoiced

14  Link for those costs, and Link paid that invoice.  The

15  Game was created at Link's instance and expense.

16      If you go to 24, Slide 24, ample case law states

17  that work-for-hire can arise where one is paid a

18  royalty.  Here, because Markham's costs were already

19  covered by Link, he didn't bear any risk.  In fact,

20  because Markham also received an advance against future

21  royalties, Mr. Markham came out ahead.  He would and

22  did made a profit whether the Game sold a million

23  copies or it sold zero.

24      And then the invoice also shows that Mr. Klamer,

25  on behalf of Link, agreed to pay all of Markham's costs

1    before Link ever received any advance from Milton

2    Bradley.  Link would have been on the hook for

3    Markham's costs whether the Game was a success or it

4    was a failure.

5         And there's nothing -- this 1959 agreement has

6    been raised by just about everybody.  There's nothing

7    in the '59 agreement that indicates the parties -- and

8    I urge you to look at Slide 32, your Honor.  There's

9    nothing that indicates that the parties didn't intend

10   to create a work-for-hire.

11        Plaintiffs have claimed that oh, my gosh, look

12   at Section 4 of the agreement, and that's an express,

13   they say, an express reservation of copyrights in

14   Markham.  That's rubbish, hogwash; legal terms.

15   Section 4 doesn't contemplate any existing copyrights

16   reverting to Markham.  It provides for certain

17   intellectual property rights to revert to Markham if he

18   were to pursue them at Link's request.

19        I'd like you to go, if you would, to Slide 33,

20   and I'd like to approach one more time with not

21   spending very much time.

22        THE COURT:  Sure.

23        MS. GLASER:  All we're trying to do here is show

24   what the evidence demonstrated is the legal

25   relationship of the parties.  You start at the bottom,

1     and this is based on 17 USC 203(a) and 304(c), which

2     are copyrights created as works made for hire are not

3     subject to termination.

4           So if you start at the bottom, Ms. Chambers and

5     Mr. Israel are works-for-hire for Bill Markham.

6     They're employees.  That's Bill Markham also doing

7     business as California Product Development.

8           The next arrow up is a work-for-hire that

9     Markham is acting as a work-for-hire, Markham and his

10    company, California Product Development, is a

11    work-for-hire for Mr. Klamer, Link Research and

12    Development.

13          And then you go up the next level, and they are

14    the licensor, Klamer and Link, to Milton Bradley and

15    Hasbro, the licensee.  That is what the evidence

16    establishes in our view, you Honor, of the legal

17    relationship of the parties.

18          I think if you look at Slide 33 and 34 you'll

19    see that the work-for-hire doctrine applies to work

20    created by employees acting within the scope of their

21    employment.  The evidence has shown that all the

22    physical work, all of the physical work of creating a

23    Game of Life prototype was done by Chambers and Israel.

24    There's no evidence, I have to say there's not just

25    evidence -- your Honor asked a couple of questions

1   about, well, is there some sort of creation moment when

2   you put that last I guess piece of a building on the

3   prototype game.  There is not one iota of evidence, to

4   my recollection, and I'll stand corrected if I'm wrong,

5   that Mr. Markham created, actually put that piece on

6   that had anything to do with the actual physical

7   creation of the prototype.  This is not just a posse of

8   evidence; there's no evidence.

9         Now, we know that Ms. Chambers and Mr. Israel

10  were both full-time employees of Mr. Markham and

11  California Product Development at the time they worked

12  on the Game.  Both were paid a salary and their

13  paychecks came from California Product Development,

14  not from Mr. Markham personally, and they were both

15  employed as artists.  In fact, they were the only

16  full-time artists employed by California Product

17  Development.  That's the evidence.

18        Now, all these contributions for Chambers

19  designing and building the gameboard and for Israel

20  doing the box cover, for which they were very

21  rightfully proud, falls squarely within the scope of

22  their employment.  And this District Court, and I'm

23  going to mispronounce this so I apologize, held in the

24  *Foraste v. Brown University*, that the copyrights to

25  works prepared by an employee in the scope of his or

1    her employment are owned by the employer on a

2    work-for-hire basis.

