UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

———————————————————————————————————— )
)
MARKHAM CONCEPTS, INC.; SUSAN GARRETSON; )
and LORRAINE MARKHAM, individually and )
in her capacity as trustee of the Bill )
and Lorraine Markham Exemption Trust )
and the Lorraine Markham Family Trust, )
)
      Plaintiffs, )
)
   v. )
)
HASBRO, INC.; REUBEN KLAMER; DAWN )
LINKLETTER GRIFFIN; SHARON LINKLETTER; )
MICHAEL LINKLETTER; LAURA LINKLETTER )
RICH; DENNIS LINKLETTER; THOMAS FEIMAN, )
in his capacity as co-trustee of the )
Irvin S. and Ida Mae Atkins Family )
Trust; ROBERT MILLER, in his capacity )
as co-trustee of the Irvin S. and Ida )
Mae Atkins Family Trust; and MAX )
CANDIOTTY, in his capacity as )
co-trustee of the Irvin S. and Ida Mae )
Atkins Family Trust, )
)
      Defendants. )
———————————————————————————————————— )

C.A. No. 15-419 WES

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

WILLIAM E. SMITH, Chief Judge.

    To people of a certain age, who grew up in the America of the 1960s and 70s — where television meant three channels and shows like Bonanza, Star Trek, and The Art Linkletter Show (more on that to come); where cars were made in America, period; and where phones were connected to wires, not cell towers — the Game of Life was a gangbuster hit found (it seemed) in every household in the country, alongside Twister, Clue, and Monopoly.  In the Game of Life, the

winner retires to "Millionaire Acres."  In this suit, life imitates art as the heirs of toy developer Bill Markham have sued over what they see as proceeds from the exploitation of the Game that they have been wrongfully denied.

The Game of Life was inspired by the first boardgame invented by Milton Bradley himself, in 1860, called the Checkered Game of Life.  It sold millions of copies after hitting the market in 1960, and continues to sell to this day.  Based on the idea that "life's a game that can be played well, or badly," historian Jill Lepore writes in The New Yorker, "[o]nly a handful of games have had as long a shelf life."  Jill Lepore, The Meaning of Life, The New Yorker, May 21, 2007, at 38, 39.  This case, filed in 2015, has had a shelf life of its own.  But after two amendments to the complaint and considerable motion practice, the parties tried to the Court (in Los Angeles[1] and Rhode Island) Plaintiffs' third claim for relief, which asks for a declaratory judgment that Markham's heirs control the Game's intellectual property. Specifically, Plaintiffs ask the Court to find that they have termination rights under section 304 of the Copyright Act of 1976.

With these, Plaintiffs would be able to acquire the copyrights

---

[1] Through the courtesy of the United States District Court for the Central District of California, this Court was able to hear live testimony from critical witnesses who, because of their age, could not travel to Rhode Island.  The Court is most grateful to those who worked to make this possible.

to the Game that were long ago transferred to Defendant Hasbro, Inc.,'s predecessor-in-interest, the Milton Bradley Company. Plaintiffs lose this turn, however: the facts found below show that the physical creation of the Game's prototype was done by Markham's erstwhile employees — Grace Chambers and Leonard Israel — as well as Markham's wife, Sue, and unnamed parties hired by Markham to furnish finishing touches. They also show that this work was done at the instance and expense of Defendant and toy developer Reuben Klamer.

I.  Findings of Fact

The series of events leading to the Game[2] hitting the market in 1960 began a year earlier. See, e.g., Exs. JTX 9, JTX 11, JTX 12. In 1959, a Reuben Klamer traveled from his home in Beverly Hills, California, to Milton Bradley's headquarters in Springfield, Massachusetts. Ex. JTX 9; Nov. 16, 2017, Trial Tr. ("Trial Tr. I") 23–26. Klamer was a toy developer with myriad contacts in the industry, and had come to pitch Milton Bradley executives a concept for a new toy. See Trial Tr. I 18–26.

Milton Bradley passed on the pitch. Id. at 25. But the company's president at the time, Jim Shay, asked Klamer to develop a product idea to commemorate Milton Bradley's 1960 centennial.

_____

[2] When the Court refers to the "Game" or the "prototype" without specifying any of their composite parts (the box cover, board, rules, etc.), it means to refer to these in their entirety.