3         What does all this mean?  And I'm about to sit

4    down.  Even if Klamer and Link weren't involved at all,

5    Plaintiffs still would not be able to terminate any

6    great grant of copyrights that Markham owned by virtue

7    of employing Chambers and Israel.  That's because

8    works-for-hire are exempted from the termination

9    provisions of the 1976 Act whether the works are made

10   for or by the purported terminating party.  In short,

11   our board, Plaintiffs have a double work-for-hire

12   problem and cannot under any circumstances, in our

13   view, terminate any copyrights in or to the Game.

14        Thank you, your Honor.

15        THE COURT:  Thank you.  Ms. Glaser.

16        All right.  So before Mr. Pollaro gives his

17   rebuttal, I have one more question for Mr. Krumholz.

18   It's kind of a weird question.  I don't think it

19   probably matters at all, but it just occurs to me it's

20   something I'm curious about.  Given that The Game of

21   Life was at least inspired by and maybe even a kind of

22   copy of The Checkered Game of Life, what was the status

23   of The Checkered Game of Life from a copyright point of

24   view in 1960?  It was a hundred years old at that time.

25   But my recollection is there are a lot of similarities

1    between The Checkered Game of Life and the knew game.

2              MR. KRUMHOLZ:  I think the evidence as it stands

3    is it was inspired, but not similar to.

4              THE COURT:  Use the microphone.

5              MR. KRUMHOLZ:  I'm sorry.  So the evidence,

6    which comes primarily from Mr. Klamer on this, is that

7    he went in and saw the name and was inspired to come up

8    with the ideas based on the name.  But the physical

9    games are very different.  So the copyright would have

10   expired regardless, but I would surmise that there

11   would have been not enough similarity in the physical

12   game to say that one was derived from the other even on

13   a copyright basis.  I think it was literally a

14   checker-type, you know, based on a checker, a

15   checkerboard.

16             THE COURT:  A checkerboard.  Okay.

17             MR. KRUMHOLZ:  Oh, look at that.

18             THE COURT:  I think there was some evidence of

19   it, wasn't there?

20             MS. GLASER:  It's in the record.

21             MR. KRUMHOLZ:  Yes.  As a matter of curiosity do

22   you want to see it, your Honor?

23             THE COURT:  No.  I just remember there being

24   some evidence.

25             MR. KRUMHOLZ:  Could I at least see if my

1    description is correct?

2              THE COURT:  Yes.

3              (Pause)

4              MR. KRUMHOLZ:  Yes, I am now comfortable in my

5    description.  It's a checkerboard, essentially, so it

6    was more the name inspired it than the physical game.

7              THE COURT:  Doesn't that also have stages of

8    life in it and life events?  Wasn't that part of it?

9              MR. KRUMHOLZ:  I don't know if that -- I don't

10   know that we know that, I guess, is what I would say.

11             THE COURT:  Okay.  Maybe I'm imagining that.

12   All right.

13             MR. POLLARO:  It was partly that; I mean it had

14   virtue, and virtues were part of it as well.

15             MR. KRUMHOLZ:  I think that's right.  I think it

16   was more of that kind of thing than stages in life.

17             THE COURT:  Well, okay.  I told you it was kind

18   of a weird question.

19             All right.  Let's get back to Mr. Pollaro.

20             MR. POLLARO:  Thank you, your Honor.  While

21   we're talking about The Checkered Game of Life, I

22   wasn't planning on putting that very high on the list,

23   but that game had a tee total; nothing like a spinner,

24   and it certainly wasn't part of the board game.  So

25   Ms. Glaser mentioned that, so I'll just start with

1 that.

2   So I do want to just knock out a few of these

3 real quick.  I think one of the ones I want to do very

4 quickly is this expense issue.  I'm looking at Slide 21

5 of Mr. Krumholz's presentation.  I don't know if you

6 have that available.

7   THE COURT:  I do.

8   MR. POLLARO:  And before I get to my point, I do

9 just want to say there's no evidence of this so-called

10 unconditional promise and, second off, if you look at

11 the law there under *Siegel*, the unconditional promise,

12 if there were one -- I have no idea if they're seeking

13 to enforce an oral agreement or what -- it's related to

14 the gameboard, and under *Siegel*, again, that's

15 irrelevant.  We're talking about who is bearing the

16 risk of the work's profitability, and you see the

17 language there.  We're not talking about the

18 typewriter, the pencils, the paper, anything like that.