Id. at 23; Ex. JTX 9.  Intrigued, Klamer agreed to do so and went searching for inspiration in Milton Bradley's archive, where he stumbled upon an old copy of the Checkered Game of Life, see Ex. JTX 9, Trial Tr. I 23, which had been invented by the company's namesake just before the Civil War to "forcibly impress upon the minds of youth the great moral principles of virtue and vice," Lepore, supra, at 41.  The concept Klamer developed on the trip back home to California was to update the Checkered Game of Life to reflect post-World War II American society and values.[3]  See Trial Tr. I 25–27; Exs. JTX 10., PTX 20, PTX 275.

But Klamer was mostly an ideas man — he needed help refining his concept and, importantly, translating it into a prototype he could actually sell to Milton Bradley.  See Trial Tr. I 28–31, 64; Ex. JTX 10.  For this he reached out to one of his toy-industry contacts, Bill Markham.  Trial Tr. I 28–33.  An experienced advertiser, Markham was head of a firm set to that purpose named California Product Development ("CPD").  See JTX 2; Trial Tr. I 112; Nov. 17, 2017, Trial Tr. ("Trial Tr. II") 64.  CPD employed two artists at the time, Grace Chambers and Leonard Israel, who were very good in Klamer's estimation, and whose presence at CPD

---

[3] Klamer testified that he had scribbled some of the thoughts he had on the plane ride from Massachusetts to California.  These notes were admitted into evidence, and reflect many of the attributes that eventually found their way into the Game.  Ex. JTX 10; Trial Tr. I 27–31.

convinced Klamer to hire Markham's firm over others he considered. Trial Tr. I 28-31. Chambers had received her training from the Art Center College of Design in Los Angeles, Trial Tr. II 60; Israel his from the Chicago Art Institute, Trial Tr. I 100.

Markham agreed to take on the project in the summer of 1959. See Trial Tr. I 29-33. With little time to waste — Milton Bradley wanted the product ready for market by January 1, 1960, see id. at 55 — Markham and his team went to work, see id. at 34-35. As to who did what during the approximately six weeks it took to produce the prototype, the Court credits especially the testimony of Chambers and Israel, which the Court heard live in Los Angeles.[4] See generally Trial Tr. II 58-111 (Chambers); Trial Tr. I 99-136 (Israel). Neither has received a cent in royalties from the Game, nor have they any financial interest in the outcome of this suit. See Trial Tr. I 108-09; Trial Tr. II 58, 80. The testimony each gave was largely consistent with that of the other. See generally Trial Tr. II 58-111; Trial Tr. I 99-136. Both, moreover, had only good things to say about their time working for Markham at CPD and with Klamer on the project. See Trial Tr. I 101; Trial Tr. II 65-66.

---

[4] Klamer also testified to these events. See Trial Tr. I 36-37. And although he, as a successor to the now-defunct Link Research Corporation, see Ex. JTX 569, has a financial interest in this suit, the Court found his testimony credible, and largely corroborative of Chambers's and Israel's.

They testified that labor was divided:  Klamer and Markham combined to provide the big ideas, many ahead of their time.  See Trial Tr. I 34, 103, 107-08, 127; Trial Tr. II 67-71, 75; see also Ex. JTX 25.  These included that the Game would be played on a circuitous path; the Game's board would contain three-dimensional elements; the Game's object would be to achieve various life milestones; and a spinner would dictate movement of the Game's players.  See Trial Tr. I 107, 126-29; Trial Tr. II 68-71; Ex. JTX 25.  Klamer also visited Markham's firm once or twice a week during development to give real-time edits to Chambers and Israel while they worked — the former on the game board, the latter on the box cover — to produce a physical instantiation of Klamer's and Markham's ideas.  Trial Tr. I 103-04, 106-08, 129, 130-33; Trial Tr. II 71-78.

Chambers and Israel both testified that they — not Markham or Klamer — were the ones at CPD who built the prototype.  Trial Tr. I 103-04, 106-07, 130-33; Trial Tr. II 71-78.  Asked who constructed the prototype's game board, Chambers said that she did "most of it."  Trial Tr. II 72.  Israel went further, testifying that "once it was decided what we wanted to have on the board, [Chambers] was the one who put it all together and did the final art work on it."  Trial Tr. I 106.  Chambers was the one who built the houses, the mountains, and the elevated track out of balsa wood, cardboard, and colored pantone paper.  Trial Tr. II 99-103.