19 We're talking about who is bearing the risk of the

20 success and profitability of this enterprise, and so

21 let me grab my --

22   THE COURT:  I just don't understand how, on what

23 basis you can say Markham bore the risk, as opposed to

24 Klamer.  Klamer had a $5,000 up-front royalty payment

25 advance on royalties; right?  And Markham billed

1   Klamer, and Markham was obligated to pay whatever he

2   billed him.  Now, it came up under $5,000 for sure, but

3   I don't see -- if Markham's company is getting paid for

4   all the work that they're doing, I don't understand how

5   they're bearing any risk.

6          MR. POLLARO:  Your Honor, it doesn't -- quite

7   frankly, it's irrelevant, and I think I mentioned that

8   before.  I think --

9          THE COURT:  You said it was Milton Bradley

10  that's bearing the risk.

11         MR. POLLARO:  And I said kind of as an aside

12  Bill Markham actually paid for it.  It doesn't matter.

13  That's not the analysis.  You can throw Bill Markham

14  out; it doesn't matter.  So let's just ignore Bill

15  Markham for a second and let's focus on the law under

16  *the Siegel* case, and you have to look at who, the focus

17  is on who -- and I'm reading now -- the focus is on who

18  bore the risk of the work's profitability.  So we're

19  not talking about the work itself, so let's just forget

20  that for now.  We're talking about the profitability of

21  the work, what's going to happen, who's publishing it.

22  Again, that's what this is all about.  And so the

23  pencils, the paper, the prototype, doesn't matter.

24         And so for the expense prong, Bill Markham's

25  name doesn't come up.  And so we agree with the law,

1    it's in I assume Hasbro's --

2           THE COURT:  Why isn't Klamer bearing the risk?

3    I don't understand.

4           MR. POLLARO:  Okay, your Honor.  I mean I'm

5    focusing on *Siegel* right now because they're talking

6    about the expense of the prototype, and *Siegel* is

7    telling you that doesn't matter, that's superficial.

8    What we're talking about is why are you even entering

9    into this business?  What are you doing with that

10   quote/unquote work?  What are you going to do with that

11   prototype?  You're going to publish it, and you're

12   going to sell it, and you're going to manufacture it,

13   and you're going to try to make money.  Who is bearing

14   that risk?  That's what *Siegel* tells us.

15          THE COURT:  Well, more than -- this is in the

16   context of copyright.  Milton Bradley doesn't have any

17   skin in the game here until it licenses the Game and

18   then decides to produce it; right?

19          MR. POLLARO:  Exactly.  And obviously, based on

20   the timeline, I'm sure you're familiar by now, your

21   Honor, is that happened before the assignment agreement

22   with Bill Markham.

23          THE COURT:  Okay.  But I mean so who bore the

24   risk of the works profitability?  Break that down.

25          MR. POLLARO:  Milton Bradley.

1           THE COURT:  Well, the work is the thing that's

2    copyrightable, and that has to be the creation, the

3    prototype.  That's what you're saying; right?

4           MR. POLLARO:  That's not what I'm saying at all.

5           THE COURT:  Okay.  Explain it to me.

6           MR. POLLARO:  *Siegel* says you don't worry about

7    the actual prototype.  We'll use our terms.  It's

8    saying here the focus is not on the cost or expense in

9    physically creating the work itself.

10          The work itself in this case is the prototype.

11   *Siegel* is telling us don't worry about that.

12          THE COURT:  Okay.

13          MR. POLLARO:  Don't worry about that.  Worry

14   about the next step.  Who is going to manufacture it?

15   Who is going to publish?  Who is going to have to hire

16   workers on the assembly line?  Who is going to have to,

17   you know, buy space on shelves or whatever, however

18   that process works.  That's what *Siegel* is telling us,

19   and that's the law, and that's correct.

20          THE COURT:  Well, if that's what it meant, then

21   wouldn't there be a comma and say if somebody decides

22   to commercially produce the work?

23          MR. POLLARO:  Again, we're in copyright law.

24   Under 1909 you don't get copyrights without publishing.

25   And again I'll address that issue that Mr. Krumholz has

1    repeatedly mentioned, that you can get copyright

2    registration or protection --

3         THE COURT:  Under your theory there could be no

4    work-for-hire for anything prior to the commercial

5    publication of the work; correct?

6         MR. POLLARO:  That's not true at all.  That's

7    not true at all.

8         THE COURT:  Okay.  Well, then just let's assume

9    that Milton Bradley decided not to buy the Game, --

10        MR. POLLARO:  Okay.

11        THE COURT:  -- all right?  So there would still

12   be, I think there would still be a work, wouldn't

13   there, a work that was copyrightable; right?