Chambers also placed the printing on the track and constructed a cardboard spinner.  See id. at 101, 132-33.  Some of these objects, such as the spinner and the mountains, were later converted to the plastic replicas used for the prototype by an outside firm Markham hired for that purpose.  See Trial Tr. I 121-22; Trial Tr. II 103-04; Ex. JTX 13.  An outside firm also bound the game board and printed the play money that was part of the prototype.  See Trial Tr. II 106-07; Ex. JTX 13.

The art for the prototype's box cover was Israel's handiwork, according to both his and Chambers's testimony.  Trial Tr. I 103-04, 110-11; Trial Tr. II 72, 74.  Israel created several small-scale sketches as possibilities for the box cover, from which Markham and Klamer selected the one they preferred.  Trial Tr. I 103.  The favored design was then made by Chambers into a box cover of proper scale.  Id. at 134.  As with the board, Markham had "nothing to do" with the physical creation of the box cover.  Id. at 107.  Indeed, it was the testimony of both Israel and Chambers that Markham was often attending to other matters at CPD during the time the prototype was taking physical form.  Id. at 116; Trial Tr. II 73-74.

The third major component to the prototype besides the board and the box — the rules — were a collective, iterative effort.  Trial Tr. I 105-06, 116-18; Trial Tr. II 76-77, 105.  Once the Game was operational, everyone in and around the CPD offices at

the time — Markham, Klamer, Chambers, and Israel — would play it, and then throw out suggested rule changes for the group to consider. Trial Tr. I 105–06, 118–19, 128; Trial Tr. II 76–77, 105. Some of these were tried and, because of some unforeseen disruptive effect on another rule, discarded. Trial Tr. I 105–06. Some, however, were ultimately adopted, then copied by Sue Markham (Bill's wife, and a copywriter by profession) into the prototype's rule book. Trial Tr. I 105–06, 116–18, 128; Trial Tr. II 105.

Once completed, Markham and Klamer presented the prototype to Milton Bradley executives, including its vice president, Mel Taft, on or around August 10, 1959, at the famous Chasen's restaurant in Hollywood, California. See Trial Tr. I 38–39, 65–68, 86; Exs. JTX 25, JTX 29. Also at Chasen's was radio and television personality Art Linkletter. See Trial Tr. I 33, 39; Exs. JTX 25, JTX 29. He was there on behalf of Link Research Corporation ("Link"), the firm Linkletter had founded with Klamer to develop consumer products that could be marketed using Linkletter's considerable celebrity. See Trial Tr. I 20, 33; Exs. JTX 29, JTX 34, JTX 39, JTX 42. Part of Klamer's pitch to Milton Bradley at the Chasen's meeting was that Linkletter could help promote the Game. See Trial Tr. I 38–39; Exs. JTX 11, JTX 12. The pitch worked: Taft and Shea were impressed by the prototype, and left the restaurant thinking that with some tweaks it could be a commercial success.

See Exs. JTX 18, JTX 19, JTX 20, JTX 21, JTX 25, JTX 33; Trial Tr. I 40-41. Soon thereafter, on August 19, Klamer mailed the prototype to Milton Bradley. Ex. JTX 12; Trial Tr. I 96.

Two agreements regarding rights to the Game followed. See Exs. JTX 1, JTX 2. The first, entered on September 21, 1959, was a License Agreement between Link and Milton Bradley. Ex. JTX 1. This agreement gave Milton Bradley the exclusive right to manufacture and market the Game, which Link "had . . . designed and constructed." Id. The License Agreement also allowed Milton Bradley to use Linkletter's name and image in its advertising of the Game, and required Linkletter to plug the Game fifty-two times on his nationally televised show. Id. In return, Link received a six percent royalty on sales of the Game and an immediate, non-refundable $5,000 advance against these royalties. Id. Absent termination or breach, the Agreement was to last as long as Milton Bradley marketed the Game. Id.