14        MR. POLLARO:  That's correct.

15        THE COURT:  Okay.  And it turns out to be not a

16   very profitable work because nobody is going to produce

17   it; right?

18        MR. POLLARO:  Okay.  I'm following your

19   hypothetical.

20        THE COURT:  Okay.  So at least theoretically

21   that could be done on a work-for-hire basis.  Somebody

22   in that relationship had to bear the risk.  It's

23   either, in this case it's either Klamer or Markham bore

24   the risk, because Milton Bradley decides not to even

25   get into this.

1          MR. POLLARO:  I understand your hypothetical,

2     but that's certainly not our facts, and you're talking

3     about a different scenario there.  Basically what it

4     sounds like you're doing is you're talking about an

5     agent that maybe just acquires products and then at

6     their own expense goes and figures out what to do with

7     them, maybe they sell them, maybe they don't.  That's

8     not even close to what happened here.  That's not even

9     remotely close to what happened here.

10         THE COURT:  No, but I'm trying to break this

11    down.  It seems to me that you could have more than one

12    entity that bears the risk of a works, a copyrightable

13    works profitability, and on a kind of spectrum of time

14    that the person bearing the risk could be the person

15    that's trying to get the product to market; and then at

16    the point where a company says hey, I'll buy that and

17    I'll produce it, now they're going to bear the risk

18    because they may produce it and incur a lot of costs in

19    doing so and not make money.

20         MR. POLLARO:  I hear what you're saying, your

21    Honor, and there's a couple of problems with that.

22    First of all, the whole point of this instance and

23    expense test is to determine the employer.  You can't

24    have multiple parties, so that's out.  That's basically

25    what they're doing.  And, quite frankly, Mr. Krumholz

1    started by saying yeah, we wanted to prove it was

2    work-for-hire for Hasbro, but we didn't think we had

3    the evidence and so Plan B was Link.  That's exactly

4    the issue.  They had to make a choice between do we go

5    with Milton Bradley, who we can't prove had any

6    control, or do we go with Link who had the control but

7    didn't have the expense.  That's exactly what happened,

8    which is why they went to this new work-for-hire.

9    That's exactly what happened.

10          But back to your question.  I think, I think, as

11   I understand it, the distinction is simply if I'm Ruben

12   Klamer, let's say, and I'm acquiring products from

13   creators like Bill Markham and I'm acquiring them to

14   sit in my warehouse and I'm going to bear that expense,

15   then that's a work-for-hire.  If I just say listen, you

16   know, give it to me, don't worry about it, I'll sort it

17   out, you go your separate way -- because that's really

18   what effectively what a work-for-hire is; right?

19   There's no ongoing relationship.  I've paid you, you

20   give me this thing, and we don't even have to see each

21   other again.  That's it.

22          But the situation here is Ruben Klamer is that

23   middleman.  He's the guy with the contacts in the

24   industry.  And so what he's doing is he is not saying

25   Bill Markham, I will pay you prototype no matter what,

1    if I don't get any money.  He's saying listen, I'm

2    going to find a publisher.  If I find a publisher, you,

3    we'll reimburse you for your costs and we'll go from

4    there.  And that's what the case law says.  So I don't

5    know if that --

6        THE COURT:  So maybe I've missed something in

7    the evidence.  You're saying that the deal between

8    Klamer and Markham was that Klamer only had to pay

9    Markham's expenses if Milton Bradley or somebody else

10   bought the Game?  I didn't think that that was --

11       MR. POLLARO:  Quite frankly there is no evidence

12   that there was an agreement before, so all we have is

13   the license agreement and the assignment agreement and

14   that license, and we obviously know what those say.

15       THE COURT:  Well, we have some evidence.  I mean

16   Klamer at least testified he hired Markham.  There's

17   some evidence that they, in fact, they had a business

18   relationship, a historic relationship and their

19   relationship as to this product, and he billed them

20   and -- Markham billed Klamer, and Klamer paid the

21   invoice.  I mean that's all evidence; right?

22       I mean I guess what I'm asking is where is the

23   evidence that says that they had an understanding that

24   Markham wouldn't have to or -- I'm sorry -- that Klamer

25   wouldn't have to pay Markham for the work that

1   Markham's company did unless and until Milton Bradley

2   or somebody else bought the game?  Is there any

3   evidence in the record of that?