The second agreement, the Assignment Agreement, was one between Link and Markham. Ex. JTX 2. Executed October 20, 1959, this agreement assigned "all of [Markham's] right, title, and interest in and to the Game[] to Link." Id. Markham received the right to a royalty stream amounting to thirty percent of the six percent royalty Link had negotiated with Milton Bradley in their License Agreement. Id. Along with a nonrefundable $773.05 advance on Markham's thirty percent, Link agreed to pay Markham the

$2,423.16 he spent producing the prototype, id., for which he had billed Link, and which included Chambers's and Israel's salary, see Ex. JTX 13. Klamer paid Markham's bill — a bill he had promised would be his responsibility at the outset of the project, Trial Tr. I 41–42, 57–58; Trial Tr. II 49 — out of the aforementioned $5,000 royalty advance Link secured from Milton Bradley. Ex. JTX 2. The Assignment Agreement stated that Markham had "invented, designed[,] and developed" the Game. Id. It also provided that Milton Bradley would communicate to Markham any contemplated changes to the Game, allowing Markham to share his thoughts on these with Milton Bradley. Id. "[T]he final decision regarding such changes," however, was to "rest with either LINK or [Milton Bradley]." Id.

While the parties hammered out these contractual arrangements, Milton Bradley was at work turning the prototype into a commercially viable boardgame. Trial Tr. I 45–50; see also Exs. JTX 18, JTX 20, JTX 21, JTX 25, JTX 26, JTX 33, JTX 40, JTX 43. Both Markham and Klamer helped advise the company as to how best to carry out this transformation. See Exs. JTX 26, JTX 27, JTX, 28, JTX 33, JTX 35, JTX 36. Comparing early versions of the Game with the prototype shows a host of changes made — many with a view toward making the Game less expensive to manufacture, but that nevertheless altered its aesthetics. Compare Ex. JTX 509, with Ex. HTX 14; see also Trial Tr. I 45–50. For instance, the

early versions had the raised mountains directly on the Game's circuitous track, whereas the prototype had them as background scenery surrounding the track. Compare Ex. JTX 509, with Ex. HTX 14; see also Trial Tr. I 45-50. Moreover, the board in the early versions had fewer, and smaller, three-dimensional elements than the prototype. Compare Ex. JTX 509, with Ex. HTX 14; see also Trial Tr. I 45-50. Milton Bradley also changed the font on the Game's box cover to make it more visually appealing, and varied the wording and order of certain of the Game's rules to make them more intelligible. Compare Ex. JTX 509, with Ex. HTX 14.

Milton Bradley first published the Game on March 12, 1960. Exs. JTX 3, JTX 4, JTX 5; Trial Tr. I 58. Later that year, on December 19, 1960, Milton Bradley applied to register copyrights in the Game's board and rules. Exs. JTX 4, JTX 5. These identified the company as the author. Exs. JTX 4, JTX 5. Milton Bradley was also noted as the author of the Game's box in a copyright application submitted the same day by Link. Ex. JTX 3. The Game, an instant classic, sold like crazy, and is still a source of revenue for Milton Bradley's successor-in-interest Hasbro, as the latter continues to market the original version of the Game, Ex. JTX 520, as well as updated versions incorporating various themes and characters, such as one recent rendition introduced at trial that included intellectual property from the popular Despicable Me children's movie franchise, Ex. JTX 511.

The ensuing "Pay Day!" has sometimes been the cause of consternation, however. Even before the Game hit stores, there was a struggle, mostly on Markham's part, to take credit for its genius. Trial Tr. I 54–56; <u>see</u> Exs. JTX 2, JTX 16, JTX 32. A provision in the Assignment Agreement, for example, required Link to ask Milton Bradley if Markham's name could appear on the Game's box cover. Ex. JTX 2. Klamer fulfilled this requirement on behalf of Link. Ex. JTX 16. But Milton Bradley kindly declined the request. Ex. JTX 32.

Then, in 1965, Markham came upon what he considered a false statement in the trade publication <u>Toy & Hobby World</u>, identifying Klamer as the designer of the Game. Exs. PTX 20, PTX 87. He responded with a brusque letter to Klamer. Ex. PTX 20. "I am sure you are not so in need of recognition that you take credit for something in which your only connection was to sell it to Milton Bradley," he wrote. <u>Id.</u> Markham sought to correct the alleged misattribution — which he found "very damaging to [his] reputation" — by asking Klamer that he prepare a letter recognizing Markham as the "sole inventor, designer and developer" of the Game. <u>Id.</u> Markham would append this letter to the press release correcting the error that he was preparing for publication. <u>Id.</u>