4         MR. POLLARO:  No, there's no evidence of an

5   unconditional promise to pay at all, and so I would say

6   there's no evidence of the scenario that you're talking

7   about as well.

8         THE COURT:  Okay.  All right.  So the evidence

9   is pretty much what I described.

10        MR. POLLARO:  I'm not sure I understand, but

11  I'll move on.

12        But I do want to direct the Court's attention to

13  Tab 1 in the Markham parties' binder.  It should have a

14  blue cover.

15        THE COURT:  In the evidence that you handed up?

16        MR. POLLARO:  Yes.

17        THE COURT:  Okay.  I have it.

18        MR. POLLARO:  And if you turn to -- I'm looking

19  at the license agreement.  If you'd turn to, it looks

20  like JTX4, 001-004.

21        THE COURT:  Okay.

22        MR. POLLARO:  In the middle of the page there's

23  a section there (3), Manufacture, and I'll just read it

24  briefly as it's relatively short:  "Licensee agrees

25  that it will develop, manufacture, sell, exploit and

1   distribute "The Game of Life" in a diligent,

2   businesslike and aggressive manner, at no expense to

3   Link."

4           That's what *Siegel* is talking about.  That's

5   exactly what *Siegel* is talking about.

6           THE COURT:  Okay.

7           MR. POLLARO:  And I'll mention, too, as well,

8   which may explain how Hasbro was able to turn the

9   license into an assignment.  The agreement also

10  contemplates that Milton Bradley will pay for all the

11  expenses and file any copyrights.  So they did that

12  themselves.

13          And make no mistake about it; that's exactly

14  what Hasbro argued today, that by saying that the

15  copyrights that list Hasbro as the owner are somehow

16  correct violates this license agreement.  They have

17  nothing but a license agreement, and so I didn't hear

18  an explanation about how that's okay.

19          I do want to touch on one very important point,

20  and it has to do with this idea that ideas aren't

21  protectable.  I think we're all in agreement that

22  that's the case, and in fact that is what patents do.

23  Patents protect ideas.  So I think I used this analogy

24  many months ago when we were arguing the summary

25  judgment motions, motions to dismiss; that you and I

1    don't have to create anything to have a patent

2    together, we can just combine ideas and put our ideas

3    down and file a patent, and you and I would have a

4    patent.

5          That's not the way copyright works.  Copyright,

6    as we've been talking about all day, is about the

7    creation.  And so what Mr. Krumholz told you was that

8    Chasen's, you know, the moment that the prototype was

9    created doesn't matter, you know, if anything it's just

10   Markham doing the rote translation of his work of his

11   employees; right?  That's basically the argument made,

12   that Markham didn't -- just because he's doing the

13   final creating, it's really the expressions from the

14   other people.  And honestly, they've just made the case

15   that the patent, by pointing out the patent that

16   identifies Ruben Klamer and Bill Markham, they've just

17   now told the world that Ruben Klamer apparently was

18   involved in this process, that Leonard and Grace had no

19   ideas, no ideas at all; it was Bill Markham and Ruben

20   Klamer.

21         So again, going back to the authorship

22   discussion that we had this morning, that rules out

23   everybody else but Bill Markham.

24         THE COURT:  But Israel and Chambers were

25   employees.  There's no dispute about that, is there?

1      MR. POLLARO:  Your Honor --

2      THE COURT:  So even if they did have ideas, they

3   belonged to, essentially belonged to Markham, don't

4   they?

5      MR. POLLARO:  Absolutely not, your Honor, and

6   there's a rather large dispute about whether or not

7   they were employees.  I'm reading from Ruben Klamer's

8   deposition in this case:  Question -- actually I'll

9   give you -- I don't have the exhibit number.  I'll just

10  give you the page number and then we can figure out

11  what the exhibit number is.  It's Ruben Klamer,

12  May 2nd, page 25 -- I'm sorry -- 44 line 25, to 45

13  line 5:

14      "Question:  You don't know whether those two

15  individuals were employees or independent contractors

16  for Mr. Markham, do you?"

17      "Independent contractors."

18      "Why do you say that?"

19      "That's what I thought they did."

20      But yet Ruben Klamer is saying he's an

21  independent contractor.  You've got Ruben Klamer

22  seeking an assignment --

23      THE COURT:  Well, that's what Mr. Klamer thought

24  Israel and Chambers were.  But Israel and Chambers both

25  said they were employees; right?