Klamer responded that he was "puzzled" by Markham's letter, and pushed back on Markham's suggestion that Klamer's only role in what had already become a "great success" was selling the Game to

Milton Bradley.  _Id._  Disinclined to upset the applecart, however, Klamer grudgingly acceded to Markham's demand for recognition, writing that the Assignment Agreement obligated Klamer to agree that Markham invented the Game.  _Id._  Going forward, Klamer went out of his way to prevent any publicity that would similarly offend Markham.  _See, e.g._, Ex. PTX 20.  For instance, Klamer preemptively wrote a publication called _The Westerner_ to warn that they not associate him with the Game in a forthcoming article.  _Id._ "Although I know what my contribution was in the project," Klamer wrote, "I want to eliminate any hassle with this particular individual . . . ."  _Id._

Markham and Klamer fought not just over the limelight, but over money too.  In a letter to Klamer dated August 15, 1963, Markham complained that the Assignment Agreement had been a raw deal, grumbling that his share of the royalties was "ridiculously low" and that Art Linkletter had done little to promote the Game on television.  Ex. PTX 21.  Markham, feeling slighted, asked that he receive fifty percent of the three percent royalty Milton Bradley was then offering Link on sales of the Game overseas, instead of the thirty percent of Link's share he had been receiving under the Assignment Agreement.  _Id._

Klamer waited until October 3, 1963, to respond, explaining his delay as follows:  "Someone whom I respected very much told me to count to twenty-five, not just to ten, when I got annoyed about

a situation." Id.  Setting the pattern he would follow in his later skirmishes with Markham over public recognition, Klamer noted his disagreement with Markham's version of history, before caving to Markham's demands.  Id.  That is to say, Klamer agreed to hand over fifty percent of the royalty Link received on foreign sales, but stated his belief that this was more than Markham was due under the Assignment Agreement, which, contrary to Markham's laments, "was and is a fair one." Id.  Klamer also came to Linkletter's defense, asserting that Milton Bradley was more than satisfied with Linkletter's promotion of the Game, and indeed "was highly impressed with the TV commercial which Art did on the Game." Id.

An exchange of passive-aggressive letters was not enough to settle the next royalty dispute.  Again having to do with Markham's share of foreign royalties, this skirmish led to Markham and Klamer suing each other in California state court in the late 1980s.  See Ex. HTX 111.  The litigation ended on July 9, 1989, when the parties signed a handwritten settlement agreement.  Ex. JTX 58. Among other things, the agreement set Markham's share of overseas sales at 36.66 percent of Link's foreign royalties, while keeping his share of U.S. sales at thirty percent of Link's domestic royalties, as stipulated in the Assignment Agreement.  Id.  The parties styled the Settlement Agreement as an amendment to the Assignment Agreement, which they agreed in 1989 they "continue[d]

to be governed by." Id.

The present litigation is an attempt by Markham's successors in interest — Markham passed away in 1993, see Ex. PTX 218 — to put an end to government by Assignment Agreement. See Third Am. Compl. ¶¶ 77–82. These Plaintiffs insist that their right to do so lies in section 304 of the Copyright Act of 1976.

II. Conclusions of Law

Plaintiffs are, however, mistaken in their insistence: the facts as found above show that this case fits squarely within the work-for-hire exception to the termination right granted authors in section 304.

The Copyright Act of 1976 provides a work's author the right to terminate a previously bestowed grant of copyright in that work. 17 U.S.C. § 304(c). The idea behind this right is to give an author a second chance to negotiate the rights to her work when — after it has been exploited during the term of an initial grant — she can better gauge the work's value. Mills Music, Inc. v. Snyder, 469 U.S. 153, 172–73 (1985). Termination rights are especially important when hindsight shows the author made a bad deal the first time around. Id.; see 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 11.01[A] (Matthew Bender rev. ed.).

Although necessary to achieve fairness in these circumstances, termination rights are not without various qualifications, Nimmer & Nimmer, supra, § 11.02, one of which —

that excepting works for hire, 17 U.S.C. § 304(c) — determines this case. Section 304(c) states, in relevant part, that "[i]n the case of any copyright subsisting in either its first or renewal term on January 1, 1978, other than a work made for hire, the . . . grant of a transfer . . . of the renewal copyright, executed before January 1, 1978, . . . is subject to termination . . . ." 17 U.S.C. § 304(c) (emphasis added). The rule, then, is that copyrights granted prior to January 1, 1978, are subject to termination, but not if the copyright is one in a work for hire. See Nimmer & Nimmer, supra, § 11.02 ("[The 1976 Act] moves in categorical fashion, disallowing all works for hire from termination.").