1          MR. POLLARO:  The inconsistencies go on and on

2     and on, I get that, your Honor.

3          The point I'm trying to make is, going back to

4     our conversation this morning about Mr. Klamer seeking

5     Bill Markham's assignments; right?  His assignment.  He

6     didn't seek an assignment from Leonard or Grace.

7          THE COURT:  Right.  But I mean as Mr. Krumholz

8     pointed out, why would he?  If they're employees --

9          MR. POLLARO:  They're not employees.  That

10    exactly counters his entire argument.  Ruben Klamer

11    thought they were independent contractors.  And under

12    their version of the law, independent contractors may

13    or may not have their own rights.  That's exactly why

14    he should have sought the rights of Leonard and Grace.

15    That's precisely why he should have asked for not just

16    Bill Markham's, Leonard and Grace's, if their version

17    of events is accurate.  That's precisely the situation.

18         THE COURT:  Okay.  So even if I give you credit

19    for that, what that gets you is that he didn't ask for

20    it; right?  I mean, so he didn't ask for that.  I mean

21    I guess so what?  There's sort of a big so what there.

22         MR. POLLARO:  It's just that the -- well, it's

23    the same situation that we started with.  They have to

24    explain away, they have to explain why all the conduct

25    and all the actions that transpired for many years

1    isn't right; and why the assignment says, you know,

2    Bill Markham, you did this, and the '65 exchange.  They

3    have to explain.  You know, Bill Markham is a bully

4    somehow?  There's nothing in the record on that.  By

5    all accounts he was a saint, always had a smile on his

6    face.

7         They literally have an excuse on how they have

8    to explain and have this Court ignore all the written

9    record.  That's what they're doing every time, just

10   trying to confuse things and say that document, yeah,

11   you know, yes, he signed that document but, you know,

12   he only allowed because that was Bill Markham being

13   unreasonable.

14        You know, out in LA, as you recall, Mr. Klamer

15   had no problem saying, yeah, I wrote that letter to

16   Milton Bradley on August 19th; yeah, I knew it wasn't

17   true; I just said it.  So he's either a compulsive

18   liar, or is he lying then, or is he lying now?  I mean

19   it's the classic problem.

20        And, you know, the 1989 deposition testimony.

21   In that deposition testimony Mr. Krumholz said, yes,

22   they did mention Leonard and Grace and said that's one

23   of the reasons why he went to Bill Markham.  Well, the

24   relationship with Ruben Klamer and Bill Markham spanned

25   decades before that.  Leonard and Grace showed up in

1    the late fifties; that's one point.  But the second

2    point is in that very same deposition repeatedly under

3    oath, said Bill Markham reduced my ideas down to

4    concrete form.  Bill Markham.  And the same deposition

5    of which he allegedly -- you know, he did say Leonard's

6    and Grace's name.  He did, he said it.  But when he

7    said who created it, Bill Markham.

8         That's exactly the problem.  Every step of the

9    way they have to come up with an excuse.  This is why

10   what is said in this document isn't right.  It's more

11   this story that we just told you; yeah, sorry Bill

12   Markham is not here.  I mean it's the same song and

13   dance at every turn.  They have to explain it away.

14        I mean Mr. Krumholz just told you that the

15   license or the agreements or -- sorry -- the

16   registrations in this case that list Milton Bradley as

17   owners come from the license.  How is that possible?  I

18   mean that's not possible.  They're not right.  And they

19   took it on because Bill Markham was cut out of the

20   conversation.  And we've laid that out in our brief, so

21   I don't really want to keep going there.

22        And just to be clear, I don't know if we put it

23   in our papers, but I think Ruben Klamer continued the

24   distance once Bill Markham died.  I think we did put it

25   in our papers.  He sent a letter within days of Bill

1    Markham's death to Lorraine Markham saying do not under

2    any circumstances contact Milton Bradley.  And he was

3    doing that because he wanted his face on the box.  He

4    wanted to elevate his -- whether it's to minimize

5    Markham or elevate him, it's some combination.  And

6    what happened in '65 wouldn't have happened if Bill

7    Markham was here today.  So that's the common theme and

8    that's what we keep hearing.