What counts as a work for hire depends on when the work was created. See Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc., 380 F.3d 624, 633–34 (2d Cir. 2004); Forward v. Thorogood, 985 F.2d 604, 606 n.2 (1st Cir. 1993). Works created on or after the effective date of the 1976 Act (January 1, 1978) have their work-for-hire status determined according to the statutory definition given in the 1976 Act. See 17 U.S.C. § 101. However, for works created before that date, this status is determined under the Copyright Act of 1909, predecessor to the 1976 Act, which contained the concept, but lacked a statutory definition, of a work for hire  See 17 U.S.C. § 26 (repealed 1978) ("[T]he word 'author' shall include an

employer in the case of works made for hire."); <u>Forward</u>, 985 F.2d at 606 n.2.  Without definitional guidance from the statute, courts have had the task of tracing the term's 1909 Act contours.  <u>Cmty. for Creative Non-Violence v. Reid</u>, 490 U.S. 730, 744 (1989).

The First Circuit's efforts in this regard led it to adopt a definition of the term that tracks the instance-and-expense test. <u>Forward</u>, 985 F.2d at 606 & n.2.  Borrowed from the Second and Ninth Circuits, this test has it that the presumptive "'author' and copyright holder of . . . [a] commissioned work[] created by independent contractors" is "the commissioning party at whose 'instance and expense' the work was done."  <u>Id.</u> at 606 (citing <u>Brattleboro Publ'g Co. v. Winmill Publ'g Corp.</u>, 369 F.2d 565, 567–68 (2d Cir. 1966)); <u>see also</u> <u>Lin–Brook Builders Hardware v. Gertler</u>, 352 F.2d 298, 300 (9th Cir. 1965) (adopting instance-and-expense test).

In <u>Forward</u>, the First Circuit held that demo tapes with music from the blues band George Thorogood and the Destroyers were not works for hire where there was no evidence they were "prepared for the use and benefit of" plaintiff music aficionado, who had arranged for the band to record the tapes.  <u>Forward</u>, 985 F.2d at 604–06.  Instead, the tapes had been recorded for the purpose of enticing a record company to sign the band to a record deal.  <u>Id.</u> at 606.  Moreover, the aficionado, as the alleged commissioning party, "neither employed nor commissioned the band members nor did

17

he compensate or agree to compensate them." Id. Because the tapes were not produced at plaintiff's instance and expense, the First Circuit ruled, he was not their author under the 1909 Act. Id.

In this case, though, the work at issue was "prepared for the use and benefit" of, and paid for by, a commissioning party, namely Reuben Klamer. See id. That is to say, the Game's prototype was produced at his instance and expense. Instance here "refers to the extent to which the hiring party provided the impetus for, participated in, or had the power to supervise the creation of the work." Marvel Characters, Inc. v. Kirby, 726 F.3d 119, 139 (2d Cir. 2013). And it was Klamer who provided the impetus for the prototype's creation when, after visiting the archives at Milton Bradley, he selected Markham's company to help him make the prototype. Ex. JTX 9; Trial Tr. I 23-26, 28-33; see Twentieth Century Fox Film Corp. v. Entertainment Distrib., 429 F.3d 869, 879 (9th Cir. 2005) (describing "the 'instance' test as an inquiry into whether the motivating factor in producing the work was the employer who induced the creation" (quotation marks omitted)). This selection is the sole reason for Markham's involvement, and spurred everything that came after: the fast work of everyone at CPD to bring the prototype into existence, Trial Tr. I 99-136; Trial Tr. II 58-111; the presentation of the prototype to Milton Bradley executives at Chasen's restaurant, Trial Tr. I 38-39; Exs. JTX 25, JTX 29; and ultimately the manufacture and sale of the

Game, Exs. JTX 12, JTX 18, JTX 19, JTX 20, JTX 21, JTX 25, JTX 33.