9        And while we're talking about the time frames,

10   the invoices, they don't match up.  The invoice was

11   sent on October 20th.  The prototype, as we know, was

12   created -- completed and sent to the attorney by

13   August 14th, so it's literally speculation about when

14   they were working on it and what they were doing.  And

15   I'm not going to read the testimony into the record,

16   but I'll identify it.  At the trial Leonard and Grace,

17   or actually I'm not sure if this was Leonard or Grace,

18   quite frankly, but I know the substance of the

19   testimony was they spent their time playing the Game.

20   So you want to talk about six weeks?  That's a

21   significant amount of time was playing the Game and

22   seeing if there were any issues, and that testimony is

23   104 line 24 to 105-5.

24       Just a couple of other issues I'll just knock

25   out real quickly.  This CPD business, it was a d/b/a.

1    There is no corporate entity.  It was Bill Markham,

2    Bill Markham alone.  There is no corporate, I mean it's

3    a nonissue.

4              THE COURT:  He represented himself as a

5    corporate entity; right?

6              MR. POLLARO:  As a d/b/a corp.  He had always

7    had a d/b/a, which --

8              THE COURT:  Okay.

9              MR. POLLARO:  -- my understanding is it has no

10   legal effect whatsoever and that's --

11             THE COURT:  So I'm not sure I'm following what

12   the point of this is, so what's the point?

13             MR. POLLARO:  The point is they keep trying to

14   obfuscate things by saying somehow it's CPD or Markham;

15   we don't know.

16             It's Bill Markham.  There was no company; there

17   was no entity.  It was Bill Markham, the individual who

18   was running this enterprise.

19             THE COURT:  Well, whatever his corporate form,

20   he had a company.  You don't dispute -- he had a

21   company and had two people, at least, working for him;

22   right?  And he also had his wife working for him.  That

23   seems undisputed, doesn't it?

24             MR. POLLARO:  Correct.  I mentioned it because

25   they keep throwing it out there like it's somehow

1    relevant, so --.

2           THE COURT:  Okay.  Anything else?

3           MR. POLLARO:  One moment, your Honor.

4           Yes, another; I think this is a quick one.  It's

5    the best evidence rule.  I'm not even sure I even still

6    understand it because Defendants have, certainly Hasbro

7    has admitted that they went to the copyright office and

8    couldn't get the works, and somehow we should be

9    faulted for -- they say we didn't do it, but looking at

10    Tab 36, I won't bother to bring it to your attention,

11    but we actually told them in an RFA that, yes, in fact,

12    we did go try and get it.  So I'm not sure why we're

13    still talking about that issue.

14           But going back to the authorship issue, I think,

15    following up on conversations from last time,

16    Mr. Krumholz has mentioned that we need to take -- or

17    actually I think this happened out in LA -- a

18    disciplined approach to determine authorship; and

19    that's exactly right.  And so the story you've seen has

20    too many holes in it and so this discipline approach is

21    everybody said Bill Markham created it.  All the

22    documents are consistent with that.  The only thing

23    that's not, that's the testimony we heard about in LA,

24    and that's it.

25           I do want to talk about the *CCNV* case real

1   quick.  The rationale is very simple.  Although that

2   case dealt with the post '76 Act, they were

3   interpreting the term "employee" -- not "employer" like

4   the instance and expense test -- "employee," and the

5   Supreme Court said very clearly if there's no

6   definition in the statute you use common agency

7   principles; you don't come up with a test, you don't

8   come up with a rule; you just do what you've always

9   done.  And that's why the commentators picked up on it

10  and that's why employer, the same exact rationale,

11  employees under the 1909 Act.  And so, quite frankly,

12  this discussion between circuits, districts or

13  whatever, the Supreme Court came down on that, so

14  that's the law, and whether other jurisdictions don't

15  want to follow it, that's their prerogative, I guess.

16          And just one quick other point is this idea that

17  I've heard it said several times that somehow Markham

18  could have deposited the prototype.  We've been very

19  clear with our positions.  First of all, in the

20  categories that these copyright registrations are

21  formed, you simply can't do that.  It doesn't fit into

22  that small exception.  So we put that in our papers, so

23  suffice to say I'm not going to spend any more time on

24  it; but it's just not correct.  There are limited

25  situations where you can do that.  That's not in the

1    registrations we're talking about, that doesn't matter,

2    so it's publication or nothing.  And by the time Milton

3    Bradley --

4            THE COURT:  Wait.  I'm not sure I understand

5    what you're saying.  You're saying that you could not

6    deposit the work with the copyright office?