Klamer had the power to supervise the prototype's creation. See Twentieth Century Fox, 429 F.3d at 879 ("The 'instance' test is shaped in part by the degree to which the hiring party had the right to control or supervise the artist's work." (quotation marks omitted)); Martha Graham, 380 F.3d at 635. Both Chambers and Israel testified to Klamer's frequent presence at CPD while they worked on the prototype. Trial Tr. I 106–08; Trial Tr. II 73. They considered Klamer the client for the project, and one whose suggestions for changes they were expected to, and did, implement. Trial Tr. I 103–04, 106–07, 130–33; Trial Tr. II 71–78; see Marvel, 726 F.3d at 139 ("Actual creative contributions or direction strongly suggest that the work is made at the hiring party's instance."). They also considered Klamer the final arbiter of the prototype's look and feel. Trial Tr. I 103–04, 106–07, 130–33; Trial Tr. II 71–78.

The preeminence of Klamer's predilections is further evidenced in the Assignment Agreement. See Ex. JTX 2. There, Markham recognized that while he had a right to learn of any contemplated changes to the prototype's design, he "understood that the final decision regarding such changes shall rest with either LINK or [Milton Bradley]." Id.; see Picture Music, Inc. v. Bourne, Inc., 457 F.2d 1213, 1217 (2d Cir. 1972) (finding the song "Who's Afraid of the Big Bad Wolf" a work-for-hire because

commissioning parties had "the power to accept, reject, or modify [the composer's] work").

Because Klamer "provided the impetus for, participated in, [and] had the power to supervise the creation of [the prototype]," the Court concludes it was made at his instance. <u>Marvel</u>, 726 F.3d at 139, 141 ("Marvel's inducement, right to supervise, exercise of that right, and creative contribution with respect to [comic-book artist Jack] Kirby's work during the relevant time period is more than enough to establish that the works were created at Marvel's instance.").

The prototype was also created at Klamer's expense.[5]   In determining who bore the expense of creation, the lodestar is financial risk; the question being who took it, or most of it. <u>See, e.g.</u>, <u>id.</u> at 140 (noting that the law here is ultimately interested in who took the "risk with respect to the work's success"); <u>Twentieth Century Fox</u>, 429 F.3d at 881 (affirming that General Dwight D. Eisenhower's World War II memoir was produced at

---

[5] An argument could have been made (but was not) that the Game was created at the instance and expense of Milton Bradley.  After all, it was Milton Bradley that solicited Klamer to come up with something for the company's anniversary, and it was Milton Bradley that, once it accepted the Game, paid Klamer $5,000 and bore the risk of its failure to sell to the public.  There are problems with this theory.  For example, it was Klamer who hired Markham, not Milton Bradley.  In any event, this argument was not made by Hasbro, presumably because, as a recipient of a license in the prototype, it would not affect the result, and because Hasbro thought it in the company's interest to present a unified theory.

the publisher's expense because it "took on all the financial risk of the book's success"); <u>Siegel v. Warner Bros. Entm't. Inc.</u>, 658 F. Supp. 2d 1036, 1058 (C.D. Cal. 2009) (noting that the focus of the expense calculus is "on who bore the <u>risk</u> of the work's profitability").

One feature of Klamer's arrangement with Markham and his company — and what likely accounted for the level of control Klamer had over the making of the prototype — was that Klamer would pay any and all costs Markham incurred during the project. Trial Tr. I 41–42, 57–58; Trial Tr. II 49; <u>see</u> Exs. JTX 2, JTX 13. This was true even if Klamer was unable to convince Milton Bradley to manufacture the Game. Trial Tr. I 41–42, 57–58; Trial Tr. II 49 <u>see</u> Exs. JTX 2, JTX 13. In other words, if the Milton Bradley executives at Chasen's had been thoroughly unimpressed by the prototype and passed on it completely — as they had on the other idea Klamer brought to them just months earlier — Klamer would have remained on the hook for the $2,423.16 Markham billed him on October 12, 1959. Trial Tr. I 41–42, 57–58; Trial Tr. II 49; <u>see</u> Exs. JTX 2, JTX 13; <u>see also</u> Ex. PTX 20 (evidencing Markham's understanding that Klamer's role in creating the Game was "to sell it to Milton Bradley"). This sum included the cost of Chambers's and Israel's labor along with the material used in the prototype. Ex. JTX 13.