7            MR. POLLARO:  Could not.  You couldn't -- no,

8    you couldn't, because you wouldn't be able to get a

9    registration.

10           THE COURT:  And why was that?

11           MR. POLLARO:  Because in going back to what I

12   said this morning, the general rule -- and I don't even

13   want to call it the general rule.  The rule is you have

14   to publish the work and then you deposit what you

15   published in the copyright office.  That's the rule.

16   There was a very limited exception that applies to

17   things that don't fit that bill, performances, things

18   like that.  It doesn't apply to things that are

19   publishable.  And so the Defendants keep making the

20   arguments we could have or should have done something

21   else.  That's simply not the case.  And I'll spare you

22   me pulling out the copyright compendium, but I can

23   assure you that it's cited in our brief and it tells

24   you exactly that.  You can't do that in the categories,

25   specifically in the categories that these registrations

1       are.

2              And then secondly on that point, while we're

3       talking about it, again, they seem to fault us for

4       being cut out of the conversation.  You know, they cut

5       us out.  I mean I've told you about the lie, I've told

6       you about we have the oral lie, in writing, we talked

7       about that with Mr. Klamer and it's in our briefs; but

8       that's perpetuated at every step of the road, and so

9       somehow for them to turn around and disingenuously say

10      we should be faulted because we weren't part of the

11      conversation on the copyrights, that's a problem of

12      their own creation.

13             I mean Bill Markham was doing everything he

14      should have been doing.  These guys behind his back

15      were divvying up his rights.  That's what happened.

16      That's what happened.  I mean Bill Markham testified

17      very clearly, and they have not responded to it once,

18      you never heard it from them.

19             He put a clause, Bill Markham put a clause into

20      this agreement that said if Link didn't perform the

21      whole game comes back.  That's it.  The whole game, the

22      whole -- all of the rights.  That's the way Bill

23      Markham operated, and that's the way that some of the

24      later agreements operated.  Some did; they had some

25      tweaks.  But that's what he said.  He testified about

1    it in his 1989 deposition very clearly.  I put that in

2    there so if these guys didn't hold up to their end of

3    the bargain, I would get the game back.  And that is a

4    reservation of rights, explain and simple, and that's

5    what the parties understood when they signed that

6    agreement.

7            THE COURT:  Okay.  Thanks very much.

8            MR. KRUMHOLZ:  Could I take two minutes to

9    clarify a couple of things on the record.

10           THE COURT:  Okay.  Make it quick.

11           MR. POLLARO:  Thank you, your Honor.

12           THE COURT:  Thank you.

13           (Pause)

14           MR. KRUMHOLZ:  I feel like this is the second

15   deposition transcript I've dropped.  So I just want to

16   clarify, your Honor, JTX 3, 4, and 5 are the

17   applications.  On the back page of each application it

18   says two copies received December 19, 1960.  Our

19   conclusions of law 13 explains that you can in fact

20   submit the deposit copies to get statutory protection.

21   They did, at least on the face of the registration, so

22   I'm not sure what he's talking about.

23           The other thing is just for the Court's benefit,

24   in terms of the evidence on the payment of cost, you

25   had referenced this.  There was a prior agreement,

1    HTX114, between them where it says explicitly that

2    Mr. Klamer would pay the cost.  JTX15 is a virtually

3    contemporaneous agreement dealing with different

4    products and different projects where they said they

5    would pay the cost.  And PTX283 is a document almost a

6    year later between them where for the first time they

7    decided to share the cost and they explicitly accepted

8    The Game of Life from that modified agreement.

9         And also the second day of testimony on page 49,

10   lines 22 through 24:

11        "Question:  Did you owe Markham for his costs

12   whether you did a deal with Milton Bradley or not?

13        "Answer:  Yes, I did."

14        THE COURT:  Okay.  Very good.

15        All right.  Thank you.  I'm going to get to work

16   on getting an opinion here together.  It will probably

17   be hopefully not too long, but at least I would say a

18   couple of months before I get you an opinion; but I'm

19   very confident you'll have it no later than August.

20        All right.  We'll be in recess.

21        (Adjourned)

22

23

24

25

C E R T I F I C A T I O N

I, Denise P. Veitch, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.


/s/ Denise P. Veitch
Denise P. Veitch, RPR


May 29, 2018
Date