Klamer also agreed to pay Markham thirty percent of the

royalty he negotiated for himself from Milton Bradley. Ex. JTX 2. And while the use of royalties as payment, as opposed to a fixed sum, "generally weighs against finding a work-for-hire relationship," Playboy Enters. v. Dumas, 53 F.3d 549, 555 (2d Cir. 1995), "[t]he absence of a fixed salary . . . is never conclusive," Picture Music, 457 F.2d at 1216, and has been found "a rather inexact method of properly rewarding with ownership the party that bears the risk with respect to the work's success," Marvel, 726 F.3d at 141. Markham was, moreover, not obliged to pay back the $773.05 advance on royalties he received from Klamer. Ex. JTX 2; cf. Picture Music, Inc. v. Bourne, Inc., 314 F. Supp. 640, 651 (S.D.N.Y. 1970) ("[T]he fact that the author was obliged to repay advances on royalties which were never accrued is an indicant that the relationship was not an employment for hire."). So the royalties involved here do nothing to change the reality that the risk, and therefore the expense, was Klamer's.

Klamer having provided the instance for and bearing the expense of the prototype's invention, the presumption arises under the 1909 Act that he was the prototype's author and entitled to its copyright ab initio. See Twentieth Century Fox, 429 F.3d at 881; Forward, 985 F.2d at 606. And contrary to Markham's contention, nothing in the Assignment Agreement overcomes this presumption. See Lin-Brook Builders, 352 F.2d at 300 (holding that "an express contractual reservation of the copyright in the

artist" is necessary to rebut the presumption of the copyright in the hiring party); Nimmer & Nimmer, _supra_, § 5.03 (noting that under the 1909 Act, "in the absence of persuasive evidence of an agreement to the contrary, it was generally held that if an artist, writer, photographer, architect or other 'author' is commissioned to create a work, the copyright in such work would vest in the person commissioning the work"). The Agreement states that "[u]pon the request of LINK, MARKHAM will pursue any copyright . . . to which he may be entitled as the inventor, designer and developer of the Game . . . [and] will assign any such copyright . . . to LINK." Ex. JTX 2.

But this language, far from naming a copyright holder other than Klamer, is operative only in a hypothetical world where Markham held a copyright in the prototype. The Assignment Agreement's post hoc description of Markham as the "inventor, designer and developer of the Game" does not make this hypothetical world a reality. _Id._; _see_ Nimmer & Nimmer, _supra_, § 11.02 ("Insofar as a work is made 'for hire' because it has been prepared by an employee within the scope of his employment, it is the relationship that actually exists between the parties, not their description of that relationship, that is determinative."). Neither does anything else in the Agreement. _See_ Ex. JTX 2. So it remains the case that in the real world — where, as the foregoing has shown, the presumption was that copyright ownership was

Klamer's — this clause in the Assignment Agreement is but an empty precaution.  Cf. Marvel, 726 F.3d at 143 ("It is all too likely that, if the parties thought about it at all, Kirby's assignments at the time he was paid or later were redundancies insisted upon by Marvel to protect its rights; we decline to infer from Marvel's suspenders that it had agreed to give Kirby its belt."). Decades of post-publication history show this was the parties' understanding as well:  Markham was never asked to "pursue any copyright" because he had no copyright to pursue.  Ex. JTX 2; see Exs. JTX 7, JTX 8, JTX 9, JTX 23.

In the final analysis, the prototype was a "work[] made for hire" under the 1909 Act, 17 U.S.C. § 26 (repealed 1978), and Plaintiffs are thus without termination rights under the 1976 Act, 17 U.S.C. § 304(c).

III. Conclusion

Like the Game of Life itself, this fifty-nine-year tug-of-war for renown and royalties has followed a long, circuitous path. And one that — on this "Day of Reckoning," to use the Game's parlance — ends essentially where it began:  for it is sometimes said, in disbelief, that success has many fathers, but failure is an orphan; nevertheless, the weight of the evidence in this case is that the success that met the Game of Life was, in fact, nothing if not the result of collective effort.  And although the credit, in the colloquial sense, can be split pro rata, the law dictates

24

that the copyrights cannot be.  For this reason — and not because
of the unparalleled contribution of any one person as compared to
another — Plaintiffs' third claim for relief fails.

IT IS SO ORDERED.

_____
William E. Smith
Chief Judge
Date: January 25, 2